IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

AUG 1 1 2003

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| JOSE ALFREDO RIVERA | § | |
| | § | |
| Petitioner | § | |
| | § | CIVIL ACTION NO. |
| vs. | § | **B-03-139** |
| | § | |
| | § | |
| JANIE COCKRELL, | § | |
| Director, Texas Department | § | |
| of Criminal Justice, | § | |
| Institutional Division | § | |
| | § | |
| Respondent | § | |

## APPLICATION FOR A WRIT OF HABEAS CORPUS

## THIS IS A DEATH PENALTY CASE.

Bryce Benjet
TEXAS DEFENDER SERVICE
510 S. Congress
Suite307
Austin, Texas 78704
TEL: (713) 222-7788
FAX: (512) 477-2153

Jim Marcus
TEXAS DEFENDER SERVICE
412 Main Street
Suite 1150
Houston, Texas 77002
TEL (713) 222-7788
FAX (713) 222-0260

Counsel for Jose Alfredo Rivera

# TABLE OF CONTENTS

I.  Introduction ................................................................. 1

II. Mr. Rivera is Mentally Retarded ............................................. 1

    A.  Mr. Rivera's Claim of Mental Retardation Meets the Gateway for Authorization to File a Successive Habeas Petition Set Forth in 28 U.S.C. § 2254 and This Court's Opinion in *In re Morris*, 328 F.3d 739. ......................... 2

    B.  *Atkins v. Virginia* .................................................... 3

    C.  The Standard for Determining Mental Retardation ........................ 6

    D.  Jose Rivera is Mentally Retarded. ...................................... 8

        1.  Evidence of Significant Limitations in Intellectual Functioning ......................................................... 10

            a.  Mr. Rivera's 1991 TDCJ admission summary listing an IQ score of 92 is not a valid measure of intellectual functioning. ...................................... 11

            b.  The WAIS-R Short Form IQ score of 80 is not a valid measure of intellectual functioning. ................................ 12

        2.  Evidence of Significant Limitations in Adaptive Behavior .......... 13

            a.  Mr. Rivera's conceptual adaptive skills deficits are evidenced by school records showing that he was consistently retained or socially promoted, and that at age 14, he was performing at a first or second grade level in the areas of reading, writing and math. ......................................... 14

            b.  Mr. Rivera exhibited further deficits in the social and practical domains of adaptive skills. ....................................... 18

c.    Mr. Rivera currently exhibits the
conceptual, social, and practical
adaptive behavior deficits which
were onset prior to age 18. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

d.    Dr. Richard E. Garnett  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

3.    Risk Factors for Mental Retardation . . . . . . . . . . . . . . . . . . . . . . . . . . 21

a.    Biomedical risk factors  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

b.    Social risk factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

c.    Behavioral risk factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

d.    Educational risk factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

4.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Prayer for Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## I.    INTRODUCTION

On August 6, 2003, the Fifth Circuit held that "[w]e believe that, by the standards set out in our previous opinion, he has made a sufficient prima facie showing to be authorized to proceed in the district court on his claim of mental retardation" and stayed Mr. Rivera's execution, which had been scheduled for that evening. *In re Rivera*, No. 03-41069 (5th Cir. Aug. 6, 2003) (Attached as Exhibit 16).

Mr. Rivera now files this petition raising his claim of mental retardation. The instant application, however, is not complete. In the state court proceedings, Mr. Rivera sought, and was denied, the appointment of expert assistance necessary to proving his claim of mental retardation. Thus, Mr. Rivera has not failed to develop this evidence, and he will require expert assistance before proceeding further in this Court. After obtaining a thorough evaluation, Mr. Rivera will require an opportunity to amend his application.[1]

## II.    MR. RIVERA IS MENTALLY RETARDED

There is significant evidence that Mr. Rivera is mentally retarded and therefore his execution would be prohibited by the United States Constitution. An expert in the field of mental retardation, Dr. Richard Garnett, has concluded that "the materials I have reviewed suggest that Mr. Rivera is mentally retarded and there is no information which could rule out the diagnosis." Exhibit 1 at 2 (Report of Richard E. Garnett, Ph.D.). Furthermore, the evidence in the record contradicting a diagnosis mental retardation has been found unreliable by the psychiatrist who gave the testimony. *See* Exhibit 2 (Declaration of David Moron, M.D.).

---

[1] Mr. Rivera respectfully requests that this Court convene a status conference regarding this case.

1

**A.    Mr. Rivera's Claim of Mental Retardation Meets the Gateway for Authorization to File a Successive Habeas Petition Set Forth in 28 U.S.C. § 2254 and This Court's Opinion in *In re Morris*, 328 F.3d 739.**

Mr. Rivera's claim of mental retardation meets the requirements for filing a successive petition set forth in 28 U.S.C. § 2244(b).  28 U.S.C. §2244(b)(2) states:

> A claim presented in a second or successive habeas corpus application under section 2254 that was not presented in a prior application shall be dismissed unless –
>
> (A) the application shows the claim relies on a new rule of constitutional law, made retroactive on collateral review by the Supreme Court, that was previously unavailable; or
>
> (B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and
>
> (ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable fact finder would have found the applicant guilty of the underlying offense.
> ***
> (C) the court of appeals may authorize the filing of a second or successive application only if it determines that the application makes a prima facie showing that the application satisfies the requirements of this subsection

The language of section 2244(b) makes no reference whatsoever as to any requirement of proof of the underlying claim raised in a successive application.  Rather, the plain language of the statute appears to leave all evaluation of the merits of a successive claim to the district court.

The Fifth Circuit recently published an order in *In re Morris*, 328 F.3d 729 (5th Cir, April 15, 2003), discussing the standards to be applied in determining whether a habeas petitioner has made a *prima facie* showing of possible merit to warrant filing a successive petition for a writ of habeas corpus in the district court.  Although the Court's analysis was understandably brief, the standard was clear that a petitioner must show:

2

(1) the claims to be presented in the proposed successive habeas corpus application have not previously been presented in any prior application to this court;

(2) the claim to be presented in the proposed successive habeas corpus application relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable *Penry v. Lynaugh,* 492 U.S. 301, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) and *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002); *and*

(3) applicant should be categorized as "mentally retarded" as defined in these cases.

*Morris,* 328 F.3d 729.

The record clearly reflects that Mr. Rivera's *Atkins* claim has not been raised in a prior federal habeas petition and that *Atkins* is a new rule of constitutional law made retroactive to cases on collateral review. *See Bell v. Cockrell,* 310 F.3d at 332. Thus, the only remaining question is whether Mr. Rivera should be categorized as mentally retarded as defined in *Atkins,* 536 U.S. 304. *See Morris,* 328 F.3d 729. On August 6, 2003, the Fifth Circuit held that "[w]e believe that, by the standards set out in our previous opinion, he has made a sufficient prima facie showing to be authorized to proceed in the district court on his claim of mental retardation." *In re Rivera,* No. 03-41069 (5th Cir. Aug. 6, 2003) (Attached as Exhibit XX). The following clearly makes a prima facie showing that Mr. Rivera is mentally retarded under the standards for making such a determination set forth in the psychological literature and cited by the United States Supreme Court in *Atkins.*

**B.    Atkins v. Virginia**

On June 20, 2002, the Supreme Court held that the Eighth Amendment's ban on excessive and cruel and unusual punishments prohibits the execution of individuals with mental retardation. Reversing its prior decision in *Penry v. Lynaugh,* 492 U.S. 302 (1989) (*Penry I*), the

3

Court concluded that "the Constitution places a substantive restriction on the State's power to take the life of a mentally retarded offender." *Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242, 2252 (2002) (internal quotation marks omitted). *Atkins* is retroactive to cases on collateral review. *Bell v. Cockrell*, 310 F.3d 330, 335 (5th Cir. 2002). In view of *Atkins*, Rivera's death sentence must be set aside.

The Court rested its conclusion on two grounds. First, the Court found persuasive that, at the time of *Penry I* in 1989, only two death penalty states and the federal government had banned the execution of mentally retarded offenders. *Id.* at 2248. However, since that time, an additional sixteen states had prohibited the use of the death penalty for the mentally retarded. The Court noted that it "is not so much the number of States that is significant, but the consistency of the direction of change." *Id.* at 2249. These enactments, "[g]iven the well-known popularity of anticrime legislation," provided the Court with "powerful evidence that today our society views mentally retarded offenders as categorically less culpable than the average criminal." *Id.*

In its search for a national consensus, the Court relied upon the fact that the legislatures passing the laws voted "overwhelmingly in favor of the prohibition." *Id.* The Court also looked to the opinions of social and professional organizations with "germane expertise," such as the American Psychological Association, the opposition to the practice by "widely diverse religious organizations," international practice, and polling data. *Id.* at 2249 n.21. While "not dispositive," these factors bolstered the Court's opinion that a consensus opposing the practice existed "among those that have addressed the issue." *Id.* Finally, the Court noted that even in those states that retained the death penalty for the mentally retarded, only five had actually carried out the execution of a mentally retarded individual since *Penry I*. *Id.* Because the practice had become "truly unusual," it was "fair to say," according to the Court, that "a national

4

consensus has developed against it." *Id.*

The second reason the Supreme Court advanced for banning the execution of the mentally retarded was that "this consensus unquestionably reflects widespread judgment about the relative culpability of mentally retarded offenders and the relationship between mental retardation and the penological purposes served by the death penalty." *Id.* at 2250. The Court noted that, due to their impairments, defendants with mental retardation "have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to control impulses and to understand the reactions of others." *Id.* These deficiencies, the Court held, while not justifying an exemption from criminal liability, do diminish a mentally retarded person's personal culpability to the extent that neither of the justifications advanced by states in support of the death penalty – retribution and deterrence – would be served by permitting a retarded person's execution. *Id.*

Retribution in the capital context had been limited to ensuring that "only the most deserving of execution are put to death." *Id.* at 2252. Because the "just deserts" rationale necessarily depends on the culpability of the offender, the most extreme punishment was deemed excessive due to the "lesser culpability of the mentally retarded offender." *Id.* And, because capital punishment can serve as a deterrent only when a crime is the result of premeditation and deliberation, no deterrence interests are served. *Id.* This type of calculus, the Court noted, is at the "opposite end of the spectrum" from the behavior of the mentally retarded because of their cognitive and behavioral impairments. *Id.*

The Court also opined that, due to the impairments of mentally retarded individuals, a host of factors – from the increased risk of false confessions, difficulties in communicating with counsel, and their lesser ability due to limited communication skill to effectively testify on their own behalf or express remorse – created, "in the aggregate," an unacceptable "risk of wrongful

5

executions" for mentally retarded defendants. *Id.* at 2251. In short, the Court held that its

"independent evaluation of the issue reveals no reasons to disagree with the judgment of the

legislatures that have . . . concluded that death is not a suitable punishment for a mentally

retarded criminal," and thus the Constitution "places a substantive restriction on the State's

power to take the life of a mentally retarded offender." *Id.* (internal quotation marks omitted).

### C.    The Standard for Determining Mental Retardation

The American Association on Mental Retardation ("AAMR") defines mental retardation

as: (1) subaverage general intellectual functioning (i.e., an IQ of approximately 70 to 75 or

below) existing concurrently with (2) related limitations in two or more of the following

applicable adaptive skill areas: communication, self-care, home living, social skills, community

use, self-direction, health and safety, functional academics, leisure, and work; and (3) onset

before the age of eighteen. American Association on Mental Retardation, MENTAL

RETARDATION: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS 5 (9th ed. 1992)

[hereinafter "1992 AAMR Manual"]. The American Psychiatric Association's Diagnostic and

Statistical Manual of Mental Disorders ("DSM-IV-TR") employs a definition that is nearly

identical to the one set out in the 1992 AAMR Manual.[2] The Supreme Court has expressly relied

---

[2] The DSM-IV-TR defines mental retardation as follows:

> The essential feature of Mental Retardation is significantly subaverage general
> intellectual functioning (Criterion A), that is accompanied by significant
> limitations in adaptive functioning in at least two of the following skill areas:
> communication, self-care, home living, social interpersonal skills, use of
> community resources, self-direction, functional academic skills, work, leisure,
> health and safety (Criterion B). The onset must occur before age 18 years
> (Criterion C).

American Psychiatric Association, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL
DISORDERS 41 (4th ed., text rev. 2000) ("DSM-IV-TR"); see Atkins, 122 S. Ct. at 2245 n.3

on the 1992 AAMR Manual's three-prong definition of mental retardation, *see Atkins*, 122 S. Ct. at 2245 n.3; *Penry I*, 492 U.S. at 307-09 n.1, as has this Court.  *See Ex parte Tennard*, 960 S.W.2d 57, 60-61 (Tex. Crim. App. 1997).

In late May 2002, the AAMR released the latest version of its manual.  Mental retardation is redefined as "a disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills.  This disability originates before age 18."  American Association on Mental Retardation, MENTAL RETARDATION: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS 1 (10th ed. 2002) [hereinafter "2002 AAMR Manual"].  The three diagnostic criteria are the same, but the new manual places a greater emphasis on adaptive behavior deficits and describes those deficits in a different way.  In the 2002 AAMR Manual, adaptive behavior is described as "the collection of conceptual, social, and practical skills that have been learned by people in order to function in their everyday lives."  *Id.* at 73.  In assessing deficits in adaptive behavior, the 2002 AAMR Manual stresses that "[l]imitations in adaptive behavior affect both daily life and the ability to respond to life changes and environmental demands."  *Id.* at 91.

The 1992 AAMR Manual defined adaptive behavior by focusing on ten specific skills.  The 2002 AAMR Manual shifts to three broader domains of adaptive behavior.  The three broader domains of conceptual, social, and practical skills in the new definition "are more consistent with the structure of existing measures [of adaptive behaviors] and with the body of research on adaptive behavior."  *Id.* at 73.  As the 2002 AAMR Manual illustrates, however, the ten skill areas listed in the 1992 definition can be conceptually linked to one or more of the three

---

(setting out American Psychiatric Association's definition with approval).

domains in the 2002 definition of mental retardation. *Id.* at 82.

Each of the three elements of the definition of mental retardation is an essential component of a professional diagnosis of the disability. The first component of the clinical assessment of mental retardation is measuring the magnitude of the individual's intellectual impairment. To be classified as mentally retarded, an individual must be found to be functioning at the very lowest intellectual level encountered in the general population, as measured by standardized intelligence tests. The intellectual functioning of any individual with mental retardation will fall within the lowest three percent of the entire population. *See Atkins*, 122 S. Ct. at 2245 n.5 ("It is estimated that between 1 and 3 percent of the population has an IQ between 70 and 75 or lower, which is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition"); *but see* DSM-IV-TR 46 ("The prevalence rate of Mental Retardation has been estimated at approximately 1%"). Thus, the first prerequisite for a diagnosis of mental retardation is severely impaired cognitive functioning.

The second requirement serves to confirm the reality of the psychometric measurement of the individual's severe impairment. The impairment must be observed to have "real-world" effects on the individual's life functioning. As the Supreme Court has noted, all people with mental retardation "have a reduced ability to cope with and function in the everyday world." *Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 442 (1985). The requirement of real, identifiable disabling consequences in the individual's life – of reduced ability to "cope with common life demands," DSM-IV-TR 42 – assures that the diagnosis applies only to persons with an actual, functional disability. *See* 1992 AAMR Manual at 38. Previous versions of the definition of mental retardation expressed this requirement in terms of "deficits in adaptive

8

behavior," *see Penry I*, 492 U.S. at 308 n.1 (citing an earlier edition of the AAMR's

classification manual), while more recent formulations employ the terms "related limitations" in

"adaptive skill areas." 1992 AAMR Manual at 5; *see* DSM-IV-TR 42. According to the 2002

AAMR definition, the significant limitations in adaptive functioning are expressed in

"conceptual, social, and practical adaptive skills." 2002 AAMR Manual at 73. Both sets of

terms reflect the same concept: that the impairment in intellectual ability must have an actual

impact on everyday functioning. *See Id.* at 74 (noting that "most adaptive behavior instruments

measure the skill level a person typically displays when responding to challenges in his or her

environment") (internal quotation marks omitted).

     The third prong of the definition of mental retardation is that the disabling condition must

have manifested itself during the developmental period of life, before the individual reaches the

age of eighteen. Requiring the disability to have occurred at birth or during childhood means that

the individual's mental development during his or her crucial early years was affected by the

impairment of the brain's ability to function. This element of the definition is derived from the

understanding of modern neuroscience about the way the brain develops and the implications of

its arrested development for cognitive impairment. *See* 1992 AAMR MANUAL at 16-18. The

2002 AAMR Manual identifies four main categories of risk factors for mental retardation –

biomedical, social, behavioral, and educational – that can occur at the prenatal, perinatal, or

postnatal stage of development. *See* 2002 AAMR Manual at 127 (Table 8.1). In practical terms,

it means that any individual with mental retardation not only has a measurable and substantial

disability now, but that he or she also had it during childhood, significantly reducing the ability to

learn and gain an understanding of the world during life's formative years.

### D.    Jose Rivera is Mentally Retarded.

Credible evidence exists that Mr. Rivera is mentally retarded. The evidence shows that Mr. Rivera has significant limitations in intellectual and adaptive functioning, and that he exhibited these diagnostic features before the age of eighteen. Dr. Richard Garnett, an expert in the field of mental retardation, confirms that there is significant evidence suggestive of mental retardation. Significantly, Dr. Garnett finds that there is no evidence which would rule out a diagnosis of mental retardation.

### 1.    Evidence of Significant Limitations in Intellectual Functioning

Although there are no valid IQ test scores documenting Mr. Rivera's actual intellectual functioning, his records suggest that these limitations exist. The evidence suggesting limitations in intellectual functioning is best described in Dr. Garnett's report:

> Academic records can often be utilized in an effort to aid in the determination of Mental Retardation. Unfortunately, again Mr. Rivera's records are limited and offer only clues and indicators. It is noted in his school records that his grades were poor (C's and D's) throughout his academic experience. According to those records, he repeated several grades (D's and F's). He was placed in Special Education and could not produce successful grades even there. At one point, 1977-78, even in special classes he was failing and records indicate that his grades in Math and Science were changed from failing grades (63 & 65) to passing (70 & 70) on his transcripts so that he could be "promoted" to the next grade. He then failed and produced no credits for the next two years. Mr. Rivera also received failing scores in the ninth grade "CVAE" program. Hugh Albright, a teacher of Mr. Rivera's, reports that the material taught at "CVAE" was at the third to fifth grade level.
>
> It is important to note that Mr. Rivera was in special classes for most of his academic career. However no testing was noted in his records. His placement in special classes seems to be a defacto determination of Mental Retardation, since it must be assumed that testing of Mr. Rivera was conducted for admission. TEA requires such assessments for admission to special education programs such as he was in. Affidavits were taken from teachers who knew him then, and were supported of such conclusions (noted later in this statement).

Mr. Rivera's achievement scores also suggest significant limitations in intellectual functioning. At age 11, while in the fifth grade, Mr. Rivera's test scores showed his reading achievement level at less than third grade. Two years later, after repeating the fifth grade, Mr. Rivera was found to "need improvement" and was reading assignments identified by a teacher at his school at only the first or second grade level. Mr. Rivera's continued to lack basic academic abilities as reflected in achievement testing conducted by TDCJ Windham School District. In 1992, at age 19, testing revealed that his grade level was:

| | |
|---|---|
| Math | 5.0 |
| Reading | 4.1 |
| Language | 3.2 |
| Comp. | 4.1 |

Thus, as an adult, Mr. Rivera was performing academically at the level of a 10 year old. Another significant fact is that Mr. Rivera's TDCJ records reflect he began sniffing paint at the age of 14. His childhood use of inhalants is also confirmed in the affidavit of his sister. The abuse of inhalants has been directly linked to brain damage and could easily have resulted in further impairment in Mr. Rivera's intellectual functioning.

Exhibit 1 at 4-5. Thus, although only a valid, individually administered test of intellectual functioning can confirm Mr. Rivera's limitations in intellectual functioning, Dr. Garnett has pointed to significant evidence that suggests these limitations.

> **a.    Mr. Rivera's 1991 TDCJ admission summary listing an IQ score of 92 is not a valid measure of intellectual functioning.**

Mr. Rivera was incarcerated in TDCJ in 1991 for attempted burglary. As with all inmates admitted to TDCJ, Mr. Rivera was given a group administered test called the Beta. *See* Exhibit 3 at 3 (TDCJ Executive Summary). According to TDCJ policy reflected in a 1998 summary, all inmates given the Beta. *See Id.* Then, if they score below a 70 on the Beta, the Culture Fair group intelligence test is administered. *Id.* Only if the inmate again scores below a 70 on the Culture Fair, is the inmate referred to the diagnostic unit for an individually administered IQ test. *Id.* Based on this procedure, it is most likely that the 92 IQ score is the result of the

11

administration of the group administered Beta or Culture Fair.

The AAMR Manual states that the "intellectual functioning should be measured using individually administered standardized psychological tests and administered by appropriately trained professionals." 2002 AAMR Manual at 52. While the AAMR standards require that intellectual functioning examinations be administered individually, TDCJ administers the exam in group settings. Furthermore, as stated by Dr. Garnett, the Beta IQ test is simply not an accurate measure of intellectual functioning under the best of testing circumstances. *See* Exhibit 1 at 3-4. Therefore, the 92 IQ score listed in Mr. Rivera's 1991 TDCJ admission summary is not relevant to a determination of intellectual functioning as it applies to a diagnosis of mental retardation.

Psychiatrist David Moron, Ph.D. testified at Mr. Rivera's trial that, based on the reported IQ score of 92, he did not believe that Rivera is mentally retarded. After being recently contacted and informed of the fact that the reported 92 IQ score was likely from a Beta IQ test, Dr. Moron states:

> [The Beta] is not considered a valid determination of intellectual functioning. Had I known what I know now, I would have definitely requested thorough psychological testing including individually administered intelligence testing.

Exhibit 2.

### b.    The WAIS-R Short Form IQ score of 80 is not a valid measure of intellectual functioning.

Mr. Rivera was administered a WAIS-R "short form" upon admission at the Ellis Unit death row in 1993. As discussed by Dr. Garnett, this is also not a valid measure of intellectual functioning:

Although the WAIS-R was a generally valid measure of intellectual functioning at that time, a "short form" of the test was not. "Short form" means that selected subtests were chosen and instead of the full 11 tests being given, only as few as 2 or 3 were given (the exact number was not noted). From that limited number of subtests, an estimate of a comprehensive IQ level was assumed. In Clinical Interpretation of the WAIS (Zimmerman, Grune & Stratton, 1973), it states that "Wechsler himself presented one of the most cogent criticisms of the brief form .... The individual reliabilities of some subtests are low so that reliance on half the items or only a few subtests to draw conclusions is inadvisable" (p. 178). The authors go on to state that "a brief test is at best a rough screening device" and that "full-scale norms are being applied to prorated scores" (p. 178). They point out that there is a "chance of serious error in calculating an IQ from a brief form". "Brief forms are of most value when chosen to suit a particular purpose. .....brief tests are rarely reported in the literature from a clinical viewpoint" (p.179). Additionally, the range of error is noted to be 9 points above and below the score for two-thirds of the cases, and therefore 18 points for the 95th percentile of confidence that the standard error of measurement typically offers. "Obviously, the problem is how serious a decision is to be made on the basis of a brief test" (p.180).

Exhibit 1 at 4. The Handbook on Psychological Assessment is similarly clear about the unreliability of "short form" tests. *See* Gary Groth Marnat, Handbook on Psychological Assessment 191 (4th Ed.) ("None of the [Weschler] short forms should be confused with a full intellectual assessment or even a valid indicator of IQ.").

In sum, although there is no conclusive evidence on whether Mr. Rivera has significant limitations in intellectual functioning, his records clearly suggest these limitations and the reported IQ score do not contradict such a finding.

###   2.    Evidence of Significant Limitations in Adaptive Behavior

Mr. Rivera clearly meets the second prong of mental retardation because he suffers from significant adaptive skills deficits.[3]

---

[3] The Texas Court of Criminal Appeals found that "other than allegations that [Mr. Rivera] did not work much, there is no evidence of deficits in adaptive behavior." *Ex Parte Rivera*, No. 27,065-02 (Tex. Crim. App. filed July 25, 2003). The court based its conclusion on

13

a.  **Mr. Rivera's conceptual adaptive skills deficits are evidenced by school records showing that he was consistently retained or socially promoted, and that at age 14, he was performing at a first or second grade level in the areas of Reading, Writing and Math.**

From the time he entered elementary school, Mr. Rivera had difficulty learning and constantly performed below his grade level. *See* Exhibit 5 at 1 (Affidavit of Hugh Albright). Mr. Rivera's school records show that he was frequently retained, beginning with his first year in elementary school. *See* Exhibit 6 ( BISD School Records). When Mr. Rivera did not successfully master his first year in elementary school, he was placed in "Level 1.5," or "High 1st," which is the equivalent of being retained. *See* Exhibit 5 at 1 (Affidavit of Hugh Albright); Exhibit 7 at 1 (Affidavit of Roberto Moreno). "High 1st" was given its name for the purpose of minimizing the social and academic stigma of being retained. *See id.*

In the fourth grade, Mr. Rivera failed the subjects of English and Spelling but was nonetheless promoted to the fifth grade. *See* Exhibit 6 at 1 (BISD School Records). After receiving "D's" in all of his core subjects in the fifth grade, Mr. Rivera was retained for a second

---

an erroneous interpretation of adaptive behavior skills. Specifically, it failed to recognize that Mr. Rivera's poor academic performance falls under the conceptual domain of adaptive behavior. Instead, the court viewed Mr. Rivera's academic performance solely within the context of intellectual functioning. While academic performance is an indicator of intellectual functioning, the areas of "language" and "reading and writing" fall under the conceptual domain of adaptive skills. 2002 AAMR Manual at 83. These areas replaced "communication" and "functional academics" in the 1992 AAMR Manual, also listed within conceptual domain of adaptive skills.

The opinion of the Texas Court of Criminal Appeals is also incorrect in stating that Mr. Rivera got a GED in 1980. *See Ex Parte Rivera*, No. 27-065-02 at 3. Although a school record included in court filings listed the term "GED" as the reason for Rivera's withdrawal, the Texas Education Agency found no record of a GED and subsequent prison records confirm that Mr. Rivera did not obtain a GED. *See* Exhibit 4 (records relevant to GED). These unfortunate errors are the logical result of the Texas Court's impractical standard of proof in which an applicant, with no right to counsel or other resources, must prove he is mentally retarded in order to meet a procedural gateway necessary to develop and raise a claim of mental retardation.

14

time. *Id.* By age 14, Mr. Rivera was performing at a first grade level but was socially promoted

to seventh grade. *See* Exhibit 6 (BISD Records); Exhibit 5 at 1 (Affidavit of Hugh Albright).

When he reached the ninth grade, Mr. Rivera was placed in "CVAE," a vocational program for

high school students who are at risk of dropping out. *See* Exhibit 6 (BISD School Records);

Exhibit 5 at 2 (Affidavit of Hugh Albright). The material taught in CVAE was equivalent to a

third-grade level, and at age 16 and in the ninth grade, Mr. Rivera failed all of his subjects. *See*

Exhibit 5 at 2 (Affidavit of Hugh Albright); Exhibit 6 (BISD Records). It was during his second

attempt at completing the ninth grade - while failing two classes - that Mr. Rivera dropped out of

school altogether. *See* Exhibit 6 (BISD Records).

　　　In addition to his being retained, Mr. Rivera's test scores clearly demonstrate that at age

14, he could not perform basic reading skills. A diagnostic test sheet shows that in the fifth

grade, Mr. Rivera could not master phonetics, vocabulary development, and comprehension. *See*

Exhibit 6 (BISD Records). Examples of exercises that Mr. Rivera could not perform at age 12

are: comparing/contrasting ideas, drawing conclusions, arranging sentences sequentially, and

pronouncing certain consonants (hard 'g') and vowel combinations. *Id.* Of approximately 50

areas like the ones named above, the diagnostic exam concluded that Mr. Rivera needed to be

retaught in all but three of them. *See* Exhibit 6 (BISD Records).

　　　In the sixth grade, and at the age of 14, Mr. Rivera was older than other children as a

result of being retained two years. He was placed in a prescriptive reading class with the goal of

improving his reading skills. *See* Exhibit 5 at 2 (Affidavit of Hugh Albright). He entered the

class reading at a 3.4 grade level and left the class reading at a 2.9 grade level, demonstrating a

loss in reading ability of half a grade level. *See* Exhibit 6 at 6 (BISD Records). Another reading

progress sheet for that year concluded that Mr. Rivera needed "much improvement in phonetics." *See id.* at 7. And while Mr. Rivera's reading teacher noted that he had completed "Air Pudding" and "Wind Sauce," these materials actually were below a second grade level. *See* Exhibit 6 at 7 (BISD Records); Exhibit 5 at 2 (Affidavit of Hugh Albright). Moreover, it is likely that Mr. Rivera could not even read those materials because in the sixth grade, he could only pronounce a few words, but really did not know how to read. *See id.*

As with the difficulty he encountered with reading, Mr. Rivera consistently underperformed in Math. At age 14, when most children have learned how to multiply, Mr. Rivera could not even make change from a dollar. *See* Exhibit 5 at 1 (Affidavit of Hugh Albright). He could not add or subtract very well, and most likely did not know how to multiply at all. *See id.* For these reasons, Mr. Rivera was placed in remedial math in the sixth grade, a class intended for students who were not mastering the subject. *See* Exhibit 6 at 8 (BISD Records); Exhibit 5 at 2 (Affidavit of Hugh Albright). While the test scores show a progress of 1.4 points, Mr. Rivera was performing below a sixth grade level. *See* Exhibit 6 at 8 (BISD Records). In actuality, Mr. Rivera's math skills were more equivalent to a first or second grade level. *See* Exhibit 5 at 2 (Affidavit of Hugh Albright). Additionally, his remedial math test scores are probably an over-statement of his true ability, as there was a tendency on the part of teachers to inflate test scores to show that the student was progressing when he really was not. *See id.* This inflation of actual ability is seen again in Mr. Rivera's social promotion from the sixth to seventh grade. Mr. Rivera's sixth grade homeroom teacher at Longoria Elementary, Hugh Albright, stated, "When a student is in the fifth or sixth grade and is only performing at a first grade level, there is not much you can do. . . they are socially promoted." *Id.* at 1.

Overall, Mr. Rivera was a academically poor student who encountered serious learning difficulties beginning with his first year in school. According to Mr. Albright, he simply "was not able to learn very much." *Id*. By the time he entered the sixth grade, Mr. Rivera realized that he was not learning and that he was at the bottom of the class. *See id*. For this reason, he had a tendency to not pay attention in class, making his ability to learn that much more difficult. *See id*. Another teacher at Longoria Elementary School, Roberto Moreno, remembered Mr. Rivera as "quiet, a slow learner. . . [who] had a lot of trouble with his studies." *See* Exhibit 7 at 1 (Affidavit of Roberto Moreno).

As a result of his inability to master the most basic subjects, Mr. Rivera was placed in special education classes [4]. *See* Exhibit 8 at 2 (Affidavit of Maria Juanita Rivera); Exhibit 9 at 1 (Affidavit of Esmeralda Maciel); Exhibit 10 at 2 (Translated Affidavit of Camelia Garcia). Of the six Rivera children, only one was not placed in special education classes. *See* Exhibit 8 at 2 (Affidavit of Maria Juanita Rivera). One of Mr. Rivera's sisters who has a nine-year old son stated that at ten or eleven years of age, Mr. Rivera could not read like her son reads today. *See* Exhibit 11 at 1 (Affidavit of Lupita Rodriguez). Growing up, Mr. Rivera had such a difficulty reading that he was embarrassed to read in front of others. *See* Exhibit 9 at 1 (Affidavit of Esmeralda Maciel). Mr. Rivera's communication deficits prior to the age of 15 are evidenced by his difficulty in comprehending; one would have to repeat things over and over because Mr. Rivera could not understand what he was being told. *See id*.

Learning and speech disabilities were present in all of the Rivera children. Mr. Rivera's

---

[4]Special education records were requested from the Special Services department in the Brownsville Independent School District. The department does not keep records that far back.

sister Camelia was made fun of by other children because she was a slow learner and had a

speech impediment. *See* Exhibit 5 at 2 (Affidavit of Hugh Albright); Exhibit 7 at 1 (Affidavit of

Roberto Moreno). Mr. Albright frankly stated that "all of the Rivera children were what some

would call dumb." Exhibit 5 at 2.

> **b.    Mr. Rivera exhibited further deficits in the social and practical domains of adaptive skills.**

Mr. Rivera had noticeably poor hygiene and an unkept physical appearance as a child.

One of his teachers noted that:

> Jose appeared very unclean in his appearance.  Jose would come to school with his clothes ragged, his shoes torn, and his pants too big or sagging on the floor. Other kids used to make fun of him because of that.

Exhibit 5 at 2 (Affidavit of Hugh Albright).

> **c.    Mr. Rivera currently exhibits the conceptual, social, and practical adaptive behavior deficits which were onset prior to age 18.**

As an adult, Mr. Rivera demonstrates serious deficiencies in being able to perform daily

living skills.  For example, Mr. Rivera does not know how to tell time, nor has he ever had a

bank account.  *See* Exhibit 12 at 1 (Affidavit of Dora Garza).  Even when he was married, Mr.

Rivera spent most of his adult life living with and depending on his parents.  *See id.* at 1.  When

things were broken around the house, it was Mr. Rivera's father who would fix them, not Mr.

Rivera.  *See id.*  Mr. Rivera never paid bills while living with his parents.  *See id.*  Although

there is disagreement as to whether Mr. Rivera ever drove a car, he never took a driving test,

probably because he knew he would not pass  *See* Exhibit 10 at 2 (Affidavit of Camelia Garcia);

Exhibit 11 at 1 (Affidavit of Lupita Rodriguez).

Mr. Rivera never found jobs for himself but rather depended on others, mostly his father, to find jobs for him. *See* Exhibit 10 at 1 (Affidavit of Camelia Garcia). He never filled out job applications, and when he tried to do so on one occasion, he had such difficulty that he repeatedly had to go back and erase, looking at the application "like it was a puzzle." *See id*; Exhibit 12 at 1 (Affidavit of Dora Garza); Exhibit 13 (Affidavit of Alfredo Rivera). Once he did find a job, he was not able to stay very long. The longest job Mr. Rivera worked lasted approximately two months, where he was a cook's helper in the same restaurant where his father worked. *See* Exhibit 12 at 1 (Affidavit of Dora Garza); Exhibit 9 at 1 (Affidavit of Esmeralda Maciel); Exhibit 11 at 1 (Affidavit of Lupita Rodriguez); *but see* Exhibit 13 (Affidavit of Alfredo Rivera).

Mr. Rivera continues to demonstrate an inability to read or write well. *See* Exhibit 11 (Affidavit of Maria Juanita Rivera). One sister describes him reading "very, very slowly, like a child who was just learning to read for the first time." Exhibit 10 at 2 (Affidavit of Camelia Garcia). He is not able to pronounce long words and many times simply "gets stuck." *See* Exhibit 11 at 1 (Affidavit of Lupita Rodriguez). Mr. Rivera's ex-wife does not remember ever seeing her husband pick up a book and read. *See* Exhibit 12 at 1 (Affidavit of Dora Garza).

In addition, Mr. Rivera's writing is incomprehensible. According to his oldest sister, Mr. Rivera never learned to write well, and she still has trouble understanding his letters, as he has a tendency to misspell words, misplace them in sentences, or leave out words altogether. *See* Exhibit 8 at 1 (Affidavit of Maria Juanita Rivera); Exhibit 9 at 1-2 (Affidavit of Esmeralda Maciel). Sometimes, Mr. Rivera will mean to say one word but will write another; for example, he will mean to say "ice," but will spell the word "eyes." *See id*. His writing can be so confusing

19

that it is impossible to understand what he is trying to say. *See* Exhibit 9 at 1-2 (Affidavit of

Esmeralda Maciel). Mr. Rivera's reading and writing skill have remained limited even in the

environment of death row where there is no access to television and reading and writing is an

inmate's primary source of contact with the outside world.

> d.    **Dr. Richard E. Garnett**

After reviewing the materials discussed above, Dr. Richard Garnett confirms the evidence

of limitations in adaptive functioning:

> The materials presented to me document that Mr. Rivera has clear limitations in
> many areas of adaptive functioning and that these limitations originated well
> before the age of 18. Mr. Rivera's inability to perform at school is representative
> of limitations in functional academic skills.
>
> ***
>
> What is clear from all of the accounts of teachers and Mr. Rivera's family, is that
> Mr. Rivera was unable to take care of day to day tasks such as hygiene, finding
> and keeping a job, paying bills, or fixing things around the house without help and
> direction from others. Reports from MHMR and professionals who evaluated Mr.
> Rivera are also strongly suggestive of Mental Retardation. A diagnosis from
> MHMR in 1985 by Pedro Ruggero, M.D., a staff psychiatrist at the Tropical
> Texas MHMR Center described Mr. Rivera included "Dependent Personality".
> The symptomatic criteria for that diagnosis includes many of the characteristics
> that are common to Mental Retardation and mistakenly aligned with other
> diagnoses. It appears that this was so in this case. This disorder is characterized
> by behaviors such as an inability to make everyday decisions without advice or
> reassurance from others; allows others to make most important decisions; agrees
> with people even when he or she believes they are wrong; has difficulty initiating
> projects or doing things on his own; volunteers to do things that are unpleasant or
> demeaning in order to get other people to like him; and feeling uncomfortable
> when alone. All of these behaviors are also seen in persons with mental
> retardation.

Exhibit 1 at 4-5.

### 3.    Risk Factors for Mental Retardation

The 2002 AAMR Manual describes four categories of risk factors that may interact to cause mental retardation. *See* 2002 AAMR Manual at 123-41. The four categories of risk factors are: (1) biomedical: factors that relate to biologic processes, such as genetic disorders or nutrition; (2) social: factors that relate to social and family interaction, such as stimulation and adult responsiveness; (3) behavioral: factors that relate to potentially causal behaviors, such as dangerous (injurious) activities or maternal substance abuse; and (4) educational: factors that relate to the availability of educational supports that promote mental development and the development of adaptive skills. *Id.* at 126. The 2002 AAMR Manual emphasizes that "the impairment of functioning that is present when an individual meets the criteria for a diagnosis of mental retardation usually reflects the presence of several risk factors that interact over time." *Id.* It is clear that risk factors in each of the four categories are present in Mr. Rivera's case. Furthermore, Dr. Garnett recognizes the presence of these various risk factors. *See* Exhibit 1 at 5.

### a.    Biomedical risk factors

Biomedical factors can include traumatic brain injury. *Id.* at 127. In 1979 or 1980, Mr. Rivera was attacked by three men and hit in the head with a steel pipe, a baseball bat and table leg which left a large cut on his head. Ever since, he sees white flashes out of his left eye, has continuous headaches, and has been very forgetful. *See* Exhibit 13 (Affidavit of Alfredo Rivera). One sister recalls that Mr. Rivera once forgot to turn off the lawnmower after mowing the lawn. *See* Exhibit 10 at 1 (Affidavit of Camelia Garcia). Another time, Mr. Rivera sent his sister to the store to buy him a newspaper, and when she returned, he had forgotten that he had asked her for

21

it and was confused as to why she was bringing him a newspaper. *See id.* This sister would

constantly send her own husband to accompany Mr. Rivera because she thought he needed help

doing simple things. *See id.*

Medical records show that Mr. Rivera started inhaling one can of spray paint a week

when he was approximately 17 years old. *See* Exhibit 14 (Excerpts of Tropical Texas MHMR

Records). One sister states that Mr. Rivera inhaled spray paint throughout his childhood. *See*

Exhibit 11 at 1 (Affidavit of Lupita Rodriguez). TDCJ records document that Mr. Rivera's

abuse of pray paint began at age 14. *See* Exhibit 15 (Excerpt of Inmate Consolidated Record). A

recent study conducted by the National Institute on Drug Abuse revealed that toluene, a solvent

found in paint sprays, results in marked atrophy (shrinkage) of brain tissue. *NIDA Research

Report Series - Inhalant Abuse* (visited July 29, 2003)

<http://www.nida.nih.gov/ResearchReports/Inhalants/Inhalants3.html>. Short-term effects are

also prevalent:

> The chemicals found in solvents, aerosol sprays, and gases can produce a variety
> of additional effects during or shortly after use. These effects are related to
> inhalant intoxication and may include belligerence, apathy, impaired judgment,
> and impaired functioning in work or social situations. Dizziness, drowsiness,
> slurred speech, lethargy, depressed reflexes, general muscle weakness, and stupor
> are other possible effects. For example, research shows that toluene can produce
> headache, euphoria, giddy feelings, and inability to coordinate movements.
> Exposure to high doses can cause confusion and delirium.

*Id.*

### b. Social risk factors

Poverty is included within the social category of risk factors for mental retardation. Mr.

Rivera grew up in a small home with at least six other children, and at times more. *See* Exhibit 8

at 1 (Affidavit of Maria Juanita Rivera). When a teacher once visited the Rivera household, she reported to other teachers that the house was filthy and dirty, and the kind of place that would get cold in the winter. *See* Exhibit 5 at 2 (Affidavit of Hugh Albright). Mr. Rivera's parents were "the kind of parents" who did not know how to care for their children. *See* Exhibit 7 at 1 (Affidavit of Roberto X. Moreno). Mr. Rivera frequently slept outside of the house as a child because it was either too hot or too crowded to sleep inside. *See* Exhibit 8 at 1 (Affidavit of Maria Juanita Rivera).

### c.    Behavioral risk factors

Child abuse and neglect is included within the behavioral category of risk factors for mental retardation. 2002 AAMR Manual at 127. Mr. Rivera's mother was physically abusive with all her children. *See* Exhibit 8 at 1 (Affidavit of Maria Juanita Rivera). She would hit the Rivera children with whatever was around the house, such as a hose or a stick. *See id.* One sister stated that she was so frightened by her mother that she would run and hide whenever her mother was going to beat her. *See id.*

### d.    Educational risk factors

Impaired parenting and inadequate family support are two risk factors for mental retardation in the educational category. 2002 AAMR Manual at 127. As mentioned above, one teacher saw Mr. Rivera's parents as the kind of parents who did not know how to care for their children, and physical abuse was prevalent. *See* Exhibit 7 at 1 (Affidavit of Roberto X. Moreno); Exhibit 8 at 1 (Affidavit of Maria Juanita Rivera).

### 4.    Conclusion

In sum, Mr. Rivera meets the diagnostic criteria of mental retardation. Mr. Rivera has

significant limitations in adaptive behavior which originated prior to the age of 18. Moreover,

the IQ score listed in Mr. Rivera's 1991 TDCJ admission summary and his death row medical

records are not relevant to a determination of intellectual functioning as it applies to a diagnosis

of mental retardation. Dr. Richard Garnett, and expert in the field of mental retardation

concludes:

> The materials that I have reviewed suggest that Mr. Rivera is mentally retarded
> and there is no information which could rule out the diagnosis. His lifelong
> history of poor academic achievement suggests significant limitations in
> intellectual functioning. Although thorough psychometric testing is advisable, the
> two reported IQ score discussed above are not valid indicators of intellectual
> functioning and thus are not relevant to the question. Furthermore, there is
> significant evidence that Mr. Rivera has deficits in the adaptive skill areas of
> academics, work, self direction, communication, health and self care. All of these
> limitations are described as originating before MR. Rivera reached the age of 18.
> Each of the reports, indicators and clues in and of themselves are only suggestive
> of Mental Retardation. However, taken as a whole there are significant and
> substantive questions raised about Mr. Rivera's mental and intellectual capability.
> There are sufficient indicators noted to call for a full test and evaluation to
> confirm or deny the existence of what appears to be Mental Retardation.

Exhibit 1 at 6.

## PRAYER FOR RELIEF

Mr. Rivera respectfully requests that this Court:

1.      Grant him relief from his unconstitutional sentence of death; and,

2.      Grant such other relief as law and justice require.

Respectfully submitted,

By/Jim Marcus

| | |
|---|---|
| Bryce Benjet | Jim Marcus |
| Texas Bar No. 24006829 | Texas Bar No. 00787963 |
| TEXAS DEFENDER SERVICE | TEXAS DEFENDER SERVICE |
| 510 S. Congress | 412 Main Street |
| Suite307 | Suite 1150 |
| Austin, Texas  78704 | Houston, Texas  77002 |
| TEL: (713) 222-7788 | TEL (713) 222-7788 |
| FAX: (512) 477-2153 | FAX (713) 222-0260 |

Counsel for Jose Alfredo Rivera

## CERTIFICATE OF SERVICE

I hereby certify that on this ___9th___ day of ___August___ 2003, a true and correct copy of the foregoing (with exhibits) was served upon opposing counsel by Federal Express for delivery on Monday, August 11, 2003 to:

Ms. Katherine Hayes
Assistant Attorney General
Office of the Attorney General
209 West 14th Street
Price Daniel Sr. Building
8th Floor
Austin, Texas  78701

25

# Exhibit 1

Richard E. Garnett, Ph.D.
6040 Camp Bowie Boulevard
Suite 2
Fort Worth, Texas 76116

Office  817/377-2252
Fax    817/763-5695
Cell    817/875-8238
Email  Drrgarnett@yahoo.com

July 31, 2003

Mr. David Sergi
109 E. Hopkins, Suite 200
San Marcos, Texas 78666

FAX: (512) 392-5042

CONSULTATION REPORT: Jose Alfredo Rivera

Dear Mr. Sergi:

This report is to provide you with my analysis and assessment concerning the above noted client's case, and to give you my reaction to the materials reviewed and my resulting opinion.

I hold a Bachelors, Masters, and Doctorate degree in Psychology, and have taught at the graduate level at the University of Miami, South Florida School of Professional Psychology, and Texas Christian University. I have thirty years of professional experience working with people with mental retardation. I have served as a psychologist and diagnostician, a counselor and therapist, and as a consultant and trainer in the field. During my thirty years of experience, I have served on committees and boards of directors for local, state, and national organizations that serve or represent people with mental retardation. I have developed curriculum and taught courses for graduate college programs, criminal justice, law enforcement, and child protective services caseworkers, all with at least some focus on people with mental retardation. In my clinical practice over the last thirty years, I have seen hundreds of people with mental retardation for a wide variety of reasons, including for stress, abuse, and assessment. I have enjoyed being an advisor, friend, and counselor for members of Advocates United of Tarrant County and currently serve on the Board of Directors for the Texas Self Advocates, both active organizations with their memberships made up of people with mental retardation. I am Immediate Past President of the Texas Association on Mental Retardation, President of The Arc of Texas, Chairman of the Fund Development Board of The Arc of Texas, a member of the regional Medicaid Managed Care Advisory Council for HHSC, and a member of the Mental Retardation Public Advisory Council for the Texas Department of MHMR. I was recently appointed by Governor Perry to the Board of Directors for the Interagency Council on Autism and Pervasive Development Disorders.

In preparing to discuss whether Mr. Rivera may be mentally retarded I have reviewed the following materials:

- Various TDCJ medical records from Mr. Rivera's current and prior incarceration
- Records from treatment at a MHMR facility for alcohol and drug abuse
- Records from the Windham School District
- Brownsville Public School Records
- Affidavits of teachers at Mr. Rivera's school
- Affidavits of family members of Mr. Rivera
- Letters written by Mr. Rivera to family members
- Reports from medical, psychological, and educational sources

Generally I would prefer additional information such an interview with Mr. Rivera, additional psychometric testing, and interviews with family members, however, the materials I have reviewed are sufficient for me to reach an initial conclusion. As I will discuss below, all of the materials provided to me are consistent with and suggestive of a diagnosis of mental retardation. I recommend that a thorough psychological evaluation be conducted to confirm this diagnosis.

Mental Retardation is a disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before the age of 18.

There are, however, several issues that need to be considered in applying that definition to a diagnosis. First, mental retardation is a condition and not a finite characteristic or score. It is a global disability and the definition assumes that identified limitations coexist with strengths. Where a person has deficits in mental process or "executive function", they might have a comparative strength in visual-motor skills, artistic expression, verbal presentation, etc. The fact that they may have been diagnosed with Mental Retardation does not preclude their being trainable in a task or skills, educable in a particular subject, able to drive a car, speak coherently and fluently, have the ability to hide their disability, or achieve and progress in school. Many people with mild Mental Retardation can reach a fifth or sixth grade level of academic achievement by their mid to late teens, hold certain jobs, and even marry and raise children. Once out of school, many blend into the population at large, and need supports and services sporadically and in times of stress.

Mental Retardation is not the same as Mental Illness. People with Mental Retardation may also have a secondary diagnosis and suffer a comorbid condition. Maladaptive behavior and pathological conditions of personality (as well as many physical disabilities) can coexist with Mental Retardation, and in fact the DSMIV provides guidelines on how to reflect such a dual diagnosis. There is often a danger of confusing Mental Retardation issues with issues related to Mental Illness or Mental Health. Sanity and competence issues, for example, are not germane to Mental Retardation, even though severe and profound Mental Retardation could be a cause for a claim of incompetence (but not insanity). Therefore, psychiatric mental status examinations and evaluations for signs of dangerousness, competence, and mental illness are not directly applicable to an assessment for Mental Retardation.

Another important consideration is that people with mild Mental Retardation can respond to structured environments and can "obey" rules under certain conditions, even though they may not develop insights, learn from their "successes" within that structure, or ultimately change from the experience. It is common for people in confinement to receive praise and high marks for their behavior while there, only to behave again in unacceptable and/or illegal ways immediately after that praise or upon release. "Mild Mental Retardation" is at the second percentile of human functioning and represents significant limitations in reasoning, planning, problem solving, abstract thinking, understanding complex ideas and learning from experience. "Mild" really means "severe and significant" limitations when seen in the context of the normal curve of ability and intelligence. It is not a "mild" condition.

The Myth of Mental Retardation is that all people with Mental Retardation look and act like they are retarded, can't function at all in society, are retarded or not retarded (dichotomous variable), can't speak clearly or coherently, can't be obedient or compliant under any circumstances, are not alert or oriented, can't learn simple vocations or hold jobs, etc. This myth permeates society and results in false and misguided conclusions regarding people with Mental Retardation.

In the determination of Mental Retardation, the diagnosis rests on a three pronged definition: limitation in IQ and adaptive behavior manifested in the developmental period. That process of diagnosis, however, involves the assessment and evaluation of many symptoms, behaviors, contextual influences, developmental factors, and pertinent indicators. If appropriate and accepted criteria are met through professional standards of review, a diagnosis can be made. It is a process of considering history, records, behaviors, and standardized processes of evaluation. In the absence of clear and convincing evidence, Mental Retardation must be determined by examining the clues, indicators, and symptoms found throughout the life of the individual, particularly during the developmental period.

In discussing Mr. Rivera, I will address (1) his limitations in intellectual functioning, (2) his limitations in adaptive behavior, and (3) the onset before the age of 18.

<u>Intellectual Functioning</u>

I have not been provided with any valid psychometric measure of Mr. Rivera's intellectual functioning and have been informed that no such test has been located. Clearly, a validly administered test of intellectual functioning such as the WAIS-III should be conducted in order to be certain of the exact level of Mr. Rivera's impairments. A review of his educational records, however, indicates that there may be significant limitations present from well before the age of 18.

Although two IQ scores are reported in the materials that I have reviewed, neither represent valid indicators of Mr. Rivera's intellectual functioning. Mr. Rivera's prison records from his incarceration in 1992 reflect an IQ score of 92. Although the test administered is not identified, I have become familiar with the IQ testing procedures at TDCJ. All non-death row inmates entering TDCJ are given the Revised Beta intelligence test. This is a group administered test originally developed by the military. The Beta IQ test is simply not an accurate test of intellectual functioning. In fact the test itself specifically notes that it should not be used for

diagnosis or determination of mental retardation. It is common for Beta IQ scores to be even 20 points away from the scores obtained on more thorough, individually administered tests. Furthermore, the fact that it is group administered greatly discounts the reliability of the results. The AAMR specifically states that intelligence tests of must be individually administered to be valid indicators of intellectual functioning.

Mr. Rivera was also given a WAIS-R "short form" test during a mental health screening when he was received on death row at the Ellis Unit and a full scale IQ of 80 was reported. Although the WAIS-R was a generally valid measure of intellectual functioning at that time, a "short form" of the test was not. "Short form" means that selected subtests were chosen and instead of the full 11 tests being given, only as few as 2 or 3 were given (the exact number was not noted). From that limited number of subtests, an estimate of a comprehensive IQ level was assumed. In Clinical Interpretation of the WAIS (Zimmerman, Grune & Stratton, 1973), it states that "Wechsler himself presented one of the most cogent criticisms of the brief form ...., the individual reliabilities of some subtests are low so that reliance on half the items or only a few subtests to draw conclusions is inadvisable" (p. 178). The authors go on to state that "a brief test is at best a rough screening device" and that "full-scale norms are being applied to prorated scores" (p. 178). They point out that there is a "chance of serious error in calculating an IQ from a brief form". "Brief forms are of most value when chosen to suit a particular purpose. .....brief tests are rarely reported in the literature from a clinical viewpoint" (p.179). Additionally, the range of error is noted to be 9 points above and below the score for two-thirds of the cases, and therefore 18 points for the 95th percentile of confidence that the standard error of measurement typically offers. "Obviously, the problem is how serious a decision is to be made on the basis of a brief test" (p.180). In the current circumstance, the doubt raised and the need for a full psychological evaluation to determine mental retardation seems clearly apparent. Therefore, the first prong of the definition of Mental Retardation is not conclusive since no accepted, substantive evaluation of Mr. Rivera's intelligence level seems to be on record. The IQ scores in the records are striking but as noted, have no useful or meaningful place in the discussion of whether Mr. Rivera has Mental Retardation.

Academic records can often be utilized in an effort to aid in the determination of Mental Retardation. Unfortunately, again Mr. Rivera's records are limited and offer only clues and indicators. It is noted in his school records that his grades were poor (C's and D's) throughout his academic experience. According to those records, he repeated several grades (D's and F's). He was placed in Special Education and could not produce successful grades even there. At one point, 1977-78, even in special classes he was failing and records indicate that his grades in Math and Science were changed from failing grades (63 & 65) to passing (70 & 70) on his transcripts so that he could be "promoted" to the next grade. He then failed and produced no credits for the next two years. Mr. Rivera also received failing scores in the ninth grade "CVAE" program. Hugh Albright, a teacher of Mr. Rivera's, reports that the material taught at "CVAE" was at the third to fifth grade level.

It is important to note that Mr. Rivera was in special classes for most of his academic career. However no testing was noted in his records. His placement in special classes seems to be a defacto determination of Mental Retardation, since it must be assumed that testing of Mr. Rivera was conducted for admission. TEA requires such assessments for admission to special education

programs such as he was in. Affidavits were taken from teachers who knew him then, and were supportive of such conclusions (noted later in this statement).

Mr. Rivera's achievement scores also suggest significant limitations in intellectual functioning. At age 11, while in the fifth grade, Mr. Rivera's test scores showed his reading achievement level at less than third grade. Two years later, after repeating the fifth grade, Mr. Rivera was found to "need improvement" and was reading assignments identified by a teacher at his school at only the first or second grade level. Mr. Rivera's continued to lack basic academic abilities as reflected in achievement testing conducted by TDCJ Windham School District. In 1992, at age 19, testing revealed that his grade level was:

| Math | 5.0 |
|------|-----|
| Reading | 4.1 |
| Language | 3.2 |
| Comp. | 4.1 |

Thus, as an adult, Mr. Rivera was performing academically at the level of a 10 year old. Another significant fact is that Mr. Rivera's TDCJ records reflect he began sniffing paint at the age of 14. His childhood use of inhalants is also confirmed in the affidavit of his sister. The abuse of inhalants has been directly linked to brain damage and could easily have resulted in further impairment in Mr. Rivera's intellectual functioning.

Adaptive Functioning

Included in the *DSM-IV TR* criteria for mental retardation is the specification that a person with mental retardation will have impairments in adaptive functioning in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self direction, functional academic skills, work, leisure, health, and safety. Basically, adaptive functioning refers to how a person copes with the demands of everyday life. My review of the materials provided shows that, consistent with a diagnosis of mental retardation, he lacks the skills necessary to cope with everyday life demands.

The materials presented to me document that Mr. Rivera has clear limitations in many areas of adaptive functioning and that these limitations originated well before the age of 18. Mr. Rivera's inability to perform at school is representative of limitations in functional academic skills. By the time Mr. Rivera was 17 years old he was still in the ninth grade and was functioning only at the third to fifth grade level. It is significant that Mr. Rivera was unable to achieve even in special education classes where the assignments were at his own level of ability. One of Mr. Rivera's teachers recalls that he would not behave or pay attention in class because he was not able to learn. He also notes that Mr. Rivera could not read well, complete basic arithmetic, or make change from a dollar. Even in physical education, it is reported that Mr. Rivera would not run or play sports.

Family members also discuss Mr. Rivera's limitations in other skill areas. Mr. Rivera's inability to accomplish basic life tasks without assistance is explained. Mr. Rivera's sister Camela Garcia reports that Mr. Rivera relied on his father to get him work and was unable to fill out a job application. She only recalled him working consistently for about two months as a dishwasher. Mr. Rivera's father recalls that his son worked with him as a cook's helper when both worked at

a hotel. Another sister recalls that Mr. Rivera moved to Florida and lived with her. She recounts that he was even able to maintain a job for and live on his own for a short while, but then moved back to Texas.

What is clear from all of the accounts of teachers and Mr. Rivera's family, is that Mr. Rivera was unable to take care of day to day tasks such as hygiene, finding and keeping a job, paying bills, or fixing things around the house without help and direction from others. Reports from MHMR and professionals who evaluated Mr. Rivera are also strongly suggestive of Mental Retardation. A diagnosis from MHMR in 1985 by Pedro Ruggero, M.D., a staff psychiatrist at the Tropical Texas MHMR Center described Mr. Rivera included "Dependent Personality". The symptomatic criteria for that diagnosis includes many of the characteristics that are common to Mental Retardation and mistakenly aligned with other diagnoses. It appears that this was so in this case. This disorder is characterized by behaviors such as an inability to make everyday decisions without advice or reassurance from others; allows others to make most important decisions; agrees with people even when he or she believes they are wrong; has difficulty initiating projects or doing things on his own; volunteers to do things that are unpleasant or demeaning in order to get other people to like him; and feeling uncomfortable when alone. All of these behaviors are also seen in persons with mental retardation.

Mr. Rivera also experience many of the risk factors for mental retardation. He was raised in an impoverished home where there was not enough room for all of the children to sleep indoors. One teacher noted that Mr. Rivera liked school as a child because there was food. Siblings report physical abuse in the home as well. There is also a family history of learning problems. Furthermore, Mr. Rivera began sniffing paint regularly in his early teens.

Conclusion on Mental Retardation

The materials that I have reviewed suggest that Mr. Rivera is mentally retarded and there is no information which could rule out the diagnosis. His lifelong history of poor academic achievement suggests significant limitations in intellectual functioning. Although thorough psychometric testing is advisable, the two reported IQ score discussed above are not valid indicators of intellectual functioning and thus are not relevant to the question. Furthermore, there is significant evidence that Mr. Rivera has deficits in the adaptive skill areas of academics, work, self direction, communication, health and self care. All of these limitations are described as originating before MR. Rivera reached the age of 18. Each of the reports, indicators and clues in and of themselves are only suggestive of Mental Retardation. However, taken as a whole there are significant and substantive questions raised about Mr. Rivera's mental and intellectual capability. There are sufficient indicators noted to call for a full test and evaluation to confirm or deny the existence of what appears to be Mental Retardation.

Mental Retardation and Confession

I have also been asked to comment on the effect the disability of mental retardation has on a person's propensity to falsely confess under coercive circumstances. Persons with mental retardation are often eager to please people in authority and do not understand even obvious implications of their behavior. Thus a person with mental retardation may confess to even a

serious offense that they did not commit and could be easily pressed to do so by police officers.

Signed this 1st day of August 2003.

Richard E. Garnett, Ph.D.

# Exhibit 2

## DECLARATION OF DAVID MORON, M.D.

I, David Moron, M.D., I am above the age of 18 and am competent to make this declaration. I declare that the following is true and correct to the best of my knowledge:

1. My name is David Moron, I am a licensed psychiatrist and I am currently employed as the clinical director of the Rio Grande State Center.

2. In 1993 I evaluated Jose Rivera for competence to stand trial and sanity. I also testified at the punishment phase of his capital murder trial. The purpose of my evaluation was not to determine mental retardation.

3. On July 31, 2003 I spoke with Bryce Benjet who is assisting in the representation of Mr. Rivera. We briefly discussed my testimony at Mr. Rivera's trial and he read to me a portion of my testimony in which I stated that I did not believe that Mr. Rivera was mentally retarded. Although I do not remember discussing mental retardation in my testimony, the record reflects that I based my conclusion on the fact that Mr. Rivera's prison records reflected an IQ score of 92. I stated that mental retardation is not a consideration unless the IQ is 75 or less. At the time, I do not believe that I knew the source of that IQ score, but probably assumed that it was the result of valid testing.

4. I have been informed that the IQ reported in Mr. Rivera's prison records was probably the result of a group administered Beta IQ test. This is not considered a valid determination of intellectual functioning. Had I known what I know now, I would have definitely requested thorough psychological testing including individually administered intelligence testing.

5. Persons with mild mental retardation often live in society without being diagnosed with the disability. Even a mental health professional may overlook a diagnosis of mild mental retardation if the evaluation is not geared toward identifying the disability. Based on my clinical interviews with Mr. Rivera and the knowledge that the reported IQ score of 92 was not on an valid test, I do not believe that my statement that Mr. Rivera is mentally retarded is reliable. In fact, I would not be surprised if thorough psychological testing revealed that Mr. Rivera has mild mental retardation.

I affirm that the above is true under pain and penalty of perjury.

Signed this __1__ day of August 2003.

David Moron, M.D.

Exhibit 3

# Executive Summary

# MROP
## (Mentally Retarded Offender Program)



## Texas Department of Criminal Justice
## Institutional Division

### Jerry H. Hodge Unit
### Rusk, Texas

March 3, 1996

# Executive Summary

## Table of Contents

History..................................................................... Page 2

Mission................................................................... Page 2

Administration......................................................... Page 2

Referral Process...................................................... Page 2

Evaluation / Staffing Process.................................. Page 2

Interdisciplinary Team............................................. Page 3

Vocational Evaluation.............................................. Page 3

Evaluation of Dually Diagnosed Clients................... Page 4

Housing and Classification....................................... Page 4

MROP Medical Care................................................ Page 6

Psychiatric Services................................................ Page 6

Windham School System......................................... Page 6

Occupational Therapy.............................................. Page 7

Substance Abuse Treatment.................................... Page 8

Treatment Planning and Monitoring......................... Page 8

Continuity of Care (Transitional Planning)............... Page 9

**HISTORY** - The Mentally Retarded Offender Program was created as a result of the Ruiz litigation. The MROP was begun at the Beto I Unit in 1984 (Appendix ). The program was relocated into the Hodge Unit in 1995, where it operates 731 beds for the male intellectually impaired special needs offenders. 106 beds are allocated for the female intellectually impaired special needs offenders at the Valley Unit in Gatesville. The Mentally Retarded Offender Program was established to minimize the negative effects of incarceration and to maximize the likelihood of successful re-integration into the community. To meet this need, programs were established to provide habilitative, social support, continuity of care, and security services to offenders identified as mentally retarded.

**MISSION** - The Mentally Retarded Offender Program's mission reflects the philosophy and practices of the Health Services Division TDCJ-ID and UTMB Managed Care. This mission is to provide opportunities to mentally retarded offenders to acquire those skills necessary to enable them to function more successfully in their prison and community environments. In addition, the mission of the Mentally Retarded Offender Program (MROP) is to ensure that mentally retarded offenders are provided sheltered housing and work conditions, fair discipline, and protection from other prisoners. The goal of the Mentally Retarded Offender Program is to operate an efficient system for the provision of habilitative services to qualified offender clients.

**ADMINISTRATION** - The organization and administration reflects the principle that all staff be responsive to both clinical and custody needs of offenders. In addition, we also attempt to operate under the principles of decentralization, accountability, and rational conflict resolution. The Program Director is responsible for the habilitation operations of the Mentally Retarded Offender Program.

**REFERRAL PROCESS** - When offenders are processed into TDCJ-ID, Diagnostic Unit, each one is administered a group intelligence test (BETA). If the offender scores below 70 on the BETA he/she is administered another intelligence test, the Culture Fair. If the offender scores below 70, he/she is then sent to the respective diagnostic facility, where the Wechsler Adult Intelligence Scale - Revised (WAIS-R) is individually administered. Those who score below 74 on the full scale IQ are transferred to the Hodge Unit MROP, for a comprehensive evaluation.

**EVALUATION/STAFFING PROCESS** - The Mentally Retarded Offender Program (MROP) will staff and operate an evaluation center in accordance with the standards of the Texas Department of Mental Health and Mental Retardation. The Psychiatric Services staff treating or providing services to clients abide by the informed consent requirements of their particular licensing boards and/or governing body of a particular discipline, as well as by the laws of the jurisdiction within which the facility is located.

A client who has been recommended for treatment has the right (except in any specific circumstances) to refuse, preferably in writing, the evaluation or treatment procedure being offered. By refusing treatment at a particular time, the client does not waive his/her right to subsequent care.

INTERDISCIPLINARY TEAM (IDT) - The interdisciplinary team (IDT) is staffed and operated in accordance with the standards of the Texas department of Mental Health and Mental Retardation (TDMHMR). The IDT will be coordinated by a core team consisting of a physician or registered nurse, licensed or certified psychologist, social case worker, vocational supervisor, social work supervisor, and rehabilitation aide. Other disciplines to participate with the IDT as needed include an occupational therapist and/or speech pathologist.

Each offender referred to the MRO Program will complete a comprehensive evaluation process to determine the presence or scope of mental retardation and the need for services within thirty (30) days of arrival at the assigned MRO Program facility. Clients returning to TDCJ-ID after having been outside the agency for more than one year will go back through the comprehensive evaluation process. All clients remaining in the MRO Program will go back through the complete comprehensive evaluation process whenever a significant change occurs in their mental abilities.

The primary purpose of the Interdisciplinary Team will be to perform a "needs" assessment at the staffing to determine what services are suited to the needs of the individual. The Individualized Habilitation Plan (IHP) will be developed during the staffing by the IDT. The IDT will also serve as the Admissions Team.

VOCATIONAL EVALUATION - (PROGRAMS: Vocational Assessment /Pre-vocational Training/Work Adjustment/Job Placement/Adult Education). Clients found appropriate for the MROP often have limited work skills, low awareness of vocational strengths and liabilities, and no vocational goals. A vocational evaluation is completed to determine individual vocational objective(s) for each client assigned to MROP taking into consideration assets, limitations, and behaviors in the context of work environments in which a client might function. Specific recommendations are made which may be used in the development of the comprehensive individual habilitation plan or individual work rehabilitation plan.

Equipment used in the vocational evaluation should be representative of the type that can be used in competitive industry and based on the capability of the person served and the labor market geographically accessible to the person. The vocational counselor will make specific job recommendations and vocational training recommendations for the client inside the prison and when he/she is released.

3

Each client referred MROP will receive a vocational assessment within thirty (30) days after being referred to the MROP. Information from this assessment will be available for the staffing held at the end of the initial thirty (30) day period of diagnosis and evaluation. A vocational assessment report will be completed within thirty (30) days on each client who has been determined to be appropriate for the MROP Individual evaluation planning will be prepared for each client to the extent possible before the client begins assessment. Each client will remain in vocational evaluation an appropriate length of time to answer individual evaluation goals. When vocational goals are not identified, then non-vocational goals will be specified.

**EVALUATION OF DUALLY DIAGNOSED (MR/MI/SA) OR OTHERWISE DIAGNOSED CLIENTS -** Evaluations by the various disciplines of the MROP treatment team are conducted to determine the diagnosis and treatment requirements of the dually diagnosed clients. The level and depth of evaluation for each client will be determined by the treatment team based on the nature of the presenting problem or referral question under the clinical direction of the psychiatrist. Evaluation consists of at least a clinical interview to obtain a clear history related to the presenting problem and a mental status examination to determine the client's level of functioning relative to the presenting problem. Referral to the psychiatrist for further evaluation may be made in response to treatment consultation, involving medication, and/or diagnostic questions. During the evaluation process the client will be interviewed by a member of the substance abuse staff to determine the client's appropriateness for placement in the Substance Abuse Treatment Program (SATP).

**HOUSING AND CLASSIFICATION -** Mentally retarded offender clients are housed in the least restrictive environment appropriate to his/her habilitation, treatment, safety, and security needs. The MROP housing assignment and cell assignment status are initially determined on the day the client arrives at the sheltered facility. The female MROP treatment team in consultation with

2.  Dually Diagnosed - This classification include MRO clients who are also mentally ill (clinical syndrome). These clients are encouraged to participate in the regular MROP activity but the treatment team may exempt those clients incapable of participation. Once the mental illness is in remission, the client may be reassigned to program activities.

3.  Vulnerable - MRO clients who are vulnerable to the more aggressive and predatory MRO clients are assigned to this classification. These clients participate in the regular MROP activities program.

4.  Aggressive/Disruptive - This classification is for assaultive, disruptive, and dangerous MRO clients.

5.  Ordinary - This group includes those clients who are potentially aggressive, disruptive, or whose behavior nor diagnoses qualify them for any of the other classifications.

6.  Model - This classification is reserved for those MRO clients who consistently demonstrate model behavior, are not victims or predators, and are rarely involved in assaults, fighting, or threatening behavior.

# Exhibit 4

08/03/2003 15:03 CW TEXAS PREMIER SERVICE AUSTIN 15042122152 NO.385 D20

_Hamm_ HIGH SCHOOL WITHDRAWAL FORM

Date 3/18/80

School No 3680　Name _Rivera Alfredo_　D.O.B. 9/21/62 Age 17

Grade Level 9　Address 1955 _Harrison_　Tel. No. _____

Computer No. 810451103　Locker No. _____

Parent's Name _Alfredo Rivera_　LAS Score 1

TEACHERS: Please withdraw the above named student from your class as of date indicated below. Record with a "W" on your attendance sheet and your class record book.

WITHDRAWAL DATE 3/18/80　(Furnish grades up to this date)

**SUBSTITUTES MUST NOT PICK UP BOOKS OR SIGN FOR TEACHERS**

| PER | SUBJECT | TEACHER | BOOK RETURNED | | | NEVER ISSUED | GRADE AVERAGE | | TEACHER'S SIGNATURE |
|---|---|---|---|---|---|---|---|---|---|
| | | | YES | NO | EX | | 6WK | SEM | |
| 1 | CORE (Rdg) | _Lerma_ | ✓ | 39 | | | 13 | | _Jimmie Williams_ |
| 2 | | | | | | | | | |
| 3 | Physical | _Rodriguez_ | ✓ | | | | 40 | | E Rodriguez |
| 4 | _Lunch_ | | | | | | | | |
| 5 | FOM | _Smith_ | ✓ | | | | fail 3 | | H. Smith |
| 6 | SH | _Fernandez_ | | | ✓ | | | | _Fernandez_ |
| 7 | Income | _Ferreira_ | ✓ | | | | Inc. 61 | | _Ferreira_ |

REASON FOR WITHDRAWAL: _(GED)_

1. Grade Clerk _Nieto_
2. Library ✓ _Class Anderson_
3. Respective Counselor _Blake Henry_
4. Attendance Clerk _Mrs B. Villanva_
5. Records Clerk _A. Sanchez_
6. Lunch Tickets _____

GRADE PRINCIPAL: _____
a. Textbooks　O.U.
b. Activity Card　A O.U.
c. Lock Clearance　O.U.
d. Parent Letter　O.U.

PRINCIPAL'S SIGNATURE _____

Form 11-76



**TEXAS EDUCATION AGENCY** 1701 NORTH CONGRESS AVENUE  AUSTIN, TEXAS 78701-1494  (512) 463-9292

JULY 30, 2003

BRYCE BENJET
510 SOUTH CONGRESS STE 307
AUSTIN, TX
78704-

Re: Jose A Rivera #460 35 4916

Your recent request for a copy of this individual's certificate of high
school equivalency and/or General Educational Development (GED) Test
scores was received.

The GED Unit has no record of issuing this person a certificate and GED
Test scores are not on file here. In order to receive a certificate or
a copy of GED Test scores, please contact the center where the individual
took the tests.

If you have questions or need additional information, please contact the
GED Unit at (512) 463-9292.

Sincerely,

G. Paris-Ealy
Director of Programs
General Educational Development (GED) Unit

*Excellence and Equity for all Students*

NUMBER  999102

---

## PERSONAL

(1)  Has any member of your immediate family been a law enforcement officer, security guard, or policeman? Yes ___  No  X

(2)  Has any member of your immediate family been in a juvenile or adult penal institution? Yes  X    No ___  H/BRO Jose Maciel-1970's-BI-Burg Bldg-3Y

(3)  Has anyone in your immediate family been hospitalized for treatment of alcoholism, narcotics addiction, or mental disorders? Yes  X    No ___  FA-alcoholic-racd treat & attended A/A meetings

(4)  Have you ever attempted to kill yourself or mutilate yourself in any manner? Yes ___  No  X

(5)  Are you expecting any trouble from any member of the inmate population? Yes ___  No  X

(6)  Have you ever escaped from a jail, reformatory, or any other penal institution? Yes ___  No  X
     If so, where and when?  N/A

(7)  Have you ever been a member of any type of militant or subversive organization? (I.e.: teenage, street, motorcycle gangs, etc) Yes ___  No  X
     If so, when and where?  N/A

---

## EDUCATION

| NAME OF SCHOOL (OR TESTING CENTER IF GED) | LOCATION | YEARS ATTENDED | GRADE OR HOURS COMPLETED |
|---|---|---|---|
| (UNDER WHAT NAME) RIVERA, Jose | | | |
| Canales Elementary | Brownsville, TX | 1967-1968 | K |
| Longoria Elementary | Brownsville, TX | 1968-1975 | 1st-6th (5th 2X) |
| Cummings High School | Brownsville, TX | 1975-1976 | (skip 7th) 8th |
| Homer Hanna High School | Brownsville, TX | 1976-1978 | 9th (2X) |
| (VERIFIED) NJP/SSD/11-18-94) | | | |
| | | | H.S. DIPLOMA? Yes ___  No  X  G.E.D.? Yes ___  No  X |

Exhibit 5

State of Texas          )
                        )                          In re Jose Rivera
Cameron County          )

### Affidavit of Hugh Albright

I, Hugh Albright, state the following is true and correct to the best of my knowledge:

1.      My name is Hugh Albright. I was a teacher at Longoria Elementary for 21 years. Prior to that, I had taught at both the middle and high school level.

2.      I was Jose Rivera's homeroom teacher in the 6th grade. During that time, the school's curriculum was departmentalized so that students were taught subjects by three different teachers. The core subject which I taught at that time was English, but I also taught other subjects such as Social Studies and Science.

3.      Overall, Jose was a very poor student. He was not able to learn very much. I think that by the time he reached the 6th grade, he had reached a point where he did not care. When a student is in the 5th or 6th grade and is only performing at a 1st grade level, there is not much you can do; many times they are socially promoted. That was the case with Jose. Jose was socially promoted from the 6th to 7th grade.

4.      Jose would sometimes misbehave in class. I think he realized that he wasn't learning and that he was at the bottom of the class. For that reason, Jose was inclined to not pay attention in class and to fool around. I think he liked school because it allowed him to get away from home, there was food there, and he had his friends. But really, Jose did not have much motivation.

5.      His English skills were "okay." They were not as poor as his sister Camelia's, who had a speech disability. As far as reading, Jose really could not read. He might say a few words, but he really couldn't read well and did not try very hard. Jose could not make change from a dollar. I suspect that Jose could not add or subtract very well, and he probably did not know how to multiply. In P.E. class, Jose was not very athletic. He would not run or play sports like baseball.

6.      Jose was in remedial math with Ms. Gonzalez. I suspect that when Jose was in

Page 1 of 2

the 6th grade, his math skills were at a 2nd grade level. At one time, I taught 4th grade, and I can say that Jose was not at a 4th grade level in math.

7.  Jose had Prescriptive Reading with Miss Garcia in the 5th grade. The books "Air Pudding" and "Wind Sauce" are below a 2nd grade level. I suspect that Jose could probably not even read those.

8.  Sometimes, there was a tendency to inflate scores to show that the student was learning. Teachers wanted to show that there was a gain and that the student had progressed. But I think in the areas of math and reading, Jose was probably performing at a 1st or 2nd grade level.

9.  Jose appeared very unclean in his appearance. Jose would come to school with his clothes ragged, his shoes torn, and his pants too big or sagging on the floor. Other kids would make fun of him because of that. Jose also had a nickname of "Paya," which I suspect was short for papaya. Kids must have called him that because his head was sort of shaped like a papaya.

10. I remember that there was a teacher who went to Jose's house, and it was a bad situation. The house was filthy and dirty, and the kind of place that would get very cold in the winter. There was no air conditioning. I don't remember too much, specifically, about Jose's siblings, but all of the Rivera children were what some would call "dumb." His sister Camelia had a serious speech impediment.

11. "CVAE" is a vocational program for high school students. The program was intended for those students who were at risk of dropping out. The material taught was at a 3rd to 5th grade level, but it was taught in a way that high school students could relate to it.

I affirm that this affidavit is true and correct to the best of my knowledge, and I so state under the pains and penalties of perjury.

Hugh Albright
Hugh Albright

Sworn to me this 27th day of June 2003.

Nancy E. Garcia
Notary Public--State of Texas

My commission expires: 9-13-03





# Exhibit 6

Name: Rivera, Jose Alfredo          Sex: M

Address(Pencil): 12-23-62
Birthdate & Place: Brownsville, Texas
Phone:
Church Preference: Catholic
Language of Home: Spain
Father: Alfredo Rivera          Citizenship: U.S.
Mother: Carmela Gonzales          U.S.
Guardian:

PHOTO



## HEALTH RECORD

### SMALLPOX

| | | | |
|---|---|---|---|
| 1 | | | |
| 2 | | | |

### DIPHTHERIA – PERTUSSIS – TETANUS

| | SERIES | BOOSTER | BOOSTER | BOOSTER |
|---|---|---|---|---|
| 1 | 10-17-69 | 11-25-69 | | |
| 2 | 11-25-69 | | | |
| 3 | 1-23-70 | | | |

### DIPHTHERIA – TETANUS

| | SERIES | BOOSTER | BOOSTER | BOOSTER |
|---|---|---|---|---|
| 1 | | | | |
| 2 | | | | |
| 3 | | | | |

### TETANUS

| | SERIES | BOOSTER | BOOSTER | BOOSTER |
|---|---|---|---|---|
| 1 | | | | |
| 2 | | | | |
| 3 | | | | |

### TYPHOID

| | SERIES | BOOSTER | BOOSTER | BOOSTER |
|---|---|---|---|---|
| 1 | 8-26-70 | | | |
| 2 | 3-6-70 | | | |
| 3 | 3-25-70 | | | |

### POLIO

Measles 3-31-71

| 1 | 6-27-70 | 2 | 8-28-70 | 3 | 5-4-71 |
|---|---|---|---|---|---|

## CUMULATIVE ACADEMIC RECORD - GRADES 1-8

| Grade | 1st | | | 2nd | | | 3rd | | 4th |
|---|---|---|---|---|---|---|---|---|---|
| Year | 1969-70 | | | 1971-1973 | | | 72-73 | | |
| School | Cortez | | | Longoria | | | | | |
| Homeroom Teacher | McDonald | Gonzales | Ibarra | Longoria | Atkinson | Johnson | | | |
| English | 4 | 5 | 5 | C | C | C | S | S | F-F |
| Spanish Level | | | | | | | | | |
| Reading or Literature | C- | C- | C- | C- | C- | C | S | S | F |
| Spelling | C- | C- | C- | C- | C | C | S | S | F |
| Writing | D- | C- | C- | D- | D | D | S | D | F |
| History | | | | | | | MIS | S | F |
| Citizenship | C- | C- | C- | C | C | C | S | S | F |
| Homemaking | | | | | | | | | |
| Geography | | | | | | | MIS | S | F |
| Physical Ed. | C | C | C+ | C | C | C | S | P | F |
| Health | | | | | | | | | |
| Music or Band | | | | | | | | | |
| Art or Drawing | | | | | | | | | |
| Mathematics | C- | C- | C- | C | C | C | S | S | F |
| Science | C | C | C | C | C | C | S | D | F |
| Present | 94 | 93 | 114 | 152 | 78 | 18 | 179 | 87 | |
| Absent | 4 | 7 | 3 | 35 | 8 | 70 | 10 | 10 | |
| Tardy | 1 | | | | | | | | |
| Promoted or Retained | | | | | | | | | |

Name Rivera, Alfredo                Sex M

Form 11 – 130 Rev. 75

Address (Pencil) _____
Birthdate 12/23/62  Place California
Church Preference Catholic
Father Alfredo Rivera
Mother Gloria Rodriguez

Phone _____
Language of Home Spanish
Citizenship U.S.

CUMULATIVE ACADEMIC RECORD — GRADES K-6

| | 5 | 6 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Grade | | | | | | | | | | | |
| School | | | | | | | | | | | |
| Homeroom Teacher | | | | | | | | | | | |
| Spanish | | | | | | | | | | | |
| English | | | | | | | | | | | |
| Reading or Literature | | | | | | | | | | | |
| Spelling | | | | | | | | | | | |
| Writing | | | | | | | | | | | |
| Social Studies | | | | | | | | | | | |
| Mathematics | | | | | | | | | | | |
| Science | | | | | | | | | | | |
| Health | | | | | | | | | | | |
| Art or Drawing | | | | | | | | | | | |
| Music or Band | | | | | | | | | | | |
| Phys. Ed. | | | | | | | | | | | |
| Citizenship | | | | | | | | | | | |
| Absent | | | | | | | | | | | |
| Present | | | | | | | | | | | |
| Transferred to | | | | | | | | | | | |
| Withdrawals Date-Reason | | | | | | | | | | | |
| Promoted or Retained | | | | | | | | | | | |
| Bilingual Education | | | | | | | | | | | |

COMPUTER #

NO.

Form 11 - 112 Rev. 74

NAME

SCHOOL YEAR

GRADE

ENGLISH

READING, SPELLING

SOCIAL STUDIES

MATHEMATICS

P E

ART/CRAFTS

BAND/CHORUS/GYM

HOMEMAKING

INDUSTRIAL ARTS

SCIENCE

SPEECH/DRAMA

SPANISH

TYPING

MECHANICAL REPAIRS

CONSTRUCTION TRADE

HOME & COMM. SER.

OFFICE DUPLICATIONS

DAYS PRESENT

DAYS ABSENT

TIMES TARDY

CITIZENSHIP

CUMMINGS

INTERMEDIATE SCHOOL PERMANENT RECORD

DATE OF BIRTH

AGE AT ENTRANCE

PLACE OF BIRTH
LONGORIA

FROM WHAT SCHOOL ENTERED

DATE ENTERED

PHONE

PARENT OR GUARDIAN

PHOTOS

SEVENTH

EIGHTH

FRESH.

SOPH.

JUNIOR

SENIOR

| ACTIVITY OR ORGANIZATION | ACTIVITIES AND ACHIEVEMENTS | | |
|---|---|---|---|
| | SEVENTH | EIGHTH | |

DPT 1
2
3
B

DT 1
2
B
B
B

TB Test
X-Ray
Rubella
Rubeola
Polio 1
2
B
B

Smallpox

Pertinent Facts:

BROWNSVILLE, TEXAS 78520

Homer—Hanna—High School    HIGH SCHOOL PERMANENT RECORD

Computer
Num.er

NO ___

NAME  Rivera, Jose Alfredo Jr.

RESIDENCE ___

DATE OF BIRTH ___

AGE AT ENTRANCE ___

PLACE OF BIRTH  Brownsville

DATE ENTERED  8-31-75

PARENT OR GUARDIAN  Alfredo Rivera

FROM WHAT SCHOOL ENTERED ___

| SCHOOL YEAR | 19__ to 19 ___ | | | | | | SCHOOL YEAR | 19__ to 19 ___ | | | | | | SCHOOL YEAR | 19__ to 19__ | | | | | | SCHOOL YEAR | 19__ to 19__ | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1st Year | 1st Qtr. | 2nd Qtr. | 3rd Qtr. | Sum | Year Ave | Cr. | 2nd Year | 1st Qtr. | 2nd Qtr. | 3rd Qtr. | Sum | Year Ave | Cr. | 3rd Year | 1st Qtr. | 2nd Qtr. | 3rd Qtr. | Sum | Year Ave | Cr. | 4th Year | 1st Qtr. | 2nd Qtr. | 3rd Qtr. | Sum | Year Ave | Cr. |
| English | | | | | | | English | | | | | | | English | | | | | | | English | | | | | | |

DAYS PRESENT

DAYS ABSENT

SCHOLASTIC AVE.

TOTAL CREDIT

Grades Below 70 — Failure

ENT. SCHOOL SHOW. YES ___ NO ✓

LAS ENG 1  4  3  2
LAS SPAN 1  2  3  4  5

| | GOV. 2 qtrs. | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | LAB SCI. 6 qtrs. | | | | | | | |
| | PE 5 qtrs. | | | | | | | |
| | HEALTH 2 qtrs. | | | | | | | |
| | ENG. 9 qtrs. | | | | | | | |
| | MATH 6 qtrs. | | | | | | | |
| | WORLD HIST/GEO. 3 qtrs. | | | | | | | |
| | AM. HIST. 3 qtrs. | | | | | | | |
| | FOR. LANG. 3 qtrs. | | | | | | | |
| | NO. IN CLASS BOYS | | GIRLS | | TOTAL | | | |
| | RANKED IN | | Quarter of Class | | | | | |
| | Transcript sent to: | | | | Date: | | | |
| | GRADUATION — Date Graduated | | | | | | | |
| | WITHDRAWAL RECORD — Date Withdrawn | | | | | | | |
| | Reason: | | | | | | | |

Form 11 — 112 Rev. 74

_Hanna_ HIGH SCHOOL WITHDRAWAL FORM

Date _3/18/80_

School No. _3680_    Name _Rivera, Alfredo_    D.O.B. _8/23/62_    Age _17_

Grade Level _9_    Address _1955 Harrison_    Tel. No. _____

Computer No. _810451103_    Locker No. _____

Parent's Name _Alfredo Rivera_    LAS Score _1_

TEACHERS: Please withdraw the above named student from your class as of date indicated below. Record with a "W" on your attendance sheet and your class record book.

WITHDRAWAL DATE _3/18/80_    (Furnish grades up to this date)

<u>SUBSTITUTES MUST NOT PICK UP BOOKS OR SIGN FOR TEACHERS</u>

| PER | SUBJECT | TEACHER | BOOK RETURNED YES | NO | BK # | NEVER ISSUED | GRADE AVERAGE 6WK | SEM | TEACHER'S SIGNATURE |
|-----|---------|---------|-----|-----|------|------|------|-----|------|
| 1 | Core (R111) | Lerma | 738 | | | | 13 | | Irmino Muniz |
| 2 | | | | | | | | | |
| 3 | Physci Riot | E. Rodriguez | ✓ | | | | 40 | | E Rodriguez |
| 4 | Lunch | | | | | | | | |
| 5 | P.M. | Smith | ✓ | | | Failing | | | H Smith |
| 6 | S.H | Fernandez | | | ✓ | | | | E Fernandez |
| 7 | Eng core | Ferrales | ✓ | | | Inc. 60 | | | M Ross |

REASON FOR WITHDRAWAL: _G.E.D._

1. Grade Clerk _J. Muniz_
2. Library _Clara Snyderson_
3. Respective Counselor _Leon Garza_
4. Attendance Clerk _Mrs B. Villarreal_
5. Records Clerk _R. Karges_
6. Lunch Tickets _____

GRADE PRINCIPAL: _____

a. Textbooks _OV_
b. Activity Card _At OV_
c. Lock Clearance _OV_
d. Parent Letter _OV_

PRINCIPAL'S SIGNATURE

Form 11-146

Brownsville Independent School District

Diagnostic and Prescriptive Reading Program

Pupil's Record Sheet
Summary of Test Results

Name of Child _Alfredo Rivera_     Age _11_     Grade _5th_

Reading Lab Teacher _Miss Garcia_     School _Longoria_

Date Leaving Lab _3/17/75_     Test Score (Grade Equivalent) _2.9_

Date Entering Lab _9/10/74_     Test Score (Grade Equivalent) _3.4_

Time in Lab _6 months_     Gains _.5_

## Diagnostic Information

|  | Date | Results (Check appropriate column) | | | | | |
|---|---|---|---|---|---|---|---|
| Vision | 1/6/75 | | Normal | | Deficiency | | |
| | | Right Eye | ✓ | | | | |
| | | Left Eye | ✓ | | | | |
| Hearing | 2/21/75 | | Normal | | Deficiency | | |
| | | Right Ear | ✓ | | | | |
| | | Left Ear | ✓ | | | | |

| Dominance | Right | Left | Ambidexterous |
|---|---|---|---|
| Normal Dominance | | | |
| Mixed Dominance | | | |
| Hand | ✓ | | |
| Eye | | | |

| Book Used | Reading Level | | | | | |
|---|---|---|---|---|---|---|
| | 1 | 2¹ | 2² | 3¹ | 3² | 4¹ |
| Basic Goals | | | | | | |
| Open Highways | | | ✓ | | | |
| New Practice Readers | | | | | | |
| Other | | | | | | |

Informal Reading Inventory
   (Oral reading level)

## Durrell-Sullivan Reading Capacity and Achievement Test

| | Date | Score | Grade Equivalent |
|---|---|---|---|
| Capacity Test | | | |
| Achievement – Form A     (Pre-Test) | 9/10/74 | 20 | 3.4 |
| Achievement – Form B     (Post-Test) | 3/17/75 | 24 | 2.9 |

## Diagnostic Reading Test
(Indicate diagnostic test used and
attach profile sheet)

Fountain Valley Diagnostic Test     ✓

Phonics Survey Test

Diagnostic Test of Word Perception Skills

READING PROGRESS SHEET

GRADES 4, 5, 6

Name of Child __R_i_v_e_r_a___A_l_f_r_e_d_o__ Date of Birth __12-23-63__

Record the date of the completion of each level and check the appropriate skills column. File in the child's permanent record folder.

| Basal Readers | Comprehension Strategies* | | Critical Reading and Study Skills* | | Check When Completed | Grade | Supplementary Readers | Date Read |
|---|---|---|---|---|---|---|---|---|
| | Satisfactory | Needs Improvement | Satisfactory | Needs Improvement | | | | |
| Level 13 – Windows | | ✓ | | ✓ | ✓-✓-'66 | | Seeking Adventure (Open Highways) | ✓ |
| Level 14 – Doorways | | ✓ | | ✓ | ✓- 9/24-'73 | | Windowpanes | |
| Level 15 – Bridges | | ✓ | | ✓ | ✓- 2/16-j'73 | 4 | The Texans | |
| | | | | | | | Read Better—Learn More | |
| | | | | | | | Sounds of Mystery | |
| Level 16 – Passports | | | | | | | Discoveries (Open Highways) | |
| Level 17 – Excursions | | | | | | | Environmental Reader | |
| Level 18 – Discoveries | | | | | | 5 | Departures | |
| | | | | | | | Fox Eyes | |
| | | | | | | | Sounds of a Young Hunter | |
| Level 19 – Voices | | ✓ | | ✓ | 4-77 | | Exploring Afar (Open Highways) | |
| Level 20 – Endeavors | | | | | | | Sea Birds | |
| Level 21 – Triumphs | | | | | 6 | | Shifting Scenes | |
| | | | | | | | Inquiry into the Past | |
| | | | | | | | Sounds of a Distant Drum | |

* Check pages 12 and 13 of the appropriate basal teachers manual for detailed listing of reading study skills.

Alfredo has read through Air Pudding and Wind Sauso Alfredo needs much improvement in phonetics.

Form 2 – 116

*Albright's class*

BROWNSVILLE INDEPENDENT SCHOOL DISTRICT

DIAGNOSTIC MATH

PUPIL'S RECORD SHEET

School _____ Math Lab Teacher _Mrs. C. Gonzalez_

Name _Rivera, Alfredo_ Length of time in Lab _7½ mos._

Grade _6th_ Gains _1.4_ (POB 11-25-62)

Date Entering Lab _9-13-76_
Date Leaving Lab _6-3-77_

DIAGNOSTIC INFORMATION

Standardized Test

SRA ACHIEVEMENT SURVEY

|  | Date | Score (Raw) | Grade Equivalent | Gains |
|---|---|---|---|---|
| Capacity Test - Level |  |  |  |  |
| Achievement Form F Post-Test | 4/21/77 | 32 | 5.5 | 1.4 |
| Achievement Form E Pre-Test | 5/19/76 | 21 | 4.1 |  |

INSTRUCTION CONCENTRATION

(An estimate of % of total time spent in each area)

|  | Addition | Subtraction | Multiplication | Division | Fraction | Decimals |
|---|---|---|---|---|---|---|
| Computation – Using Basic Operations |  |  |  |  |  |  |
| Concepts Stated Problems Using Any Basic Operation |  |  |  |  |  |  |

Name _____  Grade _____

## FOUNTAIN VALLEY DIAGNOSTIC TEST PROFILE SHEET
### Level 2 - Orange

| Phonetic Analysis | Reteach | Proceed |
|---|---|---|
| 2-1 initial consonant | | ✓ |
| 2-2 initial consonant 'b' | | ✓ |
| 2-3 | | ✓ |
| 2-4 schwa | | ✓ |
| 2-5 regular vowel combination 'ee' | | ✓ |
| 2-6 regular vowel combination 'oa' | | ✓ |
| 2-7 regular vowel combination 'ai' | | ✓ |
| 2-8 initial digraph 'ch' | | ✓ |
| 2-9 irregular vowel combination 'aw' | | |
| 2-10 initial part 'tch' | | |
| 2-11 initial digraph 'gn' | | |
| 2-12 final consonant 's' | | |
| 2-13 final blend 'nk' | | |
| 2-14 final blend 'nd' | | |
| 2-15 final blend 'nt' | | |
| 2-16 final digraph 'sh' | | |
| 2-17 phonetic part 'ight' | | |
| 2-18 phonetic part 'ight' | | |
| 2-19 phonetic part 'ar' | | |
| 2-20 diphthong 'oy' | | |
| 2-21 diphthong 'oi' | | |
| 2-22 vowel diphthong | | |

### Structural Analysis

| | Reteach | Proceed |
|---|---|---|
| 2-1 plurals 's' | | ✓ |
| 2-2 plurals 'es' | | ✓ |
| 2-3 verb form 'ing' | | ✓ |
| | | ✓ |
| | | ✓ |
| | | ✓ |
| | | ✓ |
| suffix 'er' | | ✓ |
| suffix 'ph' | | ✓ |
| | | ✓ |
| | | |
| | | |
| | | |
| 2-16 closed syllable words | | |

### Vocabulary Development

| | Reteach | Proceed |
|---|---|---|
| 2-1 | | |
| 2-2 word through context clues | | ✓ |
| 2-3 | | |
| 2-4 homonyms | | |
| 2-5 rhyming words | | |

### Comprehension

| | Reteach | Proceed |
|---|---|---|
| 2-1 main idea supporting ideas | | ✓ |
| 2-2 main idea entire story | | |
| 2-3 main idea title | | |
| 2-4 placing sentences in sequence | | ✓ |
| 2-5 recalling action patterns | | |
| 2-6 answering questions by words | | |
| 2-7 identifying gender | | ✓ |
| 2-8 recognizing tone, feeling, mood | | |
| 2-9 interpreting reading orally | | |
| 2-10 comparing & contrasting ideas | | |
| 2-11 riddles and puzzles | | |
| 2-12 drawing conclusions | | |
| 2-13 drawing conclusions | | |
| 2-14 cause and effect relationships | | |
| 2-15 forms of speech | | |
| 2-16 distinguishing | | |

### Study Skills

## Level 3 - Yellow

| Phonetic Analysis | Reteach | Proceed |
|---|---|---|
| 3-1 | | |
| 3-2 | | |
| 3-3 | | |
| 3-4 | | |
| 3-5 | | |
| 3-6 initial digraph 'ph' | | |
| 3-7 medial digraph 'gn' | | |
| 3-8 final digraph 'ph' | | |
| 3-9 irregular vowel combination 'oi' | | |
| 3-10 silent 'h' | | |
| 3-11 vowel 'o' 'dove' | | |
| 3-12 phonetic part 'e' 'a gor' | | |
| 3-13 irregular vowel combination 'ei' | | |
| 3-14 irregular murmur diphthong 'or' | | |
| 3-15 irregular vowel combination 'ie' | | |
| 3-16 phonetic part 'p hza' | | |

### Structural Analysis

| | Reteach | Proceed |
|---|---|---|
| 3-1 family | | |
| 3-2 noun plural 'ies' | | |
| 3-3 verb form 'y' | | |
| 3-4 verb form 'ilies' | | |
| 3-5 verb form 'ilied' | | |
| 3-6 verb form 'ing' | | |
| 3-7 suffix 'tion' | | |
| 3-8 suffix 'ward' | | |
| 3-9 suffix 'ment' | | |
| 3-10 suffix 'ous' | | |
| 3-11 suffix 'ion' | | |
| 3-12 suffix 'teen' | | |
| 3-13 suffix 'shr' | | |
| 3-14 suffix 'some' | | |
| 3-15 two sound words | | |

### Vocabulary Development

| | Reteach | Proceed |
|---|---|---|
| 3-1 new meaning words through context | | |
| 3-2 identify words through definition & sentence | | |
| 3-3 how, where, when, who & what | | |
| 3-4 information from definitions | | |
| 3-5 antonyms | | |
| 3-6 homonyms | | |
| 3-7 synonyms & synonymous phrases | | |
| 3-8 rhyming words | | |
| 3-9 homographs | | |

### Comprehension

| | Reteach | Proceed |
|---|---|---|
| 3-1 main idea supporting ideas | | |
| 3-2 main idea key sentences | | |
| 3-3 arranging sentences in sequence | | |
| 3-4 arranging events & ideas in sequence | | |
| 3-5 answering questions by key words | | |
| 3-6 identifying gender | | |
| 3-7 based on given opinion, hypothesis | | |
| 3-8 recognizing tone, feeling, sadness | | |
| 3-9 comparing & contrasting ideas | | |
| 3-10 riddles and puzzles | | |
| 3-11 identifying & interpreting feelings | | |
| 3-12 drawing conclusions | | |
| 3-13 cause & effect relationships | | |

### Study Skills

| | Reteach | Proceed |
|---|---|---|
| 3-1 table of contents | | |

Part 2
- 2-7. regular vowel combination 'oo'
- 2-8. irregular vowel combination 'ou'
- 2-8. initial digraph 'kn'
- 2-9. irregular vowel combination 'aw'
- 2-10. phonetic part 'ight'
- 2-11. initial digraph 'gn'

Part 3
- 2-12. final consonant 's'
- 2-13. final blend 'nk'
- 2-14. final blend 'nd'
- 2-15. final blend 'nt'
- 2-16. final digraph 'sh'
- 2-17. phonetic part 'ough'
- 2-18. phonetic part 'ight'
- 2-19. phonetic part 'tion'
- 2-20. diphthong 'oy'
- 2-21. diphthong 'oi'
- 2-22. murmur diphthong 'air'

### Structural Analysis

- 2-1. prefix 'un'
- 2-2. verb 're'
- 2-3. verb 'dis'
- 2-4. ...
- 2-5. ...
- 2-6. suffix 'ness'
- 2-7. suffix 'er'
- 2-8. suffix 'th'
- 2-10. suffix 'y'
- 2-11. verb form 'n'
- 2-12. verb form 'en'
- 2-13. contractions
- 2-14. syllable
- 2-15. accent mark/2 syllable words

### Vocabulary Development

- 2-1. recognizing unknown through context
- 2-2. ident. words through definition & sentence
- 2-3. how, when, where, who & what
- 2-4. homonyms
- 2-5. rhyming words

### Comprehension

- 2-1. main idea supporting ideas
- 2-2. main idea/telling
- 2-3. main idea/key
- 2-4. ...
- 2-5. ... with a sentence
- 2-6. ... answers by key words
- 2-7. ... opinion by ...
- 2-8. recognizing tone, feeling, humor
- 2-9. comparing/contrasting ... personal
- 2-10. sentencing & contrasting ideas
- 2-11. riddle, and puzzles
- 2-12. ... ... information
- 2-13. cause and condition
- 2-14. cause and effect relationships
- 2-15. figure of speech
- 2-16. author's opinion, intent

### Study Skills

- 2-1. table of contents
- 2-2. alphabetical sequence
- 2-3. ... ... or recording specific information
- 2-4. finding personal pronouns
- 2-5. appropriate word for context
- 2-6. judgment fact, fancy, true, false
- 2-7. following directions
- 2-8. ... main ideas & subordinate details
- 2-9. ... ... sentence

Part 1
- 3-4. hard 'c'
- 3-5. soft 'c'
- 3-6. initial digraph 'ph'
- 3-7. medial digraph 'ph'
- 3-8. final digraph 'ph'
- 3-9. irregular vowel combination 'au'
- 3-10. silent 'h'
- 3-11. vowel 'a' (how)

Part 2
- 3-12. phonetic part 'ge' (gem)
- 3-13. irregular vowel combination 'ui'
- 3-14. irregular murmur diphthong 'er'
- 3-15. irregular vowel combination 'ie'
- 3-16. phonetic part 'schwa'

### Structural Analysis

Part 1
- 3-1. noun form 'y'
- 3-2. noun plural form 'ies'
- 3-3. verb form 'y'
- 3-4. verb form 'ies'
- 3-5. verb form 'ied'
- 3-6. verb form 'ing'
- 3-7. suffix 'tion'
- 3-8. suffix 'ward'
- 3-9. suffix 'ment'
- 3-10. suffix 'ous'
- 3-11. suffix 'ern'

Part 2
- 3-12. suffix 'teen'
- 3-13. suffix 'ship'
- 3-14. suffix 'some'
- 3-15. compound words

### Vocabulary Development

Part 1
- 3-1. recognizing unknown through context
- 3-2. ident. words through definition & sentence
- 3-3. how, where, when, who & what
- 3-4. information from definitions

Part 2
- 3-5. antonyms
- 3-6. homonyms
- 3-7. synonyms & synonymous phrases
- 3-8. rhyming words
- 3-9. homographs

### Comprehension

P-1
- 3-1. main idea supporting ideas
- 3-2. main idea key sentences
- 3-3. arranging sentences/sequence
- 3-4. arranging events & ideas sequence
- 3-5. answering questions key words

P-3
- 3-6. identifying speaker, etc.
- 3-7. verifying answer, opinion, hypothesis
- 3-8. recognizing tone, feeling, sadness
- 3-9. comparing & contrasting ideas

P-4
- 3-10. riddles and puzzles
- 3-11. identifying & interpreting feelings

P-5
- 3-12. drawing conclusions
- 3-13. cause & effect relationships

### Study Skills

Part 1
- 3-1. table of contents
- 3-2. charts, pictures, maps
- 3-3. encyclopedia, dictionary, glossary
- 3-4. alphabetical sequence
- 3-5. of titles
- 3-6. summing or recording specific information

Part 2
- 3-7. sources relevant, irrelevant
- 3-8. judgment-fact, fancy, true, false
- 3-9. organization from facts

Part 3
- 3-10. appropriate word for context
- 3-11. following directions
- 3-12. classifying items into categories

FOUNTAIN VALLEY DIAGNOSTIC TEST PROFILE SHEET

## Level I – Red

### Phonetic Analysis

### Structural Analysis

### Vocabulary Development

### Comprehension

### Study Skills

| | Reteach | Proceed |
|---|---|---|

## Structural Analysis

## Vocabulary Development

## Comprehension

## Study Skills

DIAGNOSTIC ANALYSIS OF LEARNING DIFFICULTIES
California Achievement Tests - Upper Primary Battery

1. Reading Vocabulary
   A. WORD RECOGNITION

   1,12 --Gross
        differences

   2,3,6,7,8,
   9,10,13,15, --Final
   16,17,18      sounds

   4,5,14, --Middle
   19,20      sounds

   11 ---Initial sounds

   B. MEANING OF OPPOSITES

   1-25 --Basic
          vocabulary

2. Comprehension
   C. FOLLOWING DIRECTIONS

   1,2,3,6, -- Simple
   10,11        directions

   4,6,7,8, -- Directions
   9,12,13,    requiring
   14,15       choice

   D. REFERENCE SKILLS

   1,2 --Parts of book

   3,4 --Use of diction-
         ary

   5,6,7,8 --Alphabetiz-
             ing

   9,10,11 --Table of
             contents

   12,13 --Use of index

   14,15 --Reading a
           graph

   E. INTERPRETATION OF
      MATERIAL

   1,8,11 --Topic or
            central idea

   2,3,4,12, --Directly
   13,14,16    stated
               facts

   5,6,7,9,
   10,15,17, --inferences
   18,19,20,
   21,22

   23,24,25 --Sequence
             of events

   TEST OF WORD FORM

   1,5,9 --Identical

   16,22 --Identical
           words, capitals

   15,17 --Different
           words, capitals

   18,20,25 --Identical
             words, mixed forms

   19,23 --Different words,
           mixed forms

   4,6,7 --Reversed words

3. Arithmetic Reasoning
   A. MEANINGS

   1,2 --Sequence of
         numbers

   3 --Writing numbers

   4,5,6 --Value of coins

   7,8,9 --Writing money

   10,11 --Vocabulary

   12,13 --Telling time

   14,15, --Comparison of
   16       numbers

   17,18,19 --Roman
             numerals

   B. SIGNS AND SYMBOLS

   1-6 --Meaning and use
         of signs

   7-11 --Abbreviations

   C. PROBLEMS

   1,2,4 --One-step
           problems

   3,5,6,7, --Two-step
   8,9,10    problems

   6,7 --Sharing and
         averaging

   8,9,10 --Budgeting

4. Arithmetic Fundamentals
   D. ADDITION

   1-45 --Number facts

   2,4,9,12, --Adding
   17,19,20,   zeros
   25,46

   46,47 --Two-place
           simple addition

   48,49,50 --Carrying

   E. SUBTRACTION

   1-45 --Number facts

   F. MULTIPLICATION

   1-45 --Number facts

   6,21,24, --Multiplying
   27,30,33,  zeros
   34,36

   46,47,48 --Two-and three-
             place simple
             multiplication

   49,50 --Carrying

   G. DIVISION

   1-45 --Number facts

   4,6,14, --Dividing zeros
   26,35

   46 --Two-place simple
        division

   47,48, --Carrying
   49,50

5. Mechanics of English
   A. CAPITALIZATION

   1,5 --Pronoun "I"

   2,7,16 --Names of
            persons

   3,4,8, --Names of months
           or days

   6,9,10, --Names of
   12,13     places

   14,19 --First words of
           quotations

   11,15,17, --First words
   18,20       of sentences

   B. PUNCTUATION

   1,6,10,
   11,13,14, --Periods
   16,17

   2,3,5, --Question
   7,19      marks

   4,8,9,12, --Commas
   15,18,20

   C. WORD USAGE

   1,7 --Case

   2,11,14, --Tense
   16,18

   3,4,9,17 --Number

   5,6,8,10,
   12,13,15, --Good usage
   19,20

A. WORD RECOGNITION

1,12 --Gross differences

2,3,6,7,8, --Final
9,10,13,15, sounds
16,17,18

4,5,14, -- Middle
19,20 sounds

11 ---Initial sounds

B. MEANING OF OPPOSITES

1-25 --Basic vocabulary

2. Comprehension
C. FOLLOWING DIRECTIONS

1,2,3,6 -- Simple
10,11 directions

4,5,7,8 Directions
9,12,13 requireing
14,15 choice

D. REFERENCE SKILLS

1,2 --Parts of book

3,4 --Use of dictionary

5,6,7,8 --Alphabetizing

9,10,11 --Table of contents

12,13 --Use of index

14,15 --Reading a graph

E. INTERPRETATION OF MATERIAL

1,8,11 --Topic or central idea

2,3,4,12 --Directly
13,14,16 stated facts

5,6,7,9 --inferences
10,15,17
18,19,20,
21,22

23,24,25 --Sequence of events

TEST OF WORD FORM

1,5,9 --Identical words, lower case

2,3, --Different words,
8,10 lower case

11,13 --Identical words, script

12,14 --Diff. words,
21,24 script

words, capitals

15,17 --Different words, capitals

18,20,25 --Identical words, mixed forms

19,23 --Different words, mixed forms

4,6,7 --Reversed words

3. Arithmetic Reasoning
A. MEANINGS

1,2 --Sequence of numbers

3 --Writing numbers

4,5,6 --Value of coins

7,8,9 --Writing money

10,11 --Vocabulary

12,13 --Telling time

14,15 --Comparison of
16 numbers

17,18,19 --Roman numerals

B. SIGNS AND SYMBOLS

1-6 --Meaning and use of signs

7-11 --Abbreviations

C. PROBLEMS

1,2,4 --One-step problems

3,5,6,7, --Two-step
8,9,10 problems

6,7 --Sharing and averaging

8,9,10 --Budgeting

4. Arithmetic Fundamentals
D. ADDITION

1-45 --Number facts

2,4,9,12, Adding
17,19,20,-- zeros
25,46

46,47 --Two-place simple addition

48,49,50 --Carrying

E. SUBTRACTION

1-45 --Number facts

2,8,12 --Subtracting zeros

46,49 --Two-and three-place simple subtraction

44,45,47, --Borrowing
48,50

1, --Number facts

6,21,24, Multiplying
27,30,33, --zeros
34,36

46,47,48 --Two-and three-place simple multiplication

49,50 --Carrying

G. DIVISION

1-45 --Number facts

4,6,14,--Dividing zeros
26,35

46 --Two-place simple division

47,48, --Carrying
49,50

5. Mechanics of English
A. CAPITALIZATION

1,5 --Pronoun "I"

2,7,16 --Names of persons

3,4,8 --Names of months or days

6,9,10 --Names of
12,13 places

14,19 --First words of quotations

11,15,17, First words
18,20 of sentences

B. PUNCTUATION

1,6,10 --Periods
11,13,14,
16,17

2,3,5 --Question
7,19 marks

4,8,9,12 --Commas
15,18,20

C. WORD USAGE

1,7 --Case

2,11,14, --Tense
16,18

3,4,9,17 --Number

5,6,8,10 --Good usage
12,13,15
19,20

6. Spelling (1-25) See profile

# Exhibit 7

State of Texas      )

                      )                                 **In re Jose Rivera**

Cameron County   )

### Affidavit of Roberto X. Moreno

I, Roberto X. Moreno, state the following is true and correct to the best of my knowledge:

1.  My name is Roberto X. Moreno, and I live in Brownsville, Texas. I was a teacher at Longoria Elementary School in Brownsville for 30 years.

2.  Jose Rivera was never a student of mine, but as a teacher, you tend to remember students who are not even in your own class. Even though teachers try to remember all their students, the ones who are easily remembered are the students who are either very smart or those who had trouble learning.

3.  I remember Jose at Longoria Elementary. From what I remember, Jose was very quiet, a slow learner, and had a lot of trouble with his studies.

4.  Teachers also remember students by their siblings. One of Mr. Rivera's sisters, Camelia, was a student of mine. I remember that Camelia was also a slow learner in my class. Camelia had a speech impediment, and the other kids even used to make fun of her. She either did not care or did not understand what they were saying about her because it did not stop her from talking. I believe she was later placed in Special Education classes.

5.  Jose's parents were the kind of parents who wanted to do well for their children, but they did not have the skills. They cared for their children and tried to help, but they really did not know how.

6.  I started teaching at Longoria Elementary in 1972. For at least a few more years after that, the school had what you called "High 1st" and "Low 1st." That is, if a child did not master the first grade, then the following year, they would be placed in "High 1st" instead of second grade. It was really the same as retaining the student, but it was a way of minimizing the stigma that is associated with being retained.

Page 1 of 2

7.   There was a teacher at Longoria by the name of Ms. Gonzalez. Ms. Gonzalez taught remedial math to those students who had tested low in math and were not mastering the subject at their respective grade level.


I affirm that this affidavit is true and correct to the best of my knowledge, and I so state under the pains and penalties of perjury.

_Roberto X. Moreno_
Roberto X. Moreno


Sworn to me this 27th day of June 2003.

_Nancy E. Garcia_
Notary Public-State of Texas

My commission expires: 9-13-03





# Exhibit 8

State of Texas        )
                      )                          **In re Jose Rivera**
Cameron County        )

### Affidavit of Maria Juanita Rivera

I, Maria Juanita Rivera, state the following is true and correct to the best of my knowledge:

1.      My name is Maria Juanita Rivera, and I live in Brownsville, Texas. I am 29 years old, and I am the youngest sister of Jose Alfredo Rivera. I am about 10 or 11 years younger than Jose.

2.      I have lived in Brownsville all my life. I have always, and still do, live with my father, Alfredo Rivera, and my two children. I graduated from high school and took classes at University of Texas at Brownsville, Texas Southmost College to be a registered nurse. I hope to go back when my second child enters school.

3.      Growing up was very difficult for all of us. There were six children in our household. With my two parents, and sometimes half brothers or sisters who would live with us, the house could not fit us all. Most of the time, Jose would sleep outside, either on the side or in the back of the house. He slept outside also because it was always very hot inside the house. Jose also used to cook outside. He would have pots and pans out there, and he would cook for himself, and sometimes for us.

4.      My mother, who passed away about 20 years ago, would hit us when we were growing up. She was abusive to us all the time; she would hit us with whatever was there around the house: the hose, a stick, anything that was there. I was so afraid sometimes that I would run outside and hide, sometimes behind the bushes. With me the abuse was very serious, but I know that she was equally abusive to us all.

5.      Jose writes letters to me from prison about once a month. His letters are not written well at all. He has misspelled words, incomplete sentences, pronunciations marks all over the place or in the wrong place. Sometimes, he means to say one word but he'll spell another. For example, instead of spelling

the word "ice," he'll spell it "eyes." He does this with many words. Recently, his writing has improved because he has taken some classes there at the prison. I don't think his writing is as bad as it used to be.

6.    From what I remember, Jose liked to read the newspaper. He can read, but not very well. I would say his level is about 50%.

7.    I remember that Jose did know how to drive. When he was married, he would drive his wife's car around. But he never took a driving test. I don't know the reason why, but it was probably because he didn't think he could pass.

8.    I remember that Jose used to sniff paint. He did that for as long as I can remember, from when I was a little girl. My mother used to get very angry with him for it. One time, she took a stick and smashed a paint can with it; she hit it so hard that the can burst and there was paint all over, even on her face! She never liked it when Jose used to do that, but he sniffed paint for as long as I can remember.

9.    From what I can remember, all of my siblings were in special education classes, including Jose. I was the only one who was not in special education classes. I was also the only one who went to college.

I affirm that this affidavit is true and correct to the best of my knowledge, and I so state under the pains and penalties of perjury.

Maria Juanita Rivera

Sworn to me this 27th day of June 2003.

Notary Public–State of Texas

My commission expires: 9-13-03



NANCY E. GARCIA
Notary Public
STATE OF TEXAS
My Comm. Exp. Sept. 13, 2005



NANCY E. GARCIA
Notary Public
STATE OF TEXAS
My Comm. Exp. Sept. 13, 2003

Page 2 of 2

# Exhibit 9

06 18 2003 WED 14:40 FAX 956  5452674     IPO SPLX BROWNSVILLE      ⧄002
06/18/2003    15:17    TX DEF⌐⌐ER SERVICES → 19565482674-51900                    NO.195    002

| | | |
|---|---|---|
| State of Texas | ) | |
| | ) | In Re Jose Rivera |
| County of Cameron | ) | |

### Affidavit of Esmeralda Maciel

I, Esmeralda Maciel, state the following is true and correct to the best of my knowledge:

1.  My name is Esmeralda Maciel, and I live in Brownsville, Texas. I am the older sister of Jose Rivera. I am approximately 1 year older than Jose.

2.  In 1984, when Jose was about 15 years old, I moved to Chicago. I later moved to Florida and got married. I did not return to Brownsville until 1989. During the time I lived in Florida, I remember Jose came out to live with me. He lived in Florida for about six or seven months. After a few months, he decided to live by himself. He lived by himself for about three or four months. During this time, he was working in a greenery. He left that job in 1988, and then he and I returned to Brownsville together in 1989. Another job that Jose worked was as a cook in a restaurant with my stepfather. He would cook and wash the dishes there.

3.  When Jose was in elementary school, he was put in special education classes. They put him in these classes because he could not read very well. I could not give you any specific examples, but he had problems understanding words when he would read. I did not hear Jose read very often, but when he did it was you could tell it was very hard for him; he would read "con ganas." Jose did not like to read in front of others; I suppose it was because he was embarrassed that he could not say some of the words.

4.  When you talked to Jose, sometimes you would have to repeat things over and over. I believe it was because he just did not understand what you were telling him. The way I put it is that he just "wasn't there." For example, you would be talking and he just had this look on his face like he was thinking, but he wouldn't understand you. This was when he was younger than fifteen years of age.

5.  Jose doesn't write very much. But that is typical of our whole family; we just don't like to write. When Jose writes to me, I sometimes do not understand his

letters. I am not sur : what he is trying to say. He will leave out letters in some words. Also, he we ild write in both Spanish with English, his letters were "mezclada."

6.    Jose had friends wh m he was young, and sometimes I would see him talking with them, but mostly he stayed quiet. He was very serious around his friends.

I affirm that this affidavit is true and correct to the best of my knowledge, and I so state under the pains and penalties of per ury.

Esmeralda Maciel

Sworn to me this _18_ day of June 2 103.


Notary Public--State of _TEXAS_

My commission expires: _4-05-2005_

MINERVA SAENZ
MY COMMISSION EXPIRES
APRIL 05, 2005

Page 2 of 2

# Exhibit 10

State of Texas     )
                    )                                 In Re Jose Rivera

County of Harris    )

## Affidavit of Alma Lagarda

I, Alma Lagarda, declare under the penalty of perjury that I understand the Spanish language and the English language, and that, to be best of my knowledge and belief, the following statements in the English language have the same meaning as the statements in the Spanish language in the Affidavit of Camelia Garcia, sworn and subscribed before me on June 16, 2002.

I, Camelia Garcia, state that the following is true and correct to the best of my knowledge:

1.      My name is Camelia Garcia, and I live in Madelia, Minnesota. I am the sister of Jose Rivera. I am approximately four years younger than Jose.

2.      From the time Jose was little, my father would take him to work several jobs with him. One time, I remember Jose worked as a dishwasher with my father in a restaurant. He was at that job for about two months. Other than that, Jose did not work very much. My father is the one who would find jobs for Jose. I don't remember that Jose ever found a job on his own.

3.      Jose had much trouble in filling out job applications; this is why I think he did not apply for his own jobs. One time, I saw him trying to fill out one of these applications. He had such a hard time trying to complete it. He would write and then go back and erase what he wrote. He looked at the application like it was a puzzle.

4.      Jose would forget things. For example, I remember one time when Jose went outside to cut the grass, he came back inside the house and forgot to turn off the lawn-mower. Another time, I remember that I was going to the store and he asked me to buy a newspaper for him. I returned to the house with the newspaper, and he said, "What is that for?" And I laughed and said, "It's what you asked me to bring you from the store!" And Jose had just forgotten that he asked me for the newspaper. He took the paper anyway, and just put it aside. I don't even think he read it that day. Even when Jose got older, if he needed to go do something, I would sometimes ask my husband to go with him. It's not that he couldn't do things by himself, but I just thought he needed someone there to help him.

5.    Jose did not know how to tell time. One time, he was outside the house with his friends and I remember asking him, "Jose, what time is it?" And he just said something like, "I don't know!" like he was trying to just quiet me. He was trying to be funny in front of his friends, but I think he really was a little embarrassed that he didn't know how to tell time.

6.    When Jose was young, maybe in elementary school, he was put in special classes. I was also in these classes from a very young age because I had problems with my speech. Today, I still don't speak very well. I talk "mocho," which is to say when a person talks, you cannot understand him or her. I noticed that Jose speaks just like me, but I don't know if he notices it himself.

7.    When Jose would talk, he would mispronounce words and I could not understand him very well. He would talk "bien mocho." Sometimes, I would just stay watching him, wondering what he was trying to tell me. When he read, he would read very, very slowly, like a child who was just learning to read for the first time.

8.    As far as I know, Jose did not have a bank account. When he got paid from work, he would just cash the check and give the money to his wife and kids.

9.    Jose did not drive. When he was married, his wife was the one who drove him everywhere.

I affirm that this affidavit is tue and correct to the best of my knowledge, and I so state under the pains and penalties of perjury.

_____
Alma Lagarda

Sworn to me this _19th_ day of June 2003.

_____
Notary Public--State of

My commission expires: ___10-17-2004___



Page 2 of 2

Exhibit 11

State of Texas          )
                        )                    In Re Jose Rivera
County of Cameron       )

### Affidavit of Lupita Rodriguez

I, Lupita Rodriguez, state the following is true and correct to the best of my knowledge:

1.     My name is Lupita Rodriguez. I live in Brownsville, Texas. I am the sister of Jose Rivera. I am approximately six years younger than Jose.

2.     Jose would work several jobs, most of them I remember were with my father. I remember one time Jose worked with my father at a restaurant; my father was a cook and Jose worked as a dishwasher. I don't remember the name of the restaurant. I don't remember why Jose left that job, maybe it was because he didn't like it, but he was only there for a few months. I believe this was the longest job he held.

3.     Jose knew how to read a little bit. I remember he would read me the newspaper. When he would read, he would not know how to pronounce long words. He would read very slowy, word by word. Many times, he would just "get stuck." My own son is nine years old, and he reads just fine. But Jose, at ten or eleven years of age, could not read like my son.

4.     I have not talked to Jose in about two years, but he still writes me letters sometimes from where he is in prison. When he writes, some words will be missing letters. Also, his letters will be written all in Spanish, but then sometimes he will switch and write a few words in English. I figure he just doesn't know how to say or write these words in Spanish.

5.     Jose does not know how to drive. I have never seen him drive. I don't remember whether Jose ever took a driving test.

6.     I remember that Jose used to sniff spray paint when he was young. He did that from when he was little all the way to high school. He always did that. That was one thing that constantly angered my mother.

I affirm that this affidavit is  rue and correct to the best of my knowledge, and I so state under the pains and penalties of per ury.

Lupita Rodriguez

Sworn to me this *18* day of June 2t 03.

Notary Public--State of Texas

My commission expires: *4-05-6 005*

Exhibit 12

State of Texas      )
                    )
County of Cameron   )

                                         In Re Jose Rivera

### Affidavit of Dora Garza

I, Dora Garza, state the following is true and correct to the best of my knowledge:

1.  My name is Dora Garza. I live in Brownsville, Texas. I was married to Jose Rivera for approximately twelve years, from 1981 to 1993. Jose and I were separated since 1983, and although we would continue to see each other, we did not live together during the last ten years.

2.  During the first two years of our marriage, Jose and I lived with Jose's parents. When we separated, I moved out and lived on my own while Jose continued to live with his parents. From what I can remember, Jose never lived on his own.

3.  The longest job I remember that Jose held was when he worked as a dishwasher with his father in a restaurant. That lasted approximately two months. I do not remember seeing Jose ever fill out a job application.

4.  When Jose got paid, he would pay for food but not other things like rent or utilities. His parents always paid the bills. After I left his parents' house, his parents continued to pay all the bills. Jose did not have a bank account.

5.  I don't remember Jose fixing things around the house. Whenever something was broken or needed fixing, it was always his father who would handle those things. Jose would never do it.

6.  As far as I can remember, Jose knew how to read in English and Spanish. But, I hardly ever saw him pick up a book and read.

I affirm that this affidavit is true and correct to the best of my knowledge, and I so state under the pains and penalties of perjury.

_Dora Garza_

Dora Garza

Sworn to me this 20th day of June 2003.

_Minerva Saenz_

Notary Public--State of Texas

My commission expires: 4-5-2005

MINERVA SAENZ
MY COMMISSION EXPIRES
APRIL 05, 2005

# Exhibit 13

State of Texas     )

                    )                                 In re Jose Rivera

Cameron County   )

### Affidavit of Alfredo Rivera

I, Alfredo Rivera, state the following is true and correct to the best of my knowledge:

1.     My name is Alfredo Rivera, and I am the father of Jose Alfredo Rivera. I am 65 years old.

2.     Jose used to work many jobs with me. For example, Jose worked with me at the Ramada Inn for about six or seven months. I was a cook and Jose was a cook's helper. From what I remember, Jose was a very obedient worker. When they changed owners at the Ramada Inn, they cut down on the pay and that's when Jose and I both left. Another job Jose held was at the Elks Lounge as a dishwasher. Jose left that job when the old owner left.

3.     Jose would usually get jobs in person. He would hear of a job opportunity from me or from a friend, and he would show up and try and get it that way. He really didn't fill out job applications.

4.     Jose worked around the house doing various things like cutting the yard or helping paint the house.

I affirm that this affidavit is true and correct to the best of my knowledge, and I so state under the pains and penalties of perjury.

_____
Alfredo Rivera

Sworn to me this 27th day of June 2003.

Page 1 of 2

_Nancy E Garcia_

Notary Public, State of Texas

My commission expires: _9-13-03_



NANCY E GARCIA
Notary Public
STATE OF TEXAS
My Comm. Exp. Sept. 13, 2003

Exhibit 14



# TROPICAL
## TEXAS CENTER
**FOR MENTAL HEALTH & MENTAL RETARDATION**

1242 N. 77 Sunshine Strip
Harlingen, Texas 78532
(956) 423-8094

NOTE: This report is strictly confidential and is for the information only of the person to whom it is addressed. No responsibility can be accepted if it is made available to any other person. INCLUDING THE PATIENT.
Tropical Texas Ctr. for MH/MR

COPY

**7-10-03**
Date

TO: Texas Defender's Service
412 Main, Suite 1150
Houston, TX 77002
Atten: Alma

Regarding: Jose Rivera
DOB: 12-23-62
S.S.#: 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

We are in receipt of your letter dated **5/27/03** regarding the disclosure of information pertaining to the above mentioned client. The following requested information is enclosed:

Entire Medical Record

If we can be of any further assistance to you, please do not hesitate to contact this office Monday through Friday between the hours of 8:00 am to 5:00 pm.

Sincerely,

Linda Roach

Health Information Department

Enclosures (s)

An Equal Opportunity/Affirmative Action Employer

Admitting criteria and such... not   FOX=X/

To be completed by the admitting ph...

F-3773   02 13 85

I. Criteria for Admission: Check at least one clinical and one social criterion:   Onto Jan. 9, 1985

A   Clinical
☐   Need for controlled environment (e.g. suicidal, assaultive, disoriented, severely depressed, etc.).
☐   Need for specialized treatment(s) and/or diagnostic program
☐   Other _____

B.   Social
☐   Need to interrupt deleterious psycho-social interactions
☐   Behavior "intolerable" to patient, family, or community
☐   Acute interpersonal crisis
☐   Failure of outpatient treatment
☐   Inability to meet own basic life and health needs
☐   Other _____

II. Has this patient been screened by a community center recommending admission?   ☐Yes ☐No   by a hospital outpatient program?   ☐Yes ☐No

Exceptions: ☐ Court commitment   ☐ Emergency admission   ☐ Private referral
☐ Admission refused

III. Physician's Note (or justification for refusal):

This is the first admission to our A & D Ward for this 22 year old, Mexican-American, separated, unemployed male that lives with his mother and three sisters in Brownsvill Texas. He comes on a voluntary basis for treatment of inhalant abuse (spray paint) and comes on the request of his probation officer. He is currently on probation for DWI and he was suspected of being publicly intoxicated. The probation officer suggested treatment or revokation of his probation. He started inhaling paint when he was about 17 years old. He says that he only uses it about twice a week and he uses about one can of spray paint every week. He also occasionally smokes marijuana and on weekends he admits that he has about a couple of six packs of beer when he gets the money to buy them. He is oriented to time, space and person. He denies any hallucinations or delusions. Denies any suicidal or homicidal ideation.

NOTE: This report is strictly confidential and is for the information only of the person to whom it is addressed. No responsibility can be accepted if it is made available to any other person, INCLUDING THE PATIENT.
Tropical Texas Ctr. for MH/MR

COPY

Typed: 01/14/85

IV. Presumptive Diagnoses:

| Psychiatric | Medical |
|---|---|
| INHALANT ABUSE, SPRAY PAINT, CONTINUOUS | NONE |
| ALCOHOL ABUSE, EPISODIC | |
| MARIJUANA ABUSE, EPISODIC | |
| DEPENDENT PERSONALITY DISORDER | |

4/84

Medical Evaluation - Page
**Physical Exam**

## 02 13 85

12  3-42  W N CATHOLIC ACA
V-L 01-07-85 CARE  M C..
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                06135
1955 E HARRISON BROWNSVILL
                          TEXAS

---

**•Review of Systems**

| | |
|---|---|
| Special senses<br>Neuromuscular<br>Cardiorespiratory<br>Gastrointestinal<br>Genitourinary<br>Gynecologic<br>Menstrual<br>Endocrine<br>Immunologic<br>Current Complaints | Special senses are intact. Normal visual and audial acuity. Neuro muscular - no seizure, ataxia, fainting, light headiness, chronic headaches, muscle or joint pains. Cardiorespiratory - no chest pai shortness of breath, or chronic cough. Gastrointestinal - no abdom pain, nausea, vomiting or diarrhea. Normal bowel habits. Genitour - he urinates well. Endocrine - no complains. Immunologic - no complains. Current complaints - none. |

---

**•General Physical Exam**

Height _____ Weight _____ Temp 100  Pulse 72  Resp 16  BP 148/70

| | |
|---|---|
| Appearance &<br>Nutrition: | He is a well developed, obese male, alert, oriented, cooperative and in no distress. |
| Skin: | He has many tattoos on the extremities and the chest. There are stria markings on the lower abdomen. No jaundice. |
| Head, Face<br>& Scalp: | Head normal cephalic and hair appears with normal texture. Scalp with no tenderness. |
| Eyes: | Pupils are round. Ocular movements are intact. Pupils react to light and accommodation equally well. Scleras with no jaundice. Ocular fundi normal |
| Ears: | Minimal amount of soft wax. Hearing normal and no tenderness. |
| Nose: | Septum midline and both passages adequate. No discharges or bleeding. |
| Mouth, Teeth<br>& Throat: | Fair dental hygiene. There are a few dental caries on the lower molar teet on the left side noticeable. Oral pharynx with no infection. |
| Neck &<br>Thyroid: | Neck supple, there is no adenopathy, or venus distention and there is no thyromegaly. Carotid pulses symmetrically felt. |
| Chest: | Both hemithoraces symmetrical, expanding well, lungs clear and no rales. |
| Breasts: | No palpable masses. |
| Heart: | Regular sinus rhythm, and no murmur. |
| Vascular<br>system: | Good pulses and no bruit. |
| Lymphatic<br>system: | No lymphadenopathy. |
| Abdomen: | Abdomen is soft, obese, without any distention or tenderness. There is no mass or visceromegaly. No herniation. |
| Genitalia: | External genitalia normal. |
| Anus,<br>Rectum: | Not done. |
| Pelvic: | |
| Trunk &<br>Extremities: | No tenderness or deformity of trunk. Extremities - good range of motion. No varicosities or edema. |

NOTE, This report is strictly confidential and is for the information only of the person to whom it is addressed. No responsibility can be accepted if it is made available to any other person, INCLUDING THE PATIENT. Tropical Texas Ctr. for MH/MR



Dictated:  01/08/85
Received &
Transcribed:  01/10/85

08/03/2003  18:50    TEXAS DEFENDER SERVICE-AUSTIN → 15042122162    NO.365  P27

Medical Evaluation - F
**Past Medical History**
Record pertinent positive and negative findings.

RI  RA JR. JOSE A.    659

11 3-63 W M CATHOLIC B2A

V L 11-07-85 CAMERON CO.

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    C413

1055 E HARRISON BROWNSVILLE

02  13  85

| | |
|---|---|
| **Family History**<br><br>Include known inheritable conditions; presence of mental illness, alcoholism, or mental retardation in parents or siblings. | This is the first admission for this 27 year old male.  There is no history of inheritable conditions or presence of mental illness, mental retardation or alcoholism in the family. |
| **Developmental History**<br><br>Motor and physical developmental milestones; language or learning disorder; sexual development. | Motor, and physical development were within normal milestones.  Sex development normal.  He is married and has one child.  There is no language or learning disorder.  He dropped out after the 9th grade and he has been working in construction jobs, as a cook and as a janitor until April 1984.  Since then he has been unemployed. |
| **Past Medical Conditions**<br><br>Diseases; injuries; operations; radiotherapy; blood disorders; transfusions; previous diagnostic studies; History of alcoholism or substance abuse; Allergic or toxic reactions. | There is no hospitalization for any treatment or disease or surgery.  There is no history of any major injuries, fractures or dislocations  Allergy condition none.  He smokes 5 cigarettes per day.  He drinks very occasionally beer.  No history of any illicit drug.  There is no history of prescribed medication.  He does not smoke marijuana or other substances.  He has been sniffing spray cans since age 17 and he sniffs one can per week. |

NOTE: This report is strictly confidential and is for the information only of the person to whom it is addressed. No responsibility can be accepted if it is made available to any other person. INCLUDING THE PATIENT.
Tropical Texas Ctr. for MH/MR

COPY



Psychiatric Evaluation

Names and addresses of relatives and corresponding persons are found
in the Demographic Data subsection of the Data Base. Medical history is
found in the Medical Evaluation subsection of the Data Base. Refer to
Racial History for historical data and to the Prior Summaries subsection of
the Data Base for more extensive information on previous treatment.

**02   13   85**

RIVERA, Jr. Jose A. #6135

12-  3-62  M  J  CATHOLIC  32A

V  L  01-09-35  CAMERON  C0.

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          06135

1955 E HARRISON  BROWNSVILL
                         TEXA

Admitted: 01/09/85

GENERAL:  This is the first admission to our A & D Ward for this 22 year old,
Mexican-American, separated, unemployed male that lives with his mother and three
sisters in Brownsville, Texas. He came on a Voluntary basis for treatment of
inhalant abuse (spray paint) and he came on the request of his probation officer.
He is currently on probation for DWI and he was suspected of being publicly
intoxicated and the probation officer suggested treatment  or revokation of his
probation.

CHIEF COMPLAINT:  "My probation officer sent me here."

PRESENT ILLNESS:  This 23 year old, separated, unemployed Mexican-American male
started inhaling paint when he was about 17 years old.  He says that he only uses
it about twice a week and he used about one can of spray paint every week.  He
also occasionally smoked marijuana and on weekends he admits that he has about a
couple of six packs of beer when he gets the money to buy them.  He seems to try
to play low the frequency or the amount of consumption of marijuana, spray paint
or alcohol, but his legal record shows multiple frequent problems with the law
for public intoxication or drug related charges.  He also has suffered family
and financial hardship due to his drug abuse problem.  He denies DT's, blackouts or
seizures.  He denies any hallucinations, delusions, suicidal or homicidal ideation.
He denies any food or medication allergy.  Denies any previous admission to hospitals
or medical problems of any sort.

For family and social history please refer to chart.

MENTAL STATUS:  This is a rather guarded, over weight young male who has multiple
tattoos in his arms, a handkerchief tied around his head and he behaves in a rather
guarded manner.  He volunteers very little information about himself.  His main
concern seems to be when is he going to be able to leave.  He is oriented to time,
space and person.  His memory is well preserved.  He is able to repeat his social
security number, other personal data, etc.  He denies any blackouts.  His attention
span seems to be within normal limits.  His mood is probably of mild depression.
He is logical, coherent and relevant.  There are no evidences of thought disorder.
He denies any hallucinations or delusions.  Denies any suicidal or homicidal
ideation.  Intellectual ability seems to be in the average range.  The judgement
is preserved and the insight is nil.

DIAGNOSTIC IMPRESSION:  Axis I.   INHALANT ABUSE, SPRAY PAINT, CONTINUOUS 305.91
                                  ALCOHOL ABUSE, EPISODIC 305.02
                                  MARIJUANA ABUSE, EPISODIC 305.22
                        Axis II.  DEPENDENT PERSONALITY DISORDER 301.60
                        Axis III. NONE

Pedro Ruggero, M.D./bk

Dictated:  01/10/85
Transcribed: 01/14/85

NOTE. This report is strictly confidential
and is for the information only of the person
to whom it is addressed. No responsibility
can be accepted if it is made available to any
other person, INCLUDING THE PATIENT.
Tropical Texas Ctr. for MH/MR

COPY

09/03/2003   16:56   TEXAS DEPT HUMAN SERVICES... HUNTSVILLE 83712   729

IFICATE OF MEDICAL EXAMINATION OR ... HOLISM

NO. _____

THE STATE OF TEXAS
... THE BEST INTEREST                    In the County Court
... PROTECTION OF

                                          CAMERON ____ County, Texas

RIVERA, Jose Alfredo _____
n Alcoholic _____

... this record is strictly confidential ... the information only of the perso... ... it is addressed. No responsibility ... be accepted if it is made available to any ... person. INCLUDING THE PATIENT.
... Texas Ctr. for MH/MR
COPY

I, the undersigned, a person licensed to practice medicine in the State of Texas, or a
... on employed by a state medical hospital, or by an agency of the United States, having a
...nse to practice medicine in any state of the United States, do hereby certify, to-wit:

1. That my name and address is _David Morón_

   _302 Kings Highway, Suite 103_

2. That on the _15_ day of _Feb._ , 19_89_ , at _Tropical TX MHMR_,
                                                   Place of examination

...amined _Jose Alfredo Rivera_ ,hereinafter termed Patient. That Patient's ad-
...s is _1955 E. Harrison_

3. A brief diagnosis of the physical and mental condition of Patient on said date of
...ination is _Alcohol Dependence / Inhalant abuse / R/O Depression_

4. That Patient has been under my care for the following period of time _1st evaluation_

5. That I am of the opinion that Patient _is_ an alcoholic and I am further of
                                        (is-is not)
op...on that Patient _Requires_ observation and treatment in an Alcohol
                    (requires-does not require)
...ment Center.

6. That I am of the opinion that Patient _does_ require hospitalization in an
                                        (does-does not)
...hol Treatment Center.

7. That I am of the opinion that Patient _is_ likely, because of his alcoholism,
                                        (is-is not)
...ause injury to himself or others if not immediately restrained.

8. An adequate description of the type and kind of treatment given Patient or Recommended
... the direction of the examining physician is as follows:

   _No current treatment._
   _Recommend the inpatient alcohol program at Rio Grande_
   _State Center and out pt. follow-up with_
   _us after dis chang._

THIS THE _15_ DAY OF _February_ , 19_89_

                              _David Morón, M.D._
                              Examining Physician

... to and Subscribed before me this the _15th_ day of _February_ , 19_89_

                              _Rosa Elia Gonzalez_
              Notary Public _CAMERON_ County, Texas

## PROGRESS NOTES

. Date – Day the progress note is written.
. Problem List Number (PL) – Each paragraph should have a number which corresponds to the number on problem list. On
  '' given date, you may write about one or more problems on the list.
    .urce of information – On the line with the date, please first note where you got the information in the progress
  note. Examples are: individual therapy, telephone conversation, family member, etc.
: Sign your name, degree, and title at the end of your progress note.

| DATE | PL # | |
|------|------|---|
| 02/15/89 | | Client seen by Dr. Moron on this date.  See Madication Assessment note dated 02/15/89. |
| | | _Xavier E. Gonzalez_ |
| | | Medical Records/reg  02/24/87 |

NOTE: This report is strictly confidential and is for the information only of the person to whom it is addressed.  No responsibility can be accepted if it is made available to any other person, INCLUDING THE PATIENT.
Tropical Texas Ctr. for MH/MR

COPY

CNT'S NAME:  RIVERA, Jose                    CASE NO:                    102227

PROGRESS NOTES

1. Date - Day the progress note is written.
2. Problem List Number (PL) - Each paragraph should have a number which corresponds to the number on problem list. Any given date, you may write about one or more problems on the list.
3. Source of Information - On the line with the date, please first note where you got the information in the progress note. Examples are: Individual therapy, telephone conversation, family member, etc.
4. Sign your name, degree, and title at the end of your progress note.

| DATE | PL # | |
|------|------|---|
| 02/15/89 | | SCREENING ASSESSMENT FOR DETOX SERVICES AT RGSC - 30 minutes |
| | | S: Mr. Rivera, "I do not know why they send me here.  I was drinking last night and I guess this is the reason that they want me to go the hospital.  I'm not using spray paint at the present time, I'm not violent with my family.  You can talk to wife if you want to.  My last employment was in Augu of 1988.  I attempt to drink about twenty-four beers whenever I have the money and if I don't I just drink less." |
| | | O: Today, Jose Alfredo Rivera was brought in by the Sheriff's dupty under a court order commitment to get alcohol treatment at Rio Grande State Center.  I completed the screening form (refer to this form for impressions) and asked Dr. Moron, staff psychiatrist to assess this case for a detox treatment.  I staffed the case to the doctor who in turn talked to client and recommended that he be admitted for detox treatment at Rio Grande State Center. |
| | | A: During this visit, Jose Rivera came through as a shy, embarrassed, evasive individual.  He was using massive denial as it referred to his use of alcohol, family violence, use of spray paint.  I called his wife, Mrs. Dora Rivera who advised me that client in fact was violent with the children and all the family members and that he abused spray on a continuous basis. |
| | | Mr. Rivera is a Hispanic male.  He separated from his family due to the problems described above.  He is about 5 feet, 2 inches tall, and weighs 200 lbs.  He is extremely obese.  Client fails to understand that he has gained a lot of weight due to the abuse of alcohol.  He would rather say that he is heavy because he eats very well.  Today client appears depressed, distant and became somewhat paranoid when I asked him to give me his wife's phone number. |
| | | WORKING DIAGNOSIS: |
| | | AXIS I:     Alcohol Dependence |
| | |              Inhalant Dependence |
| | |              Rule out Major Depression |
| | | AXIS II:    Dependent Personality |
| | | AXIS III:   Obesity |
| | | AXIS IV:    Psycho-Social Stressors:  Unemployment, Family Violence (Verbally Abuse of children and wife and other family members). |
| | | AXIS V:     Present GAF:  (Continues alcohol abuse, family friction, possible depressive condition). |
| | | P: The Sheriff's deputy will transport Mr. Rivera to Rio Grande State Center so he can be evaluated for detox treatment. |

NOTE: This report is strictly confidential and for the information only of the person or persons to whom it is addressed.  No responsibility can be accepted if it is made available to any other person.  INCLUDING THE PATIENT.  Topical Texas Ctr for MH/MR

COPY

Geraldine Davila
Geraldine Davila, M.A., Psychologis
02/17/89

MEDICATION ASSESSMENT

1. Date - Day the notation is written.
2. Problem List (PL) Number - Each notation should have a number which corresponds to the number on the problem list.
3. Physician documentation should include: 1) medical assessment of physical and/or mental symptomatology;
   ) medication's effect on target symptoms; 3) rationale(s) for initiating or discontinuing a medication or modify
   the dosage; and 4) medication side effects; and 5) medication education.
4. Sign your name, degree, and title at the end of your notation.

| DATE | PL # | |
|------|------|---|
| 2/15/89 | | **S:** Patient brought in for an emergency evaluation.  He comes in with a court order inpatient treatment.  He is a 26 year old Hispanic male who has a long history of alcohol abuse and has been in treatment with Tropical Texas Mental Health Center in the past.  The last time that he was here was in February of 1986.  Most recently his wife went to the court stating that the patient was drinking alcohol on a daily basis.  He's also been abusing inhalants.  He has gotten violent at home and made various threats to his wife.  He does admit to drinking almost on a daily basis but denies an inhalant abuse.  He states that his last drink was last night.  He's unable to tell me how much he drunk but states that he was drinking all night long and this included beer, wine and liquor. |
| | | **O:** A short over weight Hispanic male.  He comes in with red eyes and in a very guarded manner, gives me only a minimal amount of information.  He has minimal spontaneous speech.  He's depressed with a restricted affect.  He's uncooperative to a formal mental status examination.  He has some difficulties in concentrating on the tasks asked.  He denies any delusions or hallucinations.  Denies any homicidal or suicidal ideations. |
| | | **A:** Patient in need of inpatient hospitalization.  He is at risk of experiencing symptoms of withdrawal.  He clearly meets the diagnosis of alcohol dependence and most likely will meet the diagnosis of inhalant abuse.  Whether are not he is experiencing a depression is not entirely clear at this time. |
| | | **P:** 1) Recommend inpatient alcohol treatment program at Rio Grande State Center with follow up with us.

*David Moron, M.D.*

David Moron, M.D./reg  02/24/89 |

NOTE: This report is strictly confidential and is for the information only of the person to whom it is addressed.  No responsibility can be accepted if it is made available to any other person INCLUDING THE PATIENT.
Tropical Texas Ctr. for MH/MR

COPY

CLIENT'S NAME: _____ RIVERA, Jose                    CASE NO. _____ 103327

TCMHMR-201-UR/85

# TEXAS DEPARTMENT OF CRIMINAL JUSTICE



# BUREAU OF CLASSIFICATION

## Inmate Consolidated Record Form

_____999102_____
**PRISON NUMBER**

__RIVERA, Jose Alfredo (PN) (TN)__
**INMATE NAME**

__NONE__
**ALIAS**

__NONE__
**ALIAS**

| __Hispanic__ | __Male__ | __9__ |
|---|---|---|
| **RACE** | **SEX** | **SHOE SIZE** |

| __December 23, 1962__ | __31__ |
|---|---|
| **DATE OF BIRTH** | **AGE** |

__Brownsville (Cameron County), TX__
**PLACE OF BIRTH**

__1955 E. Harrison, Brownsville, TX__
**RESIDENCE**

| | | __XXX__ |
|---|---|---|
| **DETAINERS** | (YES) | (NO) |

| __Not Guilty__ | __Catholic__ |
|---|---|
| **PLEA** | **RELIGION** |

__Rosa Alaniz (S/MO)__ __(512) 546-0084 (NJF/SSD/11-17-94)__
**IN CASE OF ILLNESS, INJURY, DEATH, NOTIFY:**

__1944 Harrison__
**ADDRESS**

| __Brownsville__ | __TX__ | __78520__ |
|---|---|---|
| **CITY** | **STATE** | **ZIP CODE** |

*Jose A. Rivera*
**INMATE SIGNATURE**

| H | 6-2-94 | BJR | 11-7-94 | Cameron |
|---|---|---|---|---|

NUMBER  999102

## NARCOTICS

| USE OF: | ADDICTION TO: | SALE OF: |
|---|---|---|
| MARIJUANA        (14) | ALCOHOL | NONE |
| PAINT (sniffed)  (14) | | |
| ALCOHOL (BEER)   (14) | | |

### ALCOHOLIC?
Yes  X   No  ___

NO

## EMPLOYMENT

| EMPLOYER & ADDRESS | OCCUPATION | BEGAN-ENDED | REASON FOR TERMINATION |
|---|---|---|---|
| Roadway Inn, A/U Frontage, Brownsville, TX (not VERIFIED; no listing) | Cook | 1982-1985 | Better job |
| UNKNOWN Roofing Business, Florida | Roofer | 1989-1989 | Part-time |
| Family Business, Minnesota | Harvest Work | 1987-1990 | Every summer arrested |
| Lucies Cafe, A/G Adams St., Brownsville, TX (not VERIFIED; NJP/SSD/11-18-94) | Cook | 1993-1994 | Arrested |

UNION MEMBERSHIP:  Yes ___  No  X
PROFESSIONAL LICENSES:  Yes ___  No  X

SOCIAL SECURITY NO:
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
ALIAS SOCIAL SECURITY NO:
NONE

OCCUPATIONAL SKILLS:
Laborer
Construction

No. 6199   P. 2/3

# UNITED STATES COURT OF APPEALS

## FOR THE FIFTH CIRCUIT

No. 03-41069

U. S. COURT OF APPEALS
**F I L E D**

AUG   6 2003

CHARLES R. FULBRUGE III
CLERK

IN RE: JOSE ALFREDO RIVERA

Movant.

------------------------

Motion for an order authorizing the
United States District Court for the Southern
District of Texas, Brownsville Division to consider
a successive habeas 28 U.S.C. § 2254 application

------------------------

Before HIGGINBOTHAM, WIENER, and BARKSDALE, Circuit Judges.

BY THE COURT:

We have now been presented with a renewed application for authorization to proceed in the district court on Rivera's claim that he is mentally retarded.  Since our earlier order, Rivera has returned to the Texas Court of Criminal Appeals.  That court, inexplicably, has decided to consider the evidence it previously declined to consider, including the submission of Dr. Garnett.  The court held that its threshold requirement had not been met, and it dismissed as an abuse of the writ.  As we observed in our earlier opinion, characterizing the failure to meet the threshold requirement as an abuse of the writ does not foot

the ruling on an independent state ground.  This is a
determination on the merits.

Rivera's claim is now properly before this court.
We believe that, by the standards set out in our previous
opinion, he has made a sufficient prima facie showing to be
authorized to proceed in the district court only on his
claim of mental retardation.

The motions for authorization to file a successive
petition on the issue of mental retardation only and for
stay of execution are GRANTED.