IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

JAN 0 5 2004

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| JOSE ALFREDO RIVERA, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. B-03-139 |
| | § | **CAPITAL LITIGANT** |
| DOUG DRETKE, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| Respondent. | § | |

## RESPONDENT'S OBJECTIONS TO PETITIONER'S EXHIBITS

In advance of this Court's January 7, 2004 evidentiary hearing and in accordance with

the deadline established by the parties in their joint advisory (Civil Docket Entry #26),

Respondent Doug Dretke ("the Director") files these written objections to the exhibits

expected to be offered by Petitioner Jose Alfredo Rivera ("Rivera"). In addition, as per

Local Rule 46, a copy of each of the disputed exhibits is attached hereto.

| Exh. # | Description | Objection | Ruling |
|---|---|---|---|
| 7 | Aug. 1, 2003 declaration of Dr. David Moron | The Director does not object to the admission of this exhibit if it is offered solely under FED. R. EVID. 703 and 705. [In fact, the Director has included this declaration as part of Respondent's Exhibit 38 just for that purpose].<br><br>However, to the extent Rivera offers the exhibit to prove the truth of the matter asserted in lieu of his presenting live witness testimony, then the Director objects to the exhibit's admission as hearsay under FED. R. EVID. 801(c) and 802. In such instance, Rivera cannot demonstrate that the statement meets any exception under FED. R. EVID. 803 or 804. | |

| 11 | June 29, 2003 affidavit of Roberto X. Moreno | The Director does not object to the admission of this exhibit if it is offered solely under FED. R. EVID. 703 and 705. [The Director has included this affidavit as part of Respondent's Exhibit 38 just for that purpose].<br><br>However, to the extent Rivera offers the exhibit to prove the truth of the matter asserted in lieu of his presenting live witness testimony, then the Director objects to the exhibit's admission as hearsay under FED. R. EVID. 801(c) and 802. In such instance, Rivera cannot demonstrate that the statement meets any exception under FED. R. EVID. 803 or 804. | |
| --- | --- | --- | --- |
| 14 | June 19, 2003 affidavit of Alma Lagarda (on behalf of Camelia Garcia) | The Director does not object to the admission of this exhibit if it is offered solely under FED. R. EVID. 703 and 705. [In fact, the Director has included this affidavit as part of Respondent's Exhibit 38 just for that purpose].<br><br>However, to the extent Rivera offers the exhibit to prove the truth of the matter asserted in lieu of his presenting live witness testimony, then the Director objects to the exhibit's admission as hearsay under FED. R. EVID. 801(c) and 802. In such instance, Rivera cannot demonstrate that the statement meets any exception under FED. R. EVID. 803 or 804. Furthermore, because the affidavit is actually from Ms. Lagarda and she reports what Ms. Garcia allegedly told her, the affidavit contains hearsay within hearsay. | |

| 15 | June 18, 2003 affidavit of Lupita Rodriguez | The Director does not object to the admission of this exhibit if it is offered solely under FED. R. EVID. 703 and 705. [The Director has included this affidavit as part of Respondent's Exhibit 38 just for that purpose].<br><br>However, to the extent Rivera offers the exhibit to prove the truth of the matter asserted in lieu of his presenting live witness testimony, then the Director objects to the exhibit's admission as hearsay under FED. R. EVID. 801(c) and 802. In such instance, Rivera cannot demonstrate that the statement meets any exception under FED. R. EVID. 803 or 804. | |
| 16 | June 28, 2003 affidavit of Dora Garza | The Director does not object to the admission of this exhibit if it is offered solely under FED. R. EVID. 703 and 705. [In fact, the Director has included this declaration as part of Respondent's Exhibit 38 just for that purpose].<br><br>However, to the extent Rivera offers the exhibit to prove the truth of the matter asserted in lieu of his presenting live witness testimony, then the Director objects to the exhibit's admission as hearsay under FED. R. EVID. 801(c) and 802. In such instance, Rivera cannot demonstrate that the statement meets any exception under FED. R. EVID. 803 or 804. | |

| 17 | June 27, 2003 affidavit of Alfredo Rivera | The Director does not object to the admission of this exhibit if it is offered solely under FED. R. EVID. 703 and 705. [The Director has included this affidavit as part of Respondent's Exhibit 38 just for that purpose].<br><br>However, to the extent Rivera offers the exhibit to prove the truth of the matter asserted in lieu of his presenting live witness testimony, then the Director objects to the exhibit's admission as hearsay under FED. R. EVID. 801(c) and 802. In such instance, Rivera cannot demonstrate that the statement meets any exception under FED. R. EVID. 803 or 804 | |
| --- | --- | --- | --- |
| 18 | May 18, 2001 affidavit of Veronica Zavala | (1) <u>Relevance</u> -- The Director objects on the grounds of FED. R. EVID. 402 because the evidence is irrelevant.<br><br>(2) <u>Hearsay</u> -- The Director objects on the grounds of FED. R. EVID. 801(c) and 802, to the extent that the statement is offered to prove the truth of the matter asserted. Additionally, Rivera cannot demonstrate that the statement meets any exception under FED. R. EVID. 803 or 804. | |
| 19 | May 14, 2001 affidavit of Joe Angel Garza | (1) <u>Relevance</u> -- The Director objects on the grounds of FED. R. EVID. 402 because the evidence is irrelevant.<br><br>(2) <u>Hearsay</u> -- The Director objects on the grounds of FED. R. EVID. 801(c) and 802, to the extent that the statement is offered to prove the truth of the matter asserted. Additionally, Rivera cannot demonstrate that the statement meets any exception under FED. R. EVID. 803 or 804. | |

| 20 | May 18, 2001 affidavit of Larry Warner | (1) <u>Relevance</u> -- The Director objects on the grounds of FED. R. EVID. 402 because the evidence is irrelevant.<br><br>(2) <u>Hearsay</u> -- The Director objects on the grounds of FED. R. EVID. 801(c) and 802, to the extent that the statement is offered to prove the truth of the matter asserted. Additionally, Rivera cannot demonstrate that the statement meets any exception under FED. R. EVID. 803 or 804. | |
| 21 | May 20, 2001 affidavit of Lupita Rodriguez | (1) <u>Relevance</u> -- The Director objects on the grounds of FED. R. EVID. 402 because the evidence is irrelevant.<br><br>(2) <u>Hearsay</u> -- The Director objects on the grounds of FED. R. EVID. 801(c) and 802, to the extent that the statement is offered to prove the truth of the matter asserted. Additionally, Rivera cannot demonstrate that the statement meets any exception under FED. R. EVID. 803 or 804. | |
| | | | |
| | | | |
| | | | |
| | | | |

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

BARRY R. McBEE
First Assistant Attorney General

DON CLEMMER
Acting Deputy Attorney General
for Criminal Justice

GENA BUNN
Chief, Postconviction Litigation Division
Assistant Attorney General


\*KATHERINE D. HAYES
Assistant Attorney General
Texas Bar No. 00796729
Southern District No. 22698

\*Attorney-in-charge

Office of the Attorney General
Postconviction Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas  78711-2548
(512) 936-1600 telephone
(512) 320-8132 telecopier

ATTORNEYS FOR RESPONDENT

## CERTIFICATE OF SERVICE

I do hereby certify that a copy of this pleading has been served on opposing counsel

Max Hendrick, III, by facsimile transmission (at 713-615-5251) as per agreement, and by

placing same in overnight mail delivery, postage prepaid, on this Friday, January 2, 2004

addressed to:

Max Hendrick, III
VINSON & ELKINS, L.L.P.
2300 First City Tower
1001 Fannin
Houston, TX 77002-6760
contact # (713) 758-2546

KATHERINE D. HAYES
Assistant Attorney General

-7-

# Copy of Disputed Exhibits

# #7, #11, ##14 thru 21

## DECLARATION OF DAVID MORON, M.D.

I, David Moron, M.D., I am above the age of 18 and am competent to make this declaration. I declare that the following is true and correct to the best of my knowledge:

1. My name is David Moron, I am a licensed psychiatrist and I am currently employed as the clinical director of the Rio Grande State Center.

2. In 1993 I evaluated Jose Rivera for competence to stand trial and sanity. I also testified at the punishment phase of his capital murder trial. The purpose of my evaluation was not to determine mental retardation.

3. On July 31, 2003 I spoke with Bryce Benjet who is assisting in the representation of Mr. Rivera. We briefly discussed my testimony at Mr. Rivera's trial and he read to me a portion of my testimony in which I stated that I did not believe that Mr. Rivera was mentally retarded. Although I do not remember discussing mental retardation in my testimony, the record reflects that I based my conclusion on the fact that Mr. Rivera's prison records reflected an IQ score of 92. I stated that mental retardation is not a consideration unless the IQ is 75 or less. At the time, I do not believe that I knew the source of that IQ score, but probably assumed that it was the result of valid testing.

4. I have been informed that the IQ reported in Mr. Rivera's prison records was probably the result of a group administered Beta IQ test. This is not considered a valid determination of intellectual functioning. Had I known what I know now, I would have definitely requested thorough psychological testing including individually administered intelligence testing.

5. Persons with mild mental retardation often live in society without being diagnosed with the disability. Even a mental health professional may overlook a diagnosis of mild mental retardation if the evaluation is not geared toward identifying the disability. Based on my clinical interviews with Mr. Rivera and the knowledge that the reported IQ score of 92 was not on an valid test, I do not believe that my statement that Mr. Rivera is mentally retarded is reliable. In fact, I would not be surprised if thorough psychological testing revealed that Mr. Rivera has mild mental retardation.

I affirm that the above is true under pain and penalty of perjury.

Signed this _1_ day of August 2003.

David Moron, M.D.

PETITIONER'S
EXHIBIT
7

State of Texas          )
                        )                          **In re Jose Rivera**
Cameron County          )

## <u>Affidavit of Roberto X. Moreno</u>

I, Roberto X. Moreno, state the following is true and correct to the best of my knowledge:

1.   My name is Roberto X. Moreno, and I live in Brownsville, Texas. I was a teacher at Longoria Elementary School in Brownsville for 30 years.

2.   Jose Rivera was never a student of mine, but as a teacher, you tend to remember students who are not even in your own class. Even though teachers try to remember all their students, the ones who are easily remembered are the students who are either very smart or those who had trouble learning.

3.   I remember Jose at Longoria Elementary. From what I remember, Jose was very quiet, a slow learner, and had a lot of trouble with his studies.

4.   Teachers also remember students by their siblings. One of Mr. Rivera's sisters, Camelia, was a student of mine. I remember that Camelia was also a slow learner in my class. Camelia had a speech impediment, and the other kids even used to make fun of her. She either did not care or did not understand what they were saying about her because it did not stop her from talking. I believe she was later placed in Special Education classes.

5.   Jose's parents were the kind of parents who wanted to do well for their children, but they did not have the skills. They cared for their children and tried to help, but they really did not know how.

6.   I started teaching at Longoria Elementary in 1972. For at least a few more years after that, the school had what you called "High 1st" and "Low 1st." That is, if a child did not master the first grade, then the following year, they would be placed in "High 1st" instead of second grade. It was really the same as retaining the student, but it was a way of minimizing the stigma that is associated with being retained.

Page 1 of 2



PENGAD-Bayonne, N.J.
**PETITIONER'S EXHIBIT**
11

7.    There was a teacher at Longoria by the name of Ms. Gonzalez.  Ms. Gonzalez taught remedial math to those students who had tested low in math and were not mastering the subject at their respective grade level.

I affirm that this affidavit is true and correct to the best of my knowledge, and I so state under the pains and penalties of perjury.

Roberto X. Moreno

Sworn to me this 27th day of June 2003.

Notary Public-State of Texas

My commission expires: 9-13-03





Page 2 of 2

State of Texas           )
                         )                    In Re Jose Rivera
County of Harris         )

### Affidavit of Alma Lagarda

I, Alma Lagarda, declare under the penalty of perjury that I understand the Spanish language and the English language, and that, to be best of my knowledge and belief, the following statements in the English language have the same meaning as the statements in the Spanish language in the Affidavit of Camelia Garcia, sworn and subscribed before me on June 16, 2002.

I, Camelia Garcia, state that the following is true and correct to the best of my knowledge:

1.  My name is Camelia Garcia, and I live in Madelia, Minnesota. I am the sister of Jose Rivera. I am approximately four years younger than Jose.

2.  From the time Jose was little, my father would take him to work several jobs with him. One time, I remember Jose worked as a dishwasher with my father in a restaurant. He was at that job for about two months. Other than that, Jose did not work very much. My father is the one who would find jobs for Jose. I don't remember that Jose ever found a job on his own.

3.  Jose had much trouble in filling out job applications; this is why I think he did not apply for his own jobs. One time, I saw him trying to fill out one of these applications. He had such a hard time trying to complete it. He would write and then go back and erase what he wrote. He looked at the application like it was a puzzle.

4.  Jose would forget things. For example, I remember one time when Jose went outside to cut the grass, he came back inside the house and forgot to turn off the lawn-mower. Another time, I remember that I was going to the store and he asked me to buy a newspaper for him. I returned to the house with the newspaper, and he said, "What is that for?" And I laughed and said, "It's what you asked me to bring you from the store!" And Jose had just forgotten that he asked me for the newspaper. He took the paper anyway, and just put it aside. I don't even think he read it that day. Even when Jose got older, if he needed to go do something, I would sometimes ask my husband to go with him. It's not that he couldn't do things by himself, but I just thought he needed someone there to help him.

Page 1 of 2




PETITIONER'S EXHIBIT 14

5.    Jose did not know how to tell time. One time, he was outside the house with his friends and I remember asking him, "Jose, what time is it?" And he just said something like, "I don't know!" like he was trying to just quiet me. He was trying to be funny in front of his friends, but I think he really was a little embarrassed that he didn't know how to tell time.

6.    When Jose was young, maybe in elementary school, he was put in special classes. I was also in these classes from a very young age because I had problems with my speech. Today, I still don't speak very well. I talk "mocho," which is to say when a person talks, you cannot understand him or her. I noticed that Jose speaks just like me, but I don't know if he notices it himself.

7.    When Jose would talk, he would mispronounce words and I could not understand him very well. He would talk "bien mocho." Sometimes, I would just stay watching him, wondering what he was trying to tell me. When he read, he would read very, very slowly, like a child who was just learning to read for the first time.

8.    As far as I know, Jose did not have a bank account. When he got paid from work, he would just cash the check and give the money to his wife and kids.

9.    Jose did not drive. When he was married, his wife was the one who drove him everywhere.

I affirm that this affidavit is tue and correct to the best of my knowledge, and I so state under the pains and penalties of perjury.

Alma Lagarda

Sworn to me this *19th* day of June 2003.

Notary Public--State of

My commission expires: *10-17-2004*



Page 2 of 2

08/18/2003 WED 16:52 FAX 956   5  674     FPD SDTX BROWNSVILLF
06/17/2003   19:16   TX DEF   ER SERVICES → 19565482674-5190€               NO.177      ☒002
                                                                                        004

State of Texas           )
                         )                              In Re Jose Rivera
County of Cameron        )

### Aff davit of Lupita Rodriguez

I, Lupita Rodriguez, state the following is true and correct to the best of my knowledge:

1.   My name is Lupita Rodriguez. I live in Brownsville, Texas. I am the sister of
     Jose Rivera. I am approximately six years younger than Jose.

2.   Jose would work several jobs, most of them I remember were with my father. I
     remember one time Jose worked with my father at a restaurant; my father was a
     cook and Jose worked as a dishwasher. I don't remember the name of the
     restaurant. I don't remember why Jose left that job, maybe it was because he
     didn't like it, but he was only there for a few months. I believe this was the
     longest job he held.

3.   Jose knew how to read a little bit. I remember he would read me the newspaper.
     When he would read, he would not know how to pronounce long words. He
     would read very slow y, word by word. Many times, he would just "get stuck."
     My own son is nine years old, and he reads just fine. But Jose, at ten or eleven
     years of age, could not read like my son.

4.   I have not talked to Jose in about two years, but he still writes me letters
     sometimes from where he is in prison. When he writes, some words will be
     missing letters. Also, his letters will be written all in Spanish, but then sometimes
     he will switch and write a few words in English. I figure he just doesn't know
     how to say or write these words in Spanish.

5.   Jose does not know how to drive. I have never seen him drive. I don't remember
     whether Jose ever took a driving test.

6.   I remember that Jose used to sniff spray paint when he was young. He did that
     from when he was little all the way to high school. He always did that. That was
     one thing that constantly angered my mother.



PERGAD-Bayonne, N.J.     PETITIONER'S
                          EXHIBIT
                          15

06/18/2003 WED 16:53 FAX 956      2674      FPD SDTX BROWNSVILLE                          Ø003
'06/17/2003    19:16    TX F  _NDER SERVICES → 19565482674-515                    NO.177   005

I affirm that this affidavit is  rue and correct to the best of my knowledge, and I so state under the pains and penalties of per ury.

Lupita Rodriguez

Sworn to me this 18 th day of June 21 03.

Notary Public--State of Texas

My commission expires: 4-05-ó 005

06/20/2003 FRI 09:11 FAX 956  5  674        FPD SDTX BROWNSVILLE                    NO. 217    002
06/20/2003    08:30    T: DEF   R SERVICES → 19565402674-51900

State of Texas            )
                          )                              In Re Jose Rivera
County of Cameron    )

### Affidavit of Dora Garza

I, Dora Garza, state the following is true and correct to the best of my knowledge:

1.  My name is Dora Garza. I live in Brownsville, Texas. I was married to Jose Rivera for approximately twelve years, from 1981 to 1993. Jose and I were separated since 1983, and although we would continue to see each other, we did not live together during the last ten years.

2.  During the first two years of our marriage, Jose and I lived with Jose's parents. When we separated, I moved out and lived on my own while Jose continued to live with his parents. From what I can remember, Jose never lived on his own.

3.  The longest job I remember that Jose held was when he worked as a dishwasher with his father in a restaurant. That lasted approximately two months. I do not remember seeing Jose ever fill out a job application.

4.  When Jose got paid, he would pay for food but not other things like rent or utilities. His parents always paid the bills. After I left his parents' house, his parents continued to pay all the bills. Jose did not have a bank account.

5.  I don't remember Jose fixing things around the house. Whenever something was broken or needed fixing, it was always his father who would handle those things. Jose would never do it.

6.  As far as I can remember, Jose knew how to read in English and Spanish. But, I hardly ever saw him pick up a book and read.

PENGAD-Bayonne, N.J.

PETITIONER'S
EXHIBIT

16

06/20/2003 FRI 09:41 FAX 956    2674    FPD SDTX BROWNSVIL'
06/20/2003    08:30    TX DE   DER SERVICES → 19565482674-5190                    NO.217    Ø003
                                                                                          ᑌᑌ3

I affirm that this affidavit is true and correct to the best of my knowledge, and I so state under the pains and penalties of perjury.



Dora Garza

Sworn to me this 20ᵗʰ day of June 2 )03.

_____
Notary Public--State of Texas

My commission expires: 4-5-2,05

MINERVA SAENZ
MY COMMISSION EXPIRES
APRIL 05, 2005

Page 2 of 2

State of Texas          )
                        )                              **In re Jose Rivera**
Cameron County          )

### Affidavit of Alfredo Rivera

I, Alfredo Rivera, state the following is true and correct to the best of my knowledge:

1.  My name is Alfredo Rivera, and I am the father of Jose Alfredo Rivera.  I am 65 years old.

2.  Jose used to work many jobs with me.  For example, Jose worked with me at the Ramada Inn for about six or seven months.  I was a cook and Jose was a cook's helper.  From what I remember, Jose was a very obedient worker.  When they changed owners at the Ramada Inn, they cut down on the pay and that's when Jose and I both left.  Another job Jose held was at the Elks Lounge as a dishwasher.  Jose left that job when the old owner left.

3.  Jose would usually get jobs in person.  He would hear of a job opportunity from me or from a friend, and he would show up and try and get it that way.  He really didn't fill out job applications.

4.  Jose worked around the house doing various things like cutting the yard or helping paint the house.

I affirm that this affidavit is true and correct to the best of my knowledge, and I so state under the pains and penalties of perjury.

_Alfredo Rivero_
Alfredo Rivera

Sworn to me this 27th day of June 2003.

Page 1 of 2



PETITIONER'S EXHIBIT
17
PENGAD-Bayonne, N.J.

Notary Public, State of Texas

My commission expires: _9-13-03_



NANCY E. GARCIA
Notary Public
STATE OF TEXAS
My Comm. Exp. Sept. 13, 2003

<u>AFFIDAVIT</u>

THE STATE OF TEXAS

COUNTY OF TRAVIS

BEFORE ME, the undersigned authority, personally appeared _Veronica Zavala_ and stated the following in the attached letter form.

The attached letter, written by me (Veronica Zavala), is true and correct to the best of my knowledge.



Veronica Zavala

SUBSCRIBED AND SWORN TO BEFORE ME on May 18, 2001

Notary Public, State of Texas
My Commission expires:

JOE ANGEL GARZA
MY COMMISSION EXPIRES
July 17, 2003



PETITIONER'S
EXHIBIT
18

My name is Veronica Zavala after the
trial when Q had a
court appointed attorney during my
appeal I corrorate to Rene Gonzalez
@ Stating the truth on my case (that
Alfredo Rivera was and is innocent) He
responded by saying that it was best
to leave it alone for I could get more
time for perjury. This happened over
a year ago.

Veronica Zavala
5-18-01

This is true and
correct to the
best of my knowledge



JOE ANGEL GARZA
MY COMMISSION EXPIRES
July 17, 2003

## AFFIDAVIT OF JOE GARZA

THE STATE OF TEXAS

COUNTY OF TRAVIS

     BEFORE ME, the undersigned authority, personally appeared Joe Angel Garza and stated the following:

     My name is Joe Angel Garza. I am a licensed private investigator in the State of Texas, and have been requested by David K. Sergi, Attorney at Law, to assist him in the Jose Alfredo Rivera case. The following information was obtained during the investigation:

1. March 27, 2001 - Dora Garza stated her sister-in-law (Lupita Rodriguez) was having a baby, and that her husband Jose Alfredo Rivera had gone to the hospital between 9:30am and 12:00pm. After his arrest, Jose Alfredo Rivera told her he was innocent but that he confessed because of being beaten (kicked in the groin) by the interviewing police/detectives. Dora Garza stated that she contacted the Federal Bureau of Investigation and she was advised that they would check into it and contact her, but she never heard from them.

2. March 27, 2001 - Lupita Rodriguez advised that she was transported to the Valley Regional Hospital on July 9, 1993 to deliver her baby. Ms. Rodriguez said her husband Jesse Rodriguez and her brother Jose Alfredo Rivera were at the hospital at approximately 9:00am and stayed until a little past 11:00am. Lupita Rodriguez said a few days later her husband called her and advised that while they were driving the police stopped him and pulled out her brother Jose Alfredo Rodriguez and started beating him up. Jesse Rodriguez asked what was going on and the police told him to shut up or they would take him to jail also. Lupita Rodriguez advised two months later two white males with badges from the D.A.'s office spoke with Jesse Rodriguez. They wanted Jesse Rodriguez to sign a piece of paper saying that he was not with Jose Alfredo Rivera at a certain date and time. Lupita Rodriguez told Jesse not to sign it because he was drunk and it was not the truth, but Jesse Rodriguez signed it anyway so he could go back to sleep. She told the attorney, Mr. Esquivel about it but nothing was done.

3. March 27, 2001 - Jose Alfredo Rivera, Jr., (son of Jose Alfredo Rivera) advised that he and a friend Jose Luis were playing near the water and they found a "doll" with no clothes. They thought this was strange and the doll looked too real so they ran to their homes and called the police. Jose Alfredo Rivera, Jr., advises that he was taken to the police station and interviewed/questioned by the police without the presence of an adult/parent. This went on for hours. Jose Alfredo Rivera, Jr., was ten or eleven years old when this happened.

4. March 27, 2001 - Spoke to Alfredo Rivera, Sr., (Father of Jose Alfredo Rivera) and he advised that he never saw any injuries on his son. He was told by his son that he was being kicked in his private parts by the police, and that his son said Police Officer/Detective Julian Ramirez was the one kicking him in the groin area. Mr. Rivera, saw his son at the hospital between the times of 8:00am and 9:00am until around 10:00am/11:00am when Lupita had her baby.



PETITIONER'S EXHIBIT 19

PENGAD-Bayonne, N.J.

2003/AUG/04/MON 02:43 PM    Ser    x Associates    FAX No. 1512392    P. 022
MAY-17-2001 09:17 P.    ANGEL SECURITY&INVESTIG    441.960    P.03

---

5. April 19, 2001, interviewed Jose Alfredo Rivera at the Terrell Unit. Jose Alfredo Rivera told police officers from the beginning that he was innocent, but they would not believe him. Jose Alfredo Rivera advised he was riding with his brother-in-law, Jesse Rodriguez, when they were pulled over and he was pulled out of the car by the police. From the very beginning the police began kicking him in his private parts. They took him to the police station where they began to interview him. The police would not listen to his innocence but kept on pressuring him to confess. This went on for some time with the police officers repeatedly striking him in his stomach and groin area. He said that the police officer that hit him the most had a silver tooth in the front. Police told him if he did not confess to the murder they would make sure that he would be placed in a cell where he would be sodomized every day and night for the rest of his life, because that is what happens to baby molesters and killers he was told. Jose Alfredo Rivera advised he became afraid and told them what they told him to say. Jose Alfredo Rivera stated that he did the video confession after they told him where they would take him to the park and what they needed for him to say. Jose Alfredo Rivera advised that he gave three different statements until they finally agreed upon the one they wanted. Jose Alfredo Rivera advised that he only knew Veronica Zavala by sight and that she lived a few houses down from him and has no idea why she would say he was with her. Jose Alfredo Rivera advised that he told the police that he wanted an attorney, but the interrogation kept on without an attorney present.

6. April 26, 2001 interviewed Veronica Zavala at the Hobby Unit in Marlin, Texas. Veronica Zavala advised from the beginning that Jose Alfredo Rivera is innocent. Veronica Zavala advised that she told the police Jose Alfredo Rivera was with her because they did not believe that she did the murder by herself. They kept on pressuring her to say who was with her. After awhile during the interview she remembered this guy that was always getting into trouble with the police, so she implicated Jose Alfredo Rivera. A few days later, much to her surprise, she found out he "confessed" to the murder. Veronica Zavala advised that she alone killed the child, Daniel Blanco. Veronica Zavala advised that she didn't have any dealings with police officers and it was all new to her - she was very afraid. She was willing to tell them anything and everything. She advised that she gave eight different statements to the police. The police kept saying that if she gave them the name of the other person that she was protecting that this would help her, so she thought this was her chance and she implicated "Paya" nickname for Jose Alfredo Rivera. She knew that he was a drug addict, not very smart and had run ins with the law. The way she understood it, they picked him up very quickly and that is when things really got out of hand. Before she knew it, the story was that she had been raped at knife point and the baby had been molested. At no time did she molest the child. She did kill the child, but did not molest the child. She cannot explain the signs of molestation on the child. She advised that the nurse that took the stand also lied about her saying that she took something to make her wild and hyperactive (unknown nurse). She advised that she made contact with the attorney, Rene Gonzalez and said that Jose Alfredo Rivera was innocent. Rene Gonzalez advised Veronica Zavala that it was best to leave it alone, because she would get more time for perjury. Veronica Zavala advised that she made contact with the assistant warden Nance. Veronica Zavala advised assistant warden Nance then made contact with the Cameron County D.A.'s Office, but there was no response.

7. I was contacted by Assistant Warden Nance, and she advised she did make contact with the prosecutor/D.A. in Cameron County and "they" advised her that they knew that

MAY-17-2001 09:18 PM  ANGEL SECURITY&INVESTIG    4411-60        P.04

Veronica Zavala would feel sorry about Jose Alfredo Rivera getting the death sentence and that she would more than likely change her story to help him out.   This took place about one year ago.

The above information is true and correct to the best of my knowledge.



Joe Angel Garza

SUBSCRIBED AND SWORN TO BEFORE ME on May 14, 2001.

Notary Public, State of Texas
My Commission expires:

JOAN KUNIS
NOTARY PUBLIC
State of Texas
Comm. Exp 02-27-2002

STATE OF TEXAS
COUNTY OF CAMERON


AFFIDAVIT OF COUNSEL FOR MOVANT UPON 28 USC 2254
IN SUPPORT OF MOTION FOR LEAVE TO TAKE DEPOSITION


Before me, the undersigned authority, appeared this day Larry Warner, well-known to me, who, upon his oath, deposed and said:

"My name is Larry Warner.
I am an attorney admitted to practice before the Supreme Court of the United States, The Supreme Court of Texas, and The United States District Court for the Southern District of Texas.
I am counsel, at the instance of the Court, for Movant upon Motion attacking his conviction and sentence of death.
On May 18, 2001 I spoke with my co-counsel, Mr. Sergi. Mr. Sergi told me that Movant's co-accused, Veronica Zavala, had signed a waiver of attorney-client privilege as to her communications with the attorney who represented Ms. Zavala on direct appeal of her conviction; that attorney is Mr. Rene Gonzalez. Mr. Sergi, an officer of this Court, also told me that Ms. Zavala had signed a document averring that she had committed perjury when she said that Movant was complicit in the capital murder. Even more importantly, Mr. Sergi told me that Ms. Zavala had signed a document stating that she had told Mr. Rene Gonzalez, that she committed perjury when she said that Movant was complicit in the capital murder.
On May 18, 2001 I spoke with Mr. Rene Gonzalez. He is an attorney admitted to practice before the Supreme Court of Texas. Mr. Gonzalez and I have known each other for more than fifteen years. We have been co-counsel in complex appeals. I know his reputation in the legal community for competence and honesty; both are good. Mr. Gonzalez told me he was very reluctant to disclose any client communications by his client merely on the basis of a written instrument. Additionally, he was quite reluctant to turn over to me the original file merely on the basis of a written instrument. He told me he would not voluntarily do so. I asked if he would appear for a deposition and respond to a subpoena for the entire original file. He told me that he would appear for a deposition, would bring his original file in response to a subpoena duces tecum, but that the following questions would have to be certified to the judge for direction to answer before he would indeed answer:

1. You represented Veronica Zavala on her direct appeal to the court of Criminal Appeals of Texas upon a charge accusing her and Jose Alfredo Rivera of capital murder, didn't you?

PETITIONER'S
EXHIBIT
20
PENGAD-Bayonne, N.J.

2. During your representation Veronica Zavala told you that she had committed perjury when she testified that Jose Alfredo Rivera was complicit in the capital murder, didn't she?

3. You can recall her exact words, can't you?

4. All your communications were in writing, weren't they?

5. You still have the writing she sent you, don't you?

6. You will produce it now, won't you?

7. Exhibit 1 is her letter to you from the original of your file in Veronica Zavala's appeal, isn't it?

8. You had a duty to keep your client's disclosure of a prior crime a secret, didn't you?

9. You did not disclose her having told you that she admitted to you committing perjury when she testified that Jose Alfredo Rivera was complicit in the capital murder, did you?

10. You are appearing here in response to a subpoena, aren't you?

11. You recognize Exhibit 2 as a release of attorney-client privilege as between you and Veronica Zavala signed by her?

11a. You recognize Exhibit 3 as a direction to deliver your original appeal file to Mr. Warner from Veronica Zavala signed by her?

12. You nonetheless insist that you produce the original of your file in her appeal only upon subpoena duces tecum, don't you?

13. You nonetheless insist that you only answer any questions relating to, arising out of, or pertaining to her communications with you in your capacity as her attorney only after those questions have been certified to the judge and the judge has ordered you to answer, don't you?

Respectfully,



Larry Warner
Attorney for Movant

     Subscribed and sworn to before me by Larry Warner this May 18, 2001.

Olga L. Glasgow
Notary Public
State of Tx
Commission expires 03-16-02

     Seal of Notary

OLGA L. GLASGOW
Notary Public
State of Texas
My Comm. Exp. 03-16-2002

## AFFIDAVIT

BEFORE ME, the undersigned authority,_____ personally appeared and stated under oath the following in the attached letter form.

The attached statement, written by me *Lupita Rodriguez* is true and correct to the best of my knowledge.

*Lupita Rodriguez*

SUBSCRIBED AND SWORN TO BEFORE ME on May 20 , 2001



Notary Public, State of Texas
My Commission expires:

```
JOE ANGEL GARZA
MY COMMISSION EXPIRES
July 17, 2003
```

PETITIONER'S
EXHIBIT
21
PENGAD-Bayonne, N.J.

It was on July 9,1993.My son Jesse Jr. was born at
5:40.am.And then the nurse told me that I would see my
son around 9:00.am.Then my brother Jose Alfredo Rivera
and my husband Jesse Rodriguez came by to visit me and
to see my baby.Then it was around 10:30.am. when my
brother told me that it was passed 9:00 am.,sowhen my
brother and my husband were about to leave the room to go
see my son at the nursery my mother and father in law came
in.Then they followed my brother and husband to see my
son at the nursery.The next day my husband Jesse came by
to the hospital around 8:00 pm. because I was gonna write
down the 6 numbers for the lottery.Later on he called me
on the phone,he sounded scared,because he told me that the
police had surrounded  his car.My husband and brother had
no idea what was going on.The policemen didnt say
anything they just opened the door and threw my brother to
the ground and started kicking him all over his body.My
husband told me that he asked the policemen what was
going on then one of the policeman told him to be quiet or
else they were gonna beat him up too,so my husband had to
go home.

*Lupita Rodriguez*