IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

JAN 0 7, 2004

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| JOSE ALFREDO RIVERA, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| V. | § | NO. B-03-139 |
| | § | |
| DOUG DRETKE, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Institutional Division, | § | |
| | § | |
| Respondent. | § | |

## PETITIONER JOSE ALFREDO RIVERA'S
## MOTION TO EXCLUDE DR. ROGER DEAN SAUNDERS'S TESTIMONY

Petitioner Jose Alfredo Rivera ("Petitioner") moves to exclude the testimony of Roger Dean Saunders, Ph.D, pursuant to Federal Rules of Evidence 104(a) and 702, and would show this Court as follows:

### I.    SUMMARY

Respondent offers Dr. Saunders as an expert on the mental status of Petitioner, vis-à-vis the diagnosis of mental retardation. Specifically, Dr. Saunders has provided to Petitioner his "vita" and three other documents that apparently constitute Dr. Saunders's report. *See* Ex. 1 ("Vita"); Ex. 2 (Report); Ex. 3 (First Report Addendum (Jan. 2, 2004)); Ex. 4 (Second Report Addendum (Jan. 3, 2004)). In sum, Dr. Saunders concludes that Petitioner is not mentally retarded, but rather "in the average to below average range of intellectual functioning." Ex. 3; Ex. 4, at 2. However, Dr. Saunders's "vita" does not demonstrate that Dr. Saunders has experience in the evaluation of patients with mental retardation. *See* Ex. 1.

This Court should exercise its broad discretion and exclude Dr. Saunders's testimony in its entirety because: (1) Dr. Saunders is not an expert on standards for the diagnosis of mental

1

retardation; (2) Dr. Saunders's general experience in clinical psychology does not qualify him to testify in this case on issues specific to mental retardation; (3) Dr. Saunders's interview and limited testing of Petitioner do not qualify him to testify in this case; and (4) even if Dr. Saunders's experience in clinical psychology were sufficient to qualify him as an expert, all testimony based on his interview assessment of Petitioner should be excluded because the assessment was not conducted using reliable principles and methods.

## II.    ARGUMENT

### A.    DR. SAUNDERS IS NOT QUALIFIED TO RENDER EXPERT TESTIMONY REGARDING MENTAL RETARDATION DIAGNOSIS

As an initial matter, Federal Rule of Evidence 702 requires that an expert be qualified by "knowledge, skill, experience, training, or education" to express an opinion on a particular issue. FED. R. EVID. 702. A court must "refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999). Expertise in a related field does not qualify a witness to testify as an expert on an issue outside that particular field.[1] Moreover, expertise in a broad field does not qualify an individual as an expert on a particular subject within that field.[2]

### 1.    Dr. Saunders Lacks "Knowledge, Skill, Experience, Training, Or Education" In The Field Of Mental Retardation Diagnosis And His Testimony Should Be Excluded

Dr. Saunders purports to be an expert on the issue of mental retardation, yet Dr. Saunders's "vita" does not list any prior experience specific to mental retardation diagnosis. *See*

---

[1]    *See Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 715 (8th Cir. 2001); *Redman v. John D. Brush & Co.*, 111 F.3d 1174, 1179 (4th Cir. 1997); *Bogosian v. Mercedes-Benz of North America*, 104 F.3d 472, 477 (1st Cir. 1997).

[2]    *See Tanner v. Westbrook*, 174 F.3d 542, 548 (5th Cir. 1999); *Christophersen v. Allied-Signal Corp.*, 939 F.2d 11-6, 1112-13 (5th Cir. 1991), *abrogated on other grounds by Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

Ex. 1.  On the face of his "vita," Dr. Saunders appears to have never before diagnosed mental retardation.  Not surprisingly then, he demonstrates no independent knowledge of the diagnostic standards.

Dr. Saunders's only exposure to this area of psychiatric diagnosis appears to be the limited period of time he spent consulting on this case, which consisted largely of a five-hour interview with Petitioner.  Dr. Saunders's interview session and vague references to other materials he reviewed, however, are not enough to make him an expert.  For example, Dr. Saunders does not refer to, and does not apply, the universally accepted standards set forth by the American Psychiatric Association in the *Diagnostic and Statistical Manual of Mental Disorders: DSM-IV-TR* (4th ed., text rev. 2000) (the "*DSM*"), or any other recognized diagnostic criteria.  The *DSM* is the authoritative standard for the diagnosis of mental retardation, among other things.  That Dr. Saunders could be qualified to offer an opinion on a diagnosis without recognizing and discussing the diagnostic standards in the *DSM* is untenable.

In short, Dr. Saunders's dearth of relevant experience and his lack of knowledge regarding basic diagnostic criteria, including the *DSM*, render Dr. Saunders wholly unqualified to serve as an expert in this case.

**2.    Dr. Saunders's General Psychological Evaluation Experience Does Not Qualify Him To Testify**

Dr. Saunders's purported qualifications for serving as an expert in this case consist solely of his work as a clinical psychologist in private practice since May 1995.  The areas of psychiatric evaluation that Dr. Saunders claims experience with, however, are such things as personality and cognitive skills assessments and treatments for psychological disorders, including treatment for sexual offenders, substance abuse disorders, and domestic violence.  *See*

Ex. 1. Dr. Saunders lists competency to stand trial and insanity questions as his "most frequently performed forensic evaluations." *Id.*

Respondent has provided no indication that Dr. Saunders's private clinical psychology practice, or other prior experience, has involved – in any respect – issues specific to the diagnosis of mental retardation. There are simply no grounds for concluding that Dr. Saunders is qualified to diagnose mental retardation. Accordingly, based on materials provided by the Respondent, Dr. Saunders has no specialized skill, experience, training, or education regarding the applicable standards for determining mental retardation in the psychiatric field and is not qualified to opine as to whether Petitioner meets those standards.

### 3.    Dr. Saunders's Interview And Limited Testing Of Petitioner Do Not Qualify Him To Testify In This Case

Conducting a limited psychiatric test and interview of the Petitioner does not qualify Dr. Saunders as an expert on appropriate diagnostic standards for mental retardation or application of those standards. Nor does Dr. Saunders's educational background and state licensure qualify Dr. Saunders as an expert on these issues. As discussed above, Dr. Saunders appears to have no specific experience in the field of mental retardation and his reports, in sum, provide no indication of any greater qualifications. Dr. Saunders's conclusory statements regarding the Petitioner's mental status evidence no foundation for his opinion. If all that was necessary for a witness to qualify as an expert on a given subject was for that witness to be educated on a subject, conduct a limited test, and interview a patient, all psychiatrists, regardless of expertise, would qualify as experts in every case. For example, if this were the standard to qualify as an expert, a general practitioner would qualify as a expert in brain surgery. The Federal Rules of Evidence and Supreme Court precedent require more.

**B.**    **EVEN IF DR. SAUNDERS'S QUALIFICATIONS MAKE A PRIMA FACIE SHOWING OF HIS QUALIFICATIONS AS AN EXPERT IN THE FIELD OF MENTAL RETARDATION, HIS TESTIMONY SHOULD BE EXCLUDED IN ITS ENTIRETY BECAUSE HIS OPINIONS ARE NOT RELIABLE**

Under Federal Rule of Evidence 702 and Supreme Court precedent interpreting that rule, this Court has a gatekeeping responsibility to "ensur[e] that an expert's testimony rests on a reliable foundation." *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999). This reliability test requires that (1) the expert's testimony be based on sufficient facts or data and (2) the expert's testimony be the product of reliable principles and methods. *See* FED. R. EVID. 702. As detailed below, Dr. Saunders's proffered testimony resoundingly fails both parts of this test.

**1.**    **Dr. Saunders's Opinion – To The Extent He Offers One – Is Based On Insufficient Data**

Devoid of any demonstrated prior experience with or knowledge of the diagnostic standards for mental retardation, Dr. Saunders apparently attempts to rely on the limited knowledge he gained consulting on this case. Dr. Saunders endeavors to become an expert by taking a one-day interview of Petitioner, which is only partially recounted in his report, and reviewing some of the documents produced in this case. *See* Exs. 2-4. At best, Dr. Saunders's interview and document review could educate him only minimally as to the basic manifestations of mental retardation – not whether the Petitioner is mentally retarded. To determine the Petitioner's mental capacity, Dr. Saunders chooses an unknown scientific approach that dismisses current valid psychological testing, despite confirmation of Dr. Kessner's results from his own testing of the Petitioner. Dr. Saunders alleges that the Petitioner is "possibly" feigning his mental retardation, without offering any grounds for this assumption. Dr. Saunders also embraces non-specific, "previously obtained assessment measures" while rejecting the only valid, individually-administered test results. Ex. 3; Ex. 4, at 2. Dr. Saunders's flawed,

unexplained, and uncertain methodology is an insufficient basis for admission into evidence of Dr. Saunders's opinions.

### 2.    Dr. Saunders's Opinion Is Not Based On Reliable And Recognizable Principles And Methods

Dr. Saunders's report is notably devoid of any scientific support or coherent methodology. In essence, Dr. Saunders's simply states that he thinks that Petitioner is not mentally retarded. This is precisely the sort of "expert" hocus pocus that *Daubert* is intended to prevent.

First, only selected portions of Dr. Saunders's interview with the Petitioner are included in Dr. Saunders's report. *See* Ex. 2. Although apparently equipped with a tape recorder, Dr. Saunders did not record the interview. This should call into question the context and relevance of the excerpts from the interview on which Dr. Saunders so heavily relies. Dr. Saunders's characterization of Petitioner's responses and staccato presentation of exchanges during the interview should not substitute for a valid scientific evaluation of Petitioner's mental status.

Curiously, Dr. Saunders dismisses the test results obtained by Petitioner's expert, Dr. Kessner, although admittedly supported by Dr. Saunders own testing, without anything more than a bald assertion that Dr. Kessner's results are a function of the factors of "language differences, lack of formal education and the possibility of malingering." Ex. 4, at 2. Notably, Dr. Saunders had apparently no difficulty communicating with the Petitioner in English. *See* Ex. 2, at 9. Moreover, Dr. Saunders failed to consider that mental retardation may be a reason for Petitioner's lack of a formal education and that his own objective testing does not support a conclusion that the Petitioner is malingering.

Another problem with the "technique" employed by Dr. Saunders in forming and rendering his opinion is that it has no objective scientific component whatsoever. Dr Saunders

simply dismisses that which does not support his conclusion and then concludes that Petitioner is not mentally retarded based on the "weight of the available data." Ex. 4, at 3.

The lack of method supporting Dr. Saunders opinions and complete lack of reference to any accepted criteria are serious deficiencies that render his opinions unreliable and his testimony inadmissible.

## III.    CONCLUSION

WHEREFORE, PREMISES CONSIDERED, Petitioner prays that upon hearing of this motion the Court: order that the testimony of Dr. Saunders be excluded or that a hearing be held on Dr. Saunders's qualifications to offer expert testimony on the issue of mental retardation prior to the hearing on the underlying motion in this matter and such other and further relief to which Petitioner may show himself to be entitled.

Respectfully submitted,

Max Hendrick, III
Attorney-in-Charge
Southern District Bar No. 0518
Texas State Bar No. 09450000
Vinson & Elkins L.L.P.
1001 Fannin St., Suite 2300
Houston, Texas 77002-6760
Phone:  713-758-2546
Fax:     713-615-5251

OF COUNSEL:
Walter M. Berger
Southern District Bar No. 21834
Texas State Bar No. 00798063
Emily W. Pipkin
Southern District Bar No. 35260
Texas State Bar No. 24037284
Vinson & Elkins L.L.P.
1001 Fannin St., Suite 2300
Houston, Texas 77002-6760              **ATTORNEYS FOR PETITIONER**
Phone: 713-758-2222                    **JOSE ALFREDO RIVERA**
Fax:    713-615-5258

## CERTIFICATE OF SERVICE

I hereby certify that on January _6_, 2004, a copy of this motion was served on the Respondent via ~~facsimile~~ at the following address:
HAND DELIVERY

Katherine D. Hayes
Assistant Attorney General
Postconviction Litigation Division
209 West 14th St., 8th Floor
Austin, Texas 78701
Telephone:  (512) 936-1600
Facsimile:  (512) 320-8132

Emily W. Pipkin

416797_2.DOC

8

# VITA

**Roger Dean Saunders, Ph.D., P.C.**
Clinical Psychologist
2300 Holloman St., Suite, 204
Conroe, Texas 77301
936-539-2225

## Education

7/92-6/93: Pre-Doctoral Residency, University of Texas Health Science Center; Medical School; Department of Psychiatry and Behavioral Science; Houston, Texas.

9/89-12/95: Doctoral Program in Clinical Psychology; Department of Psychology; University of North Texas; Denton, Texas

8/85-5/89: Master of Arts Program, in Clinical Psychology; Department of Psychology; Southern Illinois University at Edwardsville; Edwardsville, Illinois

1/79/-5/85: Bachelor of Arts, Psychology; Department of Psychology; University of Missouri, St. Louis, Missouri.

## Practice

5/95 – Present: Private clinical psychology practice in Conroe, Texas.  Primary clients for psychological assessment and direct treatment services are by forensic referral.  Clinical interviews with structured psychological instruments, designed to measure personality and cognitive skills, are employed to determine mostly offense-related referral questions and treatments needs.  Direct treatment in both individual and group formats for psychological disorders and specialized behavioral interventions are provided, including treatment for sexual offenders, substance abuse disorders, and domestic violence. Competency to stand trial and insanity questions are the most frequently preformed forensic evaluations.  Evaluations for capital murder, future dangerousness, and risk assessment have also been conducted.  Court testimony has been provided for most county courts in Southeast Texas.

## Professional License / Registration

Psychologist, Texas State Board of Examiners of Psychologists; License #2-5589
Registered Sex Offender Treatment Provider; Certificate #98401

## Professional Memberships

American Psychological Association
Texas Psychological Association

SAUN-022

**EXHIBIT 1**

JAR  You have the right to remain silent and not make any statements at all;

JAR  Any statement you make may be used against you, and may be used against you by the prosecution in your hearing in its effort to obtain the death penalty against you;

JAR  You have the right to talk and consult with your attorneys before and during this interview and to have them advise you before answering any questions;

JAR  You have the right to stop this interview at any time;

JAR  During this interview, the examiner may be using ways to tell if you are speaking the truth, and you may not be aware of these methods.

JAR  If you are not telling the truth it may be reported to the court and this information may hurt your case.

Warnings administered by:

Roger D. Saunders, Ph.D.

Date: 12-19-2003

Defendant Signature

WITNESS

Lynda Davenport

SAUN-001

**EXHIBIT 2**

# WRAT3

## WIDE RANGE ACHIEVEMENT TEST □ REVISION 3

NAME _Jose Alfredo Rivera_ GENDER: ☒M □F

DATE _12-19-2003_ BIRTH DATE _12-23-1962_ AGE _40_

SCHOOL _____ GRADE _____

REFERRED BY _OAG_        EXAMINER _ROGER D. SAUNDERS, Ph.D._

STANDARD SCORE

READING
SPELLING
ARITHMETIC

*Use only standard scores for comparisons*

---

**SPELLING/A MEASURE OF WRITTEN ENCODING**

by Gary S. Wilkinson

NAME _Jose A. Rivera_ _____ (1&2)

A  C  F  O  W  N  G  L  D  I  K  Y  X
(3) (4) (5) (6) (7) (8) (9) (10) (11) (12) (13) (14) (15)

| | | |
|---|---|---|
| 1. Go | ☒ adgudicate | 31. |
| 2. Cat | ☒ perchase | 32. |
| 3. boy | ☒ Intestude | 33. |
| 4. run | ☒ Seguection | 34. |
| 5. will | ☒ Ecuitment | 35. |
| 6. cut | ☒ mesuiam | 36. |
| 7. arm | ☒ Ocupayi | 37. |
| ☒ 8. dres | ☒ Eli | 38. |
| ☒ 9. Traen | ☒ familar | 39. |
| 10. shout | ☒ Reverance | 40. |
| 11. Watch | 26. | |
| ☒ 12. Croud | 27. | |
| 13. Kitchen | 28. | |
| ☒ 14. Resaut | 29. — SAUN-002 | |
| 15. Heaven | 30. | |

**5/10 RULES**

| | |
|---|---|
| Nonword Writing | 15 |
| Word Spelling | 11 |
| Total Spelling | 26 |

Photocopying of this test is a violation of copyright law.

COPYRIGHT © 1993 by Jastak Associates, A DIVISION OF WIDE RANGE INC. All rights reserved. Printed in U.S.A. 1993, 1984, 1965, 1978, 1976, 1984, 1993

15 Ashley Place, Suite 1A, Wilmington, DE 19804-1314

WIDE RANGE



# WRAT 3 ARITHMETIC/ A MEASURE OF NUMBER COMPUTATIONS

☐ ☐ ☐ ☐ ☐

41   17   9   6   3

3 Fingers          8 Fingers          9 or 6?          42 or 28?
3 pennies, spend 1?     3 ↑ 4 apples?        9 marbles, lose 3?   (15) ✓

**REDUCE ALL ANSWERS TO LOWEST TERMS**

$2 + 1 = 3$

$$\begin{array}{r} 6 \\ +2 \\ \hline 8 \end{array}$$

$$\begin{array}{r} 5 \\ -3 \\ \hline 2 \end{array}$$

$4 - 1 = 3$

$$\begin{array}{r} 8 \\ -6 \\ \hline 2 \end{array}$$

$$\begin{array}{r} 51 \\ +27 \\ \hline 78 \end{array}$$

$$\begin{array}{r} 497 \\ -176 \\ \hline 321 \end{array}$$

$4 \times 2 = 8$

$$\begin{array}{r} 6 \\ \times 3 \\ \hline 18 \end{array}$$

$$\begin{array}{r} 417 \\ + 534 \\ \hline 951 \end{array}$$

$5\overline{)15}$  (3)

$$\begin{array}{r} 452 \\ 137 \\ + 245 \\ \hline 814 \end{array}$$ ✗

$$\begin{array}{r} 512 \\ \times 3 \\ \hline 1536 \end{array}$$

$$\begin{array}{r} 346 \\ - 29 \\ \hline 17 \end{array}$$

$$\begin{array}{r} 34 \\ \times 21 \\ \hline 39 \\ 68 \\ \hline 114 \end{array}$$

$$\begin{array}{r} \$2.04 \\ - 5\,03 \\ \hline \$7\,01 \end{array}$$ ✗

$9\overline{)882}$ ✗

$1\frac{1}{2}$ hr = _____ min. ✗

$$\begin{array}{r} 901 \\ - 74 \\ \hline 327 \end{array}$$

$6\overline{)968}$  (103) ✗

**Which is more?**

$\frac{7}{8}$ or $\frac{13}{15}$ ✗

$$\begin{array}{r} 809 \\ \times 47 \\ \hline 4663 \end{array}$$ ✗

$6^? = $ _____ ✗

$\frac{3}{4} = $ _____ % ✗

$\frac{8}{9} \times \frac{1}{2} \times \frac{9}{4} = $ _____ ✗

Photocopying of this test is a violation of copyright law.

Page 2      SAUN-003      **Go to Next Page**

# WRAT 3 ARITHMETIC/A MEASURE OF NUMBER COMPUTATIONS



$$5$$
$$-3\tfrac{1}{3}$$

$$4\tfrac{5}{6}$$
$$3\tfrac{1}{3}$$
$$+2\tfrac{1}{2}$$

$$7.96$$
$$\times 30.8$$

Average:
24, 18, 21, 26, 17
Ans: _____

20% of 120 =
Ans: _____

26    27    28    29    30

Write as a decimal:
$52\tfrac{1}{2}\% =$ _____

$(-5)\ (+9) =$
Ans: _____

$\tfrac{3}{8} =$ _____ %

Factor:
$r^2 - 10r + 25 =$
Ans: _____

$8.2\overline{)62.703}$

31    32    33    34    35

Solve:
$$\frac{7 - (6 + 8)}{2} =$$
Ans: _____

$6 \times 3\tfrac{7}{8} =$

$\sqrt{2ax} = 6$
$x =$

Find interest on $1200 at 6% per year for 2 years compounded annually:
Ans: _____

$\log_{10}\left(\tfrac{1}{100}\right)$
Ans: _____

36    37    38    39    40

15    15    30

Photocopying of this test is a violation of copyright law.
SAUN-004

**Digit Symbol—Coding**   WAIS- III



NAME: Jose Alfredo Rivera

DOB: 12/23/1962

DATE TESTED: 12/19/2003

EXAMINER: ROGER SAUNDERS, Ph.D., PSYCHOLOGIST

RAW SCORE = 45

**Sample Items**



SAUN-006

# WRAT 3 READING / A MEASURE OF WRITTEN DECODING

## CAUTION: EXAMINER USE ONLY!

# A B O S E   R T H U P   I V Z J Q

| | | | |
|---|---|---|---|
| see<br>see | red<br>red | milk<br>milk | was<br>wuz |
| then<br>then | jar<br>jahr | letter<br>let-ĕr | city<br>sit-ee |
| between<br>be-twe'n | cliff<br>klif | stalk<br>stawk | grunt<br>grunt |
| huge<br>hyooj | plot<br>plot | sour<br>sowr | humidity<br>hyoo-mid-i-tee |
| clarify<br>klar-a-fi | residence<br>rez-i-děns | urge<br>urj | rancid<br>ran-sid |
| conspiracy<br>kon-spir-a-see | deny<br>di-ni | quarantine<br>kwor-ăn-teen | deteriorate<br>di-teer-i-o-rayt |
| rudimentary<br>roo-di-men-ta-ree | mosaic<br>mo-zay-ik | rescinded<br>ri-sind-ed | audacious<br>aw-day-shus |
| mitosis<br>mi-toh-sis | protuberance<br>proh-too-bĕ-rĕns | longevity<br>lon-jev-i-tee | predilection<br>pred-i-lek-shun |
| regime<br>re-zheem | beatify<br>be-at-i-fi | internecine<br>in-ter-nee-seen / -nes-cen | regicidal<br>rej-i-si-dăl |
| puerile<br>pyoo-er-il | factitious<br>fak-tish-us | lucubration<br>loo-kyoo-bray-shun | synecdoche<br>si-nek-do-kee |
| epithalamion<br>ep-i-tha-lay-mi-on | inefficacious<br>in-ef-i-kay-shus | | |

5/10 RULES

| | |
|---|---|
| Letter Reading | 15 |
| Word Reading | 20 |
| Total Reading | 35 |

**OBSERVATIONS/REMARKS:**

SAUN-005

Photocopying of this tool is a violation of copyright law.



WIDE RANGE

15 Ashley Place Suite 1A, Washington DC 19806 13-4

1

Roger D. Saunders, Ph.D., P.C.   Clinical Psychologist
2300 Holloman St., Suite 204   Conroe, Texas 77301
Voice: 936-539-2225     Fax: 936-539-2312

**NOTES FROM THE DECEMBER 22, 2003 INTERVIEW OF
JOSE ALFREDO RIVERA**

The psychological interview took place on 12/19/2003, in a small locked room, in the

visitation area of the Polunski Unit of TDCJ-ID near Livingston, Texas. The interview

commenced at approximately 11:15 am and continued with only one short break of about

fifteen minutes. The interview ended at approximately 4:30pm. Mr. Rivera was engaging

from the onset. Upon entering the room he kept his hands behind his back, indicating

that he was still handcuffed. This prompted the examiner to request the handcuffs be

removed. After he was convincing in his deception he jokingly demonstrated that he was

not handcuffed.

Mr. Rivera was first administered a document reflecting both Miranda Warnings and

information concerning his disclosures during the interview. He understood that he had

the right, "not to talk", but agreed to participate, adding, "My attorney said to cooperate".

Mr. Rivera conveyed his understanding of the warnings, "Whatever I say can be used

against me". He understood the difference between a telling a lie and telling the truth.

When asked if he was going to tell the truth to this examiner, he stated, "Yes, if I know

it". He understood the purpose of the examination to be, "To find out if I am retarded".

At that time Mr. Rivera began to laugh. When asked by the examiner why he was

laughing, he answered, "I'm retarded, it runs in my family, my sister is retarded".

**SAUN-007**

2

1   Mr. Rivera stated that his attorney had been David Sergi, but was unsure about his

2   involvement in his case at the present time. He also mentioned that, "The Executive

3   Director of Texas Defender Services" is assisting him in his case.  He also identified an

4   attorney named, "Hendrix".

5

6   Mr. Rivera was observed to have several tattoos, including a devil on his upper right

7   forearm, which he explained had been present since age sixteen or seventeen.  When

8   asked about the reason for the tattoo, Mr. Rivera stated that he had a devil because a

9   cousin had "Jesus" tattooed on his arm.  He also had the letters of the name "DORA"

10  tattooed on the fingers of his left hand and the name "Alicia" on his right arm.  He stated

11  that these tattoos were also put on about age seventeen.  Mr. Rivera stated that, at age

12  fifteen, he had a swastika put on his right hand.  He stated jokingly, "I'm a Mexican

13  Nazi".  He stated that originally he did not know the meaning of the symbol, but

14  understood now as: "It's a racist thing for White people and I'm a Mexican".  When

15  asked if he desired to have it removed he stated, "I don't care".

16

17  Mr. Rivera was largely cooperative with the examiner.  He was appropriately groomed

18  and dressed in prison attire.  No unusual gestures where observed.  Mr. Rivera appeared

19  to answer questions in a straightforward manner and qualified answers with detail. He

20  appeared to promote the idea that he is mentally retarded, and made a point to inform the

21  examiner several times that he was unable or incapable of successfully doing such things

22  as minor repairs on cars, completing a GED, and being successful at school.  Gait was

23  steady.  Impulse control was good during the examination but poor by criminal offense

SAUN-008

3

1    history.    Facial expression was normal. Eye contact was good. Voice level was

2    appropriate for the situation.    Mr. Rivera was oriented to person, place, time and

3    situation. Poor articulation of English words was observed.  Mr. Rivera frequently asked

4    for questions to be repeated; this was believed to be related to his poor understanding of

5    the English language.  Speech was otherwise reactive and expressive and contained no

6    association, delusion, or hallucination disorders. He stated, however, that he occasionally

7    hears his mother's and sister's voice calling to him, "Freddy". He stated that the last time

8    he heard the voice was approximately one weak prior to the interview.  He stated that he

9    also sometimes looks up and also sees a shadow moving by the door.  When asked if was

10   disturbed by the perceptual experience he stated, "No, I'm glad my people are talking to

11   me".  Mr. Rivera denied any other visual or auditory hallucinations.  Mr. Rivera reported

12   having some memory problems, which he attributed to being assaulted some years ago.

13   He also reported that he experiences "lightening flashes", and "black dots", floating in his

14   field of vision.  Mr. Rivera also complained that the letters on a typed page of words get

15   smaller and bigger.  He stated that he has requested that his eyes be checked for reading

16   glasses.  Insight was considered good in that he appeared to appreciate the seriousness of

17   his legal situation.

18

19   Affect was observed as stable.  Mood was described as normal.  He reported a normal

20   level of interest in daily activities.  No vegetative signs were reported.  Appetite was

21   reported as good, however he complained about the food that he is given on level three.

22   He stated that, approximately one month prior to the evaluation interview, he was placed

23   on level three and weighed 235 lbs.  He stated that he was recently weighed at 222lbs,

SAUN-009

4

1   quickly calculating in his head that he lost about "12 pounds". Mr. Rivera reported no

2   loss of energy, restlessness, feelings of worthlessness or guilt. He denied any suicidal or

3   homicidal ideations.

4

5   Mr. Rivera was asked about his reading preferences. He stated that he prefers romance

6   and western novels, such as those written by "Louis Lamour," who he added is one of his

7   favorite authors. When asked why he was interested in westerns he stated, "I like the

8   shoot outs". Mr. Rivera was asked why he frequently rechecks out the same books. He

9   stated that he can not read them within the period of time (one week) allotted by the

10  library. He stated that he needs to recheck the books in order to finish them. He stated

11  that he does not subscribe to any magazines but added that, if he had the money, he

12  would order wrestling magazines. Mr. Rivera stated that other inmates have given him

13  magazines in the past. When asked if he was aware of any current events in the free

14  world, he stated, "Saddam Hussein was caught". When asked who Saddam Hussein was,

15  Mr. Rivera stated, "I guess he's a terrorist". He also overheard a discussion about there

16  being a "moratorium on executions", and asked the examiner if he had any other

17  information.

18

19  Mr. Rivera stated that he makes "fishing lines", for the purposes of communicating with

20  other inmates on the unit. He stated that he makes the line from socks which are

21  unraveled and tied to objects such as shampoo bottles. He stated that when slid under the

22  door and across the floor, he can send messages and things such as commissary between

23  the cells.

**SAUN-010**

5

1

2   Mr. Rivera stated that he attended school until the beginning of the ninth grade which he

3   started twice. He explained that he had been "kicked out" for being "too old," which was

4   when he was approximately seventeen years of age. He recalled that, while in elementary

5   school, his teachers primarily spoke English, but also sometimes also spoke in Spanish.

6

7   Mr. Rivera stated that he began using spray as an inhalant from as early as the second

8   grade on.  He attributed to his inability to pay attention in class to using spray paint

9   extensively.  He remembered that, while in the sixth grade, he used to go to school

10  through roll call, then when the teacher was not looking, leave through an open window.

11  He stated that he came back later, before the end of school.  He explained that he was

12  never caught by the teacher unless told on by another student.  During times away from

13  school he would go to a friend's house and usually watch "The Price is Right" and use

14  drugs.  He added, "That was when Bob Barker was real young".  Mr. Rivera was able to

15  name several of the games from game television game show and remembered that he

16  played along with his friend. Mr. Rivera stated that skipping school occurred a couple of

17  times per week and endorsed that he did it, "More then the other kids".

18

19  Mr. Rivera stated that his first language was Spanish, and that Spanish was spoken

20  exclusively within his household.  He remembered taking Spanish lessons in school but

21  also failed them.  He endorsed that the first time he heard English was when he began

22  attending school.  When asked about what he liked best about school he stated, "The

23  girls". Mr. Rivera stated that he got along well with other students in junior high and high

SAUN-011

6

1   school.  When asked what was hardest about school, he stated, "I hate math". He stated

2   that his favorite subject was "P.E.", which occurred during the seventh period.  He

3   explained that he could, "take off early from P.E.", and "go make paint", referring to

4   inhaling. When asked about the potential risks of using paint, Mr. Rivera stated, "they say

5   it destroys your brain cells".

6

7   When asked if he ever attended auto mechanic school, he stated that he attended

8   mechanical instruction in a high school class. When asked to discuss the class, he stated,

9   "I used to huff bondo". He denied that he ever wanted to be a mechanic.  Mr. Rivera

10  stated that he tried on two occasions to complete his GED certificate but explained that

11  the mathematics was too hard. He stated that he quit trying after the second attempt.

12

13  Mr. Rivera stated that he is currently placed on "level three", as there is a new major case

14  against him.  Mr. Rivera explained, "They said I masturbated in public ... in my house".

15  When asked about the alleged offense, he stated, "They lie on me", and added that he

16  wanted the female officer who reported the case to "take a lie detector test."  Mr. Rivera

17  spontaneously added, "I don't have dirty magazines in my house."

18

19  Mr. Rivera stated that he is able to fill out some of the institutional forms such as requests

20  such as commissary or sick call.  He stated that he is unable to fill out a grievance

21  because the questions are too hard.  When asked what he did to protect himself in prior

22  incarcerations, he stated, "I was a trustee ... I worked in the county jail as a cook".  He

23  explained that when he came to TDCJ-ID, "I think they saw my records, that I was a

SAUN-012

7

1   trustee at the county jail", and made him a trustee at TDCJ-ID. He stated that he fills out

2   a commissary form by copying words from the available printed item list.  Mr. Rivera

3   stated that he gets along well with the correctional officers.  When asked what he does

4   what he does to get along with the guards, he stated, "Respect", and conveyed that mutual

5   respect is developed when he does not "back talk" the officers.  He stated that he used to

6   cuss at the officers but, "Not any more".  He has had several jobs including working in

7   the fields and, "hauling potatoes".  When asked about if he had ever fixed a radio for a

8   fellow inmate, as he had reported when a radio was found in his cell, he stated, "I just

9   borrowed it", for the purposes of listening to it.  He denied that he knew how to fix a

10  radio.  He endorsed that he lied on that occasion and has lied on other occasions to cover

11  up having contraband in his cell.  Mr. Rivera endorsed that he made a deck of playing

12  cards "out of milk cartons" in 1995.  He stated that he used the cards to play poker and

13  solitary by himself.  Mr. Rivera stated that he has friends in the Mexican Mafia but is not

14  personally a member.  When asked why he did not join the gang, he stated, "They turn on

15  you", added that he is, "a one man gang".

16

17  Mr. Rivera stated that he used the fishing lines to pass commissary items from one cell to

18  the other.  He stated that he sometimes traded "fishing lines" when he had nothing else to

19  trade.  He explained that, for a period of time his father was unemployed he did not send

20  money.  He stated that, during those times, inmates helped each other by trading.  This

21  way he could continue to get commissary items.

22

SAUN-013

8

1    Mr. Rivera stated that during the time he lived with his father, his father did not have a

2    telephone but for a one year period. He explained that his sister used to talk too much on

3    the telephone and they discontinued the service. He also explained that they never had a

4    car, and his father took the bus to work. Mr. Rivera stated that he believed his father to

5    have completed the sixth grade, but was unsure about his mother's formal education. He

6    stated that his mother died in 1985.

7

8    Mr. Rivera stated that he was raised by his mother and father. There was also a step-

9    brother and sister within the home. He denied any history of any physical or sexual

10   abuse. There were no known complications during his birth. He remembered that he did

11   have the chicken pox as a youth. Mr. Rivera stated that everyone in the family, and

12   extended family, spoke Spanish. Mr. Rivera stated that, for discipline, his parents used to

13   "tell me to act right", or might withhold privileges or monetary allowance. He added

14   "they never hit". Mr. Rivera stated that he married at age nineteen when his wife's father

15   had pressured them to do so. He stated that he didn't really want to marry. He

16   remembered working at that time as a dishwasher and cook. He continued to live with his

17   father when married, and endorsed that his parents welcomed him into their home. When

18   asked if that was common for those living in his community, he stated, "A bunch of

19   people did it like that". Mr. Rivera stated that he first had sex at age seventeen. His first

20   sexual partner was his then future wife, Dora. He was unable to state the number of

21   sexual partners he has had in his lifetime. Mr. Rivera stated that he had three children.

22   He had a son that died at age eighteen in a traffic accident. He stated that his wife moved

23   out of the father's home when he got drunk and lost his job. Mr. Rivera stated that he

SAUN-014

9

1   assisted in the care of all of his children, including changing their diapers, feeding them,

2   and giving them medicine when they were sick. He also cared for a niece Michelle, when

3   she was between the ages of eight and thirteen. He explained that he also took her

4   fishing. He stated that he went to Minnesota to work, and she (his wife) got a "housing

5   authority house ... the projects", for herself and their son. He stated that he and his wife

6   were married for approximately ten years. He stated that, after getting married, they

7   waited approximately five years to have children. They practiced contraception. He

8   remembered that his wife used to drive them to a place where he could get "rubbers".

9   When asked why he eventually divorced, Mr. Rivera stated, "She found another man, I

10  guess". Mr. Rivera endorsed that his wife was in charge through most of the marriage

11  and made most of the decisions. He recalled that, on one occasion, he was asked by his

12  wife to go to the store and buy her Kotex. He remembered being embarrassed and that he

13  had to ask for assistance in the store. He remembered also being embarrassed walking

14  home carrying the product in a translucent plastic bag where others could see.

15

16  Mr. Rivera stated that he began inhaling paint at approximately ten years old. He stated

17  that his step-brother, who was approximately five years his senior, showed him how it

18  was done. He stated that during the 1980's he used paint everyday. He stopped using

19  paint when arrested in 1993. Mr. Rivera stated that he began inhaling gasoline when he

20  worked at a gas station, beginning at age fourteen. When asked how frequently, he

21  inhaled gasoline, he stated, "every time I'd pumped gas". He stated that other inhalants

22  included "thinner and bondo." At age fourteen or fifteen, according to Mr. Rivera, he

23  began using marijuana. He stated that use was approximately three cigarettes per day,

10

1   smoking one in the morning, at noon time, and in the evening. He stated that he would

2   usually pay for marijuana through earnings from working at the gas station or from

3   donating plasma. He stated that he would earn, "six, ten or fifteen dollars," per donation.

4   Mr. Rivera stated that he smoked marijuana for a period of two to three years and stopped

5   when he married. He stated that his wife insisted that he stop due to the smell. Mr.

6   Rivera stated that he used acid on approximately three occasions, and purple haze on one

7   occasion. Mr. Rivera stated that he used powder cocaine approximately twice. At

8   approximately age seventeen, Mr. Rivera stated, he began using alcohol. He endorsed

9   that use would usually involve three to four, six-packs of beer per use. He stated that he

10  usually secured alcohol through friends who would, "hang out at the house". He stated

11  that he also used pills, "when friends had them". He stated that his mother also had

12  Valium in the house, which he sometimes used. Mr. Rivera stated that his step-brother

13  "do all kinds of drugs". He said that he often learned by watching his siblings. He stated

14  that his step-sister had used paint.

15

16  Mr. Rivera stated that he began working at approximately age fourteen as a gas station

17  attendant. He stated that he pumped gas and shuttled money between the customer and

18  the owner in the gas station. He stated that he never ran the cash register himself but

19  knew how to make change. He stated that the job ended when the gas station was

20  converted into a restaurant. Mr. Rivera stated that he worked as a dishwasher and cook

21  for the Roadway Restaurant. He worked the third shift until being fired for drinking. He

22  remembered that he and a friend were assigned to clean the bar, and that they began

23  drinking the alcohol. He stated that his father was a chef at the restaurant and taught him

1  how to prepare all the items on the menu.  He stated that he never referred to a recipe

2  book or written instructions, and did not know whether such a book existed.  At times,

3  Mr. Rivera worked alone as a cook.  At approximately age twenty-five, he was employed

4  for a three-month period during the summer, removing old roofing material near

5  Brownsville, Texas.  He stated that between December and May of 1987, he went to live

6  near his brother-in-law in Florida.  He secured a job packing potatoes into sacks when

7  there was no work available in his home area.

8

9  Mr. Rivera reported having the chicken pox as a youth.  He stated that, when sleeping at a

10  friend's house after drinking "all day long", he was assaulted by his brother-in-law and at

11  least two others.  He stated that his brother-in-law, "don't like me", and that he was

12  assaulted for no reason.  He remembered being beaten with a pipe, and endorsed that he

13  lost consciousness for "a minute or two".  He stated that a friend, who he referred to as

14  "an old man", came in and, "they ran".  He added, "I called the ambulance and they took

15  me to the hospital".  He remembered that he stayed overnight, and that approximately one

16  week later, a friend took out staples which had been placed to close the wound.  He

17  explained that he could have stayed longer in the hospital if he would have had a

18  Medicaid card.  Mr. Rivera pointed to a scar on his cheek near his left eye, which was

19  from an injury he sustained during the assault.  Mr. Rivera endorsed that he attempted to

20  report the incident to the authorities.  He stated that his rationale for reporting the crime

21  was so that he could be reimbursed for the $1,800.00 the hospital charged him.  He

22  believed the court would force his brother-in-law to pay him restitution; however he

23  received a five-year probation instead.  Mr. Rivera stated that, shortly after, he retaliated

SAUN-017

12

1   against his brother-in-law by stabbing him in the head, neck, and chest with a kitchen

2   knife. He stated that, in order to avoid arrest and prosecution for this assault, he asked his

3   friends to "Say he fell on a case of beer bottles and got cut". He stated that, due to their

4   false reports, "they couldn't prove it". He stated that, sometime later, he and his brother-

5   in-law again met at "Lopez Supermarket" and began throwing beer bottles at each other.

6   He stated that his brother-in-law fled the scene and he, Mr. Rivera, was made to clean up

7   and pay for the beer. No charges were filed, according to Mr. Rivera, because witnesses

8   at the market stated that it was the brother-in-law that initiated the throwing of the bottles.

9

10   Mr. Rivera stated that he has hypertension for which he has taken medication for the past

11   five years. He stated that he also takes "Methotrexate" for psoriasis. He explained that

12   he has had approximately three liver biopsies to determine, "whether I had a disease",

13   which can be caused by taking the medication.

14

15   Mr. Rivera stated that, after his son died, he told a nurse that he was going to take some

16   pills. In 1985, he was admitted to a TDMHMR treatment facility for thirty days for

17   alcohol abuse. He explained, "I didn't learn anything ... just went to meetings." He has

18   also attended AA support group meetings.

19

20   Mr. Rivera stated that he has been unemployed for most of his life. He stated that he has

21   survived through jobs, selling plasma, and by allowance given to him by his father. He

22   stated that he would keep the lawn, empty trash, and do other chores in return for material

23   and financial support from his father.

SAUN-018

1

2    Mr. Rivera stated that he was accused of burglary of a building.  He stated that, on one

3    occasion when he was drunk, he opened a door to a restaurant.  He stated that he was

4    hungry, had money and was going to go eat.  He stated that they believed that he was

5    attempting to burglarize the facility.  According to Mr. Rivera, he was charged with

6    shoplifting and spent seven days in jail.  He reported that he stole music cassettes that he

7    liked.  In 1982 he was charged with possession of marijuana and served a seven day jail

8    sentence.  In 1983, he was charged with DWI.  He served time in the county jail.  He also

9    served six months for assault and six months and for carrying a kitchen knife.  Mr. Rivera

10   stated that he was coerced into the confession of the murder of Luis Blanco.  He stated,

11   "They beat me up", and identified one of the officers as having "gold teeth".  Mr. Rivera

12   stated that he was coerced into making a confession to the murder of Luis Blanco.  He

13   stated that the investigator hit him in the mouth with his fist, and that as a result, he had

14   difficulty eating shortly after that time.  He stated that he was also threatened with sexual

15   molestation by inmates in the jail if he did not confess to the crime.  He spontaneously

16   added, "Zavala stated she didn't do it".

17

18   Mr. Rivera believes that he is mentally retarded because of, "too many paint".  He stated

19   that he has a sister Camilla is also mentally retarded and attended special education

20   classes.  She currently lives in Minnesota with her husband and two children.  He

21   explained that, "she gets a check".  When Mr. Rivera asked why he never lived alone, he

22   stated, "so I don't have to pay rent".  He also added, "I love my father".  Mr. Rivera

23   stated that he can count change "on paper", but not without the use of paper and pencil

**SAUN-019**

14

1   calculations.  When asked if he knew when he had been shorted, he stated, "Yes".  He

2   stated that he has never been successfully cheated on money, but others have tried many

3   times to do so.  He stated that he is knowledgeable about money but is sometimes unsure

4   about the exchange rate between pesos and dollars.  Mr. Rivera stated that he knows what

5   things cost by memory, and that he is able to add items together to equal $75.00 of

6   merchandise.  Mr. Rivera stated that he brushes his teeth and shaves regularly.  He stated

7   that he has access to a shower every day, but only takes a shower once every other day.

8   When asked why he does not shower every day, Mr. Rivera stated "I'm too lazy to get

9   up".  Mr. Rivera stated that he is able to change the oil in a car but can not otherwise

10  repair an automobile.  Mr. Rivera denied any history of fighting except in the case of his

11  brother-in-law.  He learned about the requirement to register for the selective service and

12  did so as required.  Mr. Rivera stated that he never had a driver's license or attempted to

13  pass the test.  When asked why he did not get a license he stated, "I know I wouldn't pass

14  it", and that he did not want to incur another DWI offense.  Mr. Rivera stated that he can

15  swim and has taken swimming lessons.  He also stated that likes to go fishing and does so

16  by himself.  He stated that he usually catches catfish, and can prepare and cook fish

17  himself.  He stated that he usually buys chicken livers for bait.

18

19  Mr. Rivera was provided with a partial list of words in English from the Vocabulary

20  Subtest of the WAIS-III.  At the same time, he listened to an audio cassette recording of

21  these words being pronounced in Spanish by Ofelia Alunoi, a TDCJ-ID employee who is

22  certified to translate Spanish/English for the courts.  The words and his responses are

23  noted below.

SAUN-020

15

1

2   Winter: "snow, cold, Santa Claus"

3

4   Breakfast: "food; in the morning"

5

6   Assemble: "I don't know"

7

8   Terminate: "finish"

9

10   Confide: "trust"

11

12   Remorse: "I don't know"

13

14   Ponder: "think"

15

16   Compassion: "I'm a compassion man"

17

18   Tranquil: "I'm sitting here tranquilo" (sits back in chair with hands on his stomach)

19

20

21

22

23   Roger D. Saunders, Ph.D., Clinical Psychologist

SAUN-021

Roger D. Saunders, Ph.D., P.C.    Clinical Psychologist
2300 Holloman St., Suite 204    Conroe, Texas 77301
Voice: 936-539-2225    Fax: 936-539-2312

**Psychological services to the legal community**

January 2, 2004

The statement first reflects, to the best of my knowledge, all the information reviewed in preparation for testimony in the hearing of Jose Alfredo Rivera.

All exhibits submitted by respondent with the exception of exhibits #4 and #5, and #11 through #14. Also reviewed were the following:

Grievance filed by Jose Alfredo Rivera (GRV-001-GRV-007)
TDCJ-ID Offense Report of 11/25/2003 (DISC-001-009)
Psychological report on Jose Alfredo Rivera by Gilda Kessner, Psy.D. dated 12/22/2003
Report on Jose Alfredo Rivera by Richard E.Garnett, Ph.D. dated 12/28/2003
Video (VHS) of Jose Alfredo Rivera at the crime scene
Audio cassette tape of media interview with Jose Alfredo Rivera
Interview notes and psychological test data from my meeting with Jose A. Rivera on 12/19/2003.

The purpose of the psychological interview with Mr. Rivera was to assess whether he has, or has had, mental retardation. He was also assessed for malingering mental retardation. Although not asked to provide a written psychological report, the general conclusions are as follows:

Previously obtained assessment measures placing Mr. Rivera in the average to below average range of intellectual functioning, more accurately reflect his past and present cognitive abilities. Several factors influence the recently obtained test results as administered and scored by Gilda Kessner, Psy.D., and as such, are considered an underestimation of his current level of intellectual functioning. Past functioning reflects a lifestyle atypical for individuals with mental retardation. Current functioning is assessed as near normal. Gross malingering of mental retardation was largely ruled out by providing the alternate form of the WRAT-3 and the Digit Symbol Subtest of the WAIS-III. Testimony will include factors related to these general findings.

Roger D. Saunders, Ph.D.
Clinical Psychologist

**EXHIBIT 3**

1

Roger D. Saunders, Ph.D.. P.C.   Clinical Psychologist
2300 Holloman St., Suite 204   Conroe, Texas 77301
Voice: 936-539-2225      Fax: 936-539-2312

**Psychological services to the legal community**

January 3, 2004

Provided herein are my conclusions, and the basis of those conclusions, in the determination of mental retardation status for death row inmate Jose Alfredo Rivera.

The following list refers to information reviewed in preparation for providing testimony in the hearing of Jose Alfredo Rivera. All exhibits submitted by the respondent with the exception of exhibits #4 and #5, and #11 through #14. Also reviewed were the following:

Psychological report on Jose Alfredo Rivera by Gilda Kessner, Psy.D. dated 12/22/2003.
Report on Jose Alfredo Rivera by Richard E.Garnett, Ph.D. dated 12/28/2003.

**Summary and Conclusions**

On 12/19/03, I met with, interviewed, and tested Offender Rivera at the Polunsky Unit near Livingston, Texas. The purpose of the psychological interview with Mr. Rivera was to assess whether he has, or has had, mental retardation. He was also assessed for malingering mental retardation. Although not asked to provide a formal written

SAUN-024

**EXHIBIT 4**

1    psychological evaluation report, the general conclusions and basis for the conclusion are

2    as follows:

3

4          Previously obtained assessment measures place Mr. Rivera in the average to

5    below average range of intellectual functioning, and provide a good measure of his past

6    and present cognitive abilities. Several factors influence the recently obtained test results

7    as administered and scored by Gilda Kessner, Psy.D., and as such, those obtained scores

8    are considered an underestimation of his current level of intellectual functioning. These

9    factors include language differences, lack of formal education, and the possibility of

10   malingering.    Although gross malingering on intellectual assessments of mental

11   retardation was largely ruled out by providing the alternate form of the WRAT-3 and the

12   Digit Symbol Subtest of the WAIS-III, minor deliberate alterations in test performance

13   could have occurred without detection.  Additionally, Mr. Rivera attempted to present

14   himself as having mental retardation, and to convince this examiner that he was a very

15   incapable individual.   This presentation is not typical for individuals with mental

16   retardation. Diagnostic history is also not suggestive of mental retardation.

17

18         Evidence of past and current adaptive functioning reflects a lifestyle atypical for

19   individuals with mental retardation. Current functioning was assessed as near normal,

20   based on Mr. Rivera's abilities to utilize available resources and by observations of

21   correctional officers. A propensity for criminal behavior and long-term inhalant drug and

22   alcohol abuse are not more common in individuals with mental retardation, and have in

23   themselves, negatively impacted adaptive functioning in Mr. Rivera's case.  It is

SAUN-025

3

1   unknown the degree to which Mr. Rivera's long-term inhalant abuse may have affected

2   cognitive functions, although it is likely that some impairment may have occurred. The

3   weight of the available data indicated that Mr. Rivera has been, and continues to be,

4   operating within the below average range of intelligence. Adaptive skill deficits are not

5   sufficient to lower the estimation. Therefore, Mr. Rivera is not considered to have mental

6   retardation in the present or at any time in his past.

7

8   *Roger D. Saunders, Ph.D.*

9   Roger D. Saunders, Ph.D.

10  Clinical Psychologist



SAUN-026