41



IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

JAN 0 5 2004



Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| JOSE ALFREDO RIVERA, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| V. | § | NO. B-03-139 |
| | § | |
| DOUG DRETKE, Director, Texas | § | |
| Department of Criminal Justice, | § | |
| Institutional Division, | § | |
| | § | |
| Respondent. | § | |

---

**PETITIONER JOSE ALFREDO RIVERA'S BRIEF IN SUPPORT OF APPLICATION FOR WRIT OF HABEAS CORPUS**

---

## I. BACKGROUND

On August 6, 2003, the Fifth Circuit gave Mr. Rivera leave to proceed in the district court on his claim of mental retardation because he made a sufficient prima facie showing. *In re Rivera*, No. 03-41069 (5th Cir. Aug. 6, 2003). The Court then stayed Mr. Rivera's execution. *Id.* Mr. Rivera now files this brief in support of his mental retardation claim.

## II. MENTAL RETARDATION ANALYSIS

In 2002, the Supreme Court held that it was cruel and unusual punishment to sentence a mentally retarded offender to death. *See Atkins v.* Virginia, 536 U.S. 304 (2002). In making this determination, the Court focused on the fact that mentally retarded offenders are at a greater risk of being wrongfully sentenced to die:

> [W]e cannot ignore the fact that in recent years a disturbing number of inmates on death row have been exonerated. As two recently high-profile cases demonstrate, these exonerations include mentally retarded persons who unwittingly confessed to crimes that they did not commit.

*Atkins*, 536 U.S. 304, 321 n.25. This very issue has manifested itself in this case because Mr. Rivera is mentally retarded and has been sentenced to die, in large part, because of his false confession.

Mr. Rivera respectfully requests that this Court find that he is mentally retarded and grant him relief from his unconstitutional death sentence. As Mr. Rivera will demonstrate to this Court, Mr. Rivera is mentally retarded because his intellectual functioning has been subaverage and he has been significantly limited by his adaptive skills since before the age of 18. Not only do these limitations render his sentence unconstitutional as a matter of law, but they also have played a role in Mr. Rivera's position today.

As will be discussed in detail, the evidence establishes that Mr. Rivera is mentally retarded and, therefore, his execution would be considered cruel and unusual punishment under the United States Constitution. Dr. Garnett, a mental retardation expert, carefully reviewed intellectual functioning test results and other relevant records and materials[1] and concluded, "Mr. Rivera is mentally retarded and there is no information which would rule out the diagnosis." Report I of Richard E. Garnett, Ph.D. at 2. The evidence in the record strongly supports this expert assessment. Additionally, the evidence in the record that might be viewed as contradictory to a mental retardation diagnosis has been proven unreliable by Mr. Rivera's expert, Dr. Garnett. *See* Report I of Richard E. Garnett, Ph.D. and Report II of Richard E. Garnett, Ph.D. The evidence presented establishes that Mr. Rivera is mentally retarded under the standards set forth in current psychological literature and standards relied upon by the United States Supreme Court in *Atkins*.

---

[1] *See* Report II of Dr. Richard E. Garnett at 1 for an exhaustive list.

**A.    In *Atkins v. Virginia,* the Supreme Court Banned the Execution of Mentally Retarded Individuals**

On June 20, 2002, the Supreme Court held that the Eighth Amendment's ban on excessive, cruel, and unusual punishments prevented imposition of the death penalty on mentally retarded offenders. *Atkins,* 536 U.S. 304, 321. The Court reversed its prior decision in *Penry v. Lynaugh,* 492 U.S. 302 (1989) ("*Penry I*") and concluded that "the Constitution places a substantive restriction on the State's power to take the life of a mentally retarded offender." *Atkins,* 536 U.S. at 321 (internal quotation marks omitted). *Atkins* applies retroactively to cases on collateral review. *See Bell v. Cockrell,* 310 F.3d 330, 335 (5th Cir. 2002). Because of the Supreme Court's holding in *Atkins,* this Court must set aside Mr. Rivera's death sentence.

The Supreme Court concluded that capital punishment of a mentally retarded individual was unconstitutional for two reasons. First, the Court considered that in 1989, at the time *Penry I* was decided, only two death penalty states and the federal government had banned the execution of mentally retarded offenders. *Atkins,* at 313-315. Since that time, an additional sixteen states prohibited imposition of the death penalty on the mentally retarded. The Court noted, "it is not so much the number of States that is significant, but the consistency of the direction of change." *Id.* at 315. This significant trend provided the Court with "powerful evidence that today our society views mentally retarded offenders as categorically less culpable than the average criminal," particularly given the well-known "popular[ity of] anticrime legislation." *Id.* at 304.

In its search for a national consensus, the *Atkins* Court relied on the fact that the legislatures voted "overwhelmingly in favor of the prohibition" when they adopted this legislation. *Id.* The Court also studied a range of materials from respected and well-established

social and professional organizations with "germane expertise" in this area, such as the American Psychological Association, international practice, polls, and even the opinions of "widely diverse religious organizations." *Id.* at 316 n.21. Although this information was "by no means dispositive," these factors bolstered the Court's conclusion that "there is a consensus among those who have addressed the issue" that the mentally retarded should not be put to death. *Id.* Finally, the Court noted that even in those states that retained capital punishment for the mentally retarded, only five had actually executed a mentally retarded offender since *Penry I* in 1989. *Id.* Because the practice had become "truly unusual," the Court determined that it was "fair to say that a national consensus has developed against it." *Id.*

The second reason the Court determined that execution of the mentally retarded is unconstitutional is because there is also a consensus that the mentally retarded are relatively less culpable than the average offender. Because they are relatively less culpable, the punitive purpose behind capital punishment is not satisfied when a mentally retarded offender is executed. The Court explained, "this consensus unquestionably reflects widespread judgment about the relative culpability of mentally retarded offenders and the relationship between mental retardation and the penological purposes served by the death penalty." *Id.* at 317. The Court noted that, "because of their impairments," mentally retarded defendants "have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to control impulses and to understand the reactions of others." *Id.* at 318. The Court held that although these deficiencies do not justify an exemption from criminal liability, they do diminish a mentally retarded person's personal culpability to the extent that

4

neither of the primary justifications advanced in support of the death penalty—retribution and deterrence[2]—would be served by executing a mentally retarded individual. *See id.*

Although retribution is one of the justifications advanced in support of the death penalty, the scope of those who are deserving of such a severe and final punishment is very limited, and "only the most deserving of execution are put to death." *Id.* at 319. Because the "just deserts" rationale depends on the culpability of the offender, *Atkins* determined that this extreme punishment was excessive because of the "lesser culpability of the mentally retarded offender." *Id.* The deterrence justification also does not apply in the context of a mentally retarded offender because capital punishment can serve as a deterrent only when a crime is the result of "premeditation and deliberation." *Id.* (internal quotation marks omitted). In *Atkins*, the Supreme Court pointed out that this type of "cold calculus" is at the "opposite end of the spectrum from the behavior of mentally retarded offenders" because of their inherent cognitive and behavioral impairments. *Id.* at 319-320. The court explained that "it is the same cognitive and behavioral impairments that make these [mentally retarded] defendants less culpable." Such impairments "make it less likely that they can process the information of the possibility of the execution as a penalty and, as a result, control their conduct based upon that information." *Id.*

The Supreme Court also concluded that the impairments of mentally retarded individuals—including the increased risk of false confessions, difficulties in communicating with counsel, their limited ability to give a statement, testify effectively on their own behalf, or express remorse—created, "in the aggregate," a greater "risk of wrongful executions" for mentally retarded defendants. *Id* at 319-320. The Court recognized that to have a greater risk of

---

[2] The Court explained that retribution is "the interest in seeing that the offender gets 'his just deserts'" and that deterrence is "the notion that the increased severity of the punishment will inhibit criminal actors from carrying out murderous conduct." *Id.* at 319-320.

wrongfully executing a class of persons such as the mentally retarded is absolutely unacceptable and ruled that the Constitution "places a substantive restriction on the State's power to take the life of a mentally retarded offender." *Id.* (internal quotation marks omitted).

One of these greater risks for the mentally retarded has occurred in this case—the risk of false confession. Mr. Rivera confessed that he had committed murder after several hours of interrogation at the police station. Later, Mr. Rivera revealed that the confession was false and recanted. The fact that his confession was false is supported by Ms. Zavala, the actual perpetrator of the crime for which Mr. Rivera received his sentence. At the trial phase of this case, she testified that Mr. Rivera assisted her in the commission of this murder and her testimony resulted in his conviction. However, once she became a born-again Christian in prison, she set the record straight: "On October 12, 1999, the prosecutor's office received a typewritten letter purportedly written by Zavala. In the letter, Zavala claimed that she had falsely accused appellant—that appellant was not present when the child was killed and had nothing to do with the crime." *Rivera v. State*, 89 S.W.3d 55, 57 (Tex. Crim. App. 2002). She made these admissions despite the risk of an additional sentence because of her perjury: "After the trial when I had a court appointed attorney during my appeal I wrote to Rene Gonzales [Ms. Zavala's appellate counsel] stating the truth o[f] my case (that Alfredo Rivera was and is innocent)." Affidavit of Veronica Zavala. Her subsequent recantation supports the Petitioner's contention that Mr. Rivera's confession was false.[3] The Supreme Court itself notes that mentally retarded defendants have an increased risk of false confession. *See Atkins*, at 321. Therefore, Mr. Rivera's false confession is further evidence of his mental retardation.

---

[3] It is important to note that, but for Ms. Zavala's admittedly false accusation against Mr. Rivera, he never would have been arrested and put in the position to falsely incriminate himself.

**B.    The Standard for Determining Mental Retardation**

The American Association on Mental Retardation ("AAMR") defines mental retardation as: (1) subaverage general intellectual functioning (*i.e.*, an IQ of approximately 70 to 75 or below) existing concurrently with (2) related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure and work, and (3) onset before the age of eighteen.    American Association on Mental Retardation, MENTAL RETARDATION: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS 5 (9th ed. 1992) [hereinafter "1992 AAMR Manual"].  The American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV-TR") employs a definition that is almost identical to the one in the 1992 AAMR Manual.[4]  Texas courts, including the Texas Supreme Court, have consistently relied on the 1992 AAMR Manual's three prong definition of mental retardation.  *See, e.g., Atkins*, 536 U.S. at 309, n.3; *Penry I*, 492 U.S. at 307-09 n.1; *Ex Parte Tennard*, 960 S.W.2d 57, 60-61 (Tex. Crim. App. 1997).

In late May 2002, the AAMR released the latest version of the Manual.  Mental retardation is redefined as "a disability characterized by significant limitations both in

---

[4]  The DSM-IV TR defines mental retardation as follows:

> The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A), that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living social interpersonal skills, use of community resources, self-direction, functional academic skills, work leisure, health, and safety (Criterion B).  The onset must occur before age 18 years (Criterion C).

American Psychiatric Association, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 41 (4th ed., text rev. 2000) ("DSM-IV-TR").  *See Atkins*, 536 U.S. at 309 n.3 (setting out American Psychiatric Association's definition of mental retardation with approval).

intellectual functioning and adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18." American Association on Mental Retardation, MENTAL RETARDATION: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS 1 (10th ed. 2002) [hereinafter "2002 AAMR Manual"]. The three diagnostic criteria are the same, but the new manual places a greater emphasis on adaptive behavior deficits and describes those deficits differently. In the 2002 AAMR Manual, adaptive behavior is described as "the collection of conceptual, social, and practical skills that have been learned by people in order to function in their everyday lives." *Id.* at 73. In assessing deficits in adaptive behavior, the 2002 AAMR Manual stresses that "[l]imitations in adaptive behavior affect both daily life and the ability to respond to life changes and environmental demands." *Id.* at 91.

The 1992 AAMR Manual defined adaptive behavior by focusing on ten specific skills. The 2002 AAMR Manual narrows its focus to three broader domains of adaptive behavior. The three broader domains of conceptual, social, and practical skills in the new definition "are more consistent with the structure of existing measures [of adaptive behaviors] and with the body of research on adaptive behavior." *Id.* at 73. As the 2002 AAMR Manual illustrates, however, the ten skill areas listed in the 1992 definition can be conceptually linked to one or more of the three domains in the 2002 definition of mental retardation. *See id.* at 82.

Each of the three elements of the definition of mental retardation is an essential component of a professional diagnosis of the disability. The first component of the clinical assessment of mental retardation measures the magnitude of the individual's intellectual impairment. To be classified as mentally retarded, an individual must function at the very lowest intellectual level encountered in the general population, as measured by standardized intelligence tests. The intellectual functioning of any individual with mental retardation will fall within the

lowest three percent of the population. *See Atkins*, 536 U.S. at 309 n.5 ("It is estimated that between 1 and 3 percent of the population has an IQ between 70 and 75 or lower, which is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition"); *but see*, DSM-IV-TR 46 ("The prevalence rate of Mental Retardation has been estimated at approximately 1%"). An individual that meets this standard is considered to have severely impaired cognitive functioning and, therefore, meets the first element of the mental retardation definition.

The second requirement serves to confirm the psychometric measurement of the individual's severe impairment. The impairment must have "real-world" effects on the individual's severe impairment. As the Supreme Court has asserted, people with mental retardation "have a reduced ability to cope with and function in the everyday world." *Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 442 (1985). The requirement of real, identifiable, disabling consequences in the individual's life—of reduced ability to "cope with common life demands"—assures that the diagnosis applies only to persons with an actual, functioning disability. DSM-IV-TR 42. *See* 1992 AAMR Manual at 38. Previous versions of the definition of mental retardation described this requirement in terms of "deficits in adaptive behavior." *See Penry I*, 492 U.S. at 308 n.1 (citing an earlier edition of the AAMR's classification manual). More recent formulations of the definition use the terms "related limitations" in "adaptive skill areas." 1992 AAMR Manual at 5. *See* DSM-IV-TR 42. According to the 2002 AAMR definitions, the significant limitations in adaptive functioning are limitations in "conceptual, social, and practical adaptive skills." 2002 AAMR Manual at 73. Both sets of terms reflect the same basic concept: the impairment in intellectual ability must have an actual impact on everyday functioning. *See id.* at 74 (noting that "most adaptive behavior instruments measure

the skill level a person typically displays when responding to challenges in his or her environment") (internal quotation marks omitted).

The third element of the mental retardation definition requires that the disabling condition manifest itself during childhood development, before the individual reaches the age of eighteen. Requiring the disability to have manifested itself at birth or during childhood means that the individual's mental development during his or her crucial early years was affected by the impairment of the brain's ability to function. This element of the definition is derived from modern neuroscience's understanding of the way the brain develops and the implications of its arrested development for cognitive impairment. *See* 1992 AAMR Manual at 16-18. The 2002 AAMR Manual identifies the four categories of "risk factors" for mental retardation— biomedical, social, behavioral, and educational—that can occur at the prenatal, perinatal, or postnatal stage of development. *See* 2002 AAMR Manual at 127 (Table 8.1). In practical terms, an individual with mental retardation not only has a measurable and substantial disability now, but also had it during his or her formative years, significantly reducing that individual's ability to learn and adapt day to day.

### C.    Mr. Rivera Meets the Criteria for Mental Retardation

Credible and substantial evidence establishes that Mr. Rivera fits the widely-accepted definition of mental retardation. The evidence shows that Mr. Rivera has significant limitations in intellectual and adaptive functioning and that he exhibited these diagnostic elements before the age of eighteen. Dr. Richard Garnett, an established expert in the field of mental retardation, confirms that there is significant evidence suggestive of mental retardation. In fact, in Dr. Garnett's first consultation report, he stated that "all of the materials provided to me are consistent with and suggestive of a diagnosis of mental retardation." *See* Report I of Richard E. Garnett, Ph.D. at 2. Significantly, Dr. Garnett found that *no evidence exists that would rule out a*

*diagnosis of mental retardatio*n. *Id.* After Dr. Garnett was provided with the results of a full

psychological evaluation performed by Dr. Gilda Kessner along with additional materials for his

review, he reaffirmed the conclusion in his first report that Mr. Rivera is mentally retarded:

> It is important to note that my assessment of new materials forwarded to me and
> my review of Dr. Kessner's psychological report has not caused me to change my
> original conclusions stated in my report of July 31, 2003. The findings of Dr.
> Kessner and my review of additional school records merely strengthen those
> conclusions, and my original support for a diagnosis of Mental Retardation is felt
> to survive this additional review.

Report II of Dr. Richard E. Garnett, Ph.D. at 2. Dr. Garnett went into detail about the reasons for

confirmation of his initial diagnosis:

> In my previous report of July 31, 2003, I noted that the evidence at that time
> pointed to a diagnosis of mental retardation. However, in the absence of firm
> diagnostic data regarding intellectual capacity I suggested a thorough
> psychometric evaluation to confirm what appeared at that time to be mental
> retardation.
>
> Since that time, I have reviewed further school records and the psychological
> evaluation by Dr. Gilda Kessner. In addition, I have met with Mr. Rivera in a
> face-to-face meeting at the Polunsky Unit. Based on that review and meeting, it
> seems clear to me that **Mr. Rivera meets the three pronged definition of
> Mental Retardation.** Given the available material, one would have to discount
> the evidence and exclude supportive data with hypothetical conjecture,
> misinterpretation of evidence, ignoring the standards of practice, or actual denial
> of the facts. The evidence clearly shows an intellectual level and adaptive
> behavior deficit that fulfills the diagnosis for both the DSM-IV and AAMR.
>
> There is a broad and consistent trail of indicators beginning as early as Mr.
> Rivera's first year in school which has been documented by school records,
> family affidavits, and professional reporting that shows significant and
> documented deficits in adaptive behavior skills. Mr. Rivera was simply never
> able to accomplish the developmental milestones and manifest the normal skills in
> coping and adjustment that one expects in typical growth and responsible
> adaptation to society.
>
> **Based on the evidence I have reviewed, it is my professional judgment that
> Mr. Rivera had mental retardation in the developmental period and at the
> time of the crime, and he continues to have mental retardation today.**

*See* Report II of Dr. Richard E. Garnett, Ph.D. at 9-10 (emphasis added).

### 1. Evidence of Significant Limitations in Intellectual Functioning

#### a. Mr. Rivera Scored a 68 on the Only Valid IQ Test Administered, Confirming that He Has Significant Limitations in Intellectual Functioning and Is Mentally Retarded.

On December 1, 2003, Dr. Gilda Kessner, Psy.D. a psychologist specializing in mental retardation testing, individually administered a valid IQ test to Mr. Rivera.    *See* Report of Dr. Gilda Kessner, Psy.D.; Report II of Dr. Richard E. Garnett, Ph.D. at 4.   This test meets the AAMR Manual's requirements that intelligence tests must be individually administered by a "properly trained professional."   Dr. Kessner is a psychologist that specializes in this kind of standardized testing.   She therefore is considered a "properly trained professional."   She also administered the test to Mr. Rivera individually.

Dr. Kessner confirmed that Mr. Rivera's composite score on the only valid IQ test was a 68 and establishes that Mr. Rivera has "significantly subaverage intellectual functioning." Report of Dr. Gilda Kessner, Psy.D. at 3-4.   Importantly, Dr. Kessner also administered a Malingering Test and Mr. Rivera scored "within normal limits," meaning he was putting forth adequate effort during the testing.   Report of Dr. Gilda Kessner, Psy.D. at 3.   Dr. Garnett reviewed the results of this test and concluded:

> Dr. Kessner's conclusion that Mr. Rivera's "Full Scale IQ score also meets the American Association on Mental Retardation . . . as qualifying for the intellectual component of the definition of mental retardation" and that his "current intellectual abilities are a continuation of his deficits evident in early childhood" sufficiently establishes the first and third prongs of the diagnosis of Mental Retardation.

Report II of Dr. Richard E. Garnett, Ph.D. at 4.   His IQ test results confirm not only that Mr. Rivera's intellect is in the lowest one the three percent, but they also confirm that he has had these deficits since before the age of 18.

> **b.**  **Mr. Rivera's Scores on Other Relevant Tests Confirm that He Has**
> **Significant Limitations in Intellectual Functioning and Is Mentally**
> **Retarded.**

On December 1, 2003, Dr. Gilda Kessner also administered several additional tests to Mr. Rivera to aid in determining the level of his intellectual functioning. She administered the Wide Range Achievement Test—Revision 3 and concluded that his pronouncement skills are at a fifth grade level, his spelling skills are at a third grade level, and his math skills are at a fourth grade level. Report of Dr. Gilda Kessner, Psy.D. at 3. She also administered the Kaufman Functional Academic Skills Test, which helps test the level of Mr. Rivera's real-world skills. His composite score was a 73, which "lends further confidence that the results of testing are a reasonable reflection of his true abilities." *Id.* at 4. Again, it is important to note that Mr. Rivera scored "fine" on the Malingering Test, meaning he was putting forth full effort during the testing. *Id.* at 3.

Dr. Garnett explained the significance of these test results in determining Mr. Rivera's mental retardation diagnosis:

> Achievement test scores indicated that Mr. Rivera is at approximately the third to fifth grade levels in functional academics and his achievement scores "are consistent with his scores from the WAIS-III." His achievement scores place Mr. Rivera in the second to eighth percentile, indicating a significant deficit in one important diagnostic area of adaptive skill development. One additional test, Kaufman Functional Academic Skills Test, provided Dr. Kessner with "supplemental information about Mr. Rivera's ability to utilize these skills in everyday experience," thus indicating significant deficit in skills of adaptive behavior, specifically in the area of functional academics.

Report II of Dr. Richard E. Garnett, Ph.D. at 4. These tests also confirm the presence of a significant deficit in Mr. Rivera's adaptive skills.

### c. Mr. Rivera's 1991 TDCJ Admission Summary that Lists an IQ Score of 92 Is Not a Valid Measure of Intellectual Functioning.

Mr. Rivera was incarcerated in TDCJ in 1991 for attempted burglary. As with all inmates admitted to TDCJ, Mr. Rivera was given a group-administered test called the "Beta." *See* TDCJ Executive Summary. According to TDCJ policy reflected in a 1998 summary, all inmates are routinely given the Beta. *See id.* Then, if they score below a 70 on the Beta, the Culture Fair group intelligence test is administered. *See id.* Only if the inmate again scores a 70 or below on the Culture Fair, is the inmate referred to the diagnostic unit for an individually administered IQ test. *See id.* Although this is the established procedure for testing in TDCJ, none of the group-administered tests are valid indicators of intellectual functioning because the results of a group-administered test are inherently flawed when used to make a mental retardation diagnosis.

The AAMR Manual states that "intellectual functioning should be measured using individually administered standardized psychological tests and administered by properly trained professionals." 2002 AAMR Manual at 52. While the AAMR standards require that intellectual functioning examinations be administered individually, TDCJ's policy is to administer the exam in group settings at least twice before administering the test individually. Therefore, the 92 IQ score listed on Mr. Rivera's 1991 TDCJ admission summary is not valid and is not relevant to the determination of intellectual functioning as it applies to a diagnosis of mental retardation.

The tests administered to Mr. Rivera by TDCJ are not valid. Mr. Rivera's expert, Dr. Garnett, confirmed that this test does not conform with well-established AAMR policy and therefore is not a valid indicator of Mr. Rivera's intellectual functioning:

> Although two IQ scores are reported in the materials I have reviewed [the two scores that were administered before the December 1, 2003 test], neither represent valid indicators of Mr. Rivera's intellectual functioning. . . . **The Beta IQ test is simply not an accurate test of intellectual functioning. In fact, the test itself**

**specifically notes that it should not be used for diagnosis or determination of mental retardation**. It is common for Beta IQ scores to be even 20 points away from the scores obtained on more thorough, individually administered tests. Furthermore, the fact that it is group administered greatly discounts the reliability of the results. The AAMR specifically states that intelligence tests [] must be individually administered to be valid indicators of intellectual functioning.

Report I of Dr. Richard E. Garnett, Ph.D. at 3-4 (emphasis added). This evidence buttresses the conclusion that the TDCJ IQ score is not relevant to the determination of intellectual functioning as it applies to a diagnosis of mental retardation.

### d. The WAIS-R Short Form IQ Score of 80 Is Not a Valid Measure of Intellectual Functioning.

Mr. Rivera was also administered a WAIS-R "short form" during a mental health screening at the Ellis Unit death row in 1993. As Dr. Garnett discusses in his report, this test is also not a valid measure of intellectual functioning:

Mr. Rivera was also given a WAIS-R "short form" test . . . when he was received on death row at the Ellis Unit . . . . Although the **WAIS-R was a generally valid measure of intellectual functioning at that time, a "short form" of the test was not**. "Short form" means that selected subtests were chosen and instead of the full 11 tests being given, only as few as 2 or 3 were given (the exact number was not noted). From that limited number of subtests, an estimate of a comprehensive IQ level was assumed. In Clinical Interpretation of the WAIS, (Zimmerman, Grune & Stratton, 1973), it states that "Wechsler himself presented one of the most cogent criticisms of the brief form . . . . The individual reliabilities of some subsets are low so that reliance on half the items or only a few subtests to draw conclusions is inadvisable." (p. 178) . . . . The authors . . . . point out that **there is a "chance of serious error in calculating an IQ from a brief form[."]** . . . . "**Obviously the problem is how serious a decision is going to be made on the basis of a brief test.**" (p. 180).

Report I of Richard E. Garnett, Ph.D. at 4 (emphasis added). In this case, the severity of the decision is the most extreme. It certainly would be inappropriate to rely on the short form test, a test with a "chance of serious error," in analyzing whether Mr. Rivera's execution would be unconstitutional.

The Handbook on Psychological Assessment is similarly clear about the unreliability of "short form" tests. *See* Gary Groth Marnat, *Handbook on Psychological Assessment* 191 (4th Ed.) It confirms that a "short form" test is not a valid indicator of IQ." *Id.* ("None of the [Weschler] short forms should be confused with a full intellectual assessment or even a valid indicator of IQ.").

In sum, there exists conclusive evidence that Mr. Rivera has significant limitations in intellectual functioning.    For the reasons discussed above, the IQ test administered by Dr. Kessner on December 1, 2003 is the only IQ test that can be considered a valid indicator of Mr. Rivera's intellectual functioning. His score of a 68 on that test confirms that his intellectual functioning is in the lowest one to three percent of the population, which is considered within the mentally retarded range of intellectual functioning. There are no other valid test results that contradict this finding. His records also serve to bolster his test results and further demonstrate Mr. Rivera's significant limitations.

### e. *Additional Evidence Exists that Mr. Rivera Has Significant Limitations in Intellectual Functioning.*

Dr. Kessner's valid, individually administered tests confirm Mr. Rivera's limitations in intellectual functioning. In addition, Dr. Garnett has pointed to significant evidence that further supports this conclusion. This evidence is best summarized in Dr. Garnett's own words:

> Academic records can often be utilized in an effort to aid in the determination of Mental Retardation. Mr. Rivera's records are limited and offer only clues and indicators. It is noted in his school records that his grades were poor (C's and D's) throughout his academic experience.   According to those records, he repeated several grades (D's and F's), including the first grade. He was placed in Special Education and could not produce successful grades even there. In 1977 (sixth grade, age 15) school records specifically note "social promotion." At one point at age 17 (1977-78), even in special classes he was failing and records indicate that his grades in Math and Science were changed from failing grades (63 & 65) to passing (70 & 70) on his transcripts so that he could be "promoted" to the next grade.   He then failed and produced no credits for the next two years. Mr. Rivera also received failing scores in the ninth grade "CVAE" program.

Hugh Albright, a teacher of Mr. Rivera's, reports that the material taught in "CVAE" was at the third to fifth grade level and students in CVAE were typically students in danger of dropping out of school.

It is important to note that Mr. Rivera was in special classes for most of his academic career. However no testing was noted in his records. His placement in special classes seems to be a defacto determination of Mental Retardation, since it must be assumed that testing of Mr. Rivera was conducted for admission. TEA requires such assessments for admission to special education programs such as he was in. Affidavits were taken from teachers who knew him then, and they supported this conclusion (noted later in this report).

Mr. Rivera's school achievement scores also suggest significant limitations in intellectual functioning. At age 11, while in the fifth grade, Mr. Rivera's test scores showed his reading achievement level at less than the third grade. Two years later, after repeating the fifth grade, Mr. Rivera was found to "need improvement" and was reading assignments identified by a teacher at his school at only the first or second grade level. Mr. Rivera continued to lack basic academic abilities as reflected in achievement testing conducted by the TDCJ Windham School District. In 1992, at age 30, testing revealed his educational achievement level was Math 5.0, Reading 4.1, Language 3.2, and Composite 4.1. The scores were noted as valid. Thus as an adult Mr. Rivera was performing academically at the level of a ten year old child. Through the years, in the Brownsville School District and later in the Windham School District, Mr. Rivera consistently stayed at the level indicated in 1992, *i.e.* fourth grade level (age equivalent of nine to ten years of age).

Mr. Rivera dropped out of school after the ninth grade at age seventeen, never graduating or obtaining a GED.

It was clear that Mr. Rivera did not just struggle in school; he was unable to succeed in virtually every class he was placed in. It is painfully obvious that Mr. Rivera did not have the intellectual capacity to benefit from school from as early as failing the first grade, and the test results from Dr. Kessner make the reasons obvious.

Report I of Dr. Richard E. Garnett at 4-5.

The evidence as a whole shows that Mr. Rivera has significant limitations in intellectual functioning and that he exhibited these diagnostic features before the age of eighteen. Therefore, Mr. Rivera meets the first prong of the mental retardation analysis.

## III. EVIDENCE OF SIGNIFICANT LIMITATIONS IN ADAPTIVE BEHAVIOR

Mr. Rivera meets the second prong of mental retardation because he suffers from significant adaptive skills deficits.[5]

> ### a. Mr. Rivera's conceptual adaptive skills deficits are evidenced by school records showing that he was consistently held back or socially promoted, and that at age 14, he was performing at a first or second grade level in the areas of Reading, Writing, and Math.

From the time he entered elementary school, Mr. Rivera had difficulty learning and consistently performed at a level significantly below his grade and age. *See* Affidavit of Hugh Albright at 1. Mr. Rivera's school records show that had to repeat several grades, beginning with his first year in elementary school, and that he struggled to complete the rest of his grades and was often only promoted for social reasons. *See* BISD School Records. Throughout his schooling, he was unable to master the most basic subjects and was placed in special education classes.[6] *See* Affidavit of Maria Juanita Reyes at 2; Affidavit of Esmeralda Maciel at 1;

---

[5] The Texas Court of Criminal Appeals found that "other than allegations that [Mr. Rivera] did not work much, there is no evidence of deficits in adaptive behavior." *Ex Parte Rivera*, No. 27,065-02 (Tex. Crim. App. filed July 25, 2003). The Court based its conclusion on an erroneous interpretation of adaptive behavior skills. Specifically, it failed to recognize that Mr. Rivera's poor academic performance falls under the conceptual domain of adaptive behavior. Instead, the Court viewed Mr. Rivera's academic performance solely within the context of intellectual functioning. While academic performance is an indicator of intellectual functioning, the areas of "language" and "reading and writing" fall under the conceptual domain of adaptive skills. *See* 2002 AAMR Manual at 83. These areas replaced "communication" and "functional academics" in the 1992 AAMR manual, also listed within the conceptual domain of adaptive skills.

The opinion of the Texas Court of Criminal Appeals was also mistaken in stating that Mr. Rivera got a GED in 1980. *See Ex Parte Rivera*, No. 27-065-02 at 3. Although a school record included in court findings listed the term "GED" as the reason for Mr. Rivera's withdrawal, the Texas Education Agency found no record of a GED and subsequent prison records confirm that Mr. Rivera did not obtain a GED. *See* records relevant to GED. These unfortunate errors are the logical result of the Texas Court's impractical standard of proof in which an applicant, with no right to counsel or other resources, must prove he is mentally retarded in order to meet a procedural gateway necessary to develop and raise a claim of mental retardation.

[6] Special education records were requested from the Special Services department in the Brownsville Independent School District. The department does not keep records that far back.

Translated Affidavit of Camelia Garcia at 2. Dr. Garnett explained that "it is significant that Mr. Rivera was unable to achieve even in special education classes where the assignments were at his own level of ability and below." Report II of Dr. Richard E. Garnett, Ph.D. at 6. A review of his academic failures clearly demonstrates his inability to learn or develop as a student from first grade until the day he dropped out of ninth grade at the age of 19.

Mr. Rivera's struggles were also experienced by most of his siblings. Of the six Rivera children, only one was not placed in special education classes. *See* Affidavit of Maria Juanita Rivera at 2. All of the Rivera children had learning and speech disabilities. Mr. Albright, one of the teachers at the Rivera children's school, frankly stated that "all of the Rivera children were what some would call dumb." Affidavit of Hugh Albright at 2. Dr. Garnett explained why this fact is significant: "[In Mr. Rivera's case], [t]here is also a family history of mental retardation and learning problems. Mental retardation is recognized as following a familial, genetic course." Report II of Dr. Richard E. Garnett, Ph.D. at 7. Growing up, Mr. Rivera had such difficulty reading that he was embarrassed to read in front of others. *See* Affidavit of Esmeralda Maciel at 1.

Mr. Rivera's history of problems in school also supports the conclusion that he had significant deficits before the age of 18. When Mr. Rivera did not successfully master his first year in elementary school, he was placed in "Level 1.5" or "High 1." *See* Affidavit of Hugh Albright; Affidavit of Roberto Moreno at 1. Being placed in High 1 is the equivalent of being retained in the first grade for another year. *See id.* "High 1" was given its name in an attempt to minimize the social and academic stigma of being retained. *See id.*

The evidence will show that Mr. Rivera continued to struggle with his studies, but was promoted from grade to grade for a few years, despite his extremely poor performance, because

he was already old for his grade and because teachers often promoted students so the teacher would not look like he or she had failed to help the student master a subject. For example, in the fourth grade, Mr. Rivera failed English and Spelling but was still promoted to the fifth grade. *See* BISD School Records at 1. The evidence will show that this kind of social promotion was normal practice in the Brownsville school district.

Mr. Rivera's performance did not improve the following year in the fifth grade at age 11. After receiving "D's" in all of his core subjects that year, Mr. Rivera was retained for a second time and repeated fifth grade. *Id.* One of Mr. Rivera's sisters who has a nine-year old son stated that at ten or eleven years of age, Mr. Rivera could not read like her son reads today. *See* Affidavit of Lupita Rodriguez at 1. The results from a diagnostic reading test Mr. Rivera took in the fifth grade not only support his sister's observations, but show that he may have been performing at an even lower level than suspected. His diagnostic reading test results show that he could not master phonetics, vocabulary development, or comprehension. *See* BISD Records. Examples of exercises that Mr. Rivera cold not perform at age 12 are: comparing/contrasting ideas, drawing conclusions, arranging sentences sequentially, and pronouncing certain consonants (*i.e.*, hard "g") and vowel combinations. *Id.* Of approximately 50 areas like the ones named above, the diagnostic exam concluded that Mr. Rivera needed to be retaught in 47 of the 50 areas. *See* BISD Records. Mr. Rivera was certainly significantly below average in his intellectual functioning at this stage of his childhood. At this stage of his childhood, he was also having problems communicating with others in everyday situations: One of his sisters, Esmeralda, explained:

> When you talked to Jose, sometimes you would have to repeat things over and over. I believe it was because he just did not understand what you were telling him. The way I put it is that he just "wasn't there." For example, you would be

talking and he just had this look on his face like he was thinking, but he wouldn't understand you. That was when he was younger than fifteen years of age.

*See id.*

In the sixth grade, Mr. Rivera was 14 and older than other children because he was he had been retained multiple times. He was placed in a prescriptive reading class with the goal of improving his reading skills. *See* Affidavit of Hugh Albright at 2. He entered the class reading at a 3.4 grade level and left the class reading at a 2.9 grade level, demonstrating a loss in reading ability of half a grade level. *See* BISD Records at 6. Another reading progress sheet for that year concluded that Mr. Rivera needed "much improvement in phonetics." *See id.* at 7. Mr. Rivera's reading teacher noted that he had finished reading "Air Pudding" and "Wind Sauce," books that were below a second grade level. *See* BISD Records at 7; Affidavit of Hugh Albright at 2. It is even likely that Mr. Rivera could not actually read those stories because in the sixth grade he could only pronounce a few words and did not really know how to read. *See id.* Basically, in the sixth grade Mr. Rivera was reading books at a first grade level.

Mr. Rivera experienced similar problems in Math and consistently performed significantly below average. At age 14, when the majority of children have learned to multiply, Mr. Rivera could not even make change from a dollar. *See* Affidavit of Hugh Albright at 1. He could not add or subtract very well, and most likely did not know how to multiply at all. *See id.* For these reasons, Mr. Rivera was placed in remedial math in the sixth grade, which was intended for students who could not master the subject. BISD Records at 8. Mr. Rivera's math skills were equivalent to a first or second grade level at this time. *See* Affidavit of Hugh Albright at 2. Additionally, his remedial math test scores are probably an overstatement of his true ability, as the teachers tended to inflate test scores to show the students were progressing, even when they really were not. *See id.*

According to his teacher, Mr. Albright, he simply "was not able to learn very much." *See id.* at 2. By the time he entered the sixth grade, Mr. Rivera realized that he was not learning and that he was at the bottom of the class. *See id.* For this reason, he had a tendency not to pay attention in class, making his ability to learn that much more difficult. *See id.* Another teacher at Longoria Elementary School, Roberto Moreno, remembered Mr. Rivera as "quiet, a slow learner . . . [who] had a lot of trouble with his studies." *See* Affidavit of Roberto Moreno at 1. Despite the fact that he could not master his classes, he was "socially promoted" from sixth to seventh grade. *See* BISD Records (specifically noting "social promotion" to the seventh grade); Affidavit of Hugh Albright at 1. Mr. Rivera's sixth grade homeroom teacher at Longoria Elementary related, "When a student is in the fifth or sixth grade and is only performing at a first grade level, there is not much you can do . . . they are socially promoted." *Id.* at 1.

When he reached the ninth grade, Mr. Rivera was placed in "CVAE," a vocational program for high school students who are at risk of dropping out. *See* BISD School Records; Affidavit of Hugh Albright at 2. The material taught in CVAE was equivalent to a third-grade level. Despite the fact that Mr. Rivera was in a remedial program and was old for his grade (16 and in the 9th grade), Mr. Rivera failed all of his subjects. *See* Affidavit of Hugh Albright at 2; BISD Records. It was during his second attempt at completing ninth grade—while failing two classes—that Mr. Rivera dropped out of school. *See* BISD Records. The evidence will also show that Mr. Rivera's teacher Mr. Albright related that Mr. Rivera was not only the weakest student in his class, but was also the weakest student Mr. Albright had in the six years that he taught sixth grade.

### b. *Mr. Rivera Exhibited Further Deficits in the Social and Practical Domains of Adaptive Skills.*

Mr. Rivera stood out among his classmates not only because he was such a weak student, but also because he had noticeably poor hygiene and an unkempt physical appearance as a child. His teacher, Hugh Albright, noted, "Jose appeared very unclean in his appearance. Jose would come to school with his clothes ragged, his shoes torn, and his pants too big or sagging on the floor. Other kids used to make fun of him because of that." Affidavit of Hugh Albright at 2. This evidence of social and practical deficits further supports the conclusion that Mr. Rivera has significant limitations in his adaptive skills before the age of 18.

These social and practical deficits continue today. Dr. Garnett provided examples from his interaction with Mr. Rivera on December 18:

> Mr. Rivera seemed significantly deficient in the areas of insight and judgment. He was unable to explain what several "sayings" meant ("too many cooks spoil the broth"), how various items are related (banana & pear; wagon & car) and why we need automobile license plates. When asked to select three "major cities," he chose Brownsville and Corpus Christi. His reading ability is impaired and at a very low level ("I can't spell the big ones"), can't spell simple words, and has to use his fingers to sequentially subtract (3 from 30). His functional skills in managing numbers and money seem convoluted, simple and concrete – and often inaccurate.

Report II of Dr. Richard E. Garnett, Ph.D. at 8.

These deficits can also be seen in Mr. Rivera's inability to understand the practical aspects of his case. Dr. Garnett related several examples of such deficits that he saw when he met with Mr. Rivera on December 18, 2003:

> I talked with him about the legal and court process to get some indication of his understanding of that. He seemed generally oriented but again in a simple, concrete manner. He thinks a "witness" might be someone who works for the court, and thinks the judge "works for my lawyer." He also says that his lawyer "solves the crime" so he can go free. When asked what it means to be guilty, he said it is "when you get arrested for something." He thinks people go to the penitentiary "when people don't like you and want to get rid of you." When I asked him how he reacted to being sentenced, he said he laughed but he doesn't

> know why he laughed.  Finally, if he is asked a question [at trial, for example]
> that he doesn't know the answer, he will "make up the best answer I can."  As a
> result of these answers, and others that were correct, I would suggest he does not
> have a clear and deep grasp of the process or its elements.  This has been found
> over and over to be typical of people with mental retardation.

Report II of Dr. Richard E. Garnett, Ph.D. at 8.  Such examples demonstrate that these deficits

may be even more apparent in Mr. Rivera's adulthood.

### c.  *Mr. Rivera Currently Exhibits the Conceptual, Social, and Practical Adaptive Behavior Deficits that Manifested Themselves Before Age 18.*

Mr. Rivera was almost completely dependent on his parents throughout his childhood and

the majority of his adult life.  *See* Affidavit of Dora Garza at 1.  He never helped his parents pay

the rent or the bills.  *Id.*  When things were broken around the family home, Mr. Rivera never

fixed them, his father did.  *Id.*  During the two years he was married to Dora Garza and living

with her, they lived with Mr. Rivera's parents.  *Id.*  When they separated, Mr. Rivera continued

to live with his parents.  *Id.*  In fact, his former wife cannot remember Mr. Rivera ever living on

his own.  *Id.*

As an adult, Mr. Rivera continues to demonstrate serious deficiencies in his performance

everyday skills.  For example, Mr. Rivera does not know how to tell time, nor has he ever had a

bank account.  *See* Affidavit of Dora Garza at 1.  Although his family members disagree about

whether he ever learned to drive, Mr. Rivera never actually took a driving test.  *See* Translated

Affidavit of Camelia Garcia at 2; Affidavit of Lupita Rodriguez at 1; Affidavit of Maria Juanita

Rivera at 2.  His sister explained that he probably never took a driving test because he did not

think he could pass it.  Affidavit of Maria Juanita Rivera at 2.

Mr. Rivera never found jobs for himself but depended on others, usually his father, to

find jobs for him.  He almost never filled out job applications.  *See* Affidavit of Dora Garza at 1;

Affidavit of Alfredo Rivera.  His sister Camelia remembers one of the few times that he tried to

fill one out, "One time, I saw him trying to fill out one of these [job] applications.  He had such a hard time trying to complete it.  He would write and then go back and erase what he wrote.  He looked at the application like it was a puzzle."  *See* Translated Affidavit of Camelia Garcia at 2. Once Mr. Rivera found a job, he normally could not keep it very long.  The longest job that his sisters and former wife remember him working lasted about two months, when he worked as a dishwasher or cook's helper in the restaurant where his father worked.  *See* Affidavit of Dora Garza at 1; Affidavit of Esmeralda Maciel at 1; Affidavit of Lupita Rodriguez at 1.  *But see* Affidavit of Alfredo Rivera.  According to one of his sisters, other than this job, Mr. Rivera "did not work very much."  *See* Translated Affidavit of Camelia Garcia at 2.

Mr. Rivera continues to demonstrate an inability to read or write well.  *See* Affidavit of Maria Juanita Rivera.  One sister said that he reads "very, very slowly, like a child who was just learning to read for the first time."  Translated Affidavit of Camelia Garcia at 2.  He is not able to pronounce long words and often "gets stuck" when trying to read.  *See* Affidavit of Lupita Rodriguez at 1.  Mr. Rivera's former wife rarely saw Mr. Rivera read a book.  *See* Affidavit of Dora Garza at 1.

In addition, Mr. Rivera's writing is virtually incomprehensible.  According to his oldest sister, Mr. Rivera never learned to write well, and she still has trouble understanding his letters, as he often misspells words, misplaces them in sentences, or leaves out words altogether.  *See* Affidavit of Maria Juanita Rivera at 1; Affidavit of Esmeralda Maciel.  Mr. Rivera also commonly will write one word when he intends to write another.  For example, he writes the word "eyes" when he means "ice."  *See id.*  One sister that receives letters from him from prison says that his writing is so bad that sometimes she cannot understand his letters or decipher what he is trying to say.  *See* Affidavit of Esmeralda Maciel at 2.  Mr. Rivera's reading and writing

skills have remained limited even in his current environment on death row, where there is no access to television and reading and writing is an inmate's primary source of contact with the outside world. His continued problems learning to read and write are further support of his mental retardation.

### d. Dr. Richard E. Garnett Confirms that Mr. Rivera is Limited in His Adaptive Functioning

After reviewing the materials discussed above, Dr. Richard Garnett confirmed the evidence of limitations in Mr. Rivera's adaptive functioning:

> **The materials presented to me document that Mr. Rivera has clear limitations in many areas of adaptive functioning and that these limitations originated well before the age of 18.** Mr. Rivera's inability to perform at school is representative of limitations in functional academic skills . . . .
>
> What is clear from all of the accounts of teachers and Mr. Rivera's family, is that Mr. Rivera was unable to take care of day to day tasks such as hygiene, finding and keeping a job, paying bills, or fixing things around the house without help and direction from others. Reports from MHMR and professionals who evaluated Mr. Rivera are also strongly suggestive of Mental Retardation. A diagnosis from MHMR in 1985 by Pedro Ruggero, M.D., a staff psychiatrist at the Tropical Texas MHMR Center described Mr. Rivera . . . [as a ] dependent personality. The symptomatic criteria for that diagnosis includes many of the characteristics that are common to Mental Retardation and mistakenly aligned with other diagnoses. It appears that this was so in this case. This disorder is characterized by behaviors such as an inability to make everyday decisions without advice or reassurance from others; allows others to make most important decisions; agrees with people even when he or she believes they are wrong; has difficulty initiating projects or doing things on his own; volunteers to do things that are unpleasant or demeaning in order to get people to like him; and feeling uncomfortable when alone. All of these behaviors are also seen in persons with mental retardation.

Report I of Dr. Richard E. Garnett at 4-5 (emphasis added). As Petitioner has demonstrated, these behaviors are present in Mr. Rivera. Mr. Rivera exhibits these behaviors in his inability to make everyday decisions without advice or reassurance from others and his difficulty initiating projects or doing things on his own. One of Mr. Rivera's sisters said she often sent her husband to accompany Mr. Rivera when he needed to go do something. *See* Translated Affidavit of

Camelia Garcia at 1. She explained that her husband had to go because Mr. Rivera needed someone there to help him. *See id.* Additionally, he never fixed up or worked around the house; he left that job to his father. *See* Affidavit of Dora Garza at 1. Similarly, he also rarely, if ever, took the initiative to find his own jobs or fill out job applications, he relied on his father for that as well. *See* Affidavit of Dora Garza at 1; Affidavit of Alfredo Rivera.

Also significant is the fact that Mr. Rivera agrees with people even when he knows that they are wrong. This behavior can also be seen in Mr. Rivera's false confession to the police. He agreed with them that he had committed murder and confessed after "lengthy questioning" at the police station. David Pasztor, "Controversial Execution Halted," AUSTIN AMERICAN STATESMAN, August 7, 2003, A8. He agreed with them even though the confession was false and he later recanted it. This behavior is also strong evidence of Mr. Rivera's mental retardation.

## IV. RISK FACTORS FOR MENTAL RETARDATION

The 2002 AAMR Manual describes four categories of risk factors that may interact to cause mental retardation. *See* 2002 AAMR Manual at 123-41. The four categories of risk factors are: (1) biomedical: factors that relate to biologic processes, such as genetic disorders or nutrition, (2) social: factors that relate to social and family interaction, such as stimulation and adult responsiveness, (3) behavioral: factors that relate to potentially causal behaviors, such as dangerous (injurious) activities or maternal substance abuse, and (4) educational: factors that relate to the availability of educational supports that promote mental development and the development of adaptive skills. *See id.* at 126. The 2002 AAMR Manual emphasizes that "the impairment of functioning that is present when an individual meets the criteria for a diagnosis of mental retardation usually reflects the presence of several risk factors that interact over time." *Id.* Each of the four risk factors are present in Mr. Rivera's case. After reviewing the relevant

materials in this case, Dr. Garnett, an expert in mental retardation, confirms the existence of these various factors in Mr. Rivera's case. *See* Report I of Dr. Richard E. Garnett at 5.

### a. Biomedical Risk Factors

Biomedical factors can include traumatic brain injury. *Id.* at 127. In 1979 or 1980, Mr. Rivera was attacked by three men and hit in the head with a steel pipe, a baseball bat, and a table leg, and was left with a large cut on his head. Ever since, he sees white flashes out of his left eye, has continuous headaches, and has been very forgetful. *See* Affidavit of Alfredo Rivera. One sister recalls that Mr. Rivera once forgot to turn off the lawnmower after moving the lawn. *See* Translated Affidavit of Camelia Garcia at 1. Another time, Mr. Rivera sent this sister to the store to buy him a newspaper. When she returned, he had forgotten that he asked her and was confused about why she had brought him the paper. *See id.* This sister often sent her own husband to accompany Mr. Rivera if he needed to go do something and explained that her husband went because Mr. Rivera needed someone there to help him. *See id.*

Mr. Rivera also caused himself significant brain injury through inhalant abuse. Medical records show that Mr. Rivera started to inhale one can of spray paint a week when he was approximately 17 years old. *See* Excerpts of Tropical Texas MHMR Records. TDCJ records document that Mr. Rivera's abuse of spray paint began at age 14. *See* Excerpt of Inmate Consolidated Record. One sister remembers Mr. Rivera inhaling spray paint throughout his childhood. *See* Affidavit of Lupita Rodriguez at 1. A recent study conducted by the National Institute on Drug Abuse revealed the significant long and short terms effects of inhalant use. Inhalant abuse can cause a variety of short-term effects:

> The chemicals found in solvents, aerosol sprays, and gases can produce a variety of additional effects during or shortly after use. These effects are related to inhalant intoxication and may include belligerence, apathy, impaired judgment, and impaired functioning in work or social situations. Dizziness, drowsiness, slurred speech, lethargy, ,depressed reflexes, general muscle weakness, and stupor

are other possible effects. For example, research shows that toluene can produce headache, euphoria, giddy feelings, and inability to coordinate movements. Exposure to high doses can cause confusion and delirium.

*NIDA Research Report Series-Inhalant Abuse* (visited December 15, 2003), <http://www.nida.nih.gov/ResearchReports/Inhalants/Inhalants3.html>. The study also found that toluene has serious long-term effects in its abusers. Those that abuse toluene by inhaling products such as spray paints may cause "a marked atrophy (shrinkage) of brain tissue." *Id.*

Dr. Garnett explained the implications of the biomedical risks that Mr. Rivera experienced as a child:

> Mr. Rivera reports that he started using inhalants at the age of 6 or 7, and began abusing alcohol, inhalants, and other drugs regularly in his early teens. Inhalant and alcohol abuse in the developmental years are recognized as dangerous to the developing brain and psychological status of an individual. There are also several reports, one from the University of Texas Medical Branch Hospitals Records, of head injuries from fights. The etiology of mental retardation can be simple and singular or it can be complex with multiple influences. Mental Retardation is a disability that interferes with an individual's ability to cope with the world and to learn the critical developmental skills that evolve into competent adult behavior. **In Mr. Rivera's case, there were multiple and significant influences that are recognized as barriers to developmental growth and causative factors in mental retardation and the evidence shows that deficits were apparent as early as age five.**

Report II of Dr. Richard E. Garnett, Ph.D. at 2 (emphasis added).

#### b. *Social Risk Factors*

Poverty is included within the social category of risk factors for mental retardation. Mr. Rivera grew up in a small home with at least six other children, and at times more. *See* Affidavit of Maria Juanita Rivera at 1. When a teacher once visited the Rivera household, she reported to other teachers that the house was filthy and dirty, and the kind of place that would get cold in the winter. *See* Affidavit of Hugh Albright at 2. Mr. Rivera's parents were "the kind of parents who wanted to do well for their children, but they did not have the skills. They cared for their children and tried to help, but they really did not know how." *See* Affidavit of Roberto X.

Moreno at 1.  Mr. Rivera frequently slept outside of the house of the child because it was either too hot or too crowded to sleep inside.  *See* Affidavit of Maria Juanita Rivera at 1.

### c.  Behavioral Risk Factors

Child abuse and neglect is one significant behavioral risk factor for mental retardation. 2002 AAMR Manual at 127.  Mr. Rivera was raised in an impoverished home where there may not have even been enough to eat.  "One teacher noted that Mr. Rivera liked school as a child because there was food."  Report II of Dr. Richard E. Garnett, Ph.D. at 7  His mother was physically abusive to all of her children.  *Id.  See* Affidavit of Maria Juanita Rivera at 1.  She hit the Rivera children with whatever she could find around the house—a hose or a stick, for example.  *See* Affidavit of Maria Juanita Rivera at 1.  These risks are also part of what Dr. Garnett considers the "multiple and significant influences that are recognized as barriers to developmental growth and causative factors in mental retardation."  Report II of Dr. Richard E. Garnett, Ph.D. at  7.

### d.  Educational Risk Factors

Impaired parenting and inadequate family support are two risk factors for mental retardation in the education category.  2002 AAMR Manual at 127.  As mentioned, Mr. Rivera's parents did not know how to care for or support their children.  They were "the kind of parents who wanted to do well for their children, but they did not have the skills.  They cared for their children and tried to help, but they really did not know how."  *See* Affidavit of Roberto X. Moreno at 1.  Also, the aforementioned physical abuse demonstrates more than just a lack of good parenting and support and, in fact, evidences the opposite.  *See* Affidavit of Maria Juanita Rivera at 1.

## V.  CONCLUSION

The evidence overwhelmingly shows that Mr. Rivera is mentally retarded.  He meets all the diagnostic criteria for mental retardation.  He has significant limitations in intellectual functioning as evidenced by his IQ and other test scores that were validly performed on December 1, 2003 and by the educational records and other materials provided to this Court.  He has significant limitations in adaptive behavior as evidenced by the conceptual, social, and practical deficits demonstrated to the Court.  These limitations, both intellectual and adaptive, manifested themselves well before Mr. Rivera reached the age of 18.  Mental retardation expert, Dr. Richard Garnett, who has spent significant time studying this case, confirms this conclusion:

> The materials that I have reviewed suggest that Mr. Rivera is mentally retarded and there is no information which could rule out this diagnosis.  His lifelong history of poor academic achievement suggests significant limitations in intellectual functioning . . . .  Furthermore, there is significant evidence that Mr. Rivera has deficits in the adaptive skill areas of academics, work, self direction, communication, health. and self care.  All of these limitations are described as originating before M[r]. Rivera reached the age of 18.

Report I of Dr. Richard E. Garnett at 6.  Dr. Garnett later confirmed his initial diagnosis after he received additional relevant materials and a full psychological evaluation:

> It is important to note that my assessment of new materials forwarded to me and my review of Dr. Kessner's psychological report has not caused me to change my original conclusions stated in my report of July 31, 2003.  The findings of Dr. Kessner and my review of additional school records merely strengthen those conclusions, and my original support for a diagnosis of Mental Retardation is felt to survive this additional review
>
> . . . .
>
> Based on the evidence I have reviewed, it is my professional judgment that Mr. Rivera had mental retardation in the developmental period and at the time of the crime, and he continues to have mental retardation today.

Report II of Dr. Richard E. Garnett, Ph.D. at 2, 9. Because there is conclusive evidence to support a mental retardation diagnosis, Mr. Rivera's death sentence is unconstitutional. *See Atkins v. Virginia*, 536 U.S. 304 (2002).

WHEREFORE, Petitioner respectfully requests that this Court grant him relief from his unconstitutional sentence of death and grant such other relief as law and justice require.

Respectfully submitted,

Max Hendrick, III
Attorney-in-Charge
Southern District Bar No. 0518
Texas State Bar No. 09450000
Vinson & Elkins L.L.P.
1001 Fannin St., Suite 2300
Houston, Texas 77002-6760
Phone:   713-758-2546
Fax:      713-615-5251

OF COUNSEL:

Walter M. Berger
Southern District Bar No. 21834
Texas State Bar No. 00798063
Emily W. Pipkin
Southern District Bar No. 35260
Texas State Bar No. 24037284
Vinson & Elkins L.L.P.
1001 Fannin St., Suite 2300
Houston, Texas 77002-6760
Phone:  713-758-2222
Fax:      713-615-5258

**ATTORNEYS FOR PETITIONER
JOSE ALFREDO RIVERA**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January _____, 2004, a copy of this motion was served on the Respondent via facsimile at the following address:

Katherine D. Hayes
Assistant Attorney General
Postconviction Litigation Division
209 West 14th St., 8th Floor
Austin, Texas 78701
Telephone: (512) 936-1600
Facsimile: (512) 320-8132

Emily W. Pipkin