IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

JAN 3 0 2004

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| JOSE ALFREDO RIVERA, | § § § | |
| Petitioner, | § § § § | |
| V. | § | NO. B-03-139 |
| DOUG DRETKE, Director, Texas Department of Criminal Justice, Institutional Division, | § § § § § | |
| Respondent. | § | |

## PETITIONER JOSE ALFREDO RIVERA'S POST-HEARING BRIEF

OF COUNSEL:
William E. Lawler III
D.C. Bar No. 398951
Walter M. Berger
Southern District Bar No. 21834
Texas State Bar No. 00798063
Emily W. Pipkin
Southern District Bar No. 35260
Texas State Bar No. 24037284
Vinson & Elkins L.L.P.
1001 Fannin St., Suite 2300
Houston, Texas 77002-6760
Phone: 713-758-2222
Fax:    713-615-5258

Max Hendrick, III
Attorney-in-Charge
Southern District Bar No. 0518
Texas State Bar No. 09450000
Vinson & Elkins L.L.P.
1001 Fannin St., Suite 2300
Houston, Texas 77002-6760
Phone: 713-758-2546
Fax:    713-615-5251

ATTORNEYS FOR PETITIONER
JOSE ALFREDO RIVERA

## I. INTRODUCTION

On August 6, 2003, the Fifth Circuit stayed Petitioner Jose Alfredo Rivera's execution and gave him leave to proceed in the district court on his claim of mental retardation because he made a sufficient *prima facie* showing. *In re Rivera*, No. 03-41069 (5th Cir. Aug. 6, 2003). On January 7-8, 2004, an evidentiary hearing was held to determine whether Mr. Rivera is mentally retarded. The evidence established that Mr. Rivera is mentally retarded because his intellectual functioning has been subaverage and he has been significantly limited by his adaptive skills since before the age of 18. These limitations render his sentence unconstitutional as a matter of law.

## II. MENTAL RETARDATION ANALYSIS

In 2002, the Supreme Court held that it was cruel and unusual punishment to sentence a mentally retarded offender to death. *See Atkins v. Virginia*, 536 U.S. 304 (2002). The Supreme Court's opinion embraced the definition of mental retardation promulgated by the American Association of Mental Retardation ("AAMR"): (1) subaverage general intellectual functioning (*i.e.*, an IQ of approximately 70 to 75 or below) existing concurrently with (2) related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure and work, and (3) onset before the age of eighteen. American Association on Mental Retardation, MENTAL RETARDATION: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS 5 (9th ed. 1992) [hereinafter "1992 AAMR Manual"].[1]

### A. Mr. Rivera Meets the Three-Part Test for Mental Retardation

The evidence establishes that Mr. Rivera fits the only accepted definition of mental retardation. Dr. Richard Garnett, an expert with significant and discrete experience in mental

---

[1] In late May 2002, the AAMR released the latest version of the Manual. In this version the three diagnostic criteria are the same, but the new manual places more emphasis on adaptive behavior deficits and describes those deficits as "the collection of conceptual, social, and practical skills that have been learned by people in order to function in their everyday lives." 1992 AAMR Manual. at 73. This newer version stresses that "[l]imitations in adaptive behavior affect both daily life and the ability to respond to life changes and environmental demands." *Id.* at 91.

retardation diagnosis[2] unequivocally stated in his preliminary report, "all of the materials provided to me are consistent with and suggestive of a diagnosis of mental retardation." *See* PX 6 at 2.[3] Dr. Garnett also found that no evidence was presented that rules out a diagnosis of mental retardation. *Id.* After Dr. Garnett was provided with the results of a full psychological evaluation performed by Dr. Gilda Kessner along with additional materials for his review, he confirmed his preliminary conclusion that Mr. Rivera is mentally retarded:

> My assessment of new materials forwarded to me and my review of Dr. Kessner's psychological report has not caused me to change my original conclusions . . . . The findings of Dr. Kessner and my review of additional school records merely strengthen those conclusions, and my original support for a diagnosis of Mental Retardation is felt to survive this additional review . . . .

PX 24 at 2. Dr. Garnett went into detail about the reasons he confirmed his initial diagnosis:

> I have reviewed further school records and the psychological evaluation by Dr. Gilda Kessner . . . met with Mr. Rivera in a face-to-face meeting . . . Based on that . . . it seems clear to me that **Mr. Rivera meets the three pronged definition of Mental Retardation . . . . it is my professional judgment that Mr. Rivera had mental retardation in the developmental period and at the time of the crime, and he continues to have mental retardation today.**

PX 24 at 9-10 (emphasis added); Transcript of Ev. Hr'g, Vols. II-III at 120.

### 1. Evidence of Significant Limitations in Intellectual Functioning

### a. *Mr. Rivera Scored a 68 on the only comprehensive and valid IQ test administered, the WAIS III, which both sides' witnesses agree is the "gold standard" for mental retardation testing.*

On December 1, 2003, Dr. Gilda Kessner, Psy.D., a psychologist specializing in psychological testing, individually administered a valid IQ test to Mr. Rivera. *See* PX 2; PX 24 at 4. The test she administered was the WAIS III, which all agreed was the "gold standard" for testing intellectual functioning for the purpose of diagnosing mental retardation. Tr., Vol. III at 432:12. (Dr. Saunders, the government's expert, testified that "the gold standard is the Wechsler

---

[2] Dr. Garnett has far more experience in the diagnosis of mental retardation than does the expert for the government. *See* PX 3.
[3] PX will be used to refer to Petitioner's exhibits as offered into evidence at January 7-8, 2004 evidentiary hearing.

2

scales of intelligence test"). This test meets the AAMR Manual's requirement that intelligence tests must be individually administered by a properly trained professional. Even Dr. Saunders acknowledged that "[Dr. Kessner] administered that [WAIS III] test in a standard way. It was a cleanly given test." Tr., Vol. III at 335:21-22.

Dr. Kessner determined that Mr. Rivera's composite score on the only valid IQ test ever given to Mr. Rivera was a 68 and establishes that he has "significantly subaverage intellectual functioning." PX 2 at 4. Importantly, Dr. Kessner also administered a Malingering Test and Mr. Rivera's score showed he was "putting forth his best effort" during the testing. PX 2 at 3.[4] Dr. Garnett reviewed the results of the one full scale test administered to Mr. Rivera and concluded:

> Dr. Kessner's conclusion that Mr. Rivera's "Full Scale IQ score also meets the American Association on Mental Retardation . . . as qualifying for the intellectual component of the definition of mental retardation" and that his "current intellectual abilities are a continuation of his deficits evident in early childhood" sufficiently establishes the first and third prongs of the diagnosis of Mental Retardation.

PX 24 at 5. Mr. Rivera's IQ test confirms that his intellect is in the lowest one to three percent.

### b. The government's position that half of Mr. Rivera's full scale IQ score be disregarded is not an accepted practice in diagnosing mental retardation.

Faced with clinically approved evidence that Mr. Rivera is mentally retarded, the government must try to convince the Court that Mr. Rivera has an IQ score above 75. In order to do this, the government suggests, without any clinical support or any rigorous, scientifically tested, peer-reviewed data, that the court should ignore Mr. Rivera's verbal score on the WAIS III test because he is bilingual.[5] The government's position would lead to the absurd conclusion that no bilingual individual can be adequately tested for intellectual function.

---

[4] Dr. Saunders agreed that these results ruled out the possibility of gross malingering.
[5] Witnesses for the Petitioner and the Respondent testified that they communicated with him in English. *See, e.g.,* Tr., Vol. II at 279, 285, 315. Additionally, TDCJ records list Mr. Rivera's language as English. *Id.* at 318 (Mr. Simon, one of the witnesses for the government, agreed that "the Texas Department of Criminal Justice considered Mr. Rivera's primary language English").

3

In support of its position, the government relies its expert's testimony who, apparently for this hearing alone, created an off-the-cuff vocabulary exercise consisting of nine Spanish words. *Tr.*, Vol. III at 391. This demonstration proves absolutely nothing and should not sway the Court. The demonstration appears to have been given without any consideration of the subtleties of the Spanish language, and appears to be based, at least in part, on the government's expert's view that there is only one correct Spanish translation of any particular English word.

The court can rely upon the full WAIS III test with confidence because, as explained by Dr. Garnett, the WAIS III test has been created with the understanding that it is appropriate for administration to bilingual individuals. Dr. Garnett described the weighing and norming process of the test, and it is clear that the scientific community believes that WAIS III is appropriate for administration to bilingual individuals. *Id.* at 446-449. Therefore, the full scale IQ test administered by Dr. Kessner on December 1, 2003 is the only IQ test that can be considered a valid indicator of Mr. Rivera's intellectual functioning. His score of a 68 confirms that his intellectual functioning is well within the mentally retarded range.

### c. *Mr. Rivera's academic history also shows that Mr. Rivera has significant limitations in intellectual functioning.*

Dr. Garnett determined that Mr. Rivera's academic records are consistent with Mr. Rivera's IQ and support the conclusion that he has severe limitations in intellectual functioning. Mr. Rivera was forced to repeat several grades, had very low or failing grades in virtually all his classes, and was often only passed because he was socially promoted: "generally, all kids were passed on to the next grade regardless of performance. It was very rare that a student was retained." Tr., Vol. II at 68:5-6; *see* PX 4 at 4-5; PX 10; PX 25. Mr. Hugh Albright, who taught Mr. Rivera in grade school, testified that Mr. Rivera had serious performance problems in school: "He did not perform. He seemed to lack any ability to comprehend what school was all

4

about . . . . he couldn't write a sentence. He couldn't copy from the chalkboard or even from a textbook. He . . .couldn't take dictation of numbers." Tr., Vol. II at 54:3-4, 57:14-17. Although Mr. Rivera could follow basic commands, he simply lacked the ability to think independently. When the Court asked Mr. Albright whether Mr. Rivera's performance was the result of a failed school system or the result of his inability to learn, Mr. Albright explained, "I don't think that [Mr. Rivera] had the tools to work with. I don't think he had all . . . the parts of the puzzle on the table." *Id.* at 278-79. In Mr. Albright's judgment, Mr. Rivera's inability to be taught or to learn was the problem. *Id.* at 79:2. Dr. Garnett's conclusion concurs with this assessment:

> It was clear that Mr. Rivera did not just struggle in school; he was unable to succeed in virtually every class he was placed in. It is painfully obvious that **Mr. Rivera did not have the intellectual capacity to benefit from school from as early as failing the first grade, and the test results from Dr. Kessner make the reasons obvious.**

PX 24 at 6 (emphasis added). Thus, the weight of credible and reliable evidence as a whole supports the conclusion that Mr. Rivera meets the first prong of the mental retardation analysis-- he has significant limitations in intellectual functioning.

### 2. Evidence of Significant Limitations in Adaptive Skills

Mr. Rivera meets the second prong of mental retardation because he suffers from significant adaptive skills deficits. Even the government's expert acknowledged this point when he testified, "There are adaptive deficits here . . . I'm not saying that [Mr. Rivera] does not have adaptive functioning deficits." *Id.* at 420:20-25. As the evidence shows, Mr. Rivera's adaptive deficiencies appear in a number of areas.

### a. *Mr. Rivera exhibited deficits in adaptive skills by way of his inability to perform at school*

From the time he entered elementary school, Mr. Rivera had difficulty learning and consistently performed at a level significantly below his grade and age. *See* PX 9 at 1. He was

5

consistently held back or socially promoted and, at age 14, he was performing at a first or second grade level in reading, writing, and math. *See* PX 10. Dr. Garnett explained, "it is significant that Mr. Rivera was unable to achieve even in special education classes where the assignments were at his own level of ability and below." PX 24 at 6. A review of his academic failures clearly demonstrates his inability to learn or develop as a student from first grade until the day he dropped out of school in the ninth grade at age 19. Mr. Albright also testified that Mr. Rivera was the child at school that was least capable of learning. Tr., Vol. II at 87:11-17. He explained, "One of the reasons I remember so much about [Mr. Rivera] in particular is that in all the 21 years that I was at Longoria, there was nothing—nothing ever that could match, in my judgment, his failure, his inability to perform such simple tasks. I never did see that in another kid."[6] *Id.*

### b. Mr. Rivera's childhood shows deficits in the social and practical domains of adaptive skills.

Mr. Rivera's sisters presented a clear picture of Mr. Rivera's childhood which shows significant adaptive flaws from an early age. They testified that Mr. Rivera could not take care of himself; he did not bathe, brush his teeth, wash his hair or clothes, and was perpetually dirty, resulting in his family nickname: "cochinito" or "little pig." Tr., Vol. II at 6-8, 11-12, 28. Mr. Rivera's sisters also testified that he had very few friends and that his "friends" were just those that he sniffed paint with. *Id.* at 10. He "did not react well with other students [at school]." *Id.* at 63: 18-19. He also did not engage in any activities as a child: he did not play games or sports with other children, he did not read or write, he did not even watch television. *Id.* at 9, 15-16, 29. One sister testified that he would sometimes look at the newspaper, but he only read the comics and looked at pictures. Mr. Rivera also was rarely in the family home. His oldest sister

---

[6] This evidence further bolsters the conclusion that Mr. Rivera falls well within the bottom two percent of the population in terms of intellectual functioning. Mr. Albright had on average 25 people a year for 21 years. Therefore, as the weakest student, Mr. Rivera would have been in the bottom .019% of his school's population.

testified that she would entreat him to come in, but that he preferred to be alone outside. *Id.* at 28-29. He always slept outside underneath the house, regardless of the cold or rain. *Id.*

At school, Mr. Rivera stood out among his classmates not only because he was such a weak student, but also because he had noticeably poor hygiene: "Jose appeared very unclean in his appearance . . . . his clothes ragged, his shoes torn, and his pants too big . . . . Other kids used to make fun of him because of that." PX 9 at 2.

Mr. Rivera was almost completely dependent on his parents throughout his childhood and the his adult life. *See* PX 16 at 1. He never helped his parents pay the bills and never helped fix things around the house. *Id.*; Tr., Vol. II at 30. Mr. Rivera also never found jobs for himself, but depended on others, usually his father, to find jobs for him. *Id.* at 33. Once Mr. Rivera found a job, he could not keep it very long. *See* Garza Aff. at 1; PX 13 at 1; PX 15 at 1. When he was making money, he was unable to manage it. His sister explained that she had to take away any money he earned so he would have money for necessities. Tr., Vol. II at 34.

After reviewing all relevant materials, Dr. Garnett confirmed the evidence of limitations in Mr. Rivera's adaptive functioning from his childhood to the present. His deficits continue to manifest themselves in several areas. For example, Mr. Rivera continues to demonstrate an inability to read or write well. *See* PX 12. One sister said that he reads "very, very slowly, like a child who was just learning to read for the first time." Camelia Garcia Aff. at 2. Additionally, his oldest sister said that Mr. Rivera never learned to write well, and she still has trouble understanding his letters, as he often misspells or misplaces words or leaves out words altogether. *See* PX 12 at 1; PX 13 at 1. Mr. Rivera's reading and writing skills have remained limited, even on death row, where reading and writing is an inmate's primary source of contact with the outside world. These continuing problems are further support of his mental retardation.

7

The bulk of Respondent's witnesses attempted to testify as to what Mr. Rivera could do—*i.e.* read books, order from the commissary (when he had no money), follow prison rules and instructions, pass a correspondence and Bible study course. Tr., Vol. III at 206-217, 235, 262-263, 273, 276-278. These functional skills are not inconsistent with a diagnosis of mental retardation. *See id.* at 440. More importantly, they do not have anything to do with Mr. Rivera's adaptive behavior deficits for purposes of a mental retardation analysis. What matters in the mental retardation analysis is whether Mr. Rivera had adaptive deficits before the age of eighteen. Respondent's fact witnesses do not even begin to address this issue. The testimony of Mr. Rivera's sisters and Mr. Rivera's teacher address this issue and clearly demonstrate that Mr. Rivera had significant limitations in his adaptive behavior before the age of 18.

3. **Mr. Rivera's Diminishing Intellectual Functioning and Adaptive Behavior Deficits Manifested Themselves Before the Age of 18**

The third and final element needed for a mental retardation diagnosis is the requirement that intellectual functioning deficits manifest themselves before age 18. Only Mr. Rivera has offered evidence regarding this crucial element. The testimony of his sisters and grade school teacher are perhaps the most directly relevant evidence available to the Court, and that evidence shows, without contraction by any evidence from the government, that Mr. Rivera's failures and deficiencies were all apparent before he became 18 years old. (*See* Section II.2 above).

The government's evidence regarding what Mr. Rivera is capable of is entirely based on his performance in prison now, at the age of 43. The Court need not focus on what Mr. Rivera can do at 43; it has no bearing on whether Mr. Rivera's intellectual and adaptive functioning was deficient before age 18. The evidence presented by the government does not refute the Petitioner's proof that Mr. Rivera's deficits manifested themselves before 18. Dr. Garnett

reviewed all of this information presented by Respondent and it did not alter his conclusion that, based on all of the evidence presented, Mr. Rivera has significant adaptive deficits:

> **Mr. Rivera has clear limitations in many areas of adaptive functioning and . . . these limitations originated well before the age of 18.** Mr. Rivera's inability to perform at school is representative of limitations in functional academic skills . . . . What is clear from all of the accounts of teachers and Mr. Rivera's family, is that Mr. Rivera was unable to take care of day to day tasks such as hygiene, finding and keeping a job, paying bills, or fixing things around the house without help and direction from others.

PX 6 at 5-6 (emphasis added).

### B. The Presence Of Clinical Risk Factors Support A Finding Of Mental Retardation

The 2002 AAMR Manual describes four categories of risk factors that may interact to cause mental retardation. *See* 2002 AAMR Manual at 123-141. The four categories of risk factors are: (1) biomedical, (2) social, (3) behavioral, and (4) educational. *See id.* at 126. After reviewing the relevant materials in this case, Dr. Garnett confirms the existence of all these various factors in Mr. Rivera's case. *See* PX 6 at 5.

#### 1. Biomedical Risk Factors

Biomedical factors affected Mr. Rivera's mental retardation in the form of brain injury induced by his own actions and by the actions of others. Mr. Rivera caused himself brain injury through repeated inhalant abuse from a very young age. *See* PX 15 at 1; *See* Excerpt of Inmate Consolidated Record. The Texas Department of Mental Health and Mental Retardation names substance abuse as the most common cause of mental retardation. *See* PX 28. Mr. Rivera's substance abuse is significant because it may have been a cause, or even the cause, of his mental retardation. Tr., Vol. II at 109-110. Even the government's witness, Dr. Saunders, admits to this fact. *See* Tr., Vol. III at 412-413.

Mr. Rivera also was subjected to abuse during childhood from his mother and from fights with neighborhood kids. Tr., Vol. II at 6-7; *see* Alfredo Rivera Aff. Dr. Garnett explained that

such events, which likely caused brain injury during Mr. Rivera's childhood, may also be causes of Mr. Rivera's mental retardation: "In Mr. Rivera's case, there were multiple and significant influences . . . recognized as barriers to developmental growth and causative factors in mental retardation and the evidence shows that deficits were apparent as early as age five." PX 24 at 8.

### 2. Social, Behavioral, and Educational Risk Factors

Poverty is a social risk factors for mental retardation, child abuse and neglect are behavioral risk factors for mental retardation, and impaired parenting and inadequate family support are two educational risk factors for mental retardation. 2002 AAMR Manual at 127. The conditions in Mr. Rivera's childhood home undeniably demonstrate all of these risk factors. Mr. Rivera grew up in a small, impoverished home with six other children, where may not have even been enough food. *See* PX 12 at 1. "One teacher noted that Mr. Rivera liked school as a child because there was food." PX 24 at 8. Another teacher reported that his house was filthy and dirty, a place that would get cold in the winter. *See* PX 9 at 2. The conditions at home were terrible, in large part, because Mr. Rivera's parents were abusive and did not have adequate parenting skills. *See* PX 11 at 1. Mr. Rivera and his other siblings also faced repeated physical abuse from their mother, who beat them throughout their childhood. *See* PX 12 at 1; Tr., Vol. II at 7:5. Additionally, the school that Mr. Rivera went to was a poor school where "many kids have fallen through . . . the cracks." Tr., Vol. II at 85:15. Based on Mr. Albright's testimony, it is clear that Longoria elementary was simply not equipped to recognize Mr. Rivera's special needs or to meet them: "he needed someone to recognize [his] inability in the beginning to grasp . . . basic skills" and that didn't exist at Longoria. *Id.* at 12-14.

### V. CONCLUSION

WHEREFORE, Petitioner respectfully requests that this Court grant him relief from his unconstitutional sentence of death and grant such other relief as law and justice require.

Respectfully submitted,

*Max Hendrick III w/ EWP*

Max Hendrick, III
Attorney-in-Charge
Southern District Bar No. 0518
Texas State Bar No. 09450000
Vinson & Elkins L.L.P.
1001 Fannin St., Suite 2300
Houston, Texas 77002-6760
Phone: 713-758-2546
Fax:　 713-615-5251

OF COUNSEL:

William E. Lawler III
D.C. Bar No. 398951
Walter M. Berger
Southern District Bar No. 21834
Texas State Bar No. 00798063
Emily W. Pipkin
Southern District Bar No. 35260
Texas State Bar No. 24037284
Vinson & Elkins L.L.P.
1001 Fannin St., Suite 2300
Houston, Texas 77002-6760
Phone: 713-758-2222
Fax:　 713-615-5258

**ATTORNEYS FOR PETITIONER
JOSE ALFREDO RIVERA**

## CERTIFICATE OF SERVICE

I hereby certify that on January 29, 2004, a copy of this motion was served on the Respondent via facsimile at the following address:

Katherine D. Hayes
Assistant Attorney General
Postconviction Litigation Division
209 West 14th St., 8th Floor
Austin, Texas 78701

_____
Emily W. Pipkin