United States District Court
Southern District of Texas
FILED

JAN 3 0 2004

Michael N. Milby
Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOSE ALFREDO RIVERA, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. B-03-139 |
| | § | **CAPITAL LITIGANT** |
| DOUG DRETKE, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| Respondent | § | |

**RESPONDENT'S POST-HEARING BRIEF**

Following a two-day evidentiary hearing on the issue of whether Petitioner Jose Alfredo Rivera ("Rivera") is mentally retarded, the Court ordered each party to submit a brief of no more than ten pages. 3 FH 470.[1] This timely response follows.

**STANDARD FOR REVIEWING CLAIMS OF RETARDATION**

In *Atkins v. Virginia,* 536 U.S. 304 (2002), the United States Supreme Court did not define "mental retardation" for purposes of an Eighth Amendment bar upon capital punishment; however, the Court provided guidance by quoting two generally accepted mental health definitions:

> The American Association of Mental Retardation (AAMR) defines mental retardation as follows: "*Mental retardation* refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18."[2]

> The American Psychiatric Association's [APA] definition is similar: "The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive

---

[1] "FH" stands for the federal hearing transcript, preceded by volume and followed by page reference. Volume 1 of the transcript is unavailable as of the date of filing this briefing.

[2] The AAMR's tenth edition definition was admitted at the hearing as Petitioner's Exhibit ("P-Ex") 4. 1 FH --

functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C)....

*Atkins*, 536 U.S. at 309 n.3 (internal citations omitted).[3] Here, Rivera fails to develop sufficient evidence to show that he meets these criteria and is actually mentally retarded.

## ARGUMENT

I.  **Rivera Fails Criterion "A" -- Significantly Subaverage Intellectual Functioning.**

"Significantly subaverage intellectual functioning" is defined as "an IQ of about 70 or below" as obtained by assessment on a standardized, individually administered intelligence test. APA, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS IV-TEXT REVISION 41 (4th ed. 2000) ("DSM-IV-TR"). Taking measurement error into account, "it is possible to diagnose mental retardation in individuals with IQs between 70 and 75 who exhibit significant deficits in adaptive behavior" provided the onset was before age eighteen. *Id.* at 42. Rivera was individually administered the Wechsler Adult Intelligence Scale - 3rd Edition ("WAIS-III") by Dr. Gilda Kessner, who reported a verbal IQ score of 66, a performance IQ score of 77, and a full scale IQ score of 68. Respondent's Exhibit ("R-Ex") 2 at 17. The WAIS-III has a 5 point measurement error, DSM-IV-TR at 41; therefore, Rivera's full scale IQ score of 68 could represent a range of scores from 63 to 73. Based primarily on this testing, Rivera argues he qualifies for the intellectual component of the definition of mental retardation.[4]

---

[3] The Texas legislature has not yet enacted statutory procedures for complying with *Atkins* and, thus, has not defined mental retardation in the death penalty context. However, the Court of Criminal Appeals has followed the three-criteria approach described above in determining whether an appellant has made a *prima facie* showing necessary to permit consideration of the merits of an *Atkins* claim in a successive habeas application. *See, e.g., Ex parte Rivera*, No. 27,065-02 at 2-3 (Tex. Crim. App.) (unpublished per curiam opinion of July 25, 2003).

[4] The defense experts also point to Rivera's low scores on tests of academic achievement. *See, e.g.*, P-Ex 2 at 3-4; P-Ex 24 at 4-5. As explained in Part II below, neither Rivera's scores on academic tests nor his past scholastic performance proves he is mentally retarded

Yet Rivera's experts' reliance on the verbal IQ score in the face of Rivera's significant expressive and receptive English-language deficits is contradictory to psychometric standards of interpretation. Instead, Rivera's performance IQ score of 77 is more reflective of Rivera's true intelligence is fully consistent with his three prior IQ scores of 80, 92, and 85.[5] Taken together, these factors show Rivera does not suffer from significantly subaverage general intellectual functioning.

With the exception of the Rey, the manner in which Dr. Kessner's administered the tests is not challenged.[6] *See, e.g*, 3 FH 333, 335, 354. Because Dr. Kessner gave the complete WAIS-III, which Dr. Roger Saunders called the "gold standard" of IQ tests, 3 FH 370, and because of the inherent possibility of a "practice effect" if the test is re-administered too close to the original testing date -- a fact admitted by all the experts -- Dr. Saunders did not re-administer the WAIS-III, instead choosing to rely upon the non-verbal portion of the test as being more representative of Rivera's level of intellectual functioning as is standard practice in the field of psychology. 3 FH 334-35.[7]

---

since a variety of alternative explanations exist for his performance such as apathy, lack of motivation, English-language deficiencies, and use of inhalants.

[5]    *See* R-Ex 32 at 254; R-Ex 33 at 36, 46. Although Dr. Garnett stated that TDCJ disciplinary hearing forms also reference IQ scores below 73 (2 FH 148; P-Ex 24 at 4), these notations are not IQ scores. As explained by Roy Simon, death row inmates do not have their IQs assessed prior to being placed on death row. Disciplinary hearing officers presume the inmate's IQ falls below 73 and, thus, automatically appoint counsel substitute for major offenses. 3 FH 311-12.

[6]    Dr. Kessner testified that when she initially administered the Rey test to Rivera, he became distracted and so she re-tested him. 1 FH --; P-Ex 2 at 4. When asked whether the literature shows that an examiner can re-administer the Rey and whether it was possible such re-administration could have resulted in an inflated score because of a learning effect, Kessner could not effectively answer. Nor could Dr. Kessner rule out that Rivera's "distraction" could have been his attempt to malinger of fake a lower score.

[7]    Because Dr. Kessner had administered the Wide Range Achievement Test -Revision 3 ("WRAT-3"), *see* R-Ex 2 at 1-4, Dr. Saunders gave Rivera an alternative version of the same test *not to determine Rivera's IQ* but to assess whether Rivera would perform consistently to allow Dr. Saunders to rule out malingering. 3 FH 332, 351; *see* R-Ex 2 at 2-6. While Saunders ruled out gross malingering, he could not rule out malingering on a smaller scale. 3 FH 351-52.

Under ideal circumstances, an examiner should strive to give a full scale IQ test, such as the WAIS-III; however, a full scale Wechsler is not appropriate for everyone. *See, e.g.*, 3 FH 356-58, 369-70. For example, the psychological literature instructs that socio-cultural or linguistic background may limit test performance. 3 FH 357 (quoting DSM-IV-TR at 46). For assessment of mental retardation to be meaningful, "it must take into account the individual's diversity and unique response factors. The individual's culture or ethnicity, including language spoken at home, nonverbal communication, and customs that might influence assessment results, must be considered in making a valid assessment." AAMR, MENTAL RETARDATION: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS 8 (10th ed. 2002); 1 FH -- (questioning Kessner on same). Further, an examiner "may be challenged when testing individuals with whom English is a second language," and experienced examiners have found useful administering tests with translators, using a translated version of a test (if available), and administering the test in the examinee's native tongue. The Psychological Corporation, WAIS-III TECHNICAL MANUAL 34 (2d ed. 2000); 3 FH 357 (Saunders, quoting same). Examiners are also instructed "to become familiar with the examinee's limitations and preferred mode of communication" prior to testing; that "some flexibility may be necessary to balance the needs of a particular examinee with the need to maintain standard procedures"; and that in certain instances an examiner may consider placing "greater weight" on the either verbal or performance subtests and scores as estimates of an examinee's cognitive abilities. The Psychological Corporation, WAIS-III ADMINISTRATION AND SCORING MANUAL 33 (2d ed. 1997); 3 FH 468 (questioning Garnett on same). Simply put, IQ tests are not "one-size-fits-all" and they can, and must be, altered depending on the individual circumstances.

Rivera has significant limitations with the English language -- limitations which directly impacted his verbal IQ score and, in turn, decreased his full scale IQ score. Dr. Saunders testified Rivera's first language is Spanish; that it was spoken almost exclusively within his family; that Rivera endorsed that he never really heard English to any degree until he started school; and that his teachers taught in English but used Spanish as well. 3 FH 359. Rivera's sisters testified that

Rivera always spoke Spanish and that he preferred listening to people in Spanish. 2 FH 17, 42. Dr. Saunders further testified that while Rivera was raised bilingually, he communicates in "very broken English," uses short sentences and clang associations (words that sound like other words), is very poorly articulated, and has basic difficulty with English-language skills. 3 FH 360. School records also reflect poor scores in English-language subjects. *See* R-Ex 6. Although Rivera did not personally address the Court, Dr. Saunders, who interviewed Rivera for five hours, testified that Rivera "speaks a lot like the sisters who were up here testifying." 3 FH 360.[8] Most importantly, Dr. Saunders testified that Rivera "speaks in Spanish, he thinks in Spanish...." 3 FH 359. If Rivera must translate what he hears in English to Spanish in order to process it then, when faced with timed verbal subtests heavily laden with English-language skills, Rivera would most likely perform poorly on such tests as compared to non-verbal or performance tests.

And this is exactly what happened when Rivera's IQ was tested by Dr. Kessner. For example, of the eleven subtests on the full-scale WAIS-III, six are verbal tests and, by far, these were Rivera's lowest scores. *See* R-Ex 2 at 16 (verbal subtest scores of 3, 3, 3, 5, 5, and 6 versus performance subtest scores of 5, 6, 6, 7, and 8). The three subtests on which Rivera scored lowest -- vocabulary, similarities, and information -- are most heavily reliant on English skills and old school learning. Given such scores, Dr. Saunders assessed whether Rivera could communicate additional knowledge on the vocabulary subtest when asked the words in Spanish. Rivera gave "superior" answers, "more enriched" information, and demonstrated a "richer knowledge" of some words in Spanish. 3 FH 361, 363, 368. According to Saunders, it is not that Rivera is unable to communicate or understand anything in English -- indeed, every witness at the hearing (except Rivera's own sisters) testified that they were able to communicate with Rivera -- it is that Rivera has learned some

---

[8] The record is replete with instances where the sisters either did not understand the questions put to them by the attorneys or where the witnesses gave answers in Spanish. *See, e.g.*, 2 FH 9-10, 11, 18-19, 21-22, 23, 26, 37, 39, 40, 45, 47-48. On cross-examination, Esmeralda Maciel testified that she "talk[s] more in Spanish, but they told me to talk to you in English." 2 FH 42. Despite this directive, Ms. Macial oftentimes reverted to Spanish. *E.g.*, 2 FH 37, 39, 40, 45, 47-48.

information in English and other information in Spanish so that there is a "competition" with languages when he processes information. 3 FH 363.[9] Consequently, Rivera's verbal IQ score of 66 is an unreliable indicator of intellectual functioning because it fails to access all the knowledge Rivera actually possesses. Thus, it is not psychometrically appropriate to rely on the verbal score.

Instead, Rivera's performance IQ score of 77 is more representative of his current level of intellectual functioning. 3 FH 354, 355. Other than the instructions being given in English, the performance subtests do not involve English language skills to determine intelligence; on the other hand, verbal subtests are basically "unfair" to someone who has difficulty with English or someone without complete formal education. 3 FH 358. Furthermore, Rivera's performance IQ score of 77 is commensurate with his prior IQ scores of 80, 92, and 85. 3 FH 374-75.[10] Given the above, Rivera fails to establish that he has significant limitations in intellectual ability as would place him in the bottom two percent of all individuals.

## II.     Rivera Fails Criterion "B" -- Significant Limitations In Adaptive Functioning.

"Adaptive functioning" refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting. DSM-IV-TR at 42. Here, Rivera points to various examples of his conduct as evidencing significant limitations in adaptive functioning; however, Rivera's witnesses appear to have approached the evidence with blinders on[11]

---

[9]     No one is arguing that IQ tests cannot be administered to Spanish speaking individuals. However, the WAIS-III was normed in part on *bilingual* Spanish speakers who were fluent in English. As Dr. Saunders explained, the standardized population for the WAIS-III would not have included individuals with Rivera's level of English skills. 3 FH 405.

[10]    Although both defense experts suggested disregarding the 80 and 92 scores (they made no mention of the 85 score), an expert cannot simply throw out results because he does not like them. Dr. Saunders did not blindly throw out the verbal IQ score, but instead thoroughly explained why that score is unreliable and why it should not be considered in this instance.

[11]    Despite testifying about the importance of obtaining as much information as possible in order to determine an individual's level of adaptive functioning, Dr. Kessner was forced to admit

-- failing to ask what alternative explanations can be offered for the conduct, such as Rivera's inhalant abuse, his extensive criminal history, and his negative personality characteristics. Admittedly Rivera has significant limitations in several areas, but his deficiencies are the result of his own volitional conduct and not because of retardation.

First, Rivera has an extensive history of abusing inhalants. 3 FH 383. According to Dr. Saunders, "episodic intake of inhalants may first be associated with school problems, truancy, poor grades, dropping out of school, as well as family conflict. Use of inhalants in older adults -- older adolescents and young adults [--] is often associated with social and work problems, delinquency, unemployment" -- all of which exist in Rivera's case. 3 FH 385-86. The Court should consider Rivera's inhalant abuse as an overriding factor affecting his level of adaptive functioning.[12]

Second, Rivera's extensive criminal history -- at least twenty-five arrests, nineteen of which were for public intoxication -- is not the type of conduct exhibited by retarded persons. *See* R-Ex 20. Even Dr. Garnett admitted that unlike Rivera, mentally retarded people do not repeatedly use drugs, do not assault others, do not drink and drive, do not carry weapons, do not burglarize buildings, do not sexually victimize children, and do not murder children. 2 FH 150-51.

Third, Rivera has certain antisocial personality features -- such as his numerous "run ins" with the law; his repeated lying; his failure to plan ahead; his impulsivity; his irritability or

---

that prior to interviewing Rivera, she reviewed no information whatsoever other than Rivera's Fifth Circuit application to file a successive writ and its accompanying exhibits. 1 FH --; *see* P-Ex 2 at 1-2 (listing items reviewed). Given the lack of records, it is inconceivable why she would only obtain a "brief history" on Rivera. P-Ex at 2-3. Dr. Garnett's report is also full of examples of Rivera's conduct, but again, he fails to ever address why such conduct occurred. *See* P-Ex 24 at 5-9.

[12] While substance abuse can cause mental retardation, for this to be true in Rivera's case, he must point to evidence of significant limitations in intellectual abilities and adaptive functioning existing before the age of eighteen. When pressed for such evidence, Dr. Garnett responded, "multiple arrests for chemical dependency and inhalant abuse." 3 FH 461. However, of Rivera's nineteen arrests for public intoxication, only one occurred before he reached eighteen. R-Ex 20 at 62-63. Neither do Rivera's low scores in school, standing alone, prove that Rivera's episodic use of inhalants rendered him mentally retarded.

aggressiveness; and his consistent irresponsibility as indicated by repeated failure to sustain consistent work behavior and honor financial obligations. 3 FH 387-90. Rivera also admits that he is lazy, and others have described him as unmotivated. 3 FH 420; P-Ex 9 at 1 (par. 3 & 4).

Finally, much of the conduct Rivera relies upon as establishing limited adaptive functioning fails when the true reasons for such conduct are explained. Rivera's poor grades in school[13] can be explained in part by Rivera's limitations in English-language skills, his apathy, his skipping school, and his episodic use of inhalants and other illegal substances. As far as sleeping outdoors, Rivera's father testified at trial that there was room for Rivera to sleep indoors, but that he slept outside so that his father would quit bothering him about his sniffing paint. 13 RR 548, 540-42. Although Rivera lived with his parents even after he was married, Rivera told Dr. Saunders his parents welcomed them into their house, and that it was common for people in the community to live like that. R-Ex 1 at 14.[14] The fact that Rivera has lived alone for only a short time does not evidence he is incapable of doing so but instead is because Rivera did not want to pay rent. 3 FH 392. Other than two disciplinary infractions in the past ten years, Rivera has had no trouble keeping himself and his cell clean and neat. *See, e.g.*, 3 FH 276-77, 286. One correctional officer testified that Rivera even "mattress presses" his jumper. 3 FH 278. Although Rivera contends he cannot do math, the TDCJ commissary manager testified that Rivera places orders wherein he calculates the prices and amounts owed. 3 FH 233-34. As far as Rivera not being able to or disliking read, a TDCJ property

---

[13]   While Dr. Garnett contends Rivera was placed in special education classes, P-Ex 24 at 5, when pressed for any evidence, Garnett stated that he only meant to say "special classes." 2 FH 159-60. By Garnett's account, these "special classes" consisted of Rivera being placed in a "high-one" class when he failed first grade, and the CVAE motivational class for at-risk students -- both of which Garnett admitted do not evidence retardation. 2 FH 160-61. Although Rivera's sisters have made unsupported assertions that Rivera was placed in special education, no school records reflect this to be true. *Compare* R-Ex 38 (affidavits) *with* R-Ex 6 (school records).

[14]   The trial record reflects that in 1993 at the time of trial, at least two of Rivera's sisters and their husbands were living in the Rivera household. In fact, Maria Juanita Rivera testified that she has always lived with her father. P-Ex 12 at 1 (par. 2).

officer testified that Rivera has in the past had as many as fifty-one paperback books in his cell, 3 FH 262; and the prison librarian provided a list of the titles of books checked out by Rivera, R-Ex 10, -- books which Dr. Kessner admitted were regular books, not specially written for the mentally challenged. 1 FH --; *see* R-Ex 1 at 10 (Rivera "likes" to read). Although Rivera may never have had a bank account, his work history shows he never made much money; what money he did make he used to buy inhalants, so there was never a need for him to have a bank account. Rivera's migrant work and low-skilled jobs can easily be explained by his failure to graduate from high school and his failure to acquire any formal skills -- events that occurred not because he is retarded, but because he is apathetic, lazy, unmotivated, oftentimes skipped classes, and became more interested in sniffing paint than in attending classes. *See, e.g.*, 3 FH 384-86. Because Rivera's lower level of adaptive functioning is the result of his own volitional behavior and not mental retardation[15], these examples fail to establish he meets the second criteria for mental retardation.

**III.    Rivera Fails Criterion "C" -- Onset Before Age Eighteen.**

Conspicuously absent from Rivera's case is any evidence establishing that he suffered from significant limitations in intellectual ability and adaptive functioning before eighteen. No school records show that Rivera was ever diagnosed as retarded or ever placed in special education classes. *See, e.g.*, R-Ex 6. Trial counsel Jose Esquivel testified that he believed Rivera was competent and able to help in his defense; that he did not feel there was a need to challenge Rivera's confession based on his mental status; and that no family member ever told him Rivera was retarded. 3 FH 197-98, 202. Further, as detailed by Dr. Saunders, while Rivera has been assessed by mental health

---

[15]    Most damning, although Rivera would contend he is incapable of performing even the simplest of tasks, Rivera's sister testified that when she was living in Florida, she sent money and asked Rivera to bring her daughter to her. 2 FH 31-32, 34-36. When asked by the Court whether she thought Rivera was capable of such a task, Maciel responded that she was "scared" because Rivera "didn't act normal sometimes when he was small," but that he "was more older at that time. *I thought he changed* because he was married already." 3 FH 36 (emphasis added). This is not testimony suggesting Rivera has a permanent condition like retardation, but rather, that he had "changed" his irresponsible behavior, perhaps by not abusing spray paints.

professionals, medical examiners, and TDCJ psychiatric personnel, no one has ever diagnosed Rivera as being retarded and, while it might be possible he could have "slipped through the cracks" for forty years, it is not probable. *See* 3 FH 377-79 (quoting, *e.g.*, R-Ex 32 at 254, 565; R-Ex 33 at 92, 168; R-Ex 39 at 4, 5, 6, 8). Additionally, the fact that Rivera scored poorly in school and eventually dropped out before age eighteen does not establish that he is retarded and is instead explained by other factors. Although Rivera would point the Court to evidence establishing that substance abuse can cause mental retardation, *e.g.*, P-Ex 29, as explained in Part II above, he fails to prove that his episodic use of inhalants so impaired him before the age of eighteen that he could be considered retarded. The simple truth of the matter is that the issue of retardation first arose in June 2003, some six weeks prior to Rivera's scheduled execution. Given the absence of any convincing evidence showing significant limitations in intellectual ability or adaptive functioning manifested at an earlier date, Rivera fails to prove the final prong as well.

## CONCLUSION

Because Rivera cannot establish that he is mentally retarded, this Court should deny relief.

Respectfully submitted,

*/s/ Katherine D. Hayes*

KATHERINE D. HAYES*
Assistant Attorney General
State Bar No. 00796729
Southern Dist. No. 22698

*Attorney-in-charge

Office of the Attorney General
Postconviction Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: (512) 936-1600
Telecopier: (512) 320-8132

ATTORNEYS FOR RESPONDENT

## CERTIFICATE OF SERVICE

I do hereby certify that a true and correct copy of this brief has been served by faxing same to opposing counsel Max Hendrick, III (at 713-615-5251) and by placing same in overnight mail delivery, postage prepaid, on this Thursday, January 29, 2004, addressed to:

Max Hendrick, III
VINSON & ELKINS, L.L.P.
2300 First City Tower
1001 Fannin
Houston, TX 77002-6760
contact # (713) 758-2546

_____
KATHERINE D. HAYES
Assistant Attorney General