IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

FEB 1 3 2004

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| JOSE ALFREDO RIVERA, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. B-03-139 |
| | § | **CAPITAL LITIGANT** |
| DOUG DRETKE, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| Respondent | § | |

**RESPONDENT'S REPLY BRIEF**

Submitted by:

*Katherine D. Hayes*

KATHERINE D. HAYES*
Assistant Attorney General
*Attorney-in-charge
State Bar No. 00796729
Southern District No. 22698

Office of the Attorney General
Capital Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: (512) 936-1429
Telecopier: (512) 320-8132

ATTORNEY FOR RESPONDENT

## ARGUMENT

**I.   Rivera Has Not Established Significant Limitations In Intellectual Functioning.**[1]

Rivera argues that his full scale IQ score of 68 on the WAIS-III confirms that he falls into the mentally retarded range; that the Director's position to "disregard[]" Rivera's verbal IQ score of 66 in favor of his performance IQ score of 77 is "not an accepted practice in diagnosing mental retardation"; and that Rivera's academic history shows he has significant limitations in intellectual functioning. Rivera's Post-Hearing Brief ("Brief") at 2-5. These arguments are unavailing.

Rivera suggests that because Dr. Saunders agreed that Dr. Kessner had administered the WAIS-III in a standardized manner, that he was also agreeing with her choice in selecting the appropriate intellectual assessment tool, and in her interpretation of the results. *See* Brief at 2-3. Dr. Saunders certainly did not agree with her choice to use a heavily English-based assessment tool, nor in her interpretation. As Dr. Saunders explained, Rivera talks like his sisters, apparently processing some information in English and other information in Spanish and, consequently, he performed poorly on the WAIS-III when faced with timed verbal subtests heavily laden with English language skills. 3 FH 359-60. Yet Rivera gave "superior" answers when asked the same vocabulary subtest words in Spanish. 3 FH 361, 363, 368. Rivera is incorrect in asserting that Dr. Saunders' vocabulary exercise "proves absolutely nothing." Brief at 4. To the contrary, it demonstrates that Rivera possesses intellectual capabilities that the English-based (verbal IQ) portion of the WAIS-III entirely failed to measure.[2] In fact, the WAIS-III ADMINISTRATION AND SCORING MANUAL 33 (2d ed. 1997) noted that the performance IQ score, which here was 77 placing Rivera significantly above the mentally retarded range, can be weighted more heavily in these cases. Accordingly, Dr. Saunders' conclusion that Rivera's performance IQ score should be relied upon because it is "the most accurate measure of his current intellectual functioning," 3 FH 354 -- especially since such a

---

[1]   Subsequent to Respondent Doug Dretke ("the Director") filing his post-hearing brief, the Texas Court of Criminal Appeals issued its first published opinion solely addressing mental retardation in a successive habeas application. *Ex parte Briseno*, No. 29,819-03, 2004 WL 244826 (Tex. Crim. App. Feb. 11, 2004).

[2]   Moreover, this Spanish vocabulary exercise is exactly the type of exercise which would be approved by the psychological community, with perhaps the exception of Rivera's own experts. *See, e.g.,* Director's Brief at 4 (quoting DSM-IV-TR, AAMR, and WAIS-III manuals).

-1-

score is more commensurate with Rivera's prior IQ scores (92, 85, 80), 3 FH 374-76 -- is consistent with psychological literature and practice.[3]

Rivera is also incorrect in asserting that rejecting the verbal IQ score is "not an accepted practice in diagnosing mental retardation." Brief at 3, 3-4. The practice of "weighing" psychological test results, and reliance on one IQ measure in favor of another when certain individual differences exist, is standard practice in the field of psychometrics. Blind interpretation of test results without consideration of language, culture, or any other biographic or demographic variable is unethical. As Dr. Saunders explained, IQ tests are not one-size-fits-all. *See, e.g.*, 3 FH 356-58, 369-70. He further testified that, historically, individuals who had poor English skills because their first language was not English were often believed to be dumb or mentally retarded, and that this led to harmful ethnic stereotypes. 3 FH 382.[4] Dr. Saunders testified that non-verbal measures of intelligence, such as the WAIS-III performance IQ subtests, are relied upon in these cases.

Finally, Rivera is incorrect in asserting that his poor academic history is evidence of significant limitations in intellectual functioning. Brief at 4-5. Although Rivera points out that he failed first grade and that he had low grades, *id.* at 4, Dr. Garnett conceded that these occurrences do not automatically evidence retardation. 2 FH 160-61. Contrary to Rivera's characterization that he had "very low or failing grades in virtually all his classes," Brief at 4, the scholastic records reflect

---

[3]   Dr. Garnett appeared to ignore or downplay the significant amount of scientific literature presented to him. Some evidence came directly from the published WAIS-III manuals, and suggested the WAIS-III full scale IQ was not a reliable measure to use in this case. At the same time, neither Dr. Kessner nor Dr. Garnett produced any scientific data to support their belief that the three historical IQ tests given to Rivera should be entirely rejected. As the Court heard, all three of these tests (80, 85, 92) placed Rivera significantly above the mentally retarded range of intellectual functioning. In fact, while Garnett presumed the 92 IQ score was from a group administered Beta test, and he stated (without any support) that such tests may have a 19-point measurement error, even with a 19-point reduction in score, Rivera would still fall outside the retarded range since his score at the least would be a 73 instead of a 92. 2 FH 140-41.

[4]   Dr. Garnett's statements, based on no supporting literature, that the scientific community believes that the WAIS-III is appropriate for administration to bilingual individuals, without consideration for the potential impact on resulting scores from English language deficits, is entirely erroneous and misleading. *See* Brief at 4 (citing 3 FH 446-49). As Dr. Saunders explained, the WAIS-III was normed in part on bilingual Spanish speakers fluent in English, and individuals with Rivera's level of English skills would not have been included. 3 FH 405.

otherwise. *See, e.g.,* R-Ex 6 at 2-4 (Brownsville I.S.D. records showing variety of grades, including A's and B's). Given Dr. Garnett's testimony that if he was reviewing educational records for a mentally retarded individual, he would "expect to see a consistent pattern of low scores," 2 FH 174, Rivera's inconsistent academic scores would be a contra-indicator of mental retardation.

Most damning, defense witnesses appeared oblivious to, or completely ignored, all alternative explanations for Rivera's poor academic performance, such as inhalant use or abuse, excessive absences, boredom, lack of motivation, anti-social personality features, poor family and home life, or his being teased. *See, e.g.*, 2 FH 69-75, 178-80. Defense counsel then relied upon the testimony of Hugh Albright, who is not trained in mental health or behavioral sciences, to suggest that the etiology of Rivera's failure to learn lies in some innate lack of ability. However, there was evidence that Mr. Albright was obviously confused about the nature of Rivera's poor performance.[5] Additionally, Albright was ignorant of the fact the Rivera had used inhalants for four years by the time he was in Albright's class, and that Rivera reported sneaking out of school frequently to use inhalants. 2 FH 70-71. Rivera's reliance on a poor academic record fails to establish significant limitations in intellectual functioning and, instead, is more likely the result of Rivera's volitional negative conduct.

## II. Rivera Has Not Established Significant Limitations In Adaptive Functioning.

Rivera contends that he meets this prong because he has shown he was unable to perform in school and has deficits in the social and practical domains. Brief at 5-8. Initially, Rivera suggests that because Dr. Saunders conceded Rivera has adaptive functioning deficits, that he is agreeing these are the result of retardation. *Id.* at 5. This is not the case and indeed ignores the more reasonable alternative explanations for Rivera's negative behavior. For example, while Saunders acknowledged Rivera has a deficiency in communication, that deficiency is based is the product of the degree to which he must live and adapt in an English speaking world given Rivera's English language limitations, not that this deficiency is a product of retardation. 3 FH 380.

---

[5] In his affidavit, Albright first stated, "He was not able to learn very much." P-Ex 9 (¶ 3). However, in the next paragraph, he stated, "...Jose was inclined to not pay attention in class and fool around," and, "But really, Jose did not have much motivation." P-Ex 9 (¶ 4).

Regarding Rivera's contention that his poor academic history evidences this prong, as detailed in Part I *supra*, other alternative reasons exist for his poor performance. And although Dr. Garnett contends that Rivera was "unable to achieve in special education classes," Brief at 6 (quoting P-Ex 24 at 6), Garnett conceded that Rivera only took a few "special classes," and that if he ever said "special education classes," then that was in error. 2 FH 159-60. Indeed, no records establish that Rivera was ever in any special education class. P-Ex 10 & 25; R-Ex 6.[6] Furthermore, Dr. Garnett appeared to be ignorant of the fact that, by his own testimony, Rivera was atypical of individuals with mental retardation. By Garnett's concession, no evidence proves Rivera was in special education. He relied only on a flood of anecdotal accounts of how poorly Rivera functioned in life as evidence of his retardation, yet refused to acknowledge the potential influence of his repeated antisocial behavior and chronic, daily use of volatile inhalants on his functioning. He finally admitted that Rivera's behavior, which included using drugs, drinking and driving, burglary, sexual assault, and murder, were inconsistent with mental retardation. 2 FH 150-51.

Most importantly, instead of automatically blaming his limitations on retardation, Dr. Saunders explained how two factors -- Rivera's inhalant abuse and his antisocial personality -- negatively impacted almost all categories of adaptive functioning. 3 FH 383-394. For example, evidence was presented by Dr. Saunders that showed the effects of inhalant abuse were the same as those observed in Rivera and interpreted by defense experts as mental retardation -- school problems, truancy, poor grades, dropping out of school, family conflict, social and work problems, delinquency, and unemployment. 3 FH 384 (citing DSM-IV-TR standards). He further explained that Rivera exhibits several antisocial personality features -- failing to conform to social norms with respect to lawful behaviors as indicated by his repeated arrests; deceitfulness, as indicated by repeated lying; impulsivity or failure to plan ahead; reckless disregard for the safety of others; consistent irresponsibility, as indicated by his repeated failure to sustain consistent wok behavior or honor financial obligations; and lack of remorse. 3 FH 387-90 (citing DSM-IV-TR standards). Consequently, Rivera was dirty, slept outside, did not play games, did not read, thrive in school, maintain employment, or support his children, and repeatedly committed offenses because he was

---

[6] Yet even if Rivera had been placed in special education, it could have been for a learning disability or a speech impediment and not for retardation, as Garnett admitted. 2 FH 159.

using inhalants frequently and committed antisocial acts. Moreover, Rivera's dependence on his family is not because he was incapable of doing things or unable to take care of himself on his own but, rather, reflects his own laziness and irresponsibility, and his family's apparent willingness to put up with the same. He now maintains good hygiene, writes his family, and reads as best he can because he is not using drugs, he is prevented from breaking the law, and he is removed from the family which enabled him to maintain a dependent lifestyle. Indeed, TDCJ officers testified that Rivera's behavior seemed "normal" and "appropriate" in prison, and that he appears no different from other inmates. 3 FH 260-62, 273-74, 279, 285, 287-88, 313, 314-15.

### III. Rivera Has Not Established Onset Before Age Eighteen.

Deficits in adaptive functioning are not the exclusive domain of mental retardation, regardless at what age they first appear. The interpretation of Rivera's behavior as mental retardation is convenient for him at this time, although it has never existed in his past. To date, the only individuals who have referred to Rivera as being "mentally retarded" are his defense experts and his attorneys. According to them, Rivera's purported mental retardation slipped through without detection; even Hugh Albright did nothing to signal school officials to the condition. The more likely interpretation of Rivera's behavior is that he suffers only from an antisocial personality, which was highlighted by a life of severe drug abuse and a nearly complete failure to take responsibility.

Rivera also asserts that several clinical risk factors suggest a finding of mental retardation. Brief at 9-10. Although Rivera insists that he "caused himself brain injury through repeated inhalant abuse from a very young age," no evidence proves Rivera has suffered any such brain injury or that his use of inhalants was significant enough *prior to the age of eighteen* to render him retarded. While Rivera's sister testified that their mother was physically and emotionally abusive, 2 FH 6-7, Rivera denied any history of abuse. R-Ex 1 at 14. And, although Rivera suggests that he may have become retarded because of fights with neighborhood kids, or because of his poor home life, the circumstances in Rivera's case were not so extreme, consistent or significant as to justify Rivera's self-serving conclusion.

### CONCLUSION

Because Rivera cannot establish that he is mentally retarded, this Court should deny relief.

Respectfully submitted,

*_____*
KATHERINE D. HAYES*
Assistant Attorney General
State Bar No. 00796729
Southern Dist. No. 22698

*Attorney-in-charge

Office of the Attorney General
Postconviction Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: (512) 936-1600
Telecopier: (512) 320-8132

ATTORNEYS FOR RESPONDENT

## CERTIFICATE OF SERVICE

I do hereby certify that a true and correct copy of this reply brief has been served by placing it in overnight mail delivery, postage prepaid, on this Thursday, February 12, 2004, addressed to:

Max Hendrick, III
VINSON & ELKINS, L.L.P.
2300 First City Tower
1001 Fannin
Houston, TX 77002-6760
contact # (713) 758-2546

_____
KATHERINE D. HAYES
Assistant Attorney General

-6-