IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOSE ALFREDO RIVERA, | § § § | |
| Petitioner, | § § § | |
| V. | § § | NO. B-03-139 |
| DOUG DRETKE, Director, Texas Department of Criminal Justice, Institutional Division, | § § § § | |
| Respondent. | § § § | |

### PETITIONER JOSE ALFREDO RIVERA'S
### POST-SHOW CAUSE HEARING BRIEF

OF COUNSEL:
William E. Lawler III
Southern District Bar No. LA29514
Walter M. Berger
Southern District Bar No. 21834
Texas State Bar No. 00798063
Emily W. Pipkin
Southern District Bar No. 35260
Texas State Bar No. 24037284
Vinson & Elkins L.L.P.
1001 Fannin St., Suite 2300
Houston, Texas 77002-6760
Phone: 713-758-2222
Fax:     713-615-5258

Max Hendrick, III
Attorney-in-Charge
Southern District Bar No. 0518
Texas State Bar No. 09450000
Vinson & Elkins L.L.P.
1001 Fannin St., Suite 2300
Houston, Texas 77002-6760
Phone: 713-758-2546
Fax:     713-615-5251

ATTORNEYS FOR PETITIONER
JOSE ALFREDO RIVERA

Pursuant to the Court's request that the Petitioner supplement the record by February 11, 2005, we submit this Post-Show Cause Hearing Brief and attachments which provide additional evidence that Jose Alfredo Rivera ("Rivera") is entitled to relief under *Atkins v. Virginia* because he is mentally retarded. *See*, 536 U.S. 304 (2002).

I. **MENTAL RETARDATION ANALYSIS**

In 2002, the Supreme Court held that imposing the death penalty on a mentally retarded defendant constitutes cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution. *See Atkins v. Virginia*, 536 U.S. 304 (2002). The Supreme Court adopted the American Association of Mental Retardation's ("AAMR") definition of mental retardation: (1) subaverage general intellectual functioning (*i.e.* an IQ of approximately 70 to 75 or below) existing concurrently with (2) related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure and work, and (3) onset before the age of eighteen. American Association of Mental Retardation, MENTAL RETARDATION: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS 5 (9th ed. 1992) [hereinafter 1992 AAMR Manual]. The evidence establishes that Rivera meets all three prongs of the mental retardation analysis and is therefore entitled to the protection of the Eighth Amendment.

II. **RIVERA DEMONSTRATED SIGNIFICANT DEFICITS IN INTELLECTUAL FUNCTIONING BEFORE THE AGE OF 18.**

   A. **Post-*Atkins* Decisions Consider Multiple Factors in Determining Intellectual Functioning**

To determine whether Rivera has significant limitations in intellectual functioning, the Court should look not only to Rivera's IQ score, but also to the factors other federal courts have found relevant in making an *Atkins* mental retardation analysis. In *Walton v. Johnson*, the Court

considered not only the defendant's score on the "gold standard" test (at the time the WAIS-R, which has been updated and is now called the WAIS-III), but also considered the kinds of grades that the defendant made in school, how far he progressed through school, and whether he was enrolled in any special education or remedial programs. *See*, 269 F. Supp. 2d 692, 699-700 (W.D. Va. 2003). The 11th Circuit considered similar factors in analyzing the defendant's intellectual functioning. In *In re Holladay*, the Court considered the scores on various IQ tests the defendant had taken, evidence that he was referred to as a "slow learner" when he was in grade school, how far he went in school, and a report from the Alabama Deparment of Human Resources calling the defendant "barely educable." *See*, 331 F. 3d 1169, 1175 (11th Cir. 2003).

Texas courts have considered similar factors in determining whether a defendant has subaverage general intellectual functioning. In *In re Hearn*, the Fifth Circuit looked not only at standardized test scores, but also at the defendant's school records, the fact that he failed first grade despite regular attendance, a note from the defendant's former attorney stating her belief that he was "not very intelligent," and the testimony of a family member regarding his "compromised social skills." *See*, 376 F.3d 447, 455 (5th Cir. 2004) (considering various factors in making the preliminary determination of whether a defendant had a "colorable claim" of mental retardation).

**B.   Rivera's Score of 68 on the WAIS-III Demonstrates that He Has Significant Limitations in Intellectual Functioning**

Analysis of these same factors in this case further demonstrates that Rivera has significant intellectual functioning deficits. One of the first issues that the post-*Atkins* decisions all consider is the defendant's IQ score. The Courts and the experts agree that the WAIS-III is

2

the "gold standard" for standardized IQ testing.[1] *See, e.g., Brown v. Singletary*, 229 F. Supp. 2d 1345, 1349 n. 2 (S.D. FL. 2002) (finding that "[a]n IQ is assessed by taking the Wechsler Adult Intelligence Scales test (WAIS-III), the standard instrument in the United States for assessing intellectual functioning"). Rivera scored a 68 on the "gold standard" test administered to him by Dr. Gilda Kessner on December 1, 2003. Rivera's score falls within the lowest 1 to 3 percent of the population, demonstrating that Mr. Rivera has "significantly subaverage intellectual functioning." PX 2 at 4.

### 1. Administration of the WAIS-III Gold Standard Test in English Was Valid and Proper

The Court requested that the parties address the issue of whether the WAIS-III was the proper test to administer to a native Spanish speaker. In response, Petitioner has presented ample evidence to the Court concerning the validity and propriety of the WAIS-III administered to Rivera.

Dr. Kessner has provided her expert opinion that the administration of the WAIS-III in English to Rivera was a valid and proper administration. In her affidavit, attached as Exhibit 1, she explains the steps she went through to ensure that administration in English was appropriate:

> Before going to the Polunsky Unit, I reviewed Mr. Rivera's records and saw that he had learned English in the American educational system and noted that his TDCJ records listed English as his primary language. When I first met with Mr. Rivera to administer the WAIS-III, I conducted a rapport-building exercise in which we discussed various topics, including his educational background, his work history, and his substance abuse. We spoke in English during this exercise and had no problems communicating with one another. When I asked Mr. Rivera if he was comfortable talking with me in English, he indicated that he was comfortable speaking in English and did not indicate at any point during the evaluation or administration of the WAIS-III that he preferred to speak in Spanish.

---

[1] The test administered to Rivera on December 1, 2003 was the WAIS-III, which all of the experts, including the Respondent's expert, Dr. Saunders, agree is the "gold standard" for testing intellectual functioning for the purpose of diagnosing mental retardation. *See* PX 2, PX 24, at 4. (PX will be used to refer to Petitioner's exhibits as offered into evidence at the hearings on January 7-8, 2004 and January 14, 2005).

3

Ex. 1 ¶ 5; *See also*, Tr. II, 76-77.[2] Dr. Rodolfo A. Quintana, one of Dr. Kessner's colleagues, bolsters the proof already offered that the administration of the WAIS-III was valid and proper:

> On January 28, 2005, I attended a conference entitled *Young Offenders, Mental Disorders, and Immaturity: Challenges for Lawyers and Mental Health Professionals* held in Fort Lauderdale, FL. While there, I conferred with my colleague, Rodolfo A. Quintana, Psy.D., who is a native Nicaraguan and practicing psychologist in Miami, FL. Dr. Quintana has experience in administering the WAIS-III test to individuals whose native language is Spanish. Dr. Quintana asserted that, based on his experience, he believes it is only appropriate to administer the WAIS-III to a bilingual examinee in English and to allow the examinee to answer either in English or in Spanish.
>
> The opinion provided by Dr. Quintana lends further support to my belief that the administration of the WAIS-III in English to Mr. Jose Rivera was proper and valid.

Ex. 1 ¶ 4-5. Dr. Garnett also agrees that the administration of the test was an appropriate one. He testified, "I felt very comfortable with how [Dr. Kessner] had given [the WAIS-III] and the results that she obtained." Tr. II at 97:14-15.

Further, Dr. Kessner's administration of the test meets the AAMR Manual's requirement that intelligence tests be individually administered by a properly trained professional. *See* 1992 AAMR Manual. Even Dr. Saunders acknowledged that he "ha[s] no reason to believe that the test was not administered in a standardized way." Tr. II at 133:16-17; *See* Tr. I, Vol. III at 335: 21-22 ("[Dr. Kessner] administered that [WAIS-III] test in a standard way. It was a cleanly given test.").

Finally, the Court can rely on the WAIS-III with confidence because, as both Dr. Garnett and Dr. Kessner have explained, the WAIS-III test is the result of a rigorous, sophisticated norming process that creates a test appropriate for administration to bilingual individuals. Dr. Garnett described the norming process as a complex one that takes "several years" during which

---

[2] "Tr. I" will be used to refer to the transcripts (Vols. I-III) from the January 7-8, 2004 hearing and "Tr. II" will be used to refer to the transcript from the January 14, 2005 hearing.

4

the testers "overrepresent certain groups," namely "African Americans and Hispanics," to eliminate the danger of item biases toward those groups. *See* Tr. II at 98-99. Dr. Kessner provided evidence in her affidavit regarding the excellent reliability of the test. Dr. Kessner also points out that Dr. Jerome Sattler, a highly regarded authority on testing and assessment, has described the WAIS-III as a "well-standardized test, with excellent reliability and good concurrent and construct validity . . . . The standardization procedures were excellent, sampling four geographical regions; both sexes; White, Black; Hispanic, and other racial/ethnic groups; and the entire socioeconomic range. The standardization sample well represents the nation as a whole for the age groups covered by the test." *See* Ex. 1 ¶ 7.

> 2. **The Government Provides No Authority for its Contention that the Verbal IQ Score Should Be "Tossed Out" or "Heavily Qualified"**

Faced with clinically approved evidence that Rivera is mentally retarded, the government has tried to convince the Court that Mr. Rivera has an IQ score above 75. The government has unsuccessfully tried to accomplish that feat through the testimony of its expert, Dr. Saunders. Throughout the January 7-8, 2004 hearing, Dr. Sanders testified that the Court should ignore the verbal score on the WAIS-III because Rivera is bilingual and cannot be tested by the WAIS-III in English. *See* Tr. I, Vol. III at 323-435. He made this suggestion without offering any clinical support or any rigorous, scientifically tested, peer-review data. *Id.*

Dr. Saunders offered this same expert opinion when he first began testifying at the January 14, 2004 hearing. He agreed with the Court's summary of his expert opinion that "the test, at least the verbal part of the test, just is not reflective of Mr. Rivera's intellectual capability . . . ." *Id.* at 135:7-8. Dr. Saunders explained, "what you can't do is you can't become married to the test and the test score that you obtain." *Id.* at 136:23-24. When faced with the inconsistent position he had taken that previous, less reliable IQ tests cannot be just "tossed out," but that it is

5

acceptable practice to toss out half the test—the verbal half—he changed his testimony about the way the test should be scored: "I'm afraid, perhaps, I overstated the reluctance to use that verbal IQ score. I'm – can I change that to heavily qualify that test score[?]" *Id.* at 154:24-25; *See also id.* at 180-181.

Dr. Saunders never explained how the verbal IQ should be "heavily qualified." *Id.* He also never provided the Court with an explanation as to why one vocabulary exercise in Spanish should invalidate the entire verbal IQ score. *Id.* at 196-197. He never provided the Court with an alternate, modified or discounted, IQ score. Further, all the experts, including the government's expert, agree that re-testing Rivera would not be appropriate. *See* Tr. II at 165:12-17, 195. Therefore, the only valid, standardized IQ score that is before this court is Rivera's score of 68 on the "gold standard" WAIS-III test.

### C.   Additional Factors Provide Further Support of Rivera's Intellectual Functioning Deficits

Although the WAIS-III IQ score is a valid indicator of Rivera's intellectual functioning deficits, the Court should look beyond this test to other relevant factors that will provide a global picture of Rivera's intellectual functioning. This Court should look to factors similar to those considered in *In re Hearn*, *In re Holladay*, and *Walton*, such as Rivera's school records and his teachers' impressions of him as a student. A review of Rivera's academic records supports the conclusion that Rivera has significant intellectual functioning deficits. Rivera was forced to repeat several grades, had very low or failing grades in virtually all his classes, consistently performed at a level significantly below his grade and age, and he was often only passed because of social promotion practices at his school. *See* PX 4 at 4-5; PX 9 at 1; PX 25. Mr. Albright, Rivera's grade school teacher, explained, "generally, all kids were passed on to the next grade regardless of performance." Tr. I, Vol. II at 68:5-6. Because of the practice of passing children

6

regardless of performance, Rivera was still performing at a first or second grade level in reading, writing, and math at age 14. *See* PX 10. Dr. Garnett, the Petitioner's expert on mental retardation, asserted, "it is significant that Mr. Rivera was unable to achieve even in special education classes where the assignments were at his own level of ability and below." PX 24 at 6. Despite the fact that Rivera stayed in school until he was nineteen years old, he only completed school through the eighth grade; he dropped out of school when he was in the ninth grade at age nineteen. Mr. Albright summed up Rivera's performance in school when he explained, "one of the reasons I remember so much about [Rivera] in particular is that **in all the 21 years I was at Longoria, there was nothing—nothing ever that could match, in my judgment, his failure, his inability to perform such simple tasks. I never did see that in another kid.**" Tr. I, Vol. II at 87-11-17 (emphasis added). This is strong evidence of Rivera's intellectual functioning limitations that manifested themselves long before age 18.

Testimony from Rivera's family members is also instructive to a global picture of Rivera's intellectual functioning. One of his sisters, Camelia, said that Rivera reads "very, very slowly, like a child just learning to read for the first time." Camelia Garcia Aff. at 2. Additionally, his eldest sister, Esmarelda, said that Rivera never learned to write well, and explained that she still has trouble understanding his letters, as he often misspells or misplaces words or leaves out words altogether. *See* PX 12 at 1; PX 13 at 1.

After being provided with the results of Rivera's full psychological evaluation and additional materials for his review such as school records and affidavits of family members and teachers, Dr. Garnett concluded, "It was clear that **Mr. Rivera did not just struggle in school; he was unable to succeed in virtually every class he was placed in. It is painfully obvious that Mr. Rivera did not have the intellectual capacity to benefit from school** from as early as

7

failing the first grade." PX 24 at 6 (emphasis added). Thus, the weight of credible and reliable evidence as a whole supports the conclusion that Rivera has significant limitations in intellectual functioning under the first prong of the mental retardation analysis and that he developed these limitations before the age of 18.

### III. RIVERA DEMONSTRATED SIGNIFICANT DEFICITS IN ADAPTIVE FUNCTIONING BEFORE THE AGE OF 18.

Rivera also meets the second prong of the mental retardation analysis because he suffers from significant adaptive skills deficits. Even Dr. Saunders, the government's expert, acknowledged this point when he testified on January 8, 2004: "There are adaptive deficits here . . . I'm not saying that [Rivera] does not have adaptive functioning deficits." Tr. I, Vol. III at 420:20-25.

#### A. Rivera Need Only Demonstrate Adaptive Deficits in Two of the Ten Atkins Adaptive Functioning Categories

As the evidence demonstrates, Rivera's adaptive deficiencies manifest themselves in a number of areas from an early age. Although Rivera need only show adaptive deficits in two of the ten categories of adaptive functioning adopted in *Atkins*, he has shown deficits in the majority of these categories. *See Atkins*, 536 U.S. 304. At a minimum, Rivera has irrefutably shown that he was deficient before age 18 in the categories of functional academics and self care.

#### B. The Evidence Irrefutably Demonstrates the Rivera Had Adaptive Deficiencies in Two or More Adaptive Functioning Categories

The summary of Rivera's academic failures above demonstrates an inability to learn or adapt as a student. He also "did not react well with other students [at school]." Tr. I., Vol. II at 63:18-19. Rivera's sisters testified that he had very few friends and that his "friends" were just other kids with whom he abused inhalants. *Id.* at 10. This adaptive failure is further evidenced by his inability to take care of himself: he did not bathe, brush his teeth, wash his hair or clothes, and was perpetually dirty, resulting in his family nickname: "cochinito" or "little pig." *Id.* at 6-8,

8

11-12, 28. He also refused to sleep inside with the family, instead electing to sleep outside underneath the house, regardless of cold or rain. *Id.* at 28-29. He never helped his parents around the house and rarely found jobs to help his parents pay for the bills. *Id.* at 30, 33. He relied on others, usually his father, to find jobs for him and he was not able to keep the jobs he got for very long. *Id.* at 33; *See* Garza Aff. at 1; PX 13 at 1; PX 15 at 1. When he was making money, he was unable to manage it. His sister, Esmarelda, explained that she had to take away the money he earned so that he would have money for necessities. Tr. I, Vol. II at 34. This evidence shows that Rivera had significant limitations in the adaptive categories of functional academics and self care well before the age of 18.

In addition to these limitations, Rivera has offered evidence that he caused himself brain injury through repeated inhalant abuse from a very young age, he was abused by his mother throughout his childhood, and that he was in fights with neighborhood kids. *See* Tr. I, Vol. II at 6-7; *See* PX 12 at 1; PX 15 at 1; *See* Excerpt of Inmate Consolidated Record; *See* Alfredo Rivera Aff. Dr. Garnett explained that such events, which likely caused brain injury during Rivera's childhood, may also be causes of his mental retardation: "In Mr. Rivera's case, there were multiple and significant influences . . . recognized as barriers to developmental growth and causative factors in mental retardation and the evidence shows that deficits were apparent as early as age 5." PX 24 at 8.

### C.  Evidence of Rivera's Capabilities Post-Age 18 is Irrelevant to the Diagnosis of Mental Retardation

The rebuttal evidence offered by the government points to Rivera's ability to adapt *after* the age of 18. This evidence is completely irrelevant to the mental retardation diagnosis as it does not comment on Rivera's adaptive functioning abilities before the age of 18. Additionally, any evidence that the government offers regarding what Rivera is capable of doing is not

9

relevant to the mental retardation diagnosis. As Dr. Garnett explained, "You also don't reject the diagnosis of mental retardation simply because [Rivera] can do certain things or did certain things. It is not an exclusionary kind of diagnostic process." Tr. II at 111: 22-25. Because Rivera has proved that he had adaptive functioning deficits in at least two categories before age 18 and because the government has not offered any valid rebuttal evidence, he has met the second prong of the *Atkins* mental retardation analysis.

IV.   **THE CAUSE OF RIVERA'S MENTAL RETARDATION IS IRRELEVANT TO HIS DIAGNOSIS**

The known cause for an individual's mental retardation is only determined in 25% of all cases. *See, e.g.*, Medline Plus at http://www.nlm.nih.gov/medlineplus/ency/article/001523.htm; http://www.healthscout.com/ency/article/001523.htm, accessed on February 10, 2005. One of the reasons that assessing the cause may be difficult is that "as many as 50 percent of people with mental retardation have been found to possess more than one causal factor (AAMR, 1992)." http://www.thearc.org/faqs/causeqa.html, accessed on February 11, 2005. The difficulty of determining the cause of mental retardation does not have any relevance in the context of the *Atkins* mental retardation analysis. In fact, both of Rivera's experts agree that the etiology of the mental retardation is not a necessary component of the mental retardation determination. Dr. Kessner explained, "as long as you meet the criteria, [the mental retardation determination] is not connected to any causative factor. In fact, the majority of people in the mild and some in the moderate range [of mental retardation], they don't have . . . a [known] direct link of what is causing [the mental retardation]." Tr. II at 54: 24-3. Dr. Garnett reiterated this point when he explained that the question of whether Rivera's mental retardation was caused by inhalant abuse is not part of the mental retardation determination: "from what we know about inhalant abuse . . . it does impact the brain and the brain's functions. It does have a toxic effect on the brain and

the brain's functions. And whether it was the inhalant abuse along with social deprivation or linguistics issues or getting hit in the head with a pipe, we don't really know. But there w[ere] a significant number of etiological factors in [Rivera's] history before the age of 18." *Id.* at 113:18-25. The cause of the mental retardation is simply not an element of the mental retardation determination.

## V. CONCLUSION

Rivera has provided substantial evidence in support of a determination of mental retardation. All the experts agree that Rivera's WAIS-III IQ was a valid and proper administration and that re-testing is inappropriate. Although the government's expert disagrees with Dr. Kessner's and Dr. Garnett's interpretation of the test, he is unable to articulate any valid or standardized interpretation that would provide a more accurate IQ score. Therefore, the only valid IQ score before the Court for use in making a mental retardation determination is the score of 68. This score, in combination with other relevant factors such as school records, affidavits, and testimony from siblings and childhood teachers, demonstrates that Rivera had significant limitations in intellectual functioning before the age of 18. The affidavits in evidence and the testimony from Rivera's siblings and teachers also support a determination that Rivera has significant limitations in adaptive functioning before the age of 18. Any evidence offered by the government to rebut these findings comments only on Rivera's capabilities post-18 and is therefore irrelevant to a diagnosis of mental retardation. Likewise, the cause of Rivera's mental retardation does not effect the mental retardation determination. Therefore, Rivera has met the *Atkins* standard for proving mental retardation.

WHEREFORE, Petitioner respectfully requests that this Court grant him relief from his unconstitutional sentence of death and grant such other relief as law and justice require.

Respectfully submitted,

*/s/ Max Hendrick, III*

Max Hendrick, III
Attorney-in-Charge
Southern District Bar No. 0518
Texas State Bar No. 09450000
Vinson & Elkins L.L.P.
1001 Fannin St., Suite 2300
Houston, Texas 77002-6760
Phone:  713-758-2546
Fax:    713-615-5251

OF COUNSEL:

William E. Lawler III
Southern District Bar No. LA29514
Walter M. Berger
Southern District Bar No. 21834
Texas State Bar No. 00798063
Emily W. Pipkin
Southern District Bar No. 35260
Texas State Bar No. 24037284
Vinson & Elkins L.L.P.
1001 Fannin St., Suite 2300
Houston, Texas 77002-6760
Phone: 713-758-2222
Fax:   713-615-5258

**ATTORNEYS FOR PETITIONER
JOSE ALFREDO RIVERA**

## CERTIFICATE OF SERVICE

I hereby certify that on February 11th, 2005, a copy of this motion was electronically served on counsel for the Respondent.

_____
Emily W. Pipkin