IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOSE ALFREDO RIVERA, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 1:03-cv-00139 |
| | § | **CAPITAL LITIGANT** |
| DOUG DRETKE, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| Respondent. | § | |

**RESPONDENT'S ANSWER TO PETITIONER'S
POST-SHOW CAUSE HEARING BRIEF**

Petitioner Jose Alfredo Rivera[1] is a condemned Texas capital murderer whose scheduled execution in August 2003 was stayed by the Fifth Circuit Court of Appeals in order for Rivera to file a successive habeas petition pursuant to 28 U.S.C. § 2244(b)(3)(C). *In re Rivera*, No. 03-41069 (5th Cir. August 6, 2003) (unpublished order).[2]  The sole issue now before this Court is whether Rivera's execution is barred by the Eighth Amendment and *Atkins v. Virginia,* 536 U.S. 304 (2002), because he is mentally retarded.

At the conclusion of the January 14, 2005 evidentiary hearing, the Court ordered Rivera to supplement the record with anything he felt necessary, for the Director to answer or respond and to "amplify" anything remaining, and for Rivera to reply.  Rivera filed his Post-Show Cause Hearing Brief on February 11, 2005.  Docket Entry ("DE") 64.  This answer follows.

---

[1]        Respondent Doug Dretke will be referred to as "the Director."

[2]        A copy of this order is attached as the Director's Exhibit A.

**ARGUMENT**

**I.    Appropriate Standard For Reviewing Federal Habeas Claims Of Mental Retardation**

To the extent Rivera would suggests that the Court conduct a *de novo* review of the evidence, then he ignores the appropriate standard of review established by the federal habeas statutes.  Because Rivera filed his successive federal writ petition in August 2003, review of his claim is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *Penry v. Johnson*, 532 U.S. 782, 792 (2001)  (petitions filed after AEDPA's enactment are review by AEDPA standards).  Pursuant to 28 U.S.C. § 2254, a federal court's ability to disturb state court criminal proceedings is significantly restrained.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002) (AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law").

Under the AEDPA, a petition for a writ of habeas corpus shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless the prior adjudication:

> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d);  *see also Moore v. Johnson*, 225 F.3d 495, 501 (5th Cir. 2000) (holding

that section 2254(d)(1) controls both questions of law and mixed questions of law and fact, while section 2254(d)(2) applies to pure questions of fact). Therefore, this Court is not empowered to grant the writ unless it first determines that the state court adjudication: (1) is contrary to *Atkins*; (2) involves an unreasonable application of *Atkins* to the facts of Moore's case; or (3) rests on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d).

The Supreme Court has explained that a state court decision is "contrary" to established federal law if the state court "applies a rule that contradicts the governing law set forth in [the Court's] cases," or confronts facts that are "materially indistinguishable" from a relevant Supreme Court precedent, yet reaches an opposite result.[3] *Williams v. Taylor,* 529 U.S. 420, 405-06 (2000). In the instant case, the state court did not announce or apply a rule contradicting *Atkins,* and did not face facts that were indistinguishable from *Atkins. See* 536 U.S. at 308-09 (noting that Atkins was diagnosed as "mildly mentally retarded" based upon a full scale Wechsler IQ score of 59)[4]; *see Ex parte Rivera*, No. 27,065-02 (Tex. Crim. App.) (unpublished order of July 25, 2003); *id*. (unpublished order of August 5, 2003); *Ex parte*

---

[3]    This standard "does not require citation of [Supreme Court] cases -- indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer,* 537 U.S. 3, 8 (2002) (emphasis in original).

[4]    It is important to note that the Supreme Court did not determine that Atkins was mentally retarded such that the Eighth Amendment prohibited his execution; it merely remanded the case to the Virginia Supreme Court for further proceedings. *Atkins,* 536 U.S. at 321; *see also Atkins v. Commonwealth,* 581 S.E.2d 514, 515 (Va. 2003) (opinion on remand) (concluding that the Supreme Court did not determine that Atkins was mentally retarded).

*Rivera*, No. 27,065-03 (Tex. Crim. App.) (unpublished order of August 6, 2003).[5] As noted

*infra,* Rivera advanced no IQ score and no diagnosis of mental retardation to the state court.

Thus, the "contrary" prong does not apply under the circumstances.

A state court "unreasonably applies" clearly established federal law if it unreasonably

applies the governing precedent to the facts of a particular case. *Williams,* 529 U.S. at 407-

09. This inquiry focuses on the state court's "ultimate decision," not "every jot of its

reasoning." *Santellan v. Cockrell,* 271 F.3d 190, 193 (5th Cir. 2001); *DiLosa v. Cain*, 279

F.3d 259, 262 (5th Cir. 2002) (focus should be only on objective reasonableness of state

court's "ultimate conclusion," rather than on method by which state court arrived at its

conclusion) (citing *Santellan*). Moreover, federal habeas relief is only merited where the

state court decision is both incorrect *and* objectively unreasonable, "[w]hether or not [this

Court] would reach the same conclusion."[6] *Woodford v. Visciotti,* 537 U.S. 19, 27 (2002);

---

[5]     The Texas court's unpublished orders were previously provided to the Court along
with a complete copy of all state court records from Rivera's successive habeas applications. For
convenience, these three orders are attached as the Director's Exhibits B, C, & D.

[6]     As the Supreme Court recently explained:

[T]he range of reasonable judgment can depend in part on the nature of the relevant
rule. If a legal rule is specific, the range may be narrow. Applications of the rule
may be plainly correct or incorrect. Other rules are more general, and their meaning
must emerge in application over the course of time. Applying a general standard to
a specific case can demand a substantial element of judgment. As a result, evaluating
whether a rule application was unreasonable requires considering the rule's
specificity. The more general the rule, the more leeway courts have in reaching
outcomes in case by case determinations.

*Yarborough v. Alvarado,* 124 S. Ct. 2140, 2149 (2004). Given the clinical -- rather than forensic --
nature of mental retardation diagnostic criteria, and the Supreme Court's delegation of authority on

*Williams,* 529 U.S. at 411.  As a result, the issue of Rivera's mental retardation is not before the Court *de novo.*  Rather, Rivera's evidence should be evaluated through the lens of the AEDPA to determine whether the state court's decision -- that Rivera failed to make a threshold showing that he suffers from significantly sub-average intellectual functioning and concurrent deficits in adaptive functioning prior to the age of eighteen -- is objectively unreasonable in light of the evidence presented to the state court.  28 U.S.C. § 2254(d);  *see* Director's Exhibit B at 4 (holding that Rivera "fail[ed] to produce 'sufficient specific facts' to support an *Atkins* claim," and dismissing Rivera's second state habeas application under TEX. CODE CRIM. PROC. art. 11.071, §5(a));  *see* Director's Exhibit D at 3 (finding Rivera "failed to set out sufficient facts to raise a bona fide claim of mental retardation," and dismissing his third state habeas application).[7]

---

the issue to the states, it follows that the state court is entitled to maximum leeway in this case. *Atkins,* 536 U.S. at 317 (citing *Ford v. Wainwright,* 477 U.S. 399, 405, 416-17 (1986)); *see also Ex parte Briseno,* 135 S.W.3d 1, 8 (Tex. Crim. App. 2004) (noting "[s]ome might question whether the same definition of mental retardation that is used for providing psychological assistance, social services, and financial aid is appropriate for use in criminal trials to decide whether execution of a particular person would be constitutionally excessive punishment").

[7]      Ordinarily, the Texas court's dismissal under Article 11.071, §5(a) would constitute an independent and adequate procedural bar to federal review. *E.g., Barrientes v. Johnson,* 221 F.3d 741, 758-59 (5th Cir. 2000); *Fuller v. Johnson,* 158 F.3d 903, 906 (5th Cir. 1998).  In the *Atkins* context, however, because the Texas courts have imported an antecedent showing of "sufficient specific facts" to merit further review, any dismissal of an *Atkins* claim cannot be deemed independent of the underlying constitutional ground, even if it is an adequate state bar to federal review. *See Ake v. Oklahoma,* 470 U.S. 68 (1985); *Stewart v. Smith,* 536 U.S. 856, 860 (2002) (*per curiam*).  Accordingly, the Texas court's dismissal of Rivera's successive habeas applications was an adjudication on the merits.

Alternatively, to the extent that mental retardation is a factual determination, the AEDPA dictates that state court fact findings "shall be presumed to be correct" unless the petitioner carries "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Moreover, "[t]he presumption of correctness not only applies to explicit findings of fact, but it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Valdez v. Cockrell,* 274 F.3d 941, 948 n.11 (5th Cir. 2001). Consequently, this Court must determine whether Rivera presents clear and convincing evidence to rebut the state court's finding that he is not mentally retarded. *See* Director's Exhibit B & D.

Finally, a petition for federal writ of habeas corpus will not be granted unless an applicant has exhausted state court remedies or there is either an absence of state court remedies or those remedies are insufficient to protect the applicant's rights. 28 U.S.C. §2254 (b)(1)(A) & (B)(i) & (ii). However, circuit precedent is clear that state court remedies are not exhausted pursuant to § 2254(b) when "material additional evidentiary support [is presented] to the federal court that was not presented to the state court," even if the evidence "came into existence after the state habeas relief had been denied." *Dowthitt v. Johnson,* 230 F.3d 733, 745-46 (5th Cir. 2000) (quoting *Graham v. Johnson,* 94 F.3d 958, 968 (5th Cir. 1996), and *Joyner v. King,* 786 F.2d 1317, 1320 (5th Cir. 1986)). The appropriate inquiry is, thus, to examine whether a petitioner's claim is presented "'in a significantly different and stronger evidentiary posture than it was before the state courts.'" *Dowthitt*, 230 F.3d at 746

(quoting *Joyner*, 786 F.2d at 1320). This important rule -- in the *Atkins* context -- is currently before the Fifth Circuit in *Morris v. Dretke,* 379 F.3d 199, 204-06 (5th Cir. 2004).

## II.    Appropriate Legal Definition Of Mental Retardation

One of the topics the Court identified for the January 2005 hearing was "[t]he appropriate legal definition of mental retardation." DE 55 at pg. 3. Rivera has directed the Court to the definition established by the American Association on Mental Retardation (AAMR). Rivera's Post-Show Cause Hearing Brief ("Brief") at 1 (citing AAMR, MENTAL RETARDATION: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS 5 (9th ed. 1992)). Although Rivera is correct that this definition should be considered, he is incorrect in stating that the Supreme Court "adopted" this definition in *Atkins.* Brief at 1. Instead, the Supreme Court left "to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon its execution of sentences." *Atkins*, 536 U.S. at 317. The *Atkins* Court cited with approval the AAMR's 9th edition definition and the American Psychiatric Association (APA's) definition of mental retardation, both of which require (1) significantly subaverage general intellectual functioning; (2) concurrent significant limitations in adaptive functioning; and (3) onset before age eighteen. *Id.* at 309 n.3 (internal citations omitted); *id.* at 317 n.22. As stated in *Atkins*:

> The [AAMR] defines mental retardation as follows: "*Mental retardation* refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work.

Mental retardation manifests before age 18."[8]

The [APA's] definition is similar: "The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C).[9]

*Atkins*, 536 U.S. at 309 n.3 (internal citations omitted). The Fifth Circuit has cited the above-described definitions in rejecting a capital petitioner's attempt to satisfy *Atkins. E.g., In re Johnson*, 334 F.3d 403, 404 (5th Cir. 2002), *cert. denied*, 538 U.S. 1001 (2003).

The Director agrees with Rivera that the AAMR's 9th edition definition should be considered -- in fact, he pointed to this definition for guidance in his 2004 Post-Hearing Brief. DE 49 at pg. 1. The AAMR definition should control because that is one of the alternative legal definitions followed by the Texas courts and, ultimately, it is the reasonableness of the Texas habeas court's decisions to dismiss Rivera's successive writ application which are at issue in this proceeding. *See* Director's Exhibits B, C, & D. For example, the AAMR's three-part definition provided above is essentially codified by Texas

---

    8    Although *Atkins* Court used the AAMR's 9th edition definition, in May 2002 the AAMR released its 10th edition which contained a somewhat different definition: "Mental retardation is a disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18." AAMR, MENTAL RETARDATION: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS 1 (10th ed. 2002). This definition was offered by Rivera during the January 2004 hearing. Rivera's Fed. Hrg. Exhibit 4.

    9    APA, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS IV-TEXT REVISION 49 (4th ed. 2000) ("DSM-IV-TR").

law. *See Ex parte Tennard,* 960 S.W.2d 57, 60 (Tex. Crim. App. 1997) (plurality opinion) (citing TEX. HEALTH & SAFETY CODE § 591.003(13) (West 2002) ("mental retardation" means significantly sub-average general intellectual functioning that is concurrent with deficits in adaptive behavior and originates during the developmental period)). Under Texas law, "an individual must have an IQ test score of 70 or less to meet the first part of the AAMR definition," and even then, the inquiry is not at an end until the other two factors are satisfied. *Id.* at 61. And the Texas court has explained that "[u]ntil the Texas Legislature provides an alternate statutory definition of 'mental retardation' for use in capital sentencing, we will follow the AAMR or [TEX. HEALTH & SAFETY CODE] section 591.003(13) criteria in addressing *Atkins* mental retardation claims." *Ex parte Briseno*, 135 S.W.3d 1, 8 (Tex. Crim. App. 2004). Consequently, in considering, and rejecting, Rivera's claim of mental retardation, the Texas Court of Criminal Appeals reasoned that,

> [t]o fulfill the *prima facie* requirement for an *Atkins* claim, an applicant should provide evidence of at least one I.Q. test (preferably taken before the age of 18) from which a reasonable trier of fact could conclude that the person is mentally retarded under *Atkins*,[10] coupled with supporting school and medical records and record evidence or affidavits from qualified experts (or laymen with sufficient personal knowledge of specific conduct) that raise an issue about applicant's lack of adaptive skills and the onset of mental retardation before the age of 18.

Director's Exhibit B at 3 (footnote by court).

---

[10]    Of course, if the applicant or his attorney, after a diligent search, are unaware of the existence of any prior I.Q. testing, then other materials supporting a conclusion of "significant subaverage intellectual functioning" may suffice for a *prima facie* showing.

Given the above standards, the focus of this Court should be on whether the Court of Criminal Appeals reasonably applied the state court definition of mental retardation, in conformity with *Atkins*, when it found that Rivera failed to present sufficient specific evidence to support a *bona fide* claim of mental retardation.  *See* Director's Exhibit B at 2-4; Director's Exhibit D at 3.[11]  Because Rivera failed to make a threshold showing that he falls within the category of offenders *Atkins* is designed to protect, the state court's decisions are reasonable and entitled to deference.

**III.    Rivera Fails To Establish That He Suffers From Significant Deficits In Intellectual Functioning.**

Texas law defines "significantly subaverage general intellectual functioning" as "an IQ of 70 or below."  *Howard v. State*, 153 S.W.3d 382, 386 (Tex. Crim. App. 2004) (citing *Ex parte Briseno*, 135 S.W.3d at 7, n.24);  *Ex parte Tennard*, 960 S.W.2d at 61 ("an individual must have an IQ test score of 70 or less to meet the first part of the AAMR definition.").[12]  Rivera failed to make a threshold showing of this criteria in state court and,

---

[11]    The Texas court's first opinion dismissing Rivera's successive (first subsequent) habeas application discussed the actual evidence originally offered to establish his *Atkins* claim.  Director's Exhibit B.  After the writ was dismissed, Rivera filed a Suggestion for Reconsideration and attached new evidence.  The Texas court's second opinion explained that such motions are not authorized under Texas appellate rules, and declined to reconsider the matter on the court's own initiative.  Director's Exhibit C.  Rivera then filed a third (or second subsequent) habeas application asking the court to consider all the evidence offered in his second writ and in his suggestion for reconsideration.  The Texas court's third order clarified that it had reviewed all the evidence, yet was dismissing the application as an abuse of the writ because he failed to set out sufficient facts to raise a bona fide claim of mental retardation.  Director's Exhibit D.

[12]    Although the DSM-IV-TR requires that the score be obtained on a standardized, individually administered exam, DSM-IV-TR at 41, the Director is unaware of any Texas case or statute which requires that the score be assessed in that manner.

consequently, his successive writs were correctly dismissed.  Director's Exhibits B-D.[13]

**A.    Post-*Atkins* decisions consider factors beyond IQ testing results; however, this Court's consideration of the factors does not help Rivera's case.**

Rivera contends that, in addition to his "*IQ score,*"[14] the Court should consider "multiple factors" in determining intellectual functioning, and he points to other courts which have considered *inter alia* evidence of low grades, how far a defendant progressed in school, whether a defendant was enrolled in any special education or remedial programs, and testimony of family members.  Brief at 1-2 (emphasis added) (citing *Walton v. Johnson*, 269 F.Supp. 2d 692, 699-700 (W.D. Va. 2003), *In re Holladay*, 331 F.3d 1169, 1175 (11th Cir. 2003), and *In re Hearn*, 376 F.3d 447, 455 (5th Cir. 2004)).  Of course, this Court has many factors to consider and the Director has never argued the Court's focus should be limited to merely looking at Rivera's IQ scores especially where, as here, Rivera's IQ scores were not obtained prior to age eighteen.  Indeed, in assessing the reasonableness of the Texas habeas court's adjudication of Rivera's *Atkins* claim, this Court must necessarily consider such factors because Rivera offered no IQ score whatsoever for the state court to review and relied

---

[13]    The Court already has before it the Director's arguments raised in his 2004 Post-Hearing Brief and his Reply Brief.  DE 49 & 51.  The Director asks that this briefing be incorporated with the Director's final answer and that all three pleadings be considered in conjunction.

[14]    Since Rivera used the singular tense, presumably he wants the Court to disregard his three pre-*Atkins* IQ scores of 85, 92 and 80 which were obtained during Rivera's prior incarceration for attempted burglary and when he was first admitted to TDCJ custody on death row.  *See* Director's Fed. Hrg. Exhibit 33 at PINC-0014 (IQ score of 85 reported June 25, 1991); *id*. at PINC-0046 (IQ score of 92 reported February 11, 1992);  Director's Fed. Hrg. Exhibit 32 at MED-00254 (Wechsler Adult Intelligence Scale-Revised [WAIS-R] short form full scale IQ score of 80 reported June 6, 1994 during initial death row intake assessment).  As explained in Part I B. below, however, the Court should consider these scores as contra-indicators of mental retardation.

solely on other materials instead.  And as explained in Part III.C. below, the Texas court's

rejection of such evidence was neither contrary to, nor an unreasonable application of, *Atkins*.

**B.     Rivera's WAIS-III full scale IQ score of 68 is not a reliable indicator of his true level of intellectual functioning.**

Rivera argues that his full scale IQ score of 68 on the WAIS-III "gold standard" test

demonstrates that he has significant limitations in intellectual functioning.  Brief at 2.

According to Rivera, Dr. Gilda Kessner's administration of the WAIS-III in English was

"valid and proper", and that no authority exists to "toss out" or "heavily qualify" the verbal

IQ score results.  Brief at 3-6.  These arguments are unavailing.

Dr. Kessner's *administration* of the WAIS-III test in English is not in dispute.  All the

experts agreed that the best full-scale IQ test that currently exists and that can be individually

administered is the WAIS-III.  And Dr. Roger Saunders testified that he had no criticism

necessarily of the psychometrics or Dr. Kessner's choice of tests or her actual test

administration.  4 FH 133 (ll. 21-23).[15]  Dr. Saunders also agreed that ultimately the IQ

testing of Rivera needed to be conducted in English. *See, e.g.*, 4 FH 136 (ll. 11-13), 161 (ll.

18-22).[16] However, the fact that Dr. Kessner administered the WAIS-III to Rivera in English

---

[15]     "FH" stands for the transcript of the federal hearing.  There are three volumes for the January 2004 hearing, and one volume for the January 2005 hearing.  As used herein, each "FH" citation will be preceded by volume (1-4) and followed by page and line reference (where applicable).

[16]     Rivera states that throughout the January 2004 hearing, "Dr. Saunders testified that the Court should ignore the verbal score on the WAIS-III because Rivera is bilingual *and cannot be tested by the WAIS-III in English.*"  Brief at 5 (citing 3 FH 323-435) (emphasis added).  This contention is  incorrect in a number of respects, as explained below.

and, thus, in a standardized manner does not evidence that she *interpreted* the results correctly.

In a new affidavit, Dr. Kessner relates that prior to administering any tests, she conducted a rapport-building exercise with Rivera during which they discussed various topics and that during the exercise "[w]e spoke in English ... and had no problems communicating with one another."  Rivera's Brief at 3 (Exhibit 1 at  ¶ 5).  She also maintains that he indicated he was "comfortable" talking to her in English, and at no point in testing did he indicate he preferred to speak in Spanish.  *Id.*[17]  Yet it is not that Rivera is unable to communicate or understand anything in English.  All witnesses presented during the January 2004 and 2005 hearings have testified that they were able to communicate with Rivera in English, at least to some degree.  The question is whether Rivera is fluent in English and possesses sufficient English-language skills so that a test examiner (or in this case, a Court) can confidently rely on the obtained verbal IQ score of 66 as an accurate measure of Rivera's current level of intellectual functioning.  The record here is replete with evidence which establishes that Rivera is not fluent in English and that he has significant expressive and receptive English-language deficits. Dr. Kessner's insistence otherwise, and her complete

---

[17]    Interestingly, in her affidavit, Dr. Kessner avers that she spoke to a colleague about administering the WAIS-III to individuals whose native language is Spanish, and that this individual maintains that "it is most appropriate to administer the WAIS-III to a bilingual examinee in English and to allow the examinee to answer either in English or Spanish." Brief at Exhibit 1 at ¶ 4.  If true, what this shows is that test examiners must be amenable to altering the standardized testing procedure if they feel it is necessary -- the exact argument the Director made in his original 2004 Post-Hearing Brief. DE 49 at pg. 3.  Here, however, Dr. Kessner has never testified that she actually offered to allow Rivera to give his answers in Spanish.

failure to qualify the obtained verbal IQ score of 66 to reflect any such limitations, has resulted in a full scale IQ score of 68 which is itself unreliable.

For example, Dr. Saunders testified that Rivera's first language is Spanish; that it was spoken almost exclusively within the family; that Rivera endorsed that he never really heard English to any degree until he started school; and that his teachers taught in English but used Spanish as well. 3 FH 359. Dr. Saunders reports similar conclusions in his notes from the December 2003 interview with Rivera. *See* Director's Fed. Hrg. Exhibit 1 at SAUN-011 (ll. 19-22). At the 2004 hearing, Dr. Saunders testified that while Rivera was raised bilingually, he communicates in "very broken English," uses short sentences and clang associations (mixing up words that sound like other words), is very poorly articulated, and has basic difficulty with English-language skills. 3 FH 360. In fact, during the December 2003 interview, Dr. Saunders wrote: "Poor articulation of English words was observed. Mr. Rivera frequently asked for questions to be repeated; this was believed to be related to his poor understanding of the English language." Director's Fed. Hrg. Exhibit 1 at SAUN-009 (ll. 3-5). During the 2005 hearing, Dr. Saunders answered negatively when asked if he believes that Rivera is fluent in English, and he testified that Rivera "had a poverty of English speech, that he used broken English, that his accent was heavy, and he had poor articulation of English. He used clang associations, which were words that sound [alike], such as ... ["]eyes["] for ["]ice["], and that is typical of individuals that have conflicting language backgrounds." 4 FH 166 (ll. 10-15). And although Rivera did not personally

-14-

address the Court during either hearing, Dr. Saunders, who had interviewed Rivera for over five hours, testified that Rivera "speaks a lot like the sisters who were up here testifying." 3 FH 360.[18]

Additional proof that Rivera has trouble with basic English language skills comes from Marjie Haynes, Director of the Division of Instruction for the Windham School District. *See* Director's Exhibit E. Ms. Haynes verifies that she reviewed records previously provided by Windham and which are attached to her affidavit[19]; that Rivera's Educational Achievement ("EA") was tested by Windham personnel in May 1991 when Rivera was in TDCJ custody; that Rivera's composite EA score was 4.2 (evidencing that he functions at level of 4th grade, 2/10ths of a year); and that his sub-scores were 4.1 for Reading, 5.0 for Math, and 3.2 for Language. *Id*. at ¶¶ 3, 7, & 14. According to Ms. Haynes, "Because the Language sub-score is much lower (for example, two years behind [Rivera's] math performance, it appears Mr. Rivera has trouble with the English language skills." *Id*. at ¶ 14.[20]

---

[18]    Numerous instances occurred during the testimony of Maria Juanita Rivera and Esmeralda Macial where either they did not understand the questions put to them in English by the attorneys or where the witnesses gave answers in Spanish. *See, e.g.*, 2 FH 9-10, 11, 18-19, 21-22, 23, 26, 37, 39, 40, 45, 47-48. On cross-examination, Ms. Maciel testified that she "talk[s] more in Spanish, but they told me to talk to you in English." 2 FH 43. Despite this directive, she oftentimes reverted to Spanish. 2 FH 37, 39, 40, 45, 47-48. Similarly, in his video-taped walk through of the crime scene, Rivera started initially speaking in English, but quickly reverted to Spanish. *See* Director's Fed. Hrg. Exhibit 19 (video) & Exhibit 17 (transcript).

[19]    These records were admitted at the hearing as Rivera's Fed. Hrg. Exhibit 26.

[20]    Because the Court asked during the 2005 hearing what details are known about any of the testing conducted while Rivera has been in TDCJ custody, undersigned counsel obtained

In addition to poor receptive and expressive English skills, Dr. Saunders testified that Rivera "speaks in Spanish, he thinks in Spanish...." 3 FH 359. However, he has been raised bilingually and, thus, he has learned some information in English and other information in Spanish so there is a "competition" with language when he processes information. 3 FH 360. Dr. Saunders elaborated on this at the January 2005 hearing. *E.g.*, 4 FH 135-36. Testimony from Rivera's sisters further substantiates this idea. Rivera's sister, Maria Juanita Rivera, testified that Rivera always spoke Spanish. 2 FH 17. She also testified by affidavit that:

> Jose write letters to me from prison about once a month. His letters are not written well at all. He has misspelled words, incomplete sentences, pronunciations [*sic*] marks all over the place or in the wrong place. Sometimes, he means to say one word but he'll spell another. *For example. instead of spelling the word "ice," he'll spell it "eyes." He does this with many words.* Recently, his writing has improved because he has taken some classes there at the prison. I don't think his writing is as bad as it used to be.

Rivera's Fed. Hrg. Exhibit 12 at ¶ 5 (emphasis added). As Dr. Saunders explained at the January 2005 hearing, using the word "eyes" for "ice" is a clang association, and typical of individuals that have "conflicting language backgrounds." 4 FH 166 (ll. 12-15).

Rivera's sister Esmeralda Macial testified at the January 2004 hearing that Rivera preferred to speak and listen to people in Spanish. 2 FH 42. In her affidavit testimony, this witness related that Rivera "doesn't write very much" which is "typical" of their family, but that when he does, "*he would write both in Spanish with English, his letters were 'mezclada.'*" Rivera's Fed. Hrg. Exhibit 13 at ¶5 (emphasis added). Another sister, Lupita

---

affidavits regarding testing by Windham and testing by TDCJ. *See* Director's Exhibit E (affidavit of Marjie Haynes), Exhibit F (affidavit of Philip Ryan), & Exhibit G (affidavit of Stephen Gilliland).

Rodriguez, testified by affidavit that when Rivera writes her letters from prison, "*his letters will be written all in Spanish, but then sometimes he will switch and write a few words in English.* I figure he just doesn't know how to say or write these words in Spanish." Rivera's Fed. Hrg. Exhibit 15 at ¶ 4 (emphasis added). This switching between English and Spanish is certainly illustrative of what Dr. Saunders referred to as "competition" between languages as Rivera processes information.[21]

As Dr. Saunders testified during both the hearings and as explained in the Director's 2004 Post-Hearing Brief, Rivera's Spanish language background influenced not only how he processes information, but how he stores and retrieves such information. And because Rivera apparently processes some information in English and other information in Spanish, there exists a "competition" or "conflict" between the languages. *See, e.g.*, 3 FH 360, 363; 4 FH 135 (ll. 12-25), 142 (ll. 22-23); DE 49 at pgs. 4-6. Because Dr. Saunders found that Rivera has significant expressive and receptive English-language deficits, and because the WAIS-III has six verbal sub-tests and these were Rivera's lowest scores on the test

---

[21] Importantly, in her December 2003 report, Dr. Kessner listed all the records and materials she reviewed in preparing for her evaluation of Rivera. Rivera's Fed. Hrg. Exhibit 2 at pg. 1. As elicited during cross-examination, the entirety of this review consisted of her reviewing Rivera's August 2003 Fifth Circuit motion for authorization to file a successive habeas petition and its accompanying exhibits. *Compare id. with* 1 FH 88-89. Nevertheless, the affidavits of Rivera's three sisters were included as exhibits and, therefore, Dr. Kessner was aware of these comments regarding Rivera's limitations with English. During the 2004 hearing, Dr. Kessner admitted that she never called any of the family members to talk with them or get any additional details on any matters, and instead simply relied on the affidavits. 1 FH 110-11. When questioned at the 2005 hearing about the statements regarding Rivera switching back and forth between English and Spanish, Dr. Kessner dismissed the comments by saying that Rivera spoke in English with her during the testing and was comfortable when he was speaking. 4 FH 68 (ll. 16-18); *id*. at 66-69.

administered by Dr. Kessner, he decided to assess whether Rivera could communicate additional knowledge when a portion of the WAIS-III test was given in Spanish. Consequently, Saunders asked a TDCJ employee certified to translate for the courts to record in Spanish a sample of vocabulary words which Rivera missed previously when tested by Dr. Kessner. *See* Director's Fed. Hrg. Exhibit 1 at SAUN-020-21 (explaining procedure and Rivera's responses). As Dr. Saunders explained, Rivera gave "superior" answers, "more enriched" information, and demonstrated a "richer knowledge" of some words in Spanish. 3 FH 361, 363, 368. According to Saunders, the purpose of the nine-item vocabulary exercise was "to demonstrate to the court that a single English-based test alone would not be sufficient to get a full picture of [Rivera's] verbal concept formation and intellect when testing." 4 FH 135-36. Dr. Saunders further elaborated, explaining: "It was simply a demonstration to show that Mr. Rivera does, as indeed he did, encode some of his school-based information in both -- some in Spanish and some in English, such that a single test of English-based skills would not appropriately assess all of what he knows and his -- be a fully reliable reflection, representation of his current level of intellectual functioning." 4 FH 164 (ll. 14-20). Rivera's insistence that his Spanish background played no role whatsoever regarding the validity of obtained verbal IQ scores is incredible. *See, e.g.*, 4 FH 69 (ll. 10-12) (Dr. Kessner testifying that Spanish played no role in the testing); *id*. at 121 (ll. 3-10) (Dr. Garnett testifying that he is "comfortable" with the conclusions Dr. Kessner reached regarding Spanish not influencing Rivera's answers, even despite the Spanish vocabulary

demonstration by Dr. Saunders).

Ultimately, given this Spanish-language influence, the manner in which Rivera processes and retrieves information has resulted in lower scores on the WAIS-III verbal sub-tests.[22] Thus, Rivera's verbal IQ score of 66 is an unreliable indicator of his true level of intellectual functioning because it fails to assess the knowledge Rivera actually possesses. And, in turn, this score artificially decreased Rivera's full scale IQ score. The solution, however, is not to re-test Rivera in Spanish (because no Spanish version exists). Instead, as Dr. Saunders has explained, the responsible clinician must qualify the obtained results, and explain how the results should be interpreted in this light. 4 FH 174 (error for Dr. Kessner to take at "face value" the final IQ score with no qualifiers).

Dr. Saunders testified that obtained IQ scores must always be qualified in order to ascertain whether they are current, accurate representations of the person's level of intellectual functioning. 4 FH 134-35. He also testified regarding factors which serve as "qualifiers" -- for example, factors regarding the testing environment (was there noise or other distractions during testing?), or individual subject variables (did the examinee get

---

[22]    Rivera was not penalized for getting items wrong on the WAIS-III because examinees get points for items answered correctly. However, his progress on the test is limited to whether he answers correctly. As long as Rivera keeps answering correctly and additional questions still remain, then Rivera's score on a sub-test would be higher. However, if Rivera could not answer certain verbal sub-test questions because they are asked in English (when, in reality, he knows the answer if only asked in Spanish), then the manner in which he processes information has resulted in his not obtaining a higher and more accurate sub-test score. Simply put -- if Rivera knows the information in Spanish yet an English-based test fails to tap into that knowledge because Rivera is not fluent in English -- then the English-based test does not reflect Rivera's true level of intellectual functioning.

enough sleep?, was he fatigued?, was he depressed?, was he experiencing other major mental illness?, is he taking medicine?). *Id*. at 134 (ll. 7-12). Most relevant, language fluency is a factor which must always be considered. *See id*. at 135-36. Other individual variables mentioned include whether the examinee has visual problems, or whether there is a possibility the individual may be malingering or faking his test results. *Id*. at 138 (ll. 13-25). According to Saunders, the clinician then assesses the degree to which these factors may have increased or decreased the obtained IQ score -- that is, is the obtained score a correct, accurate representation of this person's level of intellectual functioning -- and those observations are recorded on the test record itself and in the interpretation in the psychological report itself. *Id*. at 135-36.

Dr. Saunders' insistence that obtained scores are always qualified is documented by the WAIS-III Record Form itself which includes a section entitled "Behavioral Observations"and requires clinicians to document these factors. *See* Director's Fed. Hrg. Exhibit 2 at KESN-0015. The second factor listed is "Language (Is English native language? In not, indicate examinee's level of fluency; indicate expressive/receptive problems, unusual verbalization)." *Id*.[23] By requiring test examiners to answer such questions, it is clear that The Psychological Corporation, the creators of the WAIS-III, were concerned about the very real possibility that knowledge of the English language at less than a fluent level might

---

[23]    In Rivera's case, Dr. Kessner simply wrote "Spanish/English" with no further elaboration. Director's Fed. Hrg. Exhibit 2 at KESN-0015. When asked about this omission during the January 2004 hearing, Dr. Kessner reported that they were notes to herself and that the omission "is not for any particular reason" 1 FH 62.

impact the accuracy of obtained test scores results.  Other listed factors which might also

impact the accuracy of results include the source and reason for referral[24], attitude towards

testing, physical appearance, visual/auditory/motor problems, and other notes.  *Id*.

If, after clinician has assessed these factors and discovered that they may have

effected the accuracy of obtained test scores, then in some instances, it is entirely appropriate

to give more weight to one set of scores over another.  In the Director's 2004 Post-Hearing

Brief, he referred to Dr. Saunders' testimony regarding why a full scale Wechsler

examination might not be appropriate for everyone (it is not a "one-size-fits-all"

examination), and included citations to the authority Saunders relied on in court for this very

proposition.  DE 49 at pg. 4 (citing 3 FH 356-58, 369-70; DSM-IV-TR at 46;  AAMR's 10th

edition at pg. 8;  The Psychological Corporation, WAIS-III Technical Manual 34 (2d ed.

2000);  The Psychological Corporation, WAIS-III Administration and Scoring Manual

33 (2d ed. 1997)).  During the 2005 hearing, Dr. Saunders against explained that a single

English-based test "may represent an underestimation of where he is with his verbal concept

formation and IQ ... And that's why the manual suggests that it's  -- might find it preferable

to place greater weight on the performance subtests and scores as estimate[s] of the

examinee's cognitive abilities.  This is standard practice to do so."  4 FH 143 (ll. 11-19).

---

[24]    Obviously Rivera was referred by his attorneys for an evaluation on mental retardation -- an evaluation which, if the IQ testing results were low enough, could serve to prevent him from being sentenced to death. Given their legal position, certainly all post-*Atkins* inmates have an incentive to malinger or dissimilate.  Here, Dr. Saunders testified that while he did not see evidence of gross malingering, he could not rule out malingering on a smaller scale.  3 FH 351-52.

Rivera's argument that the Director provides no authority for his contention that the verbal IQ score should be "heavily qualified," Brief at 5, is belied by the record.

In an affidavit prepared for this Answer, Dr. Saunders explained how, in light of the above-described evidence and concerns, he believes Dr. Kessner's has misinterpreted Rivera's IQ testing results, and that Rivera's full scale IQ score of 68 is an under-estimation of his true level of intellectual functioning:

> Although I did not take issue with Dr. Kessner's ultimate choice of testing instruments or her administration of the WAIS-III examination, I most definitely challenge her interpretation of the results. Taking issue with Mr. Rivera's intellectual assessment was not about whether an individual whose first and primary language is Spanish can be successfully administered an English version of the test. Rather it was about the unqualified acceptance of the results obtained by Dr. Kessner in light of Mr. Rivera's strong bilingual, Spanish language history.

> It was never suggested that Mr. Rivera would not be able to communicate to some degree in English for the purposes of taking the English WAIS-III test. However, common sense reasoning would suggest that aspects of Mr. Rivera's intelligence were not tapped by the English Version WAIS-III alone when considering his extensive Spanish language background. Certainly, the language factor in Mr. Rivera's case, including his early exclusive use of Spanish, his preference for using Spanish when speaking, and his statement that he even thinks in Spanish, should be considered strong enough that the informed clinician could not accept the obtained score as wholly representative.

> The WAIS-III Administration and Scoring Manual cautions the test administrator as follows: You *may be similarly challenged when testing individuals who are not fluent in English or individuals for whom English is a second language.* (pg 34) The same manual advises that for examinees with a hearing impairment or speech disability, (or in Mr. Rivera's case a strong Spanish language background with limited English skills), *you may find it preferable to place greater weight on the Performance subtests and scores as estimates of the examinee's cognitive abilities.* (pg 33). In sum, the obtained

score should have been interpreted as an under-estimation of Mr. Rivera's true level of intellectual functioning.

Director's Exhibit H at ¶¶ 4-6.

Rivera argues that the Director is proposing that the Court simply "toss out" or "ignore" the verbal IQ score. Brief at 5, 5-6. This argument misses the point. It is Rivera's experts' reliance on the wholly unqualified verbal IQ score in the face of Rivera's significant expressive and receptive language deficits that is contradictory to psychometric standards of interpretation. As Dr. Saunders explained:

In his February 2005 Brief, Rivera appears to suggest this expert has changed his opinion concerning the utility of employing Mr. Rivera's obtained Verbal IQ score. Whether the terms "tossed out" or "heavily qualified" are used to describe the interpretation process, my opinion remains that the Verbal IQ score obtained from Mr. Rivera was not representative of his true level of verbal intelligence by the multiple factors outlined in my testimony. Again and finally, every obtained test score must be reviewed for factors that may render it unrepresentative of the examined individual and not blindly accepted in a vacuum, absent from the standard practice of the clinician's interpretative process.

Director's Exhibit H at ¶ 8

Furthermore, Dr. Saunders proposed that Rivera's performance IQ score of 77 is "more reflective" of Rivera's true level of intellectual functioning. 3 FH 354, 355. Other than the instructions being given in English, the performance sub-tests do not involve English language skills to determine intelligence[25]; on the other hand, verbal sub-tests are basically

---

[25]    The BETA-II exam which was administered to Rivera on two different occasions when he was admitted into TDCJ custody and on which Rivera scored 85 and 92, is also a performance-based test. Director's Exhibit F at ¶ 7 ("The BETA II assesses IQ through a series of [six] performance-based sub-tests...."). Similarly, the WAIS-R short form which was administered when Rivera was sent to death row an on which Rivera scored an 80 was comprised of a verbal sub-

"unfair" to someone like Rivera who has difficulty with English or someone without complete formal education. 3 FH 358. And importantly, Rivera's performance IQ score of 77 is commensurate with his prior pre-*Atkins* IQ scores of 85, 92, and 80. 3 FH 374-75; Director's Fed. Hrg. Exhibit 33 at PINC 0014 (IQ score of 85), PINC 0046 (IQ score of 92); *id*. at Exhibit 32 at MED-00254 (WAIS-R short form full scale IQ score of 80).

Finally, because questions were raised during the January 2005 hearing about whether anything specific is known about these pre-*Atkins* IQ scores besides just the scores themselves, *e.g*., 4 FH 141, undersigned counsel ascertained the following information. When Rivera was initially admitted into TDCJ custody for an attempted burglary conviction in June 1991, as part of the initial intake procedures, he was group administered a BETA II examination in English and he scored an 85. *See* Director's Exhibit I at pg. 1; Director's Exhibit F at ¶¶ 5, 9. On August 15, 1991, Rivera was released on parole; however, by October 16, 1991, his parole was revoked. Director's Exhibit I at pgs. 2-4. When Rivera was returned to TDCJ custody in February 1992, he was again administered a BETA II examination in English and he scored a 92. Director's Exhibit F at ¶¶ 5, 9. On May 4, 1992, Rivera was released from TDCJ custody on mandatory supervision. Director's Exhibit I at pgs. 5-6. On July 9, 1993, Rivera committed capital murder. *Id*. at 7-8. He is returned to TDCJ custody where, during his initial intake on death row on June 6, 1994, he was administered a WAIS-R short form (consisting of the Verbal and Block Design sub-tests) on

---

test (Vocabulary) and a performance sub-test (Bock Design). Director's Exhibit G at ¶ 12.

which he scored a full scale IQ score of 80. Director's Exhibit G at ¶¶ 5, 8, 12. Therefore, Rivera's pre-*Atkins* scores of 85 and 92 are on BETA II examinations whereas his full scale IQ score of 80 is on a WAIS-R short form. Unfortunately, no records regarding any of these three IQ tests still exist. Director's Exhibit F at ¶ 10; Director's Exhibit G at ¶ 15.

Dr. Saunders testified at the 2005 hearing that WAIS-R short form tests are "acceptable" and they are "considered reliable," although not as reliable as a full scale WAIS. 4 FH 142 (ll. 6-8); *see* 3 FH 329 (testifying that the reliability between the short form and the full scale WAIS are "very, very high" and that the correlation coefficient is .92); *id*. at 331 (short form is considered "less reliable than a full scale"). And although the individual who administered the WAIS-R short form when Rivera was admitted to death row could not remember anything in particular about Rivera, he did offer the following pertinent remark: "If Spanish had been this inmate's first and primary language and English his second, and yet he still obtained a full scale IQ score of 80 on the WAIS-R, I am all the more confident that this inmate could not be mentally retarded." Director's Exhibit G at ¶¶ 7, 13. Rivera's full scale IQ score of 80 is thus a contra-indicator[26] of mental retardation which this Court should consider in assessing Rivera's *Atkins* claim.

Two other contra-indicators of mental retardation are Rivera's pre-*Atkins* IQ scores

---

[26]    As Dr. Garnett acknowledged in the January 2004 hearing, it is not only important to locate evidence indicating mental retardation but it is just as important to hunt for contra-indicators. 2 FH 154; *see* Rivera's Fed. Hrg. Exhibit 24 at pg. 2 (stating purpose of Garnett's interview with Rivera "was to meet Mr. Rivera, conduct a clinical interview, and to search for confirmation or contrary indications of mental retardation.").

of 85 and 92 on the BETA II.  Dr. Saunders verifies that even though the BETA II exam is

not an individually administered full scale test, the results are nevertheless reliable:

> According to the Revised Beta Examination Second Edition (Beta-II) Manual
> by C.E. Kellogg and N. Morton, published by the Psychological Corporation
> in 1978, page 25, the correlation coefficients between the Beta-II IQs and
> WAIS Full Scale IQs ranged between .64 and .66. These moderate range
> coefficients are quite acceptable, especially when used as a screening
> instrument.  Also, the Beta-II IQs reported for this comparison were lower than
> the corresponding WAIS-IQ.  The average Beta-II score was 11 points lower
> than average WAIS-IQ score in this study.  While it would not be appropriate
> to add 11 points to an individual test score, comparatively the Beta-II can thus
> be considered to be an under-estimator of intelligence.

Director's Exhibit H at ¶ 11.  The overall importance of considering these pre-*Atkins* IQ

scores was explained by Dr. Saunders as follows:

> In Mr. Rivera's and other Atkins cases, the question to be answered by
> testifying experts is, "How much intelligence is present?" Arguments should
> then focus around the highest obtained test scores.  In Mr. Rivera's case the
> highest scores were 85 and 92, placing him well above the mentally retarded
> range.  Since an examinee can only feign having less intelligence and not more
> than he possesses, these scores should be taken as the basement or the lowest
> possible IQ measure that can be obtained.  Defense experts have only argued
> that these scores were obtained from somewhat less reliable (but not
> unreliable) test instruments.  Indeed they have attempted to "toss out" or
> disregard these reliable pre-Atkins IQ scores that do not support Mr. Rivera's
> claim of mental retardation.  Additionally, it appeared that defense experts were
> unwilling to entertain any qualifying factors that might result in an inflation of
> their obtained IQ test from Mr. Rivera, a score that was already very close to
> the accepted cut-off for the mentally retarded range.

Director's Exhibit H at ¶ 9.  Yet even if some question remained regarding their reliability,

these pre-*Atkins* IQ scores should still be considered because "an individual taking those tests

would not have scored at that level had they been an individual with mental retardation,

almost irregardless of the reliability of how they were administered."  4 FH 174 (ll. 6-11);

*see, e.g.*, 4 FH 94 (Dr. Kessner conceding that if the scores 80, 85 and 92 are correct, then

"those scores do not reflect mental retardation.").

Given the above, Rivera's post-*Atkins* full scale IQ score of 68 is unreliable because

Rivera's English-language deficits are not qualified.  Although a score of 68 is below the cut

off of 70 for establishing the first criteria for mental retardation, if that score does not

accurately reflect Rivera's true level of intellectual functioning -- which, here, it does not --

then the score is essentially worthless.  The Court should hold that Rivera has failed to make

this initial showing on his *Atkins* claim.

### C.    Rivera's Additional Factors Fail To Establish Significant Limitations In Intellectual Functioning.

Rivera argues that in addition to his IQ score of 68, the Court should find that he

meets this first criteria because "additional factors" support Rivera's intellectual functioning

deficits. Brief at 6-8.  More specifically, Rivera contends that his school records and

teacher's impressions of him as a student help establish this criteria. *Id*.  His evidence neither

shows that the state court unreasonably rejected his *Atkins* claim nor should it convince this

Court to grant habeas relief.

On state habeas review, the Texas court explained that in determining whether an

applicant has met the *prima facie* requirement for successive writs based on *Atkins*, an

applicant should provide evidence of at least IQ test taken prior to age eighteen;  however,

if no IQ score can be located after a diligent search, then "other materials" may suffice for

a showing of "significant subaverage intellectual functioning." Director's Exhibit B at 2 &

n.3.  Rivera provided no IQ score to the Texas court and, consequently, relied exclusively on

other evidence instead.  However, the habeas court found Rivera's evidence unconvincing,

even for just a threshold showing:

> After a careful review of all the materials submitted by [Rivera], we
> conclude that he has failed to meet the threshold factual burden.  The evidence
> he has submitted to this Court includes [Rivera's] grade reports for first
> through sixth grades.  These records indicate that [Rivera] was born on
> December 23, 1962, and began school in 1969.  He earned Cs in all classes and
> terms except one D in one term.  He repeated first grade and was placed in
> special classes, where he earned Cs, Bs, and one D.  He also repeated fifth
> grade.  By the time he finished sixth grade, his grades had fallen mostly to
> mostly Ds and Fs in his academic subjects, including Spanish, his home
> language and in which he had previously earned As.  He continued to earn Cs
> or less in academic subjects, but earned As and Bs in mechanical repairs.  At
> age 17, [Rivera] withdrew from school while in the ninth grade.  He earned a
> GED in 1980.[27]  The evidence offered by [Rivera] does not show the required
> "significantly subaverage general intellectual functioning."

Id. at 3.  Given the lack of evidence, the Texas court did not act unreasonably in finding that

Rivera failed to meet the threshold requirement of "sufficient specific facts" to support his

Atkins claim.  See id. at 4.

Furthermore, while Rivera points to various examples of conduct as establishing that

---

[27]    The Texas court reached this conclusion because Rivera's high school records expressly state that the reason for withdrawal is "GED." See, e.g., Rivera's Fed. Hrg. Exhibit 10 at pg. 5 ("Hanna High School Withdrawal Form").  The Court of Criminal Appeals did not act unreasonably in making this initial determination even where, as here, it later proved to be erroneous.  An exhibit submitted by Rivera in his suggestion for reconsideration indicated that he never actually received his GED.  See Rivera's Fed. Hrg. Exhibit 8 at pg. 1.  In any event, the Texas court would not have decided that Rivera made a prima facie showing of retardation if only it had known he did not receive a GED.

he suffers from significant limitations in intellectual functioning -- *e.g.*, his low scores in school, his repeating several grades, his dropping out of high school in ninth grade, his placement in "special education classes"[28], family members testifying that he reads slowly or never learned to write well -- such conduct is certainly not the exclusive domain of mental retardation.  While an individual with mental retardation may have faced many of these events, certainly not everyone with low grades or who has failed school is necessarily mentally retarded.  Thus, the Court should be concerned with what makes Rivera's conduct qualitatively different from other individuals who face these events yet are not mentally retarded.

Moreover, alternative and more plausible explanations can be offered for such conduct -- for example, Rivera misbehaving in class, not paying attention, or being unmotivated;  his skipping school several times a week (even sneaking out of an open window after roll call to go to a friend's house to watch "The Price is Right"), and his occasional use of drugs such as inhalants beginning from as early as second grade.[29]  *See, e.g.*, Rivera's Fed. Hrg. Exhibit

---

[28]    Rivera cites Dr. Richard Garnett's December 2003 report that Rivera "was unable to achieve in special education classes where the assignments were at his own level of ability and below."  Brief at 7 (citing Rivera's Fed. Hrg. Exhibit 24 at pg. 6).  As explained more below, on cross-examination at the January 2004 hearing, Garnett admitted that he only meant to write "special classes" and that no records established that Rivera was actually placed in special education classes.  2 FH 159-60, 160-61.

[29]    Rivera told Dr. Saunders during the December 19, 2003 evaluation that he began using spray paint as an inhalant "as early as the second grade on."  Director's Fed. Hrg. Exhibit 1 at SAUN-011 (ll. 7-8).  This post-*Atkins* recollection is highly suspect, especially in light of Rivera telling Dr. Saunders that he believes he is mentally retarded because of "too many paint."  *Id.* at SAUN-019 (l. 18). Furthermore, Rivera's recollection contradicts his own evidence of a pre-*Atkins* medical report indicating that Rivera began using inhalants around age seventeen. Rivera's Fed. Hrg.

9 at ¶ 3 (Hugh Albright describing Rivera as "sometimes misbehav[ing] in class", "inclined not to pay attention in class and to fool around", and that Rivera "did not have much motivation"); Director's Fed. Hrg. Exhibit 1 at SAUN-011 (ll. 7-17), *id.* at SAUN-012 (ll. 2-4), *id.* at SAUN-015 (ll. 16-19). And, as previously detailed in the Director's Post-Hearing Brief (DE 49), Rivera's deficiencies here and in the area of adaptive functioning are primarily the result of his own volitional conduct (for example, his inhalant abuse and extensive criminal history), or the result of anti-social personality features (*e.g.*, his repeated lying, failure to plan ahead, impulsivity, consistent irresponsibility). Consequently, the Court needs to look not to the mere existence of allegedly negative conduct, but to the possible reasons for why such conduct has occurred.

Additionally, while the Texas court noted that Rivera was placed in "special classes," there has been no evidence to support that Rivera was placed in special education classes or the reasons for such placement. Presumably the Texas court's conclusion was based on the unsupported assertions from several of Rivera's sisters. *See, e.g.*, Rivera's Fed. Hrg. Exhibit 12 at ¶ 9 (affidavit of Rivera's sister Maria Juanita Rivera referencing special education classes); Rivera's Fed. Hrg. Exhibit 13 at ¶ 3 (affidavit of Rivera's sister Esmeralda Maciel referencing same); Rivera's Fed. Hrg. Exhibit 14 at ¶ 6 (affidavit of Alma Legarda, translating affidavit of Rivera's sister Camelia Garcia, referencing same). However, no school records reflect these statements to be true. *Compare id. with* Rivera's Fed. Hrg.

Exhibit 22 (report by Dr. Pedro Ruggero: "This 23 year old, separated, unemployed Mexican-American male started inhaling paint when he was 17 years old.").

Exhibit 10 & 25.  But even if true, Esmeralda Maciel's testimony establishes that Rivera was placed in special education classes, not because he is retarded, but because "he could not read very well."  Rivera's Fed. Hrg. Exhibit 13 at ¶ 3.

Furthermore, during federal habeas proceedings, Dr. Garnett wrote in his December 28, 2003 report on Rivera: "He was placed in Special Education and could not produce successful grades even there."  Rivera's Fed. Hrg. Exhibit 24 at pg. 5;  *id*. at pg. 6 ("unable to achieve even in special education classes").  When cross-examined during the January 2004 hearing regarding what evidence actually supports this statement, Garnett conceded that he meant only to say "special classes."  2 FH 159-60.  Yet these "special classes" consisted of Rivera being placed in a "high-one" class when he failed first grade, and a CVAE motivational class for at-risk students -- both of which Dr. Garnett admitted do not evidence retardation.  2 FH 160-61. Nevertheless, assuming *arguendo* these "special classes" were indeed special education classes, even that does not evidence mental retardation.  Certainly while mentally retarded students might be placed in special education classes, the converse dos not hold true -- not all persons who take special education classes are mentally retarded. Taken as a whole, Rivera's "other evidence" fails to establish that he suffers from significant limitations in intellectual functioning.

## IV.    Rivera Fails To Establish Concurrent Significant Deficits In Adaptive Functioning.

"Adaptive behavior" is described in Texas law as "the effectiveness with or degree to which a person meets the standards of personal independence and social responsibility

expected of the person's age and cultural group." TEX. HEALTH & SAFETY CODE § 519.003(13); *Howard v. State*, 153 S.W.3d at 386 (citing *Briseno*, 135 S.W.3d at 7 (quoting § 519.003(13))). The AAMR and APA also describe the factors in evaluating adaptive functioning. *Atkins,* 536 U.S. at 309 n.3. For example, the AAMR refers to "limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work." *Id.* The APA guidelines require "significant limitations in adaptive functioning" in at least two of its list of similar skill areas. *Id.* Rivera offers no credible evidence to demonstrate that he suffers from significant deficits in adaptive functioning.

In his brief, Rivera argues that he has irrefutably shown that he has significant deficits in the areas of functional academics and self-care which manifested before age eighteen. Brief at 8. In addition referencing the "academic failures" previously discussed in Part III.C. *supra*, Rivera provides a list of conduct which allegedly proves his retardation -- (1) homeroom teacher Hugh Albright's opinion that Rivera "did not react well with other students" (2 FH 63); (2) that, according to his sister Maria Juanita Rivera , Rivera had few friends and that his 'friends" were other kids with whom he abused inhalants (2 FH 10); (3) that Rivera was unable to take care of himself -- he would not bathe, brush his teeth, ans stayed perpetually dirty (2 FH 6-8); (4) that Rivera slept outside underneath the house (2 FH 28-29); (5) that he never helped around the house and rarely found jobs to help pay bills (2 FH 30, 33); (6) that he relied on others to find jobs for him and rarely held the jobs for very

long (2 FH 33);  and (7) that he was unable to manage money so his sister would have to manage it for him (2 FH 34).  Brief at 8-9.  This conduct in no way establishes that Rivera has significant deficits in adaptive functioning.

Initially, as explained in the Director's Post-Hearing Brief, much of Rivera's negative conduct or adaptive limitations can be readily explained by three alternative, and more plausible, theories -- his inhalant abuse, his extensive criminal history, and his negative personality characteristics.  *See* DE 49 at pgs. 6-8.  Moreover, a majority of Rivera's examples are simply refuted by the record evidence.  For example, Rivera's "academic failures" can be explained in part by his limitations in English-language skills, his apathy, his skipping school, and his episodic use of inhalants and other illegal substances. Albright's recollection that Rivera did not "react well" with other students or his sister's account that he had few friends even if true does not establish that it is indicative of retardation and could instead be explained by Rivera's antisocial personality features. Although he cites testimony from his sister Maria Juanita Rivera that he would not  keep himself clean, she testified that her earliest recollections of Rivera were when he was eighteen years old. 2 FH 18. However, Rivera later contends that no evidence after age eighteen should be considered because it is irrelevant which would, thus, exclude her testimony.  Brief at 9-10.  In any event, various TDCJ guards testified that other than two disciplinary infractions in the past ten years, Rivera has had no trouble keeping himself and his cell clean and neat, and one guard testified that Rivera actually "mattress presses" his jumper.  *See, e.g.*, 3 FH 276-77, 286, 278.  Although

Rivera points to his sleeping outdoors as evidence of mental retardation, Brief at 9, his sister Maria Juanita Rivera testified that Rivera would oftentimes sleep outside because the house could not fit the whole family, and because it was hot inside the house, and that while he was outside, Rivera would cook for himself and sometimes for the family.  Rivera's Fed. Hrg. Exhibit 12 at ¶ 3.  Rivera's father testified at trial that Rivera actually slept outdoors so that his father would quit bother him about sniffing paint.  13 SF 548, 540-42.[30]

Regarding Rivera's argument that he never helped his parents around the house and never found jobs to help pay the bills, Rivera's father testified that Rivera worked around the house doing various things like cutting the yard or helping paint the house.  Rivera's Fed. Hrg. Exhibit 17.  Rivera's next argument contradicts his prior -- that he relied on others to find him jobs or that he never held jobs for long versus he never found jobs to help pay the bills.  Brief at 9.  The record disputes this claim because Rivera's father testified that he worked many jobs with his son; that Rivera worked at a Ramada Inn for six or seven months as a cook's helper;  that Rivera left the Ramada Inn job when the pay was cut and not because he could not do the job; and that Rivera  would hear about a job opportunity from his father or from a friend, and then go apply in person.  Rivera's Fed. Hrg. Exhibit 17. Finally, Rivera's contention that his sister Esmeralda "had to take away the money he earned so that he would have money for necessities" contradicts his earlier argument that Rivera

---

[30]    "SF" refers to the Statement of Facts, the transcription of trial testimony and exhibits, from Rivera's capital murder trial.  Each SF cite will be preceded by volume and followed by page reference.

never found jobs to help pay the bills. Even if true, this conduct is more easily explained by Rivera's irresponsibility and impulsivity (his anti-social personality features), and his abuse of inhalants because what money he had to spend was most likely going to fuel that substance abuse. These examples of conduct fail to establish the second criteria for mental retardation.

Because Rivera's conduct can be explained by other factors beyond mental retardation, it was crucial for Rivera to establish a qualitative difference between his own conduct and that of his local peers. As Dr. Saunders stressed at the 2005 hearing, Rivera has failed to meet this burden of proving that his conduct is attributable to mental retardation:

> There's plenty of maladaptive behavior in this person's history. There's plenty of criminal history, drug and alcohol abuse, and so you would -- it is true that these things, these diagnosis, inhalant abuse and alcohol abuse, can coexist with mental retardation. But what you want to look for is a qualitative difference between what you see when they're using the drugs and what you're seeing when they're not. In other words, I have not been presented with any evidence that suggests that in the absence of drugs or antisocial behavior, there is a qualitative difference between Mr. Rivera's adaptive functioning and that -- when compared to his local culture group. Certainly it impaired every aspect of his life when he was using drugs and engaged in that behavior. So you want to see something different over and above that that suggests he's mentally retarded.

4 FH 144-45 (ll.24-13).

In addition to the above-cited evidence failing to prove this criteria, affidavits from Rivera's family members do not support Rivera's *Atkins* claim and, thus, the state habeas court acted reasonably in rejecting this evidence. *See, e.g.*, Rivera's Fed. Hrg. Exhibits 12, 13, 14, 15, 16 & 17. No family member testified that Rivera is actually retarded or that he was ever labeled "mentally retarded" while in school. *See id*. Instead, family members

provide testimony establishing the opposite.  For example, Rivera's sister Maria Juanita Rivera states that Rivera writes her from prison about once a month, but that his letters are not written well, and contain "misspelled words, incomplete sentences, pronunciations [*sic*] marks all over the place or in the wrong place."  Rivera's Fed. Hrg. Exhibit 12 at ¶ 5.  She also testified that Rivera knew how to drive and would drive his wife's car around, but that he never took a driving test.  *Id* at ¶ 7.  Importantly, she also casts doubt on whether Rivera's alleged intellectual deficiency is a result of mental retardation or the product of his own inhalant abuse, because Rivera "used to sniff paint" and did that for as long as this witness could remember.  *Id*. at ¶ 8. An older sister, Esmeralda Maciel, testifies that Rivera was placed in special education classes, not because he is retarded, but because "he could not read very well."  Rivera's Fed. Hrg. Exhibit 13 at ¶ 3.  In contrast to the sister who gets monthly letters from Rivera, Maciel contends that Rivera "doesn't write very much," and that "is typical of our whole family;  we just don't like to write."  *Id*. at ¶ 5.  A third sister, Camelia Garcia, testifies that Rivera did not work very much, that her father would find jobs for Rivera, and that she does not remember Rivera ever finding a job on his own.  Rivera's Fed. Hrg. Exhibit #14 at ¶¶ 2, 3.  In contrast to testimony from Maria Juanita Rivera that Rivera would drive his wife's car, Garcia testifies that Rivera "did not drive" and that "his wife was the one who drove him everywhere."  *Id*. at ¶ 9.  Lupita Rodriguez, another sister, also testified that Rivera "does not know how to drive," that Rivera would write her letters from prison, and that Rivera "used to sniff paint when he was young," that he did it "from when

he was little all the way to high school," and he "always did it." Rivera's Fed. Hrg. Exhibit 15 at ¶¶ 4-6. Dora Garza, Rivera's ex-wife, testified that she was married to Rivera for approximately twelve years. Rivera's Fed. Hrg. Writ Exhibit 16 at ¶ 1. She also relates that Rivera knows how to read in English and Spanish, but that she hardly ever saw him pick up a book and read. *Id.* at ¶ 6. In sharp contrast to comments made by Rivera's sisters and ex-wife that Rivera did not work much, that he never filled out job applications, that the longest he ever held a job was a few months, and that he never worked around the house, Rivera's father Alfredo Rivera testified that the two worked together on many jobs, that Rivera worked as a cook's helper for six or seven months and left this job when the pay was cut not because he could not do the job, and that Rivera worked around the house by mowing the yard or helping paint. Rivera's Fed. Hrg. Exhibit 17 at ¶¶ 2-4.

The Texas court found that affidavits from Rivera's family members were unconvincing in establishing that Rivera faced significant deficits in adaptive functioning:

> Affidavits from three of [Rivera's] sisters recount that [Rivera] was a slow learner and apparently never learned to read well, tell time, or drive a car. Because he did not read well, [Rivera] had difficulty in filling out job applications; his father found work for him. [Rivera] also forgot things and was difficult to understand when he spoke. One sister also stated that [Rivera] began to sniff paint when he was young and continued to do so through high school. Other than allegations that he did not work much, there is no evidence of deficits in adaptive functioning.

Director's Exhibit B at 3-4; *see* Rivera's Fed. Hrg. Exhibits 12, 13, & 14. Given the evidence, the Texas court correctly found Rivera failed to meet his threshold showing.

Testimony from family members during the federal hearing does not establish that the

Texas court unreasonably rejected this criteria. For example, after testifying that Rivera never did things around the house, that he would not take care of himself, that he stayed dirty, and that he had to be reminded to do things, Rivera's sister Maria Juanita Rivera admitted on cross-examination that perhaps one of the reasons was because he had been sniffing paint for several years. 2 FH 8, 20-21. Most damning, Rivera's sister Esmeralda Macial testified that when she was living in Florida, she sent money to Rivera in Texas and asked him to bring her young daughter to her. 2 FH 31-32, 34-36. When asked by Judge Vela whether she thought Rivera was capable of such a task, she responded that she was "scared" because Rivera "didn't act normal sometimes when he was small," but that he "was more older at that time. I thought he changed because he was married already." 3 FH 36. This is not testimony evidencing Rivera has a permanent condition like mental retardation but rather, that he had "changed" his irresponsible ways, perhaps by not abusing inhalants.

Equally unconvincing is the testimony from Rivera's lay witnesses. For example, one teacher, Roberto Moreno, admits that he never even taught Rivera. *See* Rivera's Fed. Hrg. Exhibit 10 at ¶ 2. Another teacher, Hugh Albright, testified that Rivera was a "very poor student" and "not able to learn much," but he admits that by sixth grade, Rivera a reached a point where he just did not seem to care and that he did not have much motivation. Rivera's Fed. Hrg. Exhibit 9 at ¶ 3. Many of his conclusions about Rivera's alleged intellectual shortcomings are speculative as best -- "I suspect that [Rivera] could not add or subtract very well, and he probably did not know how to multiply," *id*. at ¶ 5; "I suspect that when [Rivera]

was in 6th grade, his math skills were at a 2nd grade level," *id*. at ¶ 6;  and "I suspect" that Rivera could not read the books in his prescriptive reading class, *id*. at ¶ 7.  And during cross-examination at the 2004 hearing, this witness admitted that a student's academic performance could possibly be negatively affected by language difficulties, excessive absences, poor home life, lack of motivation, being teased, and drug use (all of which the evidence shows occurred in Rivera's case).  2 FH 71-75.

Finally, the evidence adduced at Rivera's capital murder trial reveals that he is not retarded.  Although Rivera confessed to his crime and trial counsel did, in fact, challenge the admissibility, Rivera's confessions were never attacked on the basis that they were involuntarily rendered because Rivera was retarded.  Instead, defense counsel attacked the confessions as inadmissible, questioning witnesses about whether they informed Rivera of his rights; how many times officers informed Rivera of his rights;  whether Rivera appeared to understand; what the conditions were surrounding the confessions (whether Rivera could eat, use the restroom, take a break); and how many officers were present during the questioning. Counsel also questioned various officers whether someone had threatened to "put a gun to [Rivera's] head" unless he told the truth, whether an officer had kicked Rivera in the groin three times to give another statement, and whether officers were aware of any threats made to Rivera that his previous statements were not the truth.  3 SF 32, 52, 70-72. Rivera took the stand at the suppression hearing and testified that he had been threatened into giving the videotaped confession -- that officers read him his rights and did not threaten him

when he gave his first statement, 3 SF 55; that officers did not give him his rights before the second written statement, 3 SF 55; that he was allowed to sleep following the second statement, but was woken up in the morning to go make the videotaped confession, 3 SF 56-57; that an officer told him he should confess his crime and "made" him confess by grabbing Rivera and kicking him in the groin three times, 3 SF 57; and that an officer threatened him with his hands and told Rivera he felt like putting a gun to Rivera's head and "blowing [his] guts out." 3 SF 58. During cross-examination, Rivera admitted he had been arrested a number of times; that he was very familiar with his *Miranda* rights; that he had no trouble understanding what the prosecutor was asking him or what people say to him; that he signed the waiver forms before making either written statement; that he was advised of his rights by a judge prior to making the videotaped confession. 3 SF 59-65. Rivera also related other details that he had been grabbed by an officer Ramirez, that Ramirez punched him in the mouth and cut his lip, that Ramirez hit him about three times, kicked him with his knee, and picked him up off the chair and was talking to Rivera "nose to nose." 3 SF 65-68. At the conclusion of the hearing, the trial court denied the defense motions to suppress the two written confessions and the one videotaped confession, finding that Rivera understood his rights and intelligently and knowingly waived those rights, and later issued written findings. 3 SF 72; 2 Tr 5-8.[31]

---

[31]    "Tr" refers to the transcript or clerk's record of pleadings filed during Rivera's capital murder trial. Each "Tr" cite is followed by page reference.

Importantly, Rivera never raised a claim on direct appeal or during his state or federal habeas petitions attacking his confessions as being involuntarily made. Thus, there can be no contention that Rivera's will was overborne due to his alleged retardation. There is also no indication that counsel was unable to communicate with Rivera. Consequently, Rivera's case presents none of the impairments of mentally retarded individuals that the *Atkins* Court found troubling -- the increased risk of false confessions and difficulties in communicating with counsel. *Atkins,* 536 U.S. at 319-20. From these facts, it is clear that Rivera does not suffer from any significant deficits in adaptive behavior and, therefore, the rule of *Atkins* has no application to his case.

## V.    Rivera Fails To Establish Onset Prior To Age Eighteen.

Texas law requires that the significant limitations in intellectual ability and adaptive function originate "during the developmental period." *Ex parte Tennard,* 960 S.W.2d at 60 (citing TEX. HEALTH & SAFETY CODE, § 591.003(13)). The developmental period is understood to be the period before age eighteen. *Howard v. State*, 153 S.W.3d at 386 (quoting *Briseno*, 135 S.W.3d. at 7).

Conspicuously absent from Rivera's case is any evidence establishing that he suffered from significant limitations in intellectual ability and adaptive functioning before eighteen. No school records show that Rivera was ever diagnosed as retarded or ever placed in special education classes. *See, e.g.*, Rivera's Fed. Hrg. Exhibits 10 & 25. Additionally, the fact that Rivera scored poorly in school and eventually dropped out before age eighteen does not

establish that he is retarded and is instead explained by other factors. Trial counsel Jose Esquivel testified at the 2004 hearing that he believed Rivera was competent and able to help in his defense, that he did not feel there was a need to challenge Rivera's confession based on his mental status, and that no family member ever told him Rivera was retarded. 3 FH 197-98, 202. Further, while Rivera has been assessed by mental health professionals, medical examiners, and TDCJ psychiatric personnel, no one has ever diagnosed Rivera as being retarded. As Dr. Saunders concluded, while it might be possible Rivera could have "slipped through the cracks" for forty years, it is not probable. *See* 3 FH 377-79 (quoting, *e.g.*, Director's Fed. Hrg. Exhibit 32 at 254, 565; Exhibit 33 at 92, 168; Exhibit 39 at 4, 5, 6, 8). Of note, Stephen Gilliland used similar language in describing TDCJ's multi-layered system for screening inmates for special needs on admission to death row: "I am confident that no mentally retarded inmate made it through the screening process unrecognized. No one would have 'fallen through the cracks.'" Director's Exhibit G at ¶ 14. Indeed, Rivera was screened on three occasions by TDCJ (twice when admitted for burglary of a building, and once for capital murder), and he has never been identified as mentally retarded. *See* Director's Exhibit F & G

Moreover, Rivera has in the past pointed the Court to evidence establishing that substance abuse is the leading *cause* mental retardation, Rivera's Fed. Hrg. Exhibit 29, and has argued through Dr. Garnett that perhaps the cause for Rivera's retardation is his inhalant abuse. See, e.g., 3 FH 461-63. However, the specific passage in question in Rivera's exhibit

was actually removed from the website, as Dr. Saunders testified to at the 2005 hearing. 4

FH 168-69; *see* Director's Fed. Hrg. Exhibits 40 & 41. In his Brief, Rivera now contends

that the cause of his retardation is irrelevant to his diagnosis. Brief at 10-11. The Director

agrees. Nevertheless, Rivera contends there are "a significant number of etiological factors"

in his history prior to eighteen such as "the inhalant abuse along with social deprivation or

linguistics issues or getting hit in the head with a pipe." *Id.* at 11. To the extent Rivera

maintains that his alleged deficits are the result of his episodic use of inhalants, he has never

established that this use so impaired him before the age of eighteen that he could be

considered retarded.

The simple truth of the matter is that the issue of retardation first arose in June 2003,

some six weeks prior to Rivera's scheduled execution. Given the absence of any convincing

evidence showing significant limitations in intellectual ability or adaptive functioning

manifested at an earlier date, Rivera fails to prove the final prong as well.

## CONCLUSION

Because Rivera cannot establish that he is mentally retarded, this Court should deny

habeas relief.

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

BARRY R. McBEE
First Assistant Attorney General

-43-

DON J. CLEMMER
Deputy Attorney General for Criminal Justice

GENA BUNN
Chief, Postconviction Litigation Division


 s/Katherine D. Hayes
*KATHERINE D. HAYES
Assistant Attorney General
Postconviction Litigation Division
Texas Bar No. 00796729
Southern District No. 22698

*Counsel of Record

Office of the Attorney General of Texas
P.O. Box 12548, Capitol Station
Austin, Texas  78711-2548
Telephone: (512) 936-1600
Telecopier: (512) 320-8132
Email: katherine.hayes@oag.state.tx.us

ATTORNEYS FOR RESPONDENT


## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing pleading was

electronically served pursuant to LOCAL RULE 5.1, on this the 18th day of April, 2005.


 s/Katherine D. Hayes
KATHERINE D. HAYES
Assistant Attorney General