IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOSE ALFREDO RIVERA, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 1:03-cv-00139 |
| | § | **CAPITAL LITIGANT** |
| DOUG DRETKE, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| Respondent. | § | |

### AFFIDAVIT OF ROGER SAUNDERS, Ph.D

| | | |
|---|---|---|
| STATE OF TEXAS | § | |
| | § | |
| COUNTY OF MONTGOMERY | § | |

BEFORE ME, the undersigned authority on this date, personally appeared Roger Saunders, who having been duly sworn, deposed and stated as follows:

1. My name is Roger Saunders. I am a clinical psychologist who is licensed in the State of Texas.

2. I have personal knowledge that the statements contained in this affidavit are true and correct. I am of sound mind and am competent in all ways to testify to the matters stated in this affidavit.

3. I have previously given testimony in the above-referenced case on January 8, 2004 and again on January 14, 2005, regarding my December 2003 interview and evaluation of offender Rivera, and my review of voluminous materials which have been submitted into evidence by both parties during the January 2004 and 2005 evidentiary hearings.

4. Although I did not take issue with Dr. Kessner's ultimate choice of testing instruments or her administration of the WAIS-III examination, I most definitely challenge her interpretation of the results. Taking issue with Mr.



FROM :                           FAX NO. :                           Dec. 05 2000 11:51AM P2

Rivera's intellectual assessment was not about whether an individual whose first and primary language is Spanish can be successfully administered an English version of the test. Rather it was about the unqualified acceptance of the results obtained by Dr. Kessner in light of Mr. Rivera's strong bilingual, Spanish language history.

5. It was never suggested that Mr. Rivera would not be able to communicate to some degree in English for the purposes of taking the English WAIS-III test. However, common sense reasoning would suggest that aspects of Mr. Rivera's intelligence were not tapped by the English Version WAIS-III alone when considering his extensive Spanish language background. Certainly, the language factor in Mr. Rivera's case, including his early exclusive use of Spanish, his preference for using Spanish when speaking, and his statement that he even thinks in Spanish, should be considered strong enough that the informed clinician could not accept the obtained score as wholly representative.

6. The WAIS-III Administration and Scoring Manual cautions the test administrator as follows: You *may be similarly challenged when testing individuals who are not fluent in English or individuals for whom English is a second language.* (pg 34) The same manual advises that for examinees with a hearing impairment or speech disability, (or in Mr. Rivera's case a strong Spanish language background with limited English skills), *you may find it preferable to place greater weight on the Performance subtests and scores as estimates of the examinee's cognitive abilities.* (pg 33). In sum, the obtained score should have been interpreted as an under-estimation of Mr. Rivera's true level of intellectual functioning.

7. I disagree with testimony from Dr. Garnett and Dr. Kessner that the WAIS-III test is the result of a rigorous, sophisticated norming process that creates a test appropriate to bilingual individuals. In fact, the WAIS-III norming process specifically did not attempt to control for language factors including Spanish, and any inclusion of bilingual subjects in the norming sample would have only been coincidental. According to the WAIS-R Administration and Scoring Manual, *The WAIS-III normative data were collected on individuals who speak fluent English* and, *if the test is administered bilingually, it may present problems in interpreting scores* (page 34).

8. In his February 2005 Brief, Rivera appears to suggest this expert has changed his opinion concerning the utility of employing Mr. Rivera's obtained Verbal

IQ score. Whether the terms "tossed out" or "heavily qualified" are used to describe the interpretation process, my opinion remains that the Verbal IQ score obtained from Mr. Rivera was not representative of his true level of verbal intelligence by the multiple factors outlined in my testimony. Again and finally, every obtained test score must be reviewed for factors that may render it unrepresentative of the examined individual and not blindly accepted in a vacuum, absent from the standard practice of the clinician's interpretative process.

9. In Mr. Rivera's and other Atkins cases, the question to be answered by testifying experts is, "How much intelligence is present?" Arguments should then focus around the highest obtained test scores. In Mr. Rivera's case the highest scores were 85 and 92, placing him well above the mentally retarded range. Since an examinee can only feign having less intelligence and not more than he possesses, these scores should be taken as the basement or the lowest possible IQ measure that can be obtained. Defense experts have only argued that these scores were obtained from somewhat less reliable (but not unreliable) test instruments. Indeed they have attempted to "toss out" or disregard these reliable pre-Atkins IQ scores that do not support Mr. Rivera's claim of mental retardation. Additionally, it appeared that defense experts were unwilling to entertain any qualifying factors that might result in an inflation of their obtained IQ test from Mr. Rivera, a score that was already very close to the accepted cut-off for the mentally retarded range.

10. I have read the recent affidavits of TDCJ-ID employees Stephen Gilliland and Philip Ryan. Based on these affidavits I have not modified my opinion concerning Mr. Rivera's IQ test history. The information provided by these individuals regarding the administration of IQ testing only strengthens my impression that these scores must be considered as valid contrary indicators of mental retardation.

11. According to the Revised Beta Examination Second Edition (Beta-II) Manual by C.E. Kellogg and N. Morton, published by the Psychological Corporation in 1978, page 25, the correlation coefficients between the Beta-II IQs and WAIS Full Scale IQs ranged between .64 and .66. These moderate range coefficients are quite acceptable, especially when used as a screening instrument. Also, the Beta-II IQs reported for this comparison were lower than the corresponding WAIS-IQ. The average Beta-II score was 11 points lower than average WAIS-IQ score in this study. While it would not be appropriate to add 11 points to an individual test score, the Beta-II can be considered an

under-estimator of intelligence when compared to the WAIS. It is likely that no comparative data are available for the Beta-II and the most recent version of the WAIS, the WAIS-III, as their time in service did not overlap.

12. I have also read the recent affidavit of Windham School District employee Marjie Haynes. I agree with her comment that the differences between Rivera's Math and Language sub-scores is most likely indicative of Rivera having trouble with basic English language skills. Based on this affidavit, I have not modified my opinion concerning Mr. Rivera's IQ test history.

FURTHER AFFIANT SAYETH NOT.

_____
ROGER SAUNDERS, Ph.D

*Sworn to and subscribed before me on this* ___18___ *day of April, 2005.*


IRENE RANGEL
Notary Public, State of Texas
My Commission Expires
July 15, 2008

_____
Notary Public, State of Texas

My Commission Expires: July 15, 2008