IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOSE ALFREDO RIVERA, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| | § | |
| V. | § | NO. B-03-139 |
| | § | |
| DOUG DRETKE, Director, Texas | § | |
| Department of Criminal Justice, | § | |
| Institutional Division, | § | |
| | § | |
| | § | |
| Respondent. | § | |

PETITIONER JOSE ALFREDO RIVERA'S REPLY TO
RESPONDENT'S ANSWER TO POST-SHOW CAUSE HEARING BRIEF

Max Hendrick, III
Attorney-in-Charge
Southern District Bar No. 0518
Texas State Bar No. 09450000
Vinson & Elkins L.L.P.
1001 Fannin St., Suite 2300
Houston, Texas 77002-6760
Phone:  713-758-2546
Fax:    713-615-5251

OF COUNSEL:
William E. Lawler III
Southern District Bar No. LA29514
Walter M. Berger
Southern District Bar No. 21834
Texas State Bar No. 00798063
Emily W. Pipkin
Southern District Bar No. 35260
Texas State Bar No. 24037284
Vinson & Elkins L.L.P.
1001 Fannin St., Suite 2300
Houston, Texas 77002-6760
Phone:  713-758-2222
Fax:    713-615-5258

ATTORNEYS FOR PETITIONER
JOSE ALFREDO RIVERA

## I.    BACKGROUND

After exhausting his direct appeal remedies in state court, Mr. Rivera filed a state court habeas petition on December 8, 1997. On December 16, 1997, the Court of Criminal Appeals adopted the findings of the habeas court and denied the petition for habeas relief. Mr. Rivera then filed a federal habeas petition in July, 1999, which the District Court, adopting the Report and Recommendation of the Magistrate Judge, denied on October 3, 2001. The District Court denied Mr. Rivera's application for a certificate of appealability on December 3, 2001, and the Fifth Circuit denied Mr. Rivera's application for a certificate of appealability on November 22, 2002. Up until this stage of the proceedings, Mr. Rivera had not asserted a claim based on mental retardation.

Mr. Rivera then filed a subsequent application for writ of habeas corpus with the Texas Court of Criminal Appeals in which he presented for the first time a mental retardation claim based on *Atkins v. Virginia*, 538 US 304 (2002). The Court of Criminal Appeals dismissed Mr. Rivera's application on July 25, 2003 for failure to produce "sufficient specific facts" to support an *Atkins* claim. Thereafter, a Motion for Reconsideration was filed on Mr. Rivera's behalf that presented additional evidence in the form of an affidavit from Dr. Richard Garnett. On August 4, 2003, the Court of Criminal Appeals issued an Order refusing to reconsider its decision.

Mr. Rivera then sought leave from the Fifth Circuit to file a successive petition for writ of habeas corpus. The Fifth Circuit reviewed the case, and in an August 6, 2003 opinion, found that the best evidence Mr. Rivera had to show that he was mentally retarded was Dr. Richard Garnett's affidavit, which had not been properly presented to the state court. The Fifth Circuit denied Mr. Rivera's application for authorization to file a successive habeas petition. On the same date, Mr. Rivera returned to state court and filed an application for a second subsequent

writ of habeas corpus, presenting Dr. Garnett's affidavit which had not previously been properly before the court. Despite its consideration of this evidence, the Court of Criminal Appeals denied Mr. Rivera's application for habeas relief.

Mr. Rivera then returned to the Fifth Circuit, which issued a second opinion just hours later on August 6, 2003, in which it granted Mr. Rivera's petition for authorization to file a successive habeas petition and found that the state court erred in finding that Mr. Rivera did not make a sufficient *prima facia* showing of mental retardation. Based on the rulings of the Fifth Circuit, Mr. Rivera's habeas petition is now before this Court, and the Court is in a position to review the relevant evidence before it and to determine whether Mr. Rivera is mentally retarded and therefore entitled to Eighth Amendment protection under *Atkins*.

## II.  MR. RIVERA'S SUCCESSIVE HABEAS APPEAL AND AEDPA

Because Mr. Rivera filed his successive federal writ petition in August 2003, this Court's review of his claim is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Penry v. Johnson*, 532 U.S. 782, 792 (2001). Under AEDPA, a federal court may grant relief if one of two conditions is satisfied: (1) If the prior adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States"; or (2) "If the prior adjudication resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2) (1996).

The Fifth Circuit's recent decision in *Morris v. Dretke* answers the bulk of the procedural issues raised by Respondent in its Answer to Petitioner's Post Show-Cause Hearing Brief. *Morris v. Dretke*, -- F.3d -- 2005 WL 1406081 (5th Cir. 2005) (No. 04-70004). First, *Morris's*

findings on the exhaustion principles are on point in this case and render the Respondent's arguments regarding the exhaustion issue moot.    Second, Judge Higgenbotham's concurring opinion in *Morris*, which was joined in by Judge Dennis, making it the holding of the Fifth Circuit, answers the issue raised by Respondent regarding the evidence to be considered by this Court.  It clearly establishes that the federal court is not limited to the evidence presented to the state court and may consider all the evidence in the record in making an *Atkins* determination. Finally, implicit in the Fifth Circuit's findings in *Morris*, is the fact that AEDPA does not bar the federal court from proceeding with a hearing and factual investigation.

**A.    Petitioner Has Fully Satisfied The Exhaustion Principles As Established By The Fifth Circuit In Morris**

The Fifth Circuit recently addressed the issue of exhaustion in *Morris v. Dretke* when it determined that Kenneth Wayne Morris satisfied the exhaustion requirement despite the fact that he presented a factually stronger habeas claim in federal court than he did in state court.  *See*, -- F.3d -- 2005 WL 1406081.

In *Morris*, the Fifth Circuit explained that the exhaustion requirement is satisfied when "the substance of the federal habeas claim has been fairly presented to the highest state court." *Id.* at *5 (citing to *Mercadel v. Cain*, 179 F.3d 271, 275 (5th Cir. 1999)).  The relevant "exhaustion inquiry" is whether "evidence presented for the first time in a habeas proceeding *supplements*, but does not *fundamentally alter*, the claim presented to the state courts." *Id.* (emphasis in original).  The Court "reviews *de novo* the legal question of whether a federal habeas petitioner has exhausted state court remedies." *Id.* at *5.  Although new evidence in the form of IQ test results and new affidavits had been presented by the petitioner in *Morris*,[1] the

---

[1] "In addition to the evidence previously presented in the state courts and the Fifth Circuit, Morris presented other evidence supporting his retardation claim to the district court, including an affidavit from clinical psychologist Dr. Susana A. Rosin who recently tested Morris's I.Q. and level of functioning and diagnosed him with mental retardation;  a second affidavit from Dr. Rosin which refuted Respondent's claim that Morris was malingering

new evidence did not require dismissal because it did not change the legal posture of the petitioner in federal court. *See id.* The Court focused primarily on the introduction of important, new IQ evidence in a "thorough case- and fact-specific review of Morris's situation":

> [T]he *new IQ evidence presented for the first time in federal court, although it indeed factually bolstered his sole Atkins claim, did not render Morris's Atkins claim*-which same legal Eighth Amendment claim he presented to the state courts and supported with pertinent, if not conclusive, evidence of low intellectual functioning and adaptive deficits, from childhood on-*as fundamentally altered and thus unexhausted*.

*Id.* *10 (emphasis added).

The new evidence presented in this case is similar to the new evidence presented in *Morris*, although there is arguably even less new evidence presented here. In both cases, the primary new evidence is a new IQ test. Also similar to both cases is the fact that there is no evidence to suggest that either petitioner "intentionally withheld any IQ testing results or chose to forego any provided opportunity for the proper IQ testing." *Id.* at *11. The evidence presented to the state court by Mr. Rivera was remarkably detailed both in fact and in law. Mr. Rivera noted the three prongs of the mental retardation analysis under *Atkins* and diligently worked to provide relevant evidence in support of each prong such as school records, TDCJ records, and sworn affidavits from family members and former teachers. Mr. Rivera presented all the concrete, supporting evidence he had and sought further investigation of his claim at the state court level.

---

during the testing; a new affidavit from Dr. Garnett opining that his review of Dr. Rosin's findings strengthens his opinion that Morris is mentally retarded and recommending that a court hold a full hearing into the retardation issue; two affidavits from James R. Patton, who holds a doctorate in special education and disabilities, opining that Morris functions intellectually and adaptively within the mentally retarded range and that this condition predated his 18th birthday; affidavits from Morris's original trial counsel stating that they never asked their mental health expert to test Morris for mental retardation; a document purportedly signed by Jerome Brown, a mental health expert appointed to assist with trial preparation, stating that he performed no formal intellectual testing of Morris in connection with his evaluation; and another document purportedly signed by Dr. Garnett reconfirming his diagnosis of Morris as mentally retarded." *Morris v. Dretke*, 379 F.3d 199, 203 (5th Cir. 2004).

The new evidence Mr. Rivera has presented to this Court supplements his *Atkins* claim and places him in a stronger position, but does not fundamentally alter it because it does not place the claim in a "significantly different legal posture." Furthermore, here, as in *Morris*, Mr. Rivera has argued "consistently and identically in state and federal court that he is mentally retarded and thus his execution is barred by the Eighth Amendment pursuant to *Atkins*." *Id.* at *6. Support is also provided by the fact that the Fifth Circuit determined in its second opinion that Mr. Rivera was entitled to file a successive writ. The Fifth Circuit would not have determined that the writ was properly before this Court had it not, by implication, determined that Mr. Rivera had exhausted his remedies at the state court level. Therefore, the substance of his federal habeas claim was fairly presented to the highest state court and is now properly before this Court.

**B.      This Court Need Not Defer To The State Court's Ruling Under AEDPA**

Even if the Court determines that it must make an analysis under § 2254(d) in addition to making an exhaustion determination, Mr. Rivera is still not barred from relief under *Atkins*. The United States Supreme Court has given independent meaning to both the "contrary to" clause and the "unreasonable application" clause in § 2254(d)(1). *Williams v. Taylor*, 529 U.S. 362, 364 (2000). The Supreme Court in *Williams* explained that "the text [of § 2254(d)(1)] is fairly read simply as a command that a federal court not issue the habeas writ unless the state court is wrong as a matter of law [under the 'contrary to' clause] or unreasonable in its application of law in a given case [under the 'unreasonable application' clause]." *Id.* at 385. Therefore, this Court may grant Mr. Rivera habeas relief if either the "contrary to" clause or the "unreasonable application" clause in § 2254(d)(1) applies or if the state court decision is based on an "unreasonable determination of fact" under § 2254(d)(2). In *Williams*, the Supreme Court explained: "whatever 'deference' Congress had in mind with respect to both phrases [in §

2254(d)], it surely is not a requirement that federal courts actually defer to a state-court application of the federal law that is, in the independent judgment of the federal court, in error." *Id.* at 387. Because the Fifth Circuit has already made an "independent judgment" that the state court erred in its unreasonable finding that Mr. Rivera did not make a threshold showing of mental retardation, the issue of whether the Court should "defer" to the state court's application of law to fact has already been resolved. This Court may now turn to the merits of the mental retardation issue under *Atkins* that is before it.

After careful consideration of the evidence presented to the Court of Criminal Appeals, the Fifth Circuit found that Mr. Rivera "made a sufficient prima facie showing to proceed in the district court only on his showing of mental retardation." Fifth Cir. Op. II, Aug. 6, 2003. In its first August 6, 2003 opinion, the Fifth Circuit cited to *In re Morris* for the proposition that there is a "stringent requirement for the filing of a second or successive petition." Fifth Cir. Op. I, 4 (citing to *In re Morris*, 328 F.3d 739, 740 (5th Cir. 2003)). When the Fifth Circuit determined that Mr. Rivera had made a threshold case of mental retardation, it also found that the "stringent requirement" for a successive petition had been met. Under "well-settled principles of law," "an appellate court's decision of issues must be followed in all subsequent trial or intermediate appellate proceedings in the same case." *Terrell v. Household Goods Carriers' Bureau, et al*, 494 F.2d 16, 19-20 (1974 Reh'g and Reh'g En Banc Denied) ("Under well-settled principles of law the decision of this court sitting en banc at an earlier stage of this same case represents the law of the case."). This "law of the case" rule invokes a duty in the lower court to follow issues "decided by necessary implication was well as those decided explicitly." *Id.* at 19.

Not only has the Fifth Circuit ruled that Mr. Rivera made a sufficient *prima facie* showing of mental retardation, but this Court has confirmed that ruling. On remand to this

Court, Respondent argued that Mr. Rivera's habeas petition should be dismissed because he had not made a *prima facie* showing of mental retardation. *See* Resp.'s Mot. to Dismiss for Lack of Juris. and, Alternatively, Motion to Dismiss as Time-Barred Pursuant to 28 U.S.C. § 2244(d) with Brief in Support, at 3-12 (arguing that Mr. Rivera failed to make a threshold showing of mental retardation under *Atkins*). Judge Vela denied Respondent's motion. *See* Courtroom Minutes, September 26, 2003 ("The Court ruled on pending motions . . . . Motion to Dismiss for Lack of Jurisdiction (DE #7-1) Denied"). Respondent's argument regarding the sufficiency of Mr. Rivera's *prima facie* case of mental retardation has already been denied by three judges on the Fifth Circuit and by Judge Vela in this Court. Therefore, the issue of whether this Court must view the evidence with "deference" to the state court's findings has already been decided by four federal judges.

Finally, and perhaps most importantly, the Fifth Circuit held in *Morris* that "[i]n cases where the legal question is whether the new evidence a petitioner puts forth for the first time on federal habeas on a particular claim already asserted on state habeas is exhausted under § 2254(b), subparts (d) and (e) of § 2254 concerning 'factual development' are not implicated." *See Morris,* -- F.3d -- 2005 WL 1406081, *5. Here, the exhaustion issue has been raised and the Court has asked the parties to discuss *Morris* in light of the exhaustion principle. As in *Morris,* this claim is "more accurately analyzed under the 'exhaustion' rubric of § 2254(b)." *Id.* Therefore, the Court should not analyze this case under § 2254(d) or (e), but should analyze it under the exhaustion principles recently confirmed by the Fifth Circuit in *Morris v. Dretke.* Because the exhaustion requirement under § 2254(b) has been satisfied, the Court may now make a finding on the evidence that has been presented to this Court.

**C.    An Analysis Of § 2254(d) Still Will Result In No Deference To The State Court's Findings**

Even if this Court were to determine that an analysis of the claim under §2254(d) were necessary, it does not bar habeas relief in this case. As the State has conceded, the standard in § 2254(d) only applies to the question of whether Mr. Rivera has made a *prima facie* showing of mental retardation. *See* Resp.'s Ans. to Pet.'s Post-Show Cause Hrg. Brief at 4-5. As Mr. Rivera has shown, this issue has already been decided by four federal judges. The fact that the Fifth Circuit and this Court have agreed on this issue is strong evidence that the state court's decision was objectively unreasonable. By refusing to investigate further what was an adequate *prima facie* case, the state court failed to consider and fully develop the evidence before it. Therefore, the state court was unreasonable in its application of the law to the facts. The Fifth Circuit's finding and Judge Vela's findings that Mr. Rivera presented a prima facie case of mental retardation demonstrate that the state court unreasonably cut short the fact finding and, therefore, is not entitled to § 2254 deference. Because the state court's finding is unreasonable and not entitled to §2254 deference, the evidence presented to this Court must be considered *de novo*.

If this Court finds that the state court's finding of no threshold showing of mental retardation is a "determination of fact" under § 2254(d)(2), then the Court must determine whether this determination of fact is "unreasonable." Respondent incorrectly argues that, in analyzing the factual determinations of the state court, the "clear and convincing standard" applies. The Fifth Circuit has expressly ruled on this issue in *Miller-El v. Cockrell. See*, 537 U.S. 322 (2003) (finding that it was "incorrect" to "merge the independent requirements of §§ 2254(d)(2) and (e)(1)"). In *Miller-El*, the Supreme Court explained that "AEDPA does not require petitioner to prove that a decision is objectively unreasonable by clear and convincing evidence." *Id.* at 341. In *Miller*-El, the state court made subsidiary findings of fact.

Importantly, in this case, there were *no findings of fact* at the state court level. As the State has conceded, the state court never made a determination as to the ultimate question of fact as to Mr. Rivera's mental retardation. The state court merely found no *prima facie* showing of mental retardation had been made and thus cut short the mental retardation investigation before that ultimate issue was reached. As such, there is no fact finding to which the standard under 2254(e)(1) can apply. Therefore, the clear and convincing standard does not apply to the facts that are now before this Court.

The Court should only look to whether the state court's decision was based on an "unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d)(2). This Court should find that the state court's decision was unreasonable because it was wholly unreasonable for the state court to dismiss the case summarily without further inquiry in light of the facts demonstrating possible mental retardation before it. The state court completely failed to acknowledge the *prima facie* case of mental retardation before it that necessitated further investigation. As such, § 2254 (d)(2) presents no bar to granting relief to Mr. Rivera.

**D.    This Court Is Not Confined To The Record Before The State Court In Making Its *Atkins* Analysis**

Respondent has argued in its Answer to Petitioner's Post-Show Cause Hearing Brief that the Court should not consider evidence beyond that presented to the state court. *Morris* makes clear that this Court absolutely can and should look to all the evidence before it, regardless of whether that evidence was before the state court. Judge Higgenbotham's concurrence in *Morris,* which was joined in by Judge Dennis, specifically points out that review of the *Atkins* claim is not confined to the record before the state court. *Id.* *16 (Higgenbotham concurring) (explaining that "this rule [AEDPA] does not require that we confine our review of Morris' *Atkins* claim to

the record before the state court"). Therefore, this Court may consider the abundance of old and new evidence before it in determining Mr. Rivera's constitutional rights under *Atkins*.

## III.  CONSIDERATION OF THE MERITS OF MR. RIVERA'S MENTAL RETARDATION CLAIM

In 2002, the United States Supreme Court held that imposing the death penalty on a mentally retarded defendant violated the Eighth Amendment of the United States Constitution. *See Atkins v. Virginia*, 536 U.S. 304 (2002). Petitioner, Jose Alfredo Rivera, has demonstrated that he is mentally retarded under the American Association of Mental Retardation's ("AAMR") definition of mental retardation approved by the Court in *Atkins*. Mr. Rivera has conclusively shown: 1) he has significant limitations in intellectual functioning; 2) he has significant limitations in adaptive functioning; and 3) he manifested these deficits before the age of 18. As a mentally retarded defendant, Mr. Rivera is entitled to the protection of the Eighth Amendment. Consideration of like evidence in this case conclusively demonstrates that Mr. Rivera had deficits in intellectual functioning before age 18.

### A.  Mr. Rivera Has Demonstrated Significant Deficits in Intellectual Functioning That Developed Before the Age of 18

A consideration of the relevant factors shows that Mr. Rivera has significant deficits in intellectual functioning. Courts have considered not only the defendant's IQ, but also the defendant's grades in school, how far he progressed through school, whether he was enrolled in special education or remedial classes, whether he was considered a "slow learner," whether he failed any grades, and the testimony of family members and past attorneys regarding intellectual and social skills. *See Petitioner's Post-Show Cause Hearing Brief* at 2.

#### 1.  Language was not an issue in the administration of the WAIS-III to Mr. Rivera.

The courts and the experts agree that the WAIS-III is the "gold standard" for standardized IQ testing. *See id.* at 3. Dr. Gilda Kessner administered this "gold standard" test on December

1, 2003. Mr. Rivera's full scale score of 68 is well within the mentally retarded range. Respondent makes much of the fact that Mr. Rivera is a non-native English speaker. Respondent reasons that because English was not Mr. Rivera's first language, that he cannot be adequately tested in English and his verbal IQ score should either be disregarded or heavily discounted. What Respondent ignores is the fact that the person in the best position to make this determination is the test administrator: Dr. Kessner. Dr. Kessner went through the appropriate process for determining whether Mr. Rivera could be administered the WAIS-III in English. Dr. Kessner explained in her affidavit the reasons why she felt an English administration was appropriate in Mr. Rivera's case:

> A primary aspect of my evaluation included assessment of Mr. Rivera's ability to communicate in English. His Texas Department of Criminal Justice ("TDCJ") prison medical records specifically identify English as his language of communication with the medical staff. There was no indication in Mr. Rivera's records that he needed a Spanish interpreter for any formal or information proceeding in the prison. My interview query of Mr. Rivera focused on his use of English versus Spanish for the extended time he had been on Death Row. He stated that he used English exclusively in communicating with the correctional officers and other TDCJ staff. His contact with other inmates is, of course, limited but he also indicated that he had little opportunity to communicate with bilingual or Spanish speakers so that for the time of his Death Row incarceration, English has been his predominant or exclusive language. Mr. Rivera indicated he was capable of speaking English in the community before he came to Death Row. He was educated in an American school system and classes were conducted in English so that his previous experience (in school and prison) with testing had been in English.

> My interaction with Mr. Rivera was smooth and not impeded by language in any aspect . . . .

> **I considered all of the aforementioned issues in planning, administering, and interpreting my evaluation of Mr. Rivera. The process I used to determine that Mr. Rivera had the English language skills required for use of the WAIS-III as a component for a valid and reliable assessment of Mr. Rivera's IQ is consistent with those used by test developers.**

Affidavit of Gilda Kessner, June 23, 2005 at ¶ 5-6, 11 (Attached hereto as Exhibit 1) ("Kessner Aff.").

### 2.    English speaking Hispanic Americans are considered in the WAIS-III's extensive norming process.

The WAIS-III takes into account Hispanic examinees in its extensive norming process. The WAIS-III is "an English-based test developed and standardized in the U.S. with a population sample based on the 1995 U.S. census." Kessner Aff. at ¶ 7.  The *WAIS-III and WMS-III Technical Manual* (2002) (*Technical Manual*) provides that the "stratified WAIS-III normative sample represents a cross section of the U.S. population with people of all levels of intellectual ability included."  The norming process is a rigorous, sophisticated process that takes several years during which testers "overrepresent certain groups," namely African Americans and Hispanics" to eliminate the danger of item biases toward these groups.  January 14, 2005 hrg. transcript at 98-99 (hereinafter Tr. II).  Because of the extensive norming process that the WAIS-III undergoes, Dr. Kessner found it to be "an appropriate instrument to use in evaluating an English speaking bilingual Hispanic-American.  English speaking Hispanics living in the U.S. were included in the standardization procedures and Mr. Rivera is comparable to this population. . . . Any suggestion that the test developers did not 'control' for language and that inclusion of Spanish speakers would have been 'coincidental' is inconsistent with the inclusion of  Hispanics sampled heavily in the south and western geographic regions of the U.S." *Id.* at ¶7, 9.  It is in part because of this extensive norming process that this test is known as the "gold standard" for determining an individual's full-scale IQ score.

### 3.    Respondent has provided no authority to support its position that the verbal portion of the WAIS-III should be "tossed out" or "heavily qualified."

Despite the proven reliability of the test, Respondent argues that the test should be either "tossed out" or "heavily qualified."  When first asked what his expert opinion was regarding the

appropriate treatment of the WAIS-III test results, Dr. Saunders testified that he thought the verbal portion of the IQ test should be completely disregarded because, as a native Spanish speaker, he could not be adequately tested by the WAIS-III. *See* Hearing Transcript January 7-8, 2004, Vol. III at 355-359 (hereinafter Tr. I). Mr. Rivera has pointed out that this approach is not supported by the leading authorities on interpretation of the WAIS-III and would lead to the absurd conclusion that no native Spanish speaker could be adequately tested for deficits in intellectual functioning.

At the January 14, 2005 hearing, Dr. Saunders offered this same unsupported opinion, despite the fact that he was unable to offer any clinical authority or any rigorous, scientifically tested, peer review data in support of it. Dr. Saunders took the inconsistent position that the previous, less reliable IQ tests should not be just "tossed out," but at the same time argued that it is an acceptable practice to disregard the verbal portion of the WAIS-III completely. When confronted by the Court with this inconsistency, Dr. Sanders quickly backpedaled and changed his testimony about the proper way to score the WAIS-III: "I'm afraid, perhaps, I overstated the reluctance to use that verbal IQ score. I'm—can I change that to heavily qualify that test score[?]" Hearing Transcript January 14, 2005, Vol. III at 355-359 (hereinafter Tr. II). Despite the fact that Respondent was given the opportunity to explain how the verbal test score should be "heavily qualified" at the January 14, 2005 hearing, Respondent has failed to offer any suggestion—much less any credible evidence—regarding the allegedly proper way to discount the test. Likewise, Dr. Sanders has failed to provide the Court with an explanation as to why a vocabulary exercise in Spanish that was based on the questions from one subtest calls for the invalidation of the entire verbal IQ score. This off-the-cuff exercise is certainly not a more valid

indicator of Mr. Rivera's verbal IQ than the WAIS-III verbal IQ score, which has undergone a sophisticated norming process that overrepresents Hispanics in its efforts to rule out item bias.

**4.    Respondent cannot argue that Mr. Rivera's English Language skills are proof of his adaptive functioning but are not sufficient to test his verbal IQ in English.**

Respondent's arguments regarding Mr. Rivera's intellectual functioning and his adaptive functioning are inherently inconsistent as to Mr. Rivera's English language capabilities. On one hand, Respondent argues that Mr. Rivera's verbal IQ score should be disregarded because he is deficient in English. On the other hand, Respondent's proof as to Mr. Rivera's adaptive functioning relies on his ability to communicate and read in English. In an effort to demonstrate that Mr. Rivera is not limited adaptively, the State's witnesses testified that Mr. Rivera could communicate with prison guards in English, read in English, and the TDCJ records list English as Mr. Rivera's primary language. *See, e.g.,* T-II at 279, 285, 315; T-III at 263, 318. Respondent's own proof of Mr. Rivera's adaptive functioning directly contradicts his argument that Mr. Rivera cannot speak English well enough to take the WAIS-III. Respondent would like to have this Court believe that Mr. Rivera's verbal IQ score is not representative of his full scale IQ score because he took the test in English, but that his English abilities do rise to a sufficient level that his adaptive functioning is not limited. Respondent cannot have it both ways, and its argument regarding the veracity of the results of the verbal portion of the WAIS-III should be rejected.

**5.    Mr. Rivera functions at the same level in English and in Spanish.**

Mr. Rivera's level of functioning in English is actually comparable to that of his level of functioning in Spanish. Mr. Leonard Rufus, a Spanish teacher for the past 23 years, has reviewed certain correspondence from Mr. Rivera written in Spanish. Based on his knowledge and experience, he believes that Mr. Rivera is functioning at no higher than a fifth grade level in

Spanish: "Mr. Rivera is most likely functioning at the fifth grade level in Spanish. I am confident that he is not functioning at a level higher than the fifth grade and may even be functioning at a lower grade level." Affidavit of Leonard T. Rufus, June 29, 2005 at ¶ 3 (Attached hereto as Exhibit 3) ("Rufus Aff."). This level is consistent with his grade scores as seen in the Test of Adult Basic Education-Form 6 (TABE 6) and the Wide Range Achievement Test-Third Edition (WRAT-3) that Mr. Rivera took in English. Kessner Aff. ¶ 15. The grade scores are no higher than the fifth grade level regardless of whether Mr. Rivera is being tested in English or in Spanish. This demonstrates conclusively that Mr. Rivera's verbal IQ score as tested in English is an accurate measure of his intellectual functioning.

**6.    The Beta test is universally recognized as unreliable and should not be considered in making a determination regarding Mr. Rivera's constitutional rights.**

Respondent focuses heavily on the Beta tests in its Answer to Mr. Rivera's Post-Show Cause Hearing Brief in what only can be seen as an effort to divert the Court's attention from the one valid and reliable test for assessing and diagnosing mental retardation: the WAIS-III. Respondent attempts to show where the various Beta tests performed on Mr. Rivera came from in an effort to give the tests credibility. However, the Beta, by its very nature, is widely known as a relatively unreliable test by practitioners in the field. The Court should not consider the results of an unreliable test such as the Beta in assessing Mr. Rivera's constitutional rights. In fact, Dr. Garnett has testified that the "Beta-II and the WAIS-R short form tests administered to Mr. Rivera should be excluded from consideration by the Court in assessing Mr. Rivera's intellectual functioning because they are not reliable or accurate assessments of his full scale IQ." Garnett Aff. ¶ 4.

Dr. Garnett's opinion is bolstered by the writers of *The WAIS-III Administration and Scoring Manual* (2002) (Scoring Manual). The Scoring Manual explicitly states that short form

examinations like the WAIS-R and the Beta-II are not appropriate for the diagnosis of mental retardation and are not indicated for use in a legal proceeding such as this one: "***Short forms*** should be used only for a quick estimate of intellectual functioning or for screening purposes. They should not be used in isolation for diagnosis or classification. In general, ***they should not be used in examinations with a legal, judicial, or quasilegal purpose.***" *Id.* at 36 (emphasis added). Mr. Rivera was administered Beta tests when he was incarcerated in TDCJ as a mere screening device for purposes of determining whether he would need special placement within the prison system in a unit for mentally retarded offenders. The test only provides a cursory look at the examinee and is not appropriate for use in determining whether Mr. Rivera is mentally retarded and ultimately whether he should be sentenced to death:

> The Revised Beta is a group administered, paper-and-pencil test originally developed to screen World War II military recruits and later to screen prison inmates. The test takes 10 to 15 minutes to administer. There are many reasons why this test is inappropriate to use in the determination of intellectual ability and should never be used for the diagnosis of mental retardation, particularly in the context of a legal determination that will determine whether Mr. Rivera lives or dies. The biggest shortcoming is that it does not assess general intellectual functioning. This shortcoming contraindicates its use for diagnosing mental retardation both under Texas practice standards and under accepted professional diagnostic procedures. The Texas Administrative Code, American Psychiatric Association and The American Association on Mental Retardation all agree that the intelligence quotient must be obtained by assessment with one or more of the standardized, comprehensive, individually administered intelligence tests. The Beta-II does not, as is necessary for a professional diagnosis, assess the broad area of intelligence required by professional standards. The Standard Error of Measurement is +/-9 points, which is a reflection of the questionable validity of the instrument. It is also pretty well known that for a pack of cigarettes, a prisoner taking the Beta-II can get help with the answers. Because the Beta-II is part of the screening process that determines whether a prisoner is put in the Mentally Retarded Offender Program ("MROP"), prisoners have an incentive to score high on it for fear that they will be labeled a "retard" and have fewer opportunities for jobs and freedom within the prison. Additionally, the state has a disincentive to diagnose an offender with mental retardation because such a diagnosis requires special placement and special care that result in added trouble and cost to the State. For these reasons, the Beta-II is not a reliable indicator of

Mr. Rivera's intelligence quotient for purposes of assessing his mental retardation and should be excluded from consideration.

Affidavit of Richard Garnett, Ph.D., June 18, 2005 ¶ 7 (Attached hereto as Exhibit 2) ("Garnett Aff.").

Judges that have been faced with this same issue, although in the context of an ineffective assistance claim, have found that the Beta tests are unreliable. Judge Janis Graham Jack in the Southern District of Texas, Corpus Christi Division, determined while sitting on the *Valdez* case that the Beta-II was unreliable: "***The Beta-II test****, which is administered in fifteen minutes in a group setting, is universally held to be much inferior to the Wechsler exam.*" *Valdez v. Johnson*, 93 F. Supp 2d 769, 785 n.35 (S.D. Tex. 1999). Jeff Levinger, the attorney that represented Alberto Valdez in connection with his state and federal habeas corpus petitions, explained the position taken by the Court regarding the Beta-II, "[u]ltimately, Judge Jack discounted the previous tests that the TDCJ administered to Mr. Valdez because we demonstrated that such tests were not reliable." Affidavit of Jeffrey S. Levinger, June 27, 2005 at ¶ 5 (Attached hereto as Exhibit 4) ("Levinger Aff."). Mr. Rivera has demonstrated that short form tests such as the Beta are unreliable because they are cursorily given, group administered tests with a large margin of error. Therefore, this Court should not consider short form tests such as the Beta test in determining Mr. Rivera's constitutional rights.

7.    **Respondent's representation that no mentally retarded offender has "slipped through the cracks" is patently false.**

Respondent introduced into evidence Exhibit G, Affidavit of Stephen R. Gilliland, M.S. LPC. This affidavit makes the incredible assertion: "I am also confident that no mentally retarded inmate made it through the screening process unrecognized. No one would have 'fallen through the cracks.'" By way of such affidavit, Respondent suggests that Mr. Rivera cannot be mentally retarded because he was not identified as mentally retarded when his IQ was tested

during his incarceration. This suggestion is false and disingenuous. The State is well aware that not every mentally retarded inmate is identified as mentally retarded while in the TDCJ system. In fact, there are individuals who were on death row who were not only not identified as mentally retarded for their underlying offense, but also not identified as mentally retarded during any of their multiple, previous incarcerations. For example, Mr. Alberto Valdez was recently removed from Death Row because he was found to be mentally retarded. He had been through the TDCJ system several times and had been given four IQ tests while incarcerated at TDCJ, yet was not identified as mentally retarded until his successive habeas appeal was before the state court:

> Before receiving a death sentence, Mr. Valdez was in the Texas Department of Criminal Justice ("TDCJ") several times for unrelated criminal offenses. There was evidence that four so-called IQ tests were administered to Mr. Valdez during these prior incarcerations. Based on what we were able to learn about the screening process at TDCJ, we believed that the tests the TDCJ admininstered were Beta II tests. Mr. Valdez scored an 88, 95, 96, and 87 on these tests.

Levinger Aff. at ¶ 4. The TDCJ also failed to identify Mr. Valdez as mentally retarded despite the fact that there were many "red flags" that strongly indicated Mr. Valdez had intellectual and adaptive functioning deficits:

> Judge Jack also held in her 1999 opinion that there were many "red flags" suggesting mental retardation present in Mr. Valdez's case: 'Valdez had dropped out of school at an early age . . . . [,] Valdez was placed in special education, he had a history of drug and alcohol abuse from an early age, he was physically abused as a child, and he [had] been evaluated by a psychologist as a youth . . . . [,] Valdez never lived on his own, never was able to hold a steady job, and only performed menial work.' *Id.* at 92. Despite the fact that these "red flags" were present, there is no evidence that the TDCJ ever diagnosed Mr. Valdez as mentally retarded. Moreover, until last month, (following the trial court's finding that he is mentally retarded), Mr. Valdez was never placed in the MROP unit of the TDCJ
> . . .
> Mr. Valdez's case is an example where a habeas petitioner was found to be mentally retarded, even though there is no indication from his prison records that

he was ever diagnosed as mentally retarded during multiple, previous TDCJ screening tests.

Levinger Aff. at ¶ 4, 8.  One would expect that Attorney Generals working for the State would stay abreast of cases such as *Valdez*, in which an inmate "slipped through the cracks" of the TDCJ system when the State failed to identify that individual as mentally retarded.

### 8.    Additional factors provide further support of Mr. Rivera's intellectual functioning deficits.

Although the WAIS-III IQ score is a strong indicator of Mr. Rivera's intellectual functioning deficits, the Court may look beyond this test to other relevant factors that will provide a global picture of Mr. Rivera's intellectual functioning.  This Court can look to factors similar to those considered in *In re Hearn*, *In re Holladay*, and *Walton v. Johnson*, such as Mr. Rivera's school records and his teachers' impressions of him as a student in an effort to further assess his limitations in intellectual functioning.  *See In re Hearn*, 376 F.3d 447, 455 (5th Cir. 2004); *In re Holladay*, 331 F. 3d 1169, 1175 (11th Cir. 2003); *Walton*, 269 F. Supp. 2d 692, 699-700 (W.D. Va. 2003).

Mr. Rivera's academic records support the conclusion that he had significant intellectual functioning deficits before the age of 18.  Mr. Rivera failed and had to repeat several grades, had low or failing grades in the vast majority of his classes, and consistently performed at a level significantly below his grade and age.  The evidence also demonstrates that Mr. Rivera was often only passed because of social promotion practices at his school.  *See* PX 4 at 4-5; PX 9 at 1; PX 25.  Mr. Albright, Mr. Rivera's grade school teacher, explained, "generally, all kids were passed on to the next grade regardless of performance." Tr. I, Vol. II at 68:5-6.  Because of the practice of social promotion at Mr. Rivera's school, he was still performing at a first or second grade level in reading, writing, and math at age 14.  *See* PX 10.  Mr. Rivera dropped out of school at age nineteen, having only reached the ninth grade.  Mr. Albright summed up Mr. Rivera's

performance in school when he explained, "*one of the reasons I remember so much about [Mr. Rivera] in particular is that in all the 21 years I was at Longoria, there was nothing—nothing ever that could match, in my judgment, his failure, his inability to perform such simple tasks. I never did see that in another kid.*" Tr. I, Vol. II at 87-11-17 (emphasis added). Mr. Rivera's performance in school is further evidence in support of the intellectual functioning limitations that manifested themselves long before age 18.

Testimony from Mr. Rivera's family members is also instructive in assessing Mr. Rivera's intellectual functioning. His family members have consistently testified that they observed severe limitations in his intellectual abilities during his childhood. One of Mr. Rivera's sisters, Camelia, testified that Mr. Rivera reads "very, very slowly, like a child just learning to read for the first time." Camelia Garcia Aff. at 2. Additionally, his eldest sister, Esmarelda, testified that Mr. Rivera never learned to write well, and explained that she still has trouble understanding his letters, as he often misspells or misplaces words or leaves out words altogether. *See* PX 12 at 1; PX 13 at 1.

After being provided with the results of Mr. Rivera's full psychological evaluation and additional materials for his review such as school records and affidavits of family members and teachers, Dr. Garnett concluded, "*Mr. Rivera did not just struggle in school; he was unable to succeed in virtually every class he was placed in. It is painfully obvious that Mr. Rivera did not have the intellectual capacity to benefit from school from as early as failing the first grade.*" PX 24 at 6 (emphasis added). Thus, the weight of credible and reliable evidence as a whole supports the conclusion that Mr. Rivera has significant limitations in intellectual functioning under the first prong of the mental retardation analysis and that he developed these limitations before the age of 18.

**B.    Mr. Rivera Has Demonstrated Significant Deficits In Adaptive Functioning That Developed Before the Age of 18**

Mr. Rivera has presented conclusive evidence that he has significant adaptive functioning deficits that manifested themselves before he was eighteen years old.  The applicable adaptive skills areas include "communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure and work." *Atkins*, 536 U.S. at 309 n. 3.  Mr. Rivera need only demonstrate deficits in two of these areas. *Id.* at 304.  At a minimum, Mr. Rivera has conclusively shown that he was deficient in the adaptive skill areas of functional academics and self care.  However, these skill areas are interrelated and the evidence presented to demonstrate adaptive deficits in the areas of functional academics and self care is also relevant evidence of deficits in the majority of these skill areas.

**1.    Respondent provides no evidence to rebut Mr. Rivera's proof of adaptive functioning deficits.**

Respondent claims in its brief that Mr. Rivera "offers no credible evidence to demonstrate that he suffers from significant deficits in adaptive functioning."  Resp.'s Ans. to Pet.'s Post-Show Cause Hrg. Brief at 32.  Respondent has chosen to ignore the strong and conclusive support of adaptive functioning deficits presented by Mr. Rivera and to attempt to draw the Court's focus away from that evidence by confusing and clouding the issues. Despite the fact that Respondent now claims that there is "no credible evidence" of adaptive functioning deficits, the experts all agree that Mr. Rivera has adaptive deficits. *Id.*  Even Dr. Saunders, Respondent's own expert, acknowledges that Mr. Rivera suffers from adaptive deficits:  "There are adaptive deficits here . . . I'm not saying that [Mr. Rivera] does not have adaptive functioning deficits."  Tr. I-III at 420:20-25.  Dr. Garnett confirmed that Mr. Rivera has demonstrated significant limitations in adaptive functioning since his childhood. *See* PX 24 at 2, 9-10.

22

**2.    The cause of Mr. Rivera's deficits is irrelevant to the mental retardation determination.**

Respondent argues that the evidence Mr. Rivera has presented to demonstrate adaptive functioning deficits is insufficient and is only evidence of "negative conduct" that can be "readily explained by three alternative, and more plausible, theories—[Mr. Rivera's] inhalant abuse, his extensive criminal history, and his native personality characteristics." Resp.'s Ans. to Pet.'s Post-Show Cause Hrg. Brief at 33. This argument is solely intended to confuse the issues before the Court and to divert the Court's attention from the true issue at hand. What Respondent fails to grasp in making this argument is that the reasons behind Mr. Rivera's adaptive functioning deficits are wholly irrelevant. The Court need not determine *how* Mr. Rivera came to have adaptive deficits. The only relevant inquiry is *whether* he had adaptive deficits before age 18. It does not matter what "theories" can be dreamed up as the most plausible reasons for these deficits because the *cause* of mental retardation does not matter. In fact, the cause of most individuals' mental retardation is never known. *See* Post Show-Cause Hearing Brief, 10-11. Both of Mr. Rivera's experts concur that the etiology of the mental retardation is not a relevant or necessary component of the mental retardation determination. Dr. Kessner explained, "as long as you meet the criteria, [the mental retardation determination] is not connected to any causative factor. In fact, the majority of people in the mild and some in the moderate range [of mental retardation], they don't have . . . a [known] direct link of what is causing [the mental retardation]." Tr. II at 54: 24-3. Dr. Garnett agreed that the question of whether Mr. Rivera's mental retardation was caused by inhalant abuse is not part of the mental retardation analysis: "from what we know about inhalant abuse . . . it does impact the brain and the brain's functions. It does have a toxic effect on the brain and the brain's functions. And whether it was the inhalant abuse along with social deprivation or linguistics issues or getting hit

in the head with a pipe, we don't really know. But there w[ere] a significant number of etiological factors in [Mr. Rivera's] history before the age of 18." *Id.* at 113:18-25.

THE WISC-III CLINICAL USE AND INTERPRETATION (1998) further supports the position of Drs. Kessner and Garnett: "Measures of adaptive behavior are usually ratings of typical performance, or how the individual typically behaves, rather than the ability to perform some task." THE WISC-III CLINICAL USE AND INTERPRETATION 75 (1998). The relevant inquiry is *how* the individual actually behaves and not on whether he had the ability to behave in a different manner. The fact that Respondent suggests Mr. Rivera's adaptive deficiencies might possibly be attributed to Mr. Rivera's alleged irresponsibility, impulsivity, drug-use, misbehavior, lack of motivation, or failure to pay attention makes absolutely no difference in this Court's analysis. The cause of the mental retardation is simply not an element of the mental retardation determination. As Dr. Garnett explained, "You also don't reject the diagnosis of mental retardation simply because [Mr. Rivera] can do certain things or did certain things. It is not an exclusionary kind of diagnostic process." Tr. II at 111:22-25. Therefore, regardless of what theories Respondent conjures in an attempt to explain away Mr. Rivera's behavior, they cannot change the fact that Mr. Rivera's actions are demonstrative of adaptive functioning deficits before the age of 18. The theories, possibilities, and hypotheticals offered by Respondent in an effort to confuse the relevant inquiry do not rebut the evidence of adaptive functioning. In fact, they have no part in the mental retardation analysis whatsoever.

Even worse than Respondent's attempts to confuse the issues before this Court is Respondent's argument that the adaptive deficiencies demonstrated in Mr. Rivera are no different than those normally seen in Hispanic-Americans. Dr. Saunders has taken the position that: "There's plenty of maladaptive behavior in this person's history. There's plenty of

criminal history, drug and alcohol abuse, and so you would—it is true that these things . . . can coexist with mental retardation. . . . I have not been presented with any evidence that suggests that in the absence of drugs or antisocial behavior, there is a qualitative difference between Mr. Rivera's adaptive functioning and that—when compared to his local cultural group." Tr. III-144-45. There is absolutely no empirical or scientific support for the argument that the adaptive deficits seen in Mr. Rivera cannot be considered deficits because they are problems that Dr. Saunders believes he regularly sees in Mr. Rivera's "local cultural group." Stereotypes such as this one are just as irrelevant to the mental retardation determination as the various theories that Respondent proffers for Mr. Rivera's adaptive deficiencies. Furthermore, Respondent provides no evidence in support of this "local cultural group" argument, just as it provides no evidence in support of the various theories concocted as possible reasons for the adaptive deficiencies evident in Mr. Rivera.

### 3.    The evidence presented conclusively demonstrates limitations in adaptive functioning.

The evidence presented from Mr. Rivera's school records, affidavits, and testimony from siblings and childhood teachers, demonstrates that he had significant limitations in adaptive functioning before the age of 18. Mr. Rivera's history of academic failures and complete inability to learn, to adapt, and to perform academically demonstrate deficits in the area of functional academics. *See* III.A.8, *supra,* and Petitioner's Post-Show Cause Hearing Brief at 8-10. His adaptive deficits are also seen in his inability to take care of himself throughout his childhood. He was perpetually dirty, slept outside underneath the house, did not help out around the house and had a hard time keeping a job and managing what little money he made. The fact that he abused inhalants and got in fights with kids in the neighborhood is further evidence of the fact that he did not make choices indicative of an individual that was able to care for himself.

*See* Pet.'s Post-Show Cause Hrg. Brief at 8-11.  This evidence demonstrates that Mr. Rivera meets the required showing of adaptive functioning deficits in at least two skills areas.

The causes or possible factors that may have played a role in the manifestation of these deficits in Mr. Rivera before the age of 18 are also not relevant to the determination.  As Dr. Garnett explained, "In Mr. Rivera's case, there were multiple and significant influences . . . recognized as barriers to developmental growth and causative factors in mental retardation and the evidence shows that deficits were apparent as early as age 5."  PX 24 at 8.  Whether his mental retardation was caused by "inhalant abuse along with social deprivation or linguistics issues or getting hit in the head with a pipe, we don't know.  But there were a significant number of etiological factors in [Mr. Rivera's] history before the age of 18."  Tr. II at 113.  It is not the job of this Court to determine which of these many etiological factors ultimately lead to Mr. Rivera's mental retardation.  The cause of the mental retardation is not an element of the mental retardation analysis.

## IV.    CONCLUSION

Based on the Fifth Circuit's ruling in *Morris*, this Court may now consider the merits of Mr. Rivera's mental retardation claim.  Mr. Rivera has provided substantial evidence in support of a determination of mental retardation.  He has shown that he had significant limitations in intellectual and adaptive functioning before the age of 18.    Therefore, Mr. Rivera has conclusively demonstrated that he is mentally retarded under *Atkins* and the Court should grant him habeas corpus relief.

Respectfully submitted,

Max Hendrick, III
Attorney-in-Charge
Southern District Bar No. 0518
Texas State Bar No. 09450000
Vinson & Elkins L.L.P.
1001 Fannin St., Suite 2300
Houston, Texas 77002-6760
Phone:  713-758-2546
Fax:      713-615-5251

OF COUNSEL:

William E. Lawler III
Southern District Bar No. LA29514
Emily W. Pipkin
Southern District Bar No. 35260
Texas State Bar No. 24037284
Vinson & Elkins L.L.P.
1001 Fannin St., Suite 2300
Houston, Texas 77002-6760
Phone:  713-758-2222
Fax:      713-615-5258

**ATTORNEYS FOR PETITIONER
JOSE ALFREDO RIVERA**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 30, 2005, a copy of this motion was electronically served on counsel for the Respondent.

Emily W. Pipkin