# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# —BROWNSVILLE DIVISION—

| | | |
|---|---|---|
| JOSE ALFREDO RIVERA | § | |
| | § | |
| VS. | § | CIVIL NO. B-03-139 |
| | § | |
| DOUG DRETKE, Director, Texas | § | |
| Department of Criminal Justice, | § | |
| Institutional Division | § | |

# Memorandum Opinion and Order

In May 1994, Jose Alfredo Rivera (hereinafter "Rivera" or "Petitioner") was convicted and sentenced to die for the brutal rape and murder of Luis Daniel Blanco, a three-year-old boy.[1]  After his conviction and sentence, Rivera was denied habeas relief at every turn in both state and federal court.  Hours before his scheduled execution, the United States Court of Appeals for the Fifth Circuit granted him a stay of execution pursuant to *Atkins v. Virginia*, 536 U.S. 304 (2002), based upon his claim that he is mentally retarded.  It has been left to this Court to determine whether Rivera is indeed mentally retarded and, therefore, exempt from the death penalty under the laws of the State of Texas.

## I.    BACKGROUND

The facts and circumstances of Petitioner's underlying crime are particularly heinous, and it is hard to imagine a more pointless crime or one with more aggravating circumstances.  On July 10, 1993, the body of Luis was discovered floating face down in a resaca located in Lincoln Park in Brownsville, Texas.[2]  His shorts and tennis shoes were found in the water near his body.  A ligature created from the waistband of his underwear was tied around his neck and the police

---

[1]    Parts of the record refer to the victim as Daniel Luis Blanco.

[2]    A resaca, or an oxbow lake, is a type of waterway that resembles a canal or small river. Resacas can be spotted throughout Brownsville and the Rio Grande Valley.

observed signs that he had been sexually molested.  Shortly thereafter, police took Veronica Zavala,

a neighbor of the Blanco family, into custody.  She gave a statement implicating Petitioner in the

murder and he was then also taken into custody.  After tendering two somewhat contradictory

written statements to law enforcement officials, Rivera personally led Brownsville police officers

on a guided tour of the crime scene, which was captured on film for presentation to the jury.  Rivera

told officers about how he had encountered Zavala, who was babysitting Luis, while walking

through Lincoln Park in the middle of the afternoon.  They began to talk and soon thereafter began

ingesting cocaine.  Subsequently, they had sexual relations with each other and then decided to rape

the young victim.  After sexually assaulting Luis, they used his underwear to strangle him and then

dumped his body into the nearby resaca.

Rivera was tried in Cameron County, Texas, where a jury found him guilty and assessed the

death penalty.[3]  His sentence was appealed and affirmed by the Texas Court of Criminal Appeals

in an unpublished opinion.  *Rivera v. State*, No. 71,916 (Tex. Crim. App. Mar. 6, 1996

(unpublished)).  Rivera did not file a petition for a writ of certiorari.  In 1997, Rivera next sought

relief via a state habeas corpus application.  This application was denied the next year and affirmed

by the Texas Court of Criminal Appeals in another unpublished opinion.  *Ex parte Rivera*, No.

27,065-01 (Tex. Crim. App. Dec. 16, 1998 (unpublished)).

Following that affirmance, Rivera sought relief in federal court for the first time.  *Rivera v.

Johnson*, No. 1:99CV123 (S.D. Tex. filed Jan. 11, 1999).  His 1999 habeas petition raised 24

---

[3]    This Court notes that Rivera now claims that Zavala has recanted or at least tried to
recant the statements she made implicating him in the murder.  The record contains copies of letters that
she has written claiming that he is innocent and that she was the sole perpetrator of the crime.  These
letters contradict her prior statements to Brownsville police officers in which she stated that both she and
Rivera murdered the victim.  The Fifth Circuit, however, has rejected Rivera's actual innocence claim and
that issue is not before this Court.  *In re Rivera*, No. 03-41065, 10–11 (5th Cir. Aug. 6, 2003).

different grounds.  In 2001, United States Magistrate Judge John William Black issued a Report and Recommendation in which he advised the district court to deny Petitioner's motion for an evidentiary hearing, grant the state's motion for summary judgment, and deny all habeas relief. 1:99CV123 at Docket No. 54.  That recommendation was adopted by this Court's predecessor, the late Judge Filemon B. Vela.  1:99CV123 at Docket No. 67.

Rivera appealed to the Fifth Circuit.  The Fifth Circuit essentially upheld the reasoning of Judge Black as adopted by Judge Vela and denied a certificate of appealability on all claims.  *Rivera v. Cockrell*, No. 01-41317 (5th Cir. Nov. 27, 2002).  It also denied Rivera's request for a stay of execution.

In the meantime, the Supreme Court of the United States decided the case of *Atkins v. Virginia*, 536 U.S. 304 (2002).  In essence, the majority of the Supreme Court held that the death penalty was a cruel and unusual punishment when applied to mentally retarded capital offenders.[4] *Id.* at 316.  The majority's conclusion relied on its review of what it described as a "national consensus" and its feeling that the Eighth Amendment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society."  *Id.* at 311–12 (quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958)).  The majority wrote:

> Construing and applying the Eighth Amendment in the light of our "evolving standards of decency," we therefore conclude that such punishment is excessive and that the Constitution "places a substantive restriction on the state's power to take the life" of a mentally retarded offender.

---

[4]    Similar reasoning has subsequently been used by the Supreme Court to hold that those under the age of 18 who commit capital crimes cannot be executed.  *See Roper v. Simmons*, 543 U.S. 551 (2005).  In an ironic turn of events, on remand, the petitioner in *Atkins* was found to not be mentally retarded.  Maria Glod, *Va. Killer Isn't Retarded, Jury Says; Execution Set; Case Prompted Supreme Court Ruling*, WASH. POST, Aug. 6, 2005, at A01.

3

*Atkins*, 536 U.S. at 321 (quoting *Ford v. Wainwright*, 477 U.S. 399, 405–06 (1986)).[5]

Subsequent to the *Atkins* decision, Rivera filed a new habeas petition in state court claiming that he is mentally retarded and that he is innocent of the crime of which he was convicted. This petition was denied and Rivera appealed. In its order dismissing Rivera's subsequent application, the Texas Court of Criminal Appeals discussed the fact that the evidence in support of Rivera's claim of mental retardation was unconvincing. *Ex parte Rivera*, No. 27,065-02 (Tex. Crim. App. July 25, 2003). Briefly summarized, the court described the evidence as consisting of:

1.   Elementary school records indicating poor grades, frequent absences, and repeated years;

2.   Middle school records up to the age of 17 when he eventually dropped out of the ninth grade;

---

[5]   This Court will confine its discussion of *Atkins* to those topics that are pertinent to the issues that relate to the issue of mental retardation. It goes without saying that the *Atkins* decision, as well as *Roper*, have been roundly criticized. Various critics and commentators have levied criticism at *Atkins* for:

1.   Ignoring their own precedents, including the case of *Penry v. Lynaugh*, 492 U.S. 302 (1989);

2.   Using what it deemed a "national consensus," trends, and polls to determine the constitutionality of Virginia law;

3.   Using the views of religious and professional advocacy groups as well as foreign law to support its conclusion.

4.   Adopting an "evolving standard" for the interpretation of the Eighth Amendment;

5.   Ignoring the plight of the victims of crime and their families;

6.   Ignoring the will of the citizens and representatives of states whose laws they have invalidated; and

7.   Ignoring the various safeguards already in place in most jurisdictions that protect the rights of those accused of capital crimes.

This Court feels no need to venture into a discussion or analysis of the merits of *Atkins* or any of these criticisms as they are not at issue in this matter. Further, this Court is compelled to follow the dictates of *Atkins* regardless of any points of agreement or disagreement with its holding or reasoning. Thus, any discussion would not only be dicta, but also pointless.

4

3.    Affidavits from three of Rivera's sisters that recount his difficulties in learning, his inability to perform basic life skills, and his repeated drug usage (primarily inhalant abuse that began at a young age and continued throughout his childhood);

4.    Various medical records, none of which contain a diagnosis of mental retardation;

5.    Records indicating that Rivera achieved a General Equivalency Diploma ("GED") in 1980;[6] and

6.    Prison records indicating that he had been given Intelligence Quotient ("IQ") tests while in prison (for a previous unrelated conviction).[7]

The Texas Court of Criminal Appeals found that this inconclusive mixture of anecdotal evidence failed to produce "sufficient specific facts" to raise a prima facie claim of mental retardation and dismissed his subsequent application for a writ of habeas corpus as an abuse of discretion under Article 11.071 § 5(a) of the Texas Code of Criminal Procedure.

Shortly thereafter, Rivera sought permission from the Fifth Circuit to file a successive federal habeas petition. *In re Rivera*, No. 03-41065 (filed Aug. 5, 2003). Relying on its prior opinion in *In re Morris*, 328 F.3d. 739 (5th Cir. 2003), the court opined that the standard needed to bring a successive writ claiming mental retardation is "simply a sufficient showing of possible merit to warrant a fuller exploration by the district court." *Rivera*, No. 03-41065, 4 (5th Cir. Aug. 6, 2003) (quoting *In re Morris*, 328 F.3d at 740). The Fifth Circuit referenced the three-prong standard for determining the existence of mental retardation set forth by the American Association on Mental Retardation ("AAMR") and a similar standard set forth by the American Psychiatric Association ("APA") generally requiring: (1) subaverage intellectual functioning; (2) co-existing with two or

---

[6]    The record before this Court indicates that Rivera dropped out of the GED program in which he was enrolled never having completed it.

[7]    These scores, though below average, were not within the range that would indicate mental retardation. As will be discussed in greater detail below, these test scores were specifically an 85 on a Beta II test given in June 1991 and a 92 on a Beta II test given in February 1992. During his current incarceration, he received an 80 on a short-form WAIS-R test given in June 1994.

more limitations in adaptive skills (such as communication, self care, home living, social skills, self direction, health, and safety); and (3) onset of both 1 and 2 prior to the age of 18.

At the time of its opinion, the Fifth Circuit had before it a report on Petitioner from Dr. Richard Garnett that had not been presented to any state tribunal. While not going so far as to diagnose Rivera as mentally retarded, Dr. Garnett reviewed the evidence presented to the state court and postulated that Rivera's history and characteristics were consistent with those "persons with mental retardation." Seemingly, the inability to make a firm diagnosis stemmed from the fact that an adequate IQ test (presumably with a low score) had never been administered to Rivera.[8]

The Fifth Circuit agreed with the Texas Court of Criminal Appeals that no prima facie case had been made, and noted that the Texas appellate court had declined to rule on the merits of Rivera's application. *Rivera*, No. 03-41065, at 10. In fact, the Fifth Circuit went one step further and denied authorization for Rivera to file an actual innocence claim. *Id*. at 11.

As soon as the Fifth Circuit ruled, the Texas Court of Criminal Appeals reversed course and decided to consider the evidence (including the submission of Dr. Garnett) that it had originally refused to consider. *Ex parte Rivera*, No. 27,065-03 (Tex. Crim. App. Aug. 6, 2003). Despite taking that evidence into consideration, the Texas Court of Criminal Appeals issued an opinion reiterating its first holding that the threshold requirement had not been met and dismissed Rivera's cause as an abuse of the writ.

Based upon this turn of events, the Fifth Circuit reheard the case and determined that the Texas Court of Criminal Appeals' latest action was an actual ruling on the merits. *In re Rivera*, No. 03-41069 (5th Cir. Aug. 6, 2003). The Fifth Circuit ruled that Rivera had made a sufficient showing

---

[8]      The Fifth Circuit opinion later explains that the state court denied a request made by Rivera's counsel for funds to retain an expert to perform the needed testing. *In re Rivera*, No. 03-41065 at 9.

to be authorized to proceed "only on his claim of mental retardation." *Id.* at 2. Given that finding, the Fifth Circuit authorized the successive writ, stayed the execution, and directed this Court to proceed. *Id.*

This case, being a "subsequent" or successive writ, was assigned to United States District Judge Filemon B. Vela—the judge who presided over Rivera's first federal habeas petition. The issue was briefed and an evidentiary hearing was held in January 2003. More briefing ensued. Prior to issuing his ruling, however, Judge Vela was stricken with cancer and passed away.

This case was then reassigned to the undersigned judge. This Court held various phone conferences with the parties after it had fully reviewed the prior pleadings and the entire record, including the transcripts from the evidentiary hearing held before Judge Vela. In order to be fair to both sides, and in order that there should be no question about the propriety of this Court's proceedings, the Court offered to hold another evidentiary hearing so that both sides could fully present any evidence that they had not had an opportunity to present, and so that the Court, if the parties believed it was necessary, would have the opportunity to actually view the witnesses that had already testified. This offer was turned down by both sides. *See* Transcript of Tel. Conf. June 2, 2004.

The Court, however, still had certain questions it felt needed to be answered based upon its review of all that had transpired since Rivera's first petitions for habeas relief were denied in both state and federal court. To fill that informational void, the Court considered appointing its own expert and it eventually entered a show cause order to ascertain why it should not follow that course of action. *Docket No. 55*. Both parties opposed the prospect of a court-appointed expert.[9] *See*

---

[9]    Some of the opposition included a fallback argument that if the Court was to follow such a course, then the parties would suggest that the expert have a very limited role—so limited, in fact, that if the Court followed this suggested course of action, the expert would be of little or no value to the Court.

*Docket Nos. 57 & 58.*  In light of the fact that both parties objected, the Court deemed its best option would be to hold a show cause hearing at which it could see, hear, and question the experts who had previously testified and then determine whether a court-appointed expert was warranted.  The second evidentiary hearing was held on January 14, 2005.

Following that hearing, extensive briefing, and the Fifth Circuit's decision in *Morris v. Dretke*, 413 F.3d 484 (5th Cir. 2005), the Court is now in a position to rule on the entire case without the appointment of a new expert.  In making its ruling, this Court relies not only on the evidence that was addressed at the hearing over which it presided, but also on the evidence introduced at the hearing over which Judge Vela presided.  There was no objection and, in fact, there was a general agreement that the Court could look at the evidence from both hearings.  Indeed, it has reviewed that evidence (both the exhibits and the testimony) in great detail and is relying on the evidence from both *Atkins* hearings in making its current ruling.

## II.   THE EXHAUSTION PROBLEM

The first issue before this Court is both procedural and evidentiary in nature.  After the Fifth Circuit directed this Court to consider the *Atkins* issue, and before the first *Atkins* hearing was held before Judge Vela, Rivera was examined and given an IQ test.  Therefore, this Court has evidence before it that has never been presented to any court in support of Rivera's *Atkins* claim.[10]  Thus, the initial issue this Court must resolve is whether this new evidence is a mere supplementation of the prior writ, or whether this new evidence amounts to a new writ thereby rendering Rivera's claim unexhausted.  If Rivera's claim is indeed unexhausted, his writ cannot be considered by this Court

---

[10]       The second Fifth Circuit opinion of August 6, 2003, described that sometime after its first opinion of that same date, the Texas Court of Criminal Appeals decided to consider certain unspecified evidence, including the affidavit of Dr. Garnett.  *In re Rivera*, No. 03-41069, at 1.  To the extent that this evidence was considered by the state courts, it clearly does not present an exhaustion issue.  Nevertheless, the evidence presented to this Court greatly exceeds that presented to any state court.

pursuant to 28 U.S.C. § 2254(b)(1)(A), which requires federal habeas petitioners to fully exhaust state court remedies prior to proceeding in federal court. This requirement is not jurisdictional. Instead, it is designed to allow state courts the initial opportunity to correct their own alleged violations. *Anderson v. Johnson*, 338 F.3d. 382, 386 (5th Cir. 2003).

Fortunately, a case procedurally more advanced on this issue was already being briefed to the Fifth Circuit when it came time for this Court to decide the matter at hand. For this, and for other reasons set out below, the Court has delayed its ruling until the issue was resolved in this circuit. The Fifth Circuit has now resolved the issue in *Morris v. Dretke*, 413 F.3d 484 (5th Cir. 2005). *Morris* is controlling on this issue not only because it addressed the precise legal issue at hand, but also because the facts are strikingly similar.

In *Morris*, as with Rivera in the instant case, the petitioner was on the verge of being executed when the *Atkins* decision was published. His direct appeal and petition for a writ of certiorari had already been denied as were his state and federal habeas petitions. Like Rivera, Morris then proceeded to file a subsequent application for a writ of habeas corpus claiming that he is mentally retarded and, thus, cannot be executed pursuant to *Atkins*. The evidence he produced to that court was quite similar to the kind of evidence introduced by Rivera in his state proceeding. In fact, he, too, filed his habeas petition in state court without the benefit of an IQ score after having asked the court to provide funds for an expert to perform the needed testing. The Texas Court of Criminal Appeals eventually dismissed Morris' application as an abuse of the writ.

The following day Morris filed a request for permission to file a successive federal writ with the Fifth Circuit using the same information he presented to the state trial court. The circuit court stayed Morris' execution based on what they described as a prima facie showing of mental retardation and sent the case to the federal district court for further proceedings (just as they

ultimately did in the instant case). When Morris presented his evidence to the federal district court, he, like Rivera, offered for the first time expert psychological evidence that included test results from a Wechsler Adult Intelligence Scale test ("WAIS-III") along with two other diagnostic tests.[11] The test results supported a newly-presented affidavit by a Dr. Rosin who concluded that Morris was mentally retarded. There was also additional evidence to the same effect from Dr. Garnett, the same Dr. Garnett who has testified twice in this matter. This newly-presented information led to a problem that the district court had to resolve before deciding the *Atkins* issue: did the inclusion of the additional evidence constitute a new, unexhausted writ, or was it merely a "supplementation" of the original writ? This, of course, is the same initial puzzle that this Court faces.

The district court ultimately dismissed without prejudice Morris' petition based on the conclusion that the newly-presented evidence constituted an unexhausted writ. *Morris v. Dretke*, No. 4:03CV2186, 2003 WL 24270088 (S.D. Tex. Dec. 4, 2003). The Fifth Circuit reversed, writing:

> After thorough case- and fact-specific review of Morris's situation, this Court concludes that the new IQ evidence presented for the first time in federal court, although it indeed factually bolstered his sole *Atkins* claim, did not render Morris's *Atkins* claim…as fundamentally altered and thus unexhausted. We find Morris's case falls much closer on the spectrum to the cases where this Court has found new evidence merely supplemented the petitioner's claim.

*Morris*, 413 F.3d at 495. Based upon the record, it held that despite the *Atkins* claim being supported by significantly better evidence, the petition presented in federal court was not in a significantly different legal posture than was the case in state court. *Id.* at 496. The Fifth Circuit concluded that since Morris' evidence met the exhaustion requirement of § 2254(b)(1)(A), his *Atkins*

---

[11]    The defendant's full scale IQ score in *Morris* was a 53. If accurate, the issue of diminished intellectual capacity in that case may not be as debatable as it is in this case, although this Court notes that a low IQ score is not necessarily conclusive on this issue. *See*, *e.g.*, *Ex parte Rodriguez*, 164 S.W.3d 400 (Tex. Crim. App. 2005); *Ex parte Briseno*, 135 S.W.3d 1, 7 n.24 (Tex. Crim. App. 2004).

claim could continue in federal court. The district court, therefore, retained full discretion to grant an evidentiary proceeding.

The Fifth Circuit's analysis was quite in depth factually, and its opinion implied that a similar analysis on a case-by-case basis might be required by the district court. Yet, at this juncture, a detailed analysis of the evidence—which will be made below when discussing the actual *Atkins* claim—is not needed. The pertinent facts in the *Morris* appeal are about as close as one can imagine to the facts herein. Furthermore, the quality of the evidence presented in support of Rivera's habeas petition is strikingly similar both in terms of the type and the amount of factual presentations made in state court, and in terms of the qualitative improvement in the evidence made in the federal *Atkins* presentation due to the additional evidence obtained after the state habeas proceedings had concluded.

That being the case, this Court finds that Rivera has indeed exhausted his state court remedies, that the presentation of new evidence does not render his *Atkins* claim unexhausted under 28 U.S.C. § 2254(b)(1)(A), and that this Court can now proceed to the merits of his *Atkins* claim considering all of the evidence presented to it.

## III.    THE *ATKINS* DECISION

As stated earlier, the Supreme Court in *Atkins* held that the Eighth Amendment to the Constitution forbids the execution of mentally retarded offenders. Nevertheless, having made this proclamation, it gave little by way of instruction as to how district courts and, ultimately on appeal, circuit courts should make this determination. Indeed, the dissent emphasized the lack of solid guidelines and criticized the majority stating:

> This newest invention promises to be more effective than any of the others in turning the process of capital trial into a game. One need only read the definitions of mental retardation adopted by the American Association on Mental Retardation and the

American Psychiatric Association…to realize that the symptoms of this condition can readily be feigned.

*Atkins*, 536 U.S. at 353 (Scalia, J., dissenting).  It later added:

> [Determination of a person's incapacity] is a matter of great difficulty, partly from the easiness of counterfeiting this disability…and partly from the variety of the degrees of this infirmity, whereof some are sufficient, and some are insufficient to excuse persons in capital offenses….

*Id*. at 354 (quoting Matthew Hale's endorsement of the common law's traditional method for taking account of guilt-reducing factors).  The difficulties presented by the ability to fake symptoms, as Justice Scalia outlined above, are merely the tip of the iceberg.

Indeed, this very case presents unique problems not foreseen, or at least not forecasted, by the *Atkins* majority or by either of the two dissents.  As anyone who reads *Atkins* readily realizes, each side of a capital case will have to retain an expert, both of whom should be prepared to cover the intellectual functioning and adaptive abilities of the petitioner.  This places the finder of fact in the position of having to sift through the quagmire of conflicting testimony inherent in cases that involve "dueling experts."  The Texas Court of Criminal Appeals has noted this aspect on at least two occasions.  *Ex parte Briseno*, 135 S.W.3d 1, 8 (Tex. Crim. App. 2004); *Ex parte Rodriguez*, 164 S.W.3d 400, 406 (Tex. Crim. App. 2005).  This case certainly has that obvious feature; however, it is further complicated by the defendant's long-term drug usage, the fact that Spanish is his first language, and the fact that his childhood records are, at best, incomplete.  When one adds those factors to the possibility of feigning the condition and the subjectivity of determining a person's intellectual functioning, one can easily conclude that this is hardly the method by which the fate of a capital offender should be decided.

## IV.  LEGAL STANDARDS OF MENTAL RETARDATION

The majority in *Atkins* did not adopt any standards of proof to be used by a fact finder in

determining whether a capital offender is mentally retarded. It did, however, quote both an AAMR standard and the APA definition of mental retardation. The AAMR definition of mental retardation cited by the Supreme Court is the 1992 version, which reads as follows:

> *Mental retardation* refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18.

AAMR, MENTAL RETARDATION: DEFINITION, CLASSIFICATION AND SYSTEMS OF SUPPORT 5 (9th Ed. 1992).[12] The APA definition similarly states that the essential features of mental retardation are:

> …significantly subaverage general intellectual functioning (Criterion A), that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social and interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health (Criterion B). The onset must occur before age 18 years (Criterion C).

AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 41 (4th Ed. 2000) [hereinafter "DSM-IV"].[13] The Court notes that all experts in this case have agreed that mental retardation can have a variety of etiologies and that, for *Atkins* purposes,

---

[12]    It should be noted the AAMR published a different definition of mental retardation in 2002, the same year that *Atkins* was decided. The 2002 AAMR definition of mental retardation is: "a disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18." AAMR, MENTAL RETARDATION: DEFINITION, CLASSIFICATION AND SYSTEMS OF SUPPORT 1 (10th Ed. 2002) [hereinafter "2002 AAMR Manual"]. According to the 2002 AAMR Manual, the 1992 definition replaced the 1983 definition thereby eliminating the notion of maladaptive behavior. The 1992 definition also dropped the prior practice of classifying individuals into IQ-based subgroups (mild, moderate, severe, and profound). *Id.* at 27.

[13]    Both the AAMR and APA definitions of mental retardation are quite similar. Indeed, at least one other court has noted that they are "essentially congruent." *United States v. Nelson*, —F.Supp.2d—, 2006 WL 571863, at *4 (E.D. La. Feb. 22, 2006).

the etiology is irrelevant.[14]

While not adopting either of these definitions as the controlling legal standard, the implication by their citation is that the Supreme Court at least does not disagree with them. The majority did concede that the "serious disagreement" that might result from its opinion would be "in determining which offenders are in fact retarded." *Atkins*, 536 U.S. at 317. The Supreme Court's actual ruling, however, was to refer this issue to the states: "[W]e leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." *Id.* (quoting *Ford*, 477 U.S. at 405).

Having had this issue punted to it, the Texas Court of Criminal Appeals was called upon to address it in *Ex parte Briseno*, 135 S.W.3d 1 (Tex. Crim. App. 2004). That court first described the various efforts of the Texas Legislature to adopt a definition of mental retardation or to otherwise flesh out the requirements to prove the existence of mental retardation, which had failed. *Id.* at 6–7. In its review of the various possible standards, the Texas Court of Criminal Appeals reviewed the prior legislation proposed in House Bill 236. *See* Tex. H.B. 236, 77th Leg., R.S. (2001). The Bill proposed in 2001 would have codified for *Atkins* purposes a definition of mental retardation. That Bill passed both Houses in 2001 but was eventually vetoed. The next Legislature, the 78th Legislature, failed to pass any statute addressing *Atkins* despite the fact that several proposals were

---

[14]    There was some evidentiary sparring over the Texas Department of Mental Health and Mental Retardation's ("TDMHMR") deletion of drug usage as the "leading cause" of mental retardation on its website, a change that occurred after the first *Atkins* hearing was held in this case. Dr. Garnett testified that the reason for this change was a shift of bureaucratic responsibilities as opposed to any real scientific debate over the proposition. The State's expert, Dr. Roger Saunders, on the other hand, indicated that it was removed in response to his inquiry to TDMHMR as to the support for the statement. The ultimate reason behind this website change has no pertinence to the issue before the Court.

considered.[15]

The *Briseno* court then looked to the Texas Health & Safety Code, which has for years defined retardation as "significantly subaverage general intellectual functioning that is concurrent with deficits in adaptive behavior and originates during the developmental period."  TEX. HEALTH & SAFETY CODE ANN. § 591.003(13).  That definition, while not exactly the same as either the AAMR or APA definitions, seemingly encompasses the same elements.

The *Briseno* court eventually adopted as a stop-gap measure both the 1992 AAMR definition and the definition contained in the Texas Health & Safety Code, but raised the question of whether a definition contained in a statutory scheme designed to address social services should be applicable within a criminal context.  *Briseno*, 135 S.W.3d at 7–8.  However, this question was not pertinent to the Texas court's ultimate resolution of the issue because the parties in that case as well as the trial court had invoked the 1992 AAMR definition and conceded its application.  *Id*. at 8.

The issue became less theoretical in *In re Hearn*, 418 F.3d 444 (5th Cir. 2005).  In that case, the State attempted to attack the qualifications of the doctor diagnosing mental retardation because his qualifications did not match the standard set out in a different section of the Texas Health & Safety Code.  *See* TEX. HEALTH & SAFETY CODE ANN. § 591.003(16).  The Fifth Circuit rejected this attack holding that Section 591 was enacted to ensure that a continuum of quality services be provided to the mentally retarded population and, as such, is <u>not</u> governing on an *Atkins* issue. *Hearn*, 418 F.3d at 447.  This holding is consistent with earlier decisions by the Texas Court of Criminal Appeals.  *See*, *e.g.*, *Rodriguez v. State*, 899 S.W.2d 658 (Tex. Crim. App. 1995) (en banc).

The issue of whether a definition designed to address social services should be implemented

---

[15]    The Texas Legislature has since finished its 2005 session as well as two special sessions and it has yet to pass legislation to govern this situation.

in a criminal context is not limited to one concerning expertise; it goes to the very heart of the issue

and embraces several problems created by the *Atkins* decision.  While not adopting the AAMR

definition, as stated above, the Supreme Court seemingly gave it some credence by referring to it.

By failing to articulate a legal standard, such as is used in determining competency to stand trial,[16]

the Court has, in effect, delegated to third parties outside the justice system the ability to determine

who is or is not executed.

It is somewhat fortuitous that the *Atkins* majority adopted an "evolving standard" concerning

the Eighth Amendment because the defintion of mental retardation is just that.  This Court notes that

since 1908, the AAMR or its predecessors have utilized ten different definitions of the term "mental

retardation" including one adopted in 2002.  *See* 2002 AAMR Manual, at 20–23.  Consequently, the

very definition cited by the Supreme Court in 2002 in *Atkins* (the 1992 definition) did not match the

2002 definition established by the AAMR.  Thus, the AAMR definition cited in *Atkins* was out of

date when published.

In fact, the entire term "mental retardation" may not be used in the future.  The Board of

Directors of the AAMR has voted to change its name and "explore an appropriate substitute for the

term mental retardation."  *Id*. at 36.  This is not merely a theoretical concern as prior changes in the

AAMR definition have resulted in significant changes to the number of individuals who were

classified as mentally retarded.  *Id*. at 26.  "There is no doubt that the field of mental retardation is

---

[16]    The test for determining whether someone is competent to stand trial is whether the
defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational
understanding–and whether he has a rational as well as factual understanding of the proceedings against
him."  *Dusky v. United States*, 362 U.S. 402, 402 (1960); *Carter v. Johnson*, 131 F.3d 452, 459 (5th Cir.
1997).  This Court realizes that the Supreme Court technically left it to the States to define the term
"mental retardation," but that ruling has the practical effect, at least in Texas, of leaving the test for
determining the existence of mental retardation in a state of flux.  Even the *Briseno* court noted that the
social sciences definition of mental retardation "has been in a state of flux for over 65 years."  *Briseno*,
135 S.W.3d at 8 n.29.

in a state of flux regarding not just a fuller understanding of the construct of mental retardation, but also in the language and processes we use in naming, defining, and classifying." *Id.* at 199. In fact, at least one of the motivations in adopting the 2002 definition was to ensure "adequate and appropriate services to users of the system." *Id.* at 208. Another motivation was to "integrate the vast amount of commentary and research that has occurred since the 1992 System's publication and to operationalize more clearly the multidimensional construct of mental retardation and best-practice guidelines regarding diagnosis, classification, and planning supports for people with mental retardation." *Id.*

Regardless of the potential implications raised by allowing third parties outside of the justice system to impact the definitions of legally significant terms, this Court must nonetheless follow the course that the Supreme Court has instituted. Because the State of Texas has not codified a definition of mental retardation to be used in criminal trials, this Court looks to Texas case law for guidance. As stated earlier, the *Briseno* court discussed the available standards for determining mental retardation. It also set out certain parameters to aid Texas courts on the proper resolution of any *Atkins* issues. It first held that, while the issue is a question of fact, a jury is not needed in a post-conviction habeas situation. *Briseno*, 135 S.W.3d at 9. It further held that the burden of proof on such a motion should lie with the petitioner due in some part to the fact that the inmate has the burden of proof in a habeas situation, and in some part on the fact that many states hold mental retardation to be an affirmative defense to be proven at least by a preponderance of the evidence. *Id*. at 12. Finally, it utilized the 1992 AAMR definition.

*Briseno*'s use of the 1992 AAMR definition may have been more a result of the fact that the parties and the trial court had used it rather than a conscious decision by the court that it was, in fact,

the best guideline available.[17]   Nevertheless, the Fifth Circuit, like the *Atkins* Court, has also

impliedly endorsed its use in Texas cases.  For example, in *Morris*, the court wrote, "[Morris] also

properly outlined the AAMR's definition for mental retardation, since adopted by the [Texas Court

of Criminal Appeals] as one of Texas's current standards for determining mental retardation…and

noted the necessity to meet all three essential prongs of the definition." *Morris*, 413 F.3d at 496

(citing *Briseno*, 135 S.W.3d at 7–8).  It should also be noted that the Fifth Circuit in *Hearn* discussed

at length both the standard by which the *Briseno* court judged the alleged mental retardation of the

petitioner and the kind of evidence that might be used.  *Hearn*, 418 F.3d at 446–48.  In doing so, it

again ratified, albeit impliedly, the AAMR standard utilized in *Briseno* as the standard for

determining mental retardation.  More recently, this standard was reaffirmed by the Fifth Circuit in

*United States v. Salazar*, — F.3d —, 2006 WL 679018 (5th Cir. Mar. 17, 2006).  In that case, the

Fifth Circuit cited *Briseno* as authority for the standard being the 1992 AAMR definition.

Additionally, the parties in this case have all argued that the AAMR definition is the one that

should be utilized.  Although it is unclear which AAMR definition Petitioner would have this Court

utilize, either the 1992 or 2002, he refers to the AAMR definition as the "widely-accepted definition

of mental retardation."[18]   *Docket No. 41*, at 10.   Respondent argues that even though the State of

---

[17]    The Texas Court of Criminal Appeals subsequently employed the 1992 AAMR definition
in *Hall v. State*, 160 S.W.3d 24 (Tex. Crim. App. 2004), a case that was decided shortly after *Briseno*.

[18]    Petitioner aruges that even though the 1992 AAMR definition is the one that has been
adopted by previous courts, the three diagnostic criteria evinced in both the 1992 and 2002 AAMR
Manuals are much the same. *Id*. at 8.  According to Petitioner, the difference between the 1992 and 2002
definitions is that "the new manual places a greater emphasis on adaptive behavior deficits and describes
those deficits differently." *Id.*  The 1992 AAMR Manual defined adaptive behavior in terms of ten
specific skills: communication, self-care, home living, social skills, community use, self-direction, health
and safety, functional academics, leisure, and work.  The 2002 AAMR Manual focuses on three broader
domains of adaptive behavior: conceptual, social, and practical skills.  Petitioner states that "the ten skill
areas listed in the 1992 definition can be conceptually linked to one or more of the three domains in the
2002 definition."  *Id*.

Texas has not officially adopted or codified the AAMR definition of mental retardation, "[t]he [1992] AAMR definition should control because that is one of the alternative legal definitions followed by the Texas courts." *Docket No. 70*, at 8. Further, "the AAMR's three-part definition…is essentially codified by Texas law." *Id.*

That being the case, this Court will utilize the 1992 AAMR criteria in deciding this matter because it is the definition that has been endorsed by prior courts and because it is the definition upon which both sides agree, despite the fact that Petitioner discusses both definitions without advancing one over the other. It is important to note, as stated before, that no court has made a factual determination based on all of the evidence before this Court. In fact, no court has seen most of the more probative evidence advanced by Rivera that is now before this Court. It is also important to note that the evidence that was reviewed by both the state trial court and the Texas Court of Criminal Appeals was reviewed prior to the decision in *Briseno* so that neither court had the benefit of using that holding as a framework by which to judge the evidence presented.

## V.    ISSUES THAT COMPLICATE THE ANALYSIS OF THE AVAILABLE EVIDENCE

As discussed above, this case involves unique procedural aspects that stem not only from the fact that this case involves successive habeas petitions, but also from the fact that two different federal district judges have presided over Petitioner's current habeas petition. Two evidentiary hearings have been held and, although the evidence presented in each hearing is for the most part consistent, not surprisingly, the evidence itself is contradictory. There is evidence supporting Rivera's *Atkins* claim and evidence to the contrary. In some instances, the same piece of evidence is viewed as supporting the claim and disputing the claim depending upon the witness' perspective and the side that called that particular witness to testify. Nevertheless, it is not just the orientation of each witness that is compelling contradictory conclusions. To assume that would be unfair to the

witnesses called by both parties and would be far too simplistic.  The evidence inherently lends itself to contradictory conclusions.

For example, until his current incarceration, Rivera had a serious drug problem that began in his middle or even his elementary school days.  There is at least some agreement that his drug problems might have been the cause of some of the very problems (especially in the area of adaptive behavior) that can also be attributed in their etiology to mental retardation.  It is also clear that Rivera's Hispanic background—i.e., Spanish being his first language, the language that was spoken at his home, and his language of choice—has also clouded the picture, albeit in a somewhat ironic and ambiguous fashion.[19]  Moreover, even though the record contains several IQ scores, the only reliable test according to the experts from both sides is the WAIS-III test that was administered to Rivera at the age of 41 after he had been convicted of capital murder and had been denied habeas relief at both the state and federal levels.  These problems overlay the other problems that are inherent in any *Atkins* case: (1) the subjectivity in analyzing adaptive behavior and even in the performance and scoring of an IQ test; (2) requiring experts to speculate retrospectively as to what conditions existed prior to the age of 18 (what caused those conditions, when they came into existence, and what information should be used in making an assessment); (3) the obvious motivation, given the alternative, of any death row inmate to be classified as mentally retarded; and (4) the inevitable battle of dueling experts.

## VI.    THE PROBLEMS UNFORESEEN BY *ATKINS*

As discussed earlier, the Supreme Court in *Atkins*, especially the dissenting Justices,

---

[19]    The Court finds irony in that it is the lawyers for the Hispanic petitioner who are arguing in favor of the validity of an English-based standardized test while the State argues that such a test is inherently biased.

expressed concerns about the possibility of a defendant purposefully malingering on an IQ test in order to fall under *Atkins*.  This, of course, is a real danger and was suggested by the State's expert in this very case.  He suggested that the most difficult type of malingering to detect is when the subject merely does not try.[20]  Nevertheless, two interrelated problems not foreseen or at least not verbalized by the *Atkins* opinion have been raised by the evidence in this case, and both seem to be at least as serious as the problem of alleged malingering.  The first problem is raised by the concept of the "practice effect."  It is almost procedural in nature but it has some very substantive aspects.

Due to the "practice effect," one cannot give the WAIS-III, which is considered the gold standard, multiple times in a short period.  The practice effect, at least according to one source, affects the performance portion of the test more than the verbal.  Verbal IQ scores gain 2 to 3 points while performance scores jump 3 to 8 points.  Such an increase could raise a full scale score by as much as 2 to 3 points.[21]  Thus, the first administration, which one presumes will normally be given by a psychologist hired by the convicted individual, precludes further meaningful examination by the State.  Given the subjective nature of these tests, there is much latitude for disagreement over how certain answers are scored.  Rather than being able to retest the individual, the party who "goes second" is somewhat bound by the results of the first test.  Commonly accepted scientific principles

---

[20]    Dr. Saunders implied that Rivera may have been malingering by pointing to the results of the first screening test—i.e., the Rey test—administered by Dr. Gilda Kessner, which will be discussed in greater detail below.  He also testified that Rivera tried to convince him during his interview that he was mentally retarded and that the results of the prior IQ tests he had taken were inaccurate.  Dr. Saunders noted that such behavior was uncharacteristic of mental retardation because mentally retarded individuals often attempt to mask their condition.

[21]    *See* George C. Baroff, *Establishing Mental Retardation in Capital Cases: An Update*, 41 MENT. RETARD. 198, 199 (2003).

preclude later testing either by the second party or, as in this case, by the court.[22]

Thus, the result is that the first party that tests the individual is the only party that may present original results. The only path left for the second party to follow is to criticize the test itself, the administration of the test, or the results. The second party must face the finder of fact with little original evidence of its own. This alleviates to some extent the battle of the experts that must be expected in light of *Atkins*, but it greatly hampers the fact finder. In addition to the practice effect, which stems from the act of taking the test itself, the experts theorized that the attendance of Petitioner at the hearings would also compromise the results. For instance, one of the experts in this case described the hearings as a "graduate training program in how to take the test."

While this race to the jailhouse to test the individual in question will no doubt apply in every case, this case presents an additional problem that, though unique in the cases reported since *Atkins*, will no doubt be faced again by subsequent courts. There are millions of Hispanic individuals who live on the United States-Mexico border (and throughout the United States). A large percentage of those individuals either speak only Spanish or have English skills that can be characterized as being somewhat short of fluency. If the experts who testified in this matter are accurate, as will be discussed in greater detail below, there is no reliable IQ test "normed" for this population. Thus, individuals who lack fluency in English are at a great disadvantage in proving their *Atkins* claims.

## VII.  DISCUSSION

Although the 1992 AAMR definition contains three prongs that Petitioner must satisfy in order to prove his *Atkins* claim, the facts of this case are such that the first and second prongs are

---

[22]    This Court notes that it waited the prescribed year before holding a hearing concerning whether it should hire its own expert. Yet, even after waiting that year, all experts in this matter testified that Rivera could not be reliably retested.

inextricably intertwined with the third prong. For example, Rivera has arguably presented evidence indicating that he has diminished intellectual capacity in the form of an IQ score of 68. Because a reliable IQ score ascertained before the age of 18 does not exist, Rivera asks this Court to back into the definition of mental retardation by pointing to Rivera's adaptive limitations before the age of 18 and extrapolating that they must have been a manifestation of his diminished intellectual capacity. The State, on the other hand, launches a two-fold attack on that line of reasoning. First, the State calls into question the accuracy of the IQ score because the test was administered in English and Rivera's first language is Spanish. Second, the State strongly suggests that any adaptive limitations that existed before the age of 18 were a manifestation of drug abuse rather than diminished intellectual capacity.[23] The State emphasizes that Rivera failed to present any evidence regarding his existing adaptive limitations and points to its own evidence that, at least in the artificial environment of prison, Rivera currently functions quite well. Regardless, the Court's discussion will focus on the first two prongs of the AAMR definition without trying to discuss the third prong separately since such an attempt would lead to needless repetition.

### A. Limitations in Intellectual Functioning and Onset

#### 1. The WAIS-III

The first prong of the AAMR definition requires that the petitioner establish that he has subaverage intellectual functioning. The experts that testified in both *Atkins* hearings agreed that the generally accepted method of determining an adult's intellectual capacity is the administration of a comprehensive IQ test, specifically a WAIS-III. Indeed, the WAIS-III, according to the

---

[23] An argument exists that even if Rivera has a diminished intellectual capacity due to, among other things, his abuse of inhalants, the long-term damage did not occur until after the age of 18. The State argues this point by pointing to the absence of a diagnosis of mental retardation or proof of organic brain damage in Rivera's medical records.

testimony of all three experts who testified in this case, is considered the "gold standard" of IQ tests and is considered to be the most reliable means of assessing a person's intellectual capacity.[24]

The WAIS-III is designed to assess intelligence of individuals between 16 and 89 years of age. The mean IQ is 100 and the standard deviation is 15. It was standardized on 2,450 English-speaking adults from the United States. The WAIS-III normally consists of 11 subparts testing both verbal and performance skills. In taking the test, one is not penalized for guessing.[25] If, in a particular section, one misses three answers in a row, that section is considered over and the examiner goes to the next section. Some portions of the test are timed while others are not. There appears to be some give and take between the examiner and the test subject. When the test subject does not follow the exact instructions, he is not given credit despite the fact that he demonstrates an understanding of the word and how it is used.[26] If there are some abnormalities in the test, the test administrator is required to note them in the test report. Further, as mentioned above, once an individual has been administered the WAIS-III, it cannot be administered again for at least a year due to the practice effect.

No IQ score is black and white, especially a score of 68. An IQ score is really more indicative of an estimated range, which the AAMR Manual refers to as a "zone of uncertainty."

---

[24]    The Stanford-Binet test is often mentioned in the literature as being an alternative to the WAIS-III; however, it has not been standardized for individuals above the age of 23 and, therefore, is not an available alternative means of testing Petitioner. At least in scientific lore, the Stanford-Binet is considered to be the more difficult of the two tests.

[25]    In fact, Dr. Kessner stated that, at times, Rivera got at least some credit for his second answer or guess.

[26]    For example, in the second section of the test, Rivera was tested on vocabulary. He was asked to define the word "sentence" to which he questioned, "Sentenced to death?" Dr. Kessner asked him to tell her more about it and he stated, "Write a sentence." He received no credit for this inquiry despite displaying two different meanings and two relevant uses of the same word because, according to Dr. Kessner, he never actually defined the word.

2002 AAMR Manual, at 57.  An IQ score of 70 is most accurately understood "not as a precise score, but as a range of confidence with parameters of at least one [standard error of measurement] (i.e., scores of about 66 to 74; 66% probability), or parameters of two [standard errors of measurement] (i.e., scores of 62 to 78; 95% probability)." *Id.*  The DSM-IV designates subaverage intellectual functioning as a score of 70 or below, and is almost always qualified by a reference to the applicable standard error of measurement.  *See* Transcript of Jan. 14, 2005 Hearing, at 158.

Neither the AAMR nor the APA intend the cut-off to be fixed.  A fixed IQ of 70 on the WAIS-III will identify 2.28% of the population as being mentally retarded while a fixed Stanford-Binet score of 70 will identify over 3% of the population.  2002 AAMR Manual, at 58.  The difference in the two figures represents over 2 million individuals in the United States alone.  *Id.*  According to the 2002 AAMR Manual, the standard error of measurement should be considered in determining the existence of significant subaverage intellectual functioning. 2002 AAMR Manual, at 58.  However, taking the standard error of measurement into consideration blurs the demarcation line for subaverage intellectual capacity—i.e., an IQ score of 70.  The 2002 AAMR Manual states:

> In effect, this expands the operational definition of mental retardation to 75, and that score of 75 may still contain measurement error…. Incorporating measurement error in the definition of mental retardation serves to remind test administrators (who should understand the concept) and bureaucrats (who might not be familiar with the concept) that an achieved Wechsler IQ score of 65 means that one can be about 95% confident that the true score is somewhere between 59 and 71.

*Id.* at 59.

In addition to the standard deviation problem, there are other inherent problems with all standardized IQ tests.  Research has shown that on any given version of a test the IQ scores will

increase over time.[27]  The rate of increase is about one-third of a point per year.[28]  Hypothetically then, in a 15-year-old test, scores are inflated by 5 points.  Thus, one can anticipate an individual to score higher in the later years of a test.[29]

Before the 1997 version of the test became effective (the version that was administered to Rivera), it was "normed" for various sections of the population, including African and Hispanic Americans.[30]  The Court heard testimony that "norming" the WAIS-III (or any other similar test) is an expensive and extensive process and is "normed" by necessity using individuals who are fluent in English.  The intent of this norming process is to make the test applicable to all individuals and to perform a restandardization to keep the questions current.  According to the testimony, there is no Spanish version of the WAIS-III test applicable to those adults in the United States who, like Rivera, are of Mexican descent.  There is a Spanish version developed for Puerto Ricans; however, Dr. Gilda Kessner—one of Petitioner's experts—testified that "the differences in language between Puerto Rican [sic] and the population of the United States is so disparate that it can't be used over here."  *See* Transcript of Jan. 14, 2005 Hearing, at 103.

## 2.    Rivera's IQ Score

Dr. Kessner, administered the 1997 English version of the WAIS-III test to Rivera on

---

[27]    *See* Transcript of Jan. 14, 2005 Hearing, at 10; *see also* Baroff, *supra* note 20, at 199; Tomoe Kanaya et al., *The Impact of Rising IQ Scores on American Society Via Mental Retardation Diagnoses*, AMERICAN PSYCHOLOGIST, Oct. 2003.

[28]    This phenomenon is sometimes referred to as the "Flynn effect."

[29]    If this Court were to take that concept into consideration, Rivera's adjusted score would have been 66 in 1997, the year the WAIS-III was revised, instead of the 68 he scored in 2003.

[30]    According to the information available to this Court, the last re-norming of the WAIS-III occurred in 1995.

December 1, 2003, shortly before the first *Atkins* hearing was held by Judge Vela.[31]  It was administered in an interview room at the Polunsky Unit in Livingston, Texas, where Rivera is currently housed.  The test had eleven sections—some sections tested verbal skills while others tested performance skills.[32]  Rivera scored 66 on the verbal portion and 77 on the performance portion for a full scale score of 68.  Dr. Kessner testified and her reports states that based on a score of 68, there is a 95% likelihood that Rivera's true score falls between 65 and 73.[33]  Being that the agreed-upon cutoff for mental retardation is 70, this presents a truly borderline case.

One of the most contentious issues that has arisen in this case centers around the fact that the WAIS-III was administered to Rivera completely in English.[34]  Both sides agree that Rivera's first language is Spanish and there is at least a tacit agreement that he is more comfortable speaking in Spanish.  They disagree, however, as to his level of fluency in English.

Another somewhat less contentious issue is that, while the WAIS-III is arguably the more objective portion of the mental retardation analysis (since it is a standardized test), the examiner

---

[31]   Although Dr. Kessner administered other tests to Rivera—specifically a Wide Range Achievement Test (WRAT-III), a Kaufman Functional Academic Skills Test, a Mini-Mental State Examination, a Test of Memory Malingering, and a Rey Test—most of the testimony focused on the WAIS-III test she also administered to Rivera.  Therefore, the Court's discussion will focus on the WAIS-III.

[32]   Dr. Kessner actually administered twelve sections to Rivera, but did not count the twelfth subpart in computing her score. Transcript Jan. 14, 2005 Hearing, at 13.

[33]   Based on the materials reviewed by this Court, the WAIS-III has a margin of error of five points, which means that the range of Rivera's IQ is between 63 and 73; however, both Dr. Kessner's testimony and report use 65 as the bottom of the margin of error and this Court will rely on that evidence.

[34]   It should be noted that there was some testimony suggesting that a test administered to Rivera in Spanish, even if one existed, may not be an appropriate means of testing Rivera since he may not be fluent in Spanish either.

seems to have a great deal of discretion in determining whether an answer is correct.[35]  In fact, in some sections, the best answer receives two points while a less than perfect answer still receives one point.  A totally incorrect answer receives a zero.  Within these parameters, one has a certain amount of discretion.  In fact, Dr. Kessner admitted in retrospect that she would have graded at least one answer differently.[36]  The issue involving the amount of discretion that goes into scoring a WAIS-III is compounded by the possibility of malingering.  Although the State has conceded that gross malingering can be ruled out, there is at least some question as to whether Rivera was malingering on a smaller scale.

Finally, the record contains previous IQ scores that for the most part exceed the upper reaches of a score that would indicate mental retardation.  Little information has been provided regarding those scores and, while the parties argue over their reliability, they all agree that those tests are not comparable to a full scale WAIS-III score.  Given that the alternative to a mental retardation diagnosis is death, an inherent layer of doubt underlies the reliability of much of the anecdotal evidence in these proceedings, especially when no reliable IQ score exists prior to the age of 18.

### a.      Rivera's "Fluency" in English

Even though Rivera's first language is Spanish, Dr. Kessner testified during both *Atkins* hearings that she believed Rivera could communicate effectively in English and that the results of the WAIS-III were not compromised by his language abilities.  *See also Docket No. 64*, at Ex. A. Dr. Kessner based her conclusions on her observations of Petitioner and her interactions with him

---

[35]     *See* GARY GROTH-MARNAT, HANDBOOK OF PSYCHOLOGICAL ASSESSMENT 139–40 (4th ed. 2003).

[36]     Dr. Kessner testified that Rivera's overall score would not have been affected had he received that extra point.

during the administration of the tests.[37]  At the second *Atkins* hearing, she asserted that the records she reviewed both prior to and after her previous testimony did not contradict her conclusions.  Dr. Garnett echoed Dr. Kessner's conclusions in his testimony.

The State argues that the results of the WAIS-III test are rendered unreliable by the fact that Rivera's first and primary language is Spanish.  Although the State's expert testified that Dr. Kessner properly administered the English version of the WAIS-III to Rivera, namely because Rivera was educated in English, it argues that he never attained a level of fluency that would allow him to take a WAIS-III test completely in English and achieve accurate results.  The State's solution to what it deems to be Rivera's lack of English fluency is to heavily "qualify" the verbal portion of the WAIS-III results and to rely more heavily on the performance portion of the test as a more accurate reflection of Rivera's non-verbal intellectual capacity.  Stated differently, the State asks this Court to ignore the verbal portion of the WAIS-III test because the test was administered in English and Rivera's English proficiency (or lack thereof) renders it inaccurate.

Rivera argues that the State's conclusion that the test is inaccurate because Rivera is bilingual is absurd.  He believes that his English skills are such that his score of 68 on the WAIS-III is an accurate reflection of his intellectual capacity.  This argument is bolstered by Dr. Kessner's testimony and by an affidavit in which she outlines the steps she took to ensure that it was appropriate to administer the test to Rivera in English.  *See Docket No. 64*.  Rivera believes that the combined (performance and verbal) score of 68 and the negative finding on the Rey test conclusively prove that the first prong of the AAMR definition is satisfied.  He points to his academic records as support for the results of the WAIS-III emphasizing that he was forced to repeat

---

[37]      It should be noted that Dr. Kessner does not speak Spanish.

several grades and that he had low or failing grades in almost every class.  He claims he was the "recipient" or, perhaps more accurately, the "victim" of social promotion.  Indeed, at least one former teacher questioned Rivera's ability to learn, and Dr. Garnett concluded that his lack of intellectual functioning can be seen as far back as the first grade.

In order to cast doubt on Rivera's English fluency, the State points to Dr. Saunders' testimony regarding his interview of Rivera in prison.  Dr. Saunders testified that Rivera spoke in broken English and that his articulation of English words was poor.  Moreover, during that interview, Dr. Saunders played a recording of nine vocabulary words in Spanish that Rivera had missed during Dr. Kessner's administration of the WAIS-III in English.  Rivera was able to give what Dr. Saunders considered correct answers when asked those words in Spanish.  Even though Dr. Saunders' experiment has no basis in any accepted diagnostic methodology, he concluded that the results of the "demonstration" show that Rivera is more comfortable in Spanish.[38]

As further support for this conclusion, the State pointed to the video-taped recording of Rivera giving a tour of the crime scene to Brownsville police officers and the testimony and affidavits of Rivera's sisters.  Although Rivera spoke in English at the beginning of the recording, he soon reverted to Spanish for the remainder of the recording.[39]  At the hearing held before Judge

---

[38]    This Court has been troubled by the lack of scientific support for Dr. Saunders' position specifically with respect to: (1) his experiment in substituting Spanish for several questions Rivera missed during Dr. Kessner's administration of the test in English and (2) his conclusion that this Court can "qualify" these results by, in effect, relying solely on the performance portion of the WAIS-III.  That being said, the substance of his overall point that a less than fluent person taking an English based IQ test is a cause for concern has widespread support.  *See*, *e.g.*, Virginia Gonzalez et al., *Theoretical and Practical Implications of Assessing Cognitive and Language Development in Bilingual Children with Qualitative Methods*, 20 BILINGUAL RES. J. 93 (1996); REBECCA KOPRIVA, COUNCIL OF CHIEF STATE SCHOOL OFFICERS, ENSURING ACCURACY IN TESTING FOR ENGLISH LANGUAGE LEARNERS Ch. 4 (2002).

[39]    The Court notes that the recording depicts Rivera responding in Spanish to questions asked in English.  A translated transcript of the recording shows that Rivera's answers were responsive to the questions asked in English thereby illustrating that Rivera is at least somewhat versed in English.

Vela, Rivera's sisters often switched between English and Spanish—a practice that is common here in South Texas. Additionally, one of Rivera's sisters testified that he is more comfortable speaking in Spanish. Moreover, the record contains the affidavit of one of Rivera's sisters that had to be translated from Spanish to English.

Although everyone agrees that no Spanish verison of the WAIS-III exists that has been normed to the primarily Spanish-speaking adult population of Mexican descent, the State points to the WAIS-III  manual to suggest that Dr. Kessner should have made accommodations in her administration of the test to Rivera. The manual states:

> You may be similarly challenged when testing individuals who are not fluent in English or individuals for whom English is a second language. Experienced examiners have found several approaches useful, including administering the test with the assistance of a translator, using a translated version, if available, and administering it in the examinee's native language, or administering the test bilingually. All of these methods may present problems in interpreting the score. The WAIS-III normative data were collected on individuals who speak fluent English.

DAVID WESCHLER, WAIS-III ADMINISTRATION AND SCORING MANUAL 34 (3d ed. 2003). The manual does not state a clear method for making accommodations to Spanish speakers, nor does it state one way or the other whether it is appropriate to rely more heavily on one portion of the test based on language ability. However, because the test was normed using fluent English speakers, the manual at least seems to suggest that a "cleanly" given test, such as the one that was administered to Rivera by Dr. Kessner, may not be an adequate reflection of Rivera's intellectual capacity.[40] It should be noted, however, that Rivera has, according to the State's own evidence, been

---

[40]    Petitioner himself has at least impliedly acknowledged that alternatives exist in administering the WAIS-III to non-fluent English speakers. *See Docket No. 64* at 3–4. Attached to one of his briefs is Dr. Kessner's affidavit in which she states that she conferred with one of her colleagues, Dr. Rudolfo Quintana, at a conference. Dr. Quintana, who is of Nicaraguan descent, allegedly has experience administering the WAIS-III to individuals in Spanish and he allegedly stated that he feels it is

able to communicate in English and even reads books in English.  Moreover, Dr. Kessner testified

that while his English skills may be limited compared to some, his abilities in that regard do not

invalidate the WAIS-III results.

While this Court finds the State's argument that Rivera is less than fluent in English

plausible, the arguments stemming from Dr. Saunders' testimony are problematic.  First, there is no

scientific support for Dr. Saunders' technique of quizzing Rivera using words translated from

English to Spanish and then using the results to discount the verbal WAIS-III score of 66.  This

experiment would not survive even the mildest *Daubert* challenge.  *See Daubert v. Merrell Dow

Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  It is not surprising at all to this Court, which is located

in a border community with a large Hispanic population, that Rivera communicates "better" in

Spanish than in English.  However, the fact that a bilingual individual feels more comfortable

speaking one language and the test is given in another does not in and of itself invalidate the verbal

portion of the test.  Indeed, even Dr. Saunders testified that Dr. Kessner properly administered the

WAIS-III in English because Rivera was educated in English.

Second, when Dr. Saunders was questioned about whether the Court should "throw out" the

verbal portion of Rivera's WAIS-III, he stated that he would not throw it out.  Instead, he suggested

that the Court should "qualify" it.  However, this Court was provided with no scientific methodology

for "qualifying" it and the mere suggestion that this Court should realize that the true level of his

intellectual functioning should be near the performance score of 77 amounts to nothing more than

guess work, even when performed by one trained in the field (much less by one trained in law rather

---

best to administer the WAIS-III in English to non-fluent examinees and allow them to respond in either
English or Spanish.  Although these statements are obviously hearsay, this Court points out that Dr.
Kessner did not administer the test in the manner suggested by Dr. Quintana, namely because she does
not speak Spanish.

than psychology).

Perhaps even more perplexing is the fact that Dr. Saunders' suggestions, while certainly raising doubts about the accuracy of Rivera's WAIS-III test results, raise a plethora of potential problems for this and other courts. The State concedes that the WAIS-III is the gold standard test, but wants this Court to ignore the results. Further, the State's expert agrees with those called by Rivera that it would be pointless to try to retest Rivera, the course that would otherwise seem to be most prudent. If this Court takes the State's argument to its logical conclusion, no reliable IQ test exists to examine a large portion of the adult Spanish-speaking population of the United States. If the State's position in this case is accurate, then the results of any test administered to Rivera, or to any Spanish speaker who is not of Puerto Rican descent, is subject to questioning. Furthermore, if the State is correct, a Spanish-speaking person who is less than fluent in English and sentenced to death row may never be able to successfully raise an *Atkins* claim, or will be severely hindered in doing so because no reliable test exists to help establish the first prong of the AAMR criteria.[41]

As a district court located on the United States-Mexico border, this Court finds the second position very troubling. The number of persons in South Texas alone for whom Spanish is their primary language numbers in the tens, if not hundreds, of thousands. While the United States Census Bureau statistics are not necessarily based on scientifically controlled data, they are instructive on this issue. The United States Census Bureau estimates that over 28 million Americans

---

[41] Given the fact that no WAIS-III test exists that has been normed to the Spanish-speaking population of Mexican descent that is not fluent in English, and no Stanford-Binet exists for mature adults, the only other alternative is to test individuals either through a translator or to have a bilingual administrator give the test. As has already been pointed out, the WAIS-III manual indicates that problems in interpreting the score will result from such an administration thereby inviting the argument that the score is unreliable.

speak Spanish at home and, of those, almost half speak English "less than very well."[42]  US CENSUS BUREAU, LANGUAGE USE AND ENGLISH-SPEAKING ABILITY: 2000 2 (Oct. 2003).   Not surprisingly, the Western and Southern portions of the United States combined have about three times the number of Spanish speakers (21 million) as the Northeast and Midwest (7 million).  *Id.* at 4  Texas has all but one of the top twenty counties in the United States with the highest proportion of non-English speakers, Santa Cruz County in Arizona being the sole exception.  *Id.* at 7.

Not surprisingly, here in the Brownsville Division, the statistics are also high.  The division's largest city is Brownsville, which is located in Cameron County.  Brownsville's unofficial estimated population is 140,000.  Approximately 109,153 individuals in Brownsville who are over the age of five speak Spanish at home.  *Id.*  The number of people who speak English "less than very well" totals over 69,000 or somewhere just under one half of the entire population.  *Id.*  If one looks at the statistics of Spanish speakers following the Rio Grande River upstream from Cameron County, one can surmise how often Spanish is spoken along the border.  For example, traveling upstream from Brownsville you reach Hidalgo County (82% Spanish speakers), Starr County (90% Spanish speakers), Zapata County (78% Spanish speakers), and Webb County (91% Spanish speakers) at which point the Southern District of Texas ends and the Western District begins with Maverick County (91% Spanish speakers).[43]    In 2003, the population of Texas was 49.5% non-Hispanic

---

[42]    The Census Bureau broke responders into four categories: (1) those that speak English very well; (2) those that speak English well; (3) those that speak English "not well; and (4) those that speak English "not at all."  According to the statistics, approximately eight million Spanish speakers in this country speak English "not well" or "not at all."  US CENSUS BUREAU, LANGUAGE USE AND ENGLISH-SPEAKING ABILITY: 2000 1 (Oct. 2003).

[43]    U.S. Census Bureau, Census 2000 Summary File 3 (SF 3) - Sample Data.  These statistics are not adjusted for an individual's English-speaking ability.

white, 35.3% Hispanic, 10.8% African-American, and 4.3% Other.[44] By the year 2040, the Hispanic

population of Texas is predicted to be over 52%.[45] Assuming this growth pattern to be accurate, that

Hispanics are more likely to be Spanish speakers, and that they are not culturally Puerto Rican, the

lack of an available and appropriate IQ test may present some real constitutional problems for death

penalty states.

This Court presents these demographic facts and projections as background in order to

illustrate the very real dilemma that the State's position presents. Its position can be reduced to the

following basics:

1.    The burden of proof is on the petitioner to prove mental retardation.

2.    One of the three factors one must prove to be considered mentally retarded is that he
      or she has diminished intellectual capacity.

3.    The established manner of proving diminished intellectual capacity is the
      administration of an IQ test.

4.    The gold standard test for adults is the WAIS-III.

5.    The WAIS-III cannot be accurately given to Spanish-speaking adults who are less
      than fluent in English unless they are culturally Puerto Rican.

6.    Rivera is from a Spanish-speaking, Mexican-American household and is, according
      to the State, less than fluent in English.

7.    According to the State, because he is less than fluent in English, his WAIS-III verbal
      score is not valid and should be "qualified" upward.

8.    The Court (or anyone else for that matter) cannot accurately test or retest someone
      situated like Rivera because a WAIS-III test normed to the Spanish-speaking
      population of the United States that is not fluent in English does not exist.

---

[44]    TEXAS GUARANTEED STUDENT LOAN CORPORATION, STATE OF STUDENT AID AND
HIGHER EDUCATION 3 (Sep. 2005).

[45]    *Id.*

9.   Consequently, in theory, Rivera, or someone similarly situated, can never convincingly satisfy his burden of proof (short of an abundance of overwhelming anecdotal evidence) because he could never obtain a reliable score on any test recognized as the gold standard due to the fact that his alleged lack of proficiency in English disqualifies him from obtaining an accurate score in the first place.

If this position is truly the position of the State of Texas, then this Court foresees major constitutional difficulties for the State. It is, in effect, stating that only fluent English speakers can qualify for the test that may ultimately prove that they are entitled to the *Atkins* shield.

To summarize the quandary that this Court faces based upon the testimony before it:

1.   Rivera's experts believe that the results of the WAIS-III given to Rivera are accurate thereby satisfying the first element of the AAMR definition of mental retardation.

2.   All experts agree that Rivera cannot be retested (without affecting the reliability of the results) in English or with a Spanish translator. This is due in part to problems inherent in translating, in part on the "practice effect," and in part because he was educated in English.

3.   The practice effect, while normally lasting a year, is enhanced in this case by the fact that Rivera has sat through two evidentiary hearings in which the WAIS-III was discussed in great detail.

4.   No reliable IQ test exists for adults who are less than fluent in English and whose original language is Spanish but who were "educated" in English (unless they are Puerto Rican).

5.   The State, based upon the demonstration performed on Rivera by Dr. Saunders (one with no proven reliable methodology), would have this Court qualify the verbal portion of Rivera's WAIS-III test. The State would put more emphasis on the performance portion thereby putting his overall IQ at his performance score of 77, which is above the cutoff for mental retardation. Such a score would be much more in line with Rivera's prior IQ scores, albeit on less-sophisticated, group-administered screening tests.

### b.    The Examiner's Discretion and Malingering

The State, while not relying on the question of whether Rivera intentionally skewed the results of the WAIS-III, further attacked the efficacy of the test results by pointing to the Rey test

that was administered to Rivera by Dr. Kessner. The Rey test was given to Rivera to determine if

he was malingering.[46] A Rey test is essentially a memory test that allows an administrator to

determine whether the subject is putting forth a sincere effort.[47] Dr. Kessner testified that although

she gave the Rey test prior to the administration of the WAIS-III, outside noise distracted Rivera

thereby ruining the results. In other words, Rivera failed the Rey test the first time it was

administered with a score of 6 out of 15. Thereafter, Dr. Kessner administered the WAIS-III and

then, to insure an honest effort was being put forth, re-administered the Rey test. Rivera achieved

satisfactory results on the Rey test the second time with a score of 11 out of 15. The State suggests

that this subsequent administration is not supported by any literature and that the satisfactory Rey

score could be the result of a learning effect. Furthermore, it contends that Dr. Kessner can offer

only her opinion in support of the manner in which she gave the Rey test and in support of the

accuracy of the results. However, this criticism is not supported by any actual evidence of

malingering, only the suggestion that it had not been satisfactorily ruled out.

### c.    Previous IQ Scores

The WAIS-III administered by Dr. Kessner is the only fully-documented IQ test given to

Rivera, at least the only one that is in evidence. The test was administered to Rivera at the age of

41—after he was convicted of capital murder and assessed the death penalty and after he was denied

---

[46]    Various studies have been conducted over the years by psychologists to determine the
extent and the ability to feign mental retardation. *See*, *e.g.*, L. Johnstone & D.J. Cooke, *Feigned
Intelligence Deficits on the Wechsler Adult Intelligence Scale–Revised*, 42 Br. J. Clin. Psychol. 303
(2003). For our purposes, it is sufficient to note that the literature indicates that further study is necessary
with regard to the WAIS-III test.

[47]    Dr. Kessner also administered a Test of Memory Malingering, which is a three-part test
she described as more of a standardized assessment. Transcript of January 7, 2004 Hearing, at 16. She
stated that his score of 48 on that test indicated he was putting forth a sincere effort.

habeas relief at every turn.  There are at least four other IQ scores that were mentioned throughout the testimony or to which there are passing references in the exhibits.  Three of those scores are the result of tests administered to Rivera in prison—two of them occurring during a previous incarceration for a different offense and one that was obtained during his current incarceration. Those scores include an 85 on a Beta II test given in June 1991, a 92 on a Beta II test given in February 1992, and an 80 on a short form WAIS-R test given in June 1994.  As this case proceeded, the Court was extremely interested in those scores and it pressed the State for more information as to the types of tests that were administered, the circumstances under which they were given, and the manner in which they were scored.  *See Docket No. 55*.  The Court was repeatedly told that this information was unavailable.  *See, e.g.*, Transcript of Tel. Conf. June 2, 2004.  It was not until after both hearings were conducted and after the Court had been repeatedly told that information concerning these prior tests did not exist, that the State finally submitted information about them. *See Docket No. 70*.

The fourth IQ score of "-70" is mentioned in Rivera's Brownsville Independent School District ("BISD") records and appears to be the result of a Kuhlmann-Finch test administered while Rivera was in the third grade.[48]  The Kuhlmann-Finch test (named for Dr. Fredrick Kuhlmann and Dr. Frank H. Finch) was the second test in a series developed under that format.  The preceding test was the Kuhlmann-Binet test.  These tests were based upon the principle that an intelligence test should measure general mental development.  FRANK H. FINCH & FREDERICK KUHLMANN, KUHLMANN-FINCH TESTS: MANUAL 41–42 (2d ed. 1956).  The developers of the Kuhlmann-Finch

---

[48]    The IQ score in the records is written as quoted above in the text.  This Court notes that one cannot have a "negative seventy" IQ on the Kuhlmann-Finch test (or to this Court's knowledge any other IQ test for that matter).  While there is no testimony that puts this score into context, one can speculate that the minus sign was intended to indicate "less than" rather than a negative number.

test recommended that it be repeated every two to three years in the low grades and every three to four years in the upper grades to discover changes in an individual or his environment or both. *Id.* at 59–60. No subsequent test was ever performed (or at least not recorded) by BISD on Rivera.

Although the results of the elusive tests given in prison or the Kuhlmann-Finch test given in elementary school are at least mentioned in the evidence, the actual tests are not in evidence and little information has been provided regarding them. None are a WAIS-III test, however, which both sides agree is the most reliable test for determining an adult's IQ. The Court notes that all four of these tests were shorter, screening-type tests. Moreover, all of the experts that testified in this case and all of the literature that this Court has reviewed suggests that one sacrifices accuracy for speed when one administers tests designed for screening purposes. It should also be noted that the circumstances surrounding their administration are either totally unknown or were less than ideal.

Rivera argues that this Court should ignore all previous IQ scores because they are the results of unreliable tests and the circumstances surrounding them are unknown, i.e., there is no way to determine whether they were administered properly. The State contends that these previous scores cast doubt on the reliability of Rivera's verbal score because: (1) the WAIS-III was given in English instead of Spanish, Rivera's language of choice, and (2) they are more in line with his performance score. Yet, all of the affidavits supplied to this Court strongly imply that the State gave Rivera the two Beta tests and the WAIS-R short form test in English. *See Docket No. 70.* This Court cannot help but discount the effect it gives all of these scores given the paucity of the available information, especially given its direct requests for this information that were ignored for months.

**B.    Limitations in Adaptive Functioning and Onset**

For the most part, the State has impliedly conceded, or at least not extensively argued against, the fact that Rivera had before the age of 18 at least some limitations in adaptive

functioning.  The State's attack instead focuses on alternative causes for these deficits.  It argues that Rivera's "extensive history of abusing inhalants," his "extensive criminal history," and his "antisocial personality features" are the causative factors of his failure to adequately function in society.  The gist of their argument is that Rivera's history of substance abuse and his extensive criminal record are not reflections of mental retardation.  Indeed, Dr. Garnett conceded that, as a group, mentally retarded people do not repeatedly use drugs or repeatedly commit the kinds of criminal conduct engaged in by Rivera.  Rather, the State would emphasize that Rivera just has some unpleasant antisocial personality traits that place him outside the pale of societal behavior.  These traits include his repeated problem with telling the truth, his impulsiveness, his irritability and aggressiveness, and his consistent irresponsibility.  There is also a strong suggestion that this behavior is a manifestation of drug abuse rather than diminished intellectual capacity.  To emphasize their argument, they point out that he was never diagnosed as mentally retarded, that he was never placed in special education classes,[49] and that he did not incur any specific problem growing up that cannot be explained by his almost constant drug abuse.[50]  The State also emphasizes that Rivera's defense counsel from the murder trial testified in these proceedings that he was "competent" to stand trial and was able to assist in his own defense.  The State argues that although it is possible for Rivera to have "slipped through the cracks" in terms of a proper diagnosis, it is highly improbable that a person like Rivera could have slipped through the societal cracks for over forty years.  It argues that there is only one plausible reason that the issue of mental retardation was only raised

---

[49]     The record contains conflicting evidence as to whether Rivera was ever in "special education" classes as opposed to some other form of remedial class or ESL class.  The substantial weight of the evidence indicates he was never formally in "special education" classes.

[50]     Indeed, Dr. Saunders testified that given Rivera's long-term inhalant abuse, he was surprised that his IQ score was not lower.  Transcript of Jan. 7, 2004 Hearing, vol. 3, at 394.

post-*Atkins*, some six weeks prior to Rivera's scheduled execution—it is a desperate attempt to prevent Rivera's execution.

The State also points to the observations made by prison personnel and visitors who have observed Rivera during his current incarceration to emphasize its argument that Rivera's adaptive limitations can be attributed to personality defects rather than to mental retardation.  It claims that those observations belie the argument that Rivera has adaptive limitations because he keeps himself and his cell neat and clean, he orders from the commissary and can calculate costs and prices, he reads books, and lives overall an ordered life.  The State concludes that once Rivera was forced to quit his antisocial pattern of almost constant substance abuse, he functions quite well.

Rivera, on the other hand, points to multiple areas of limitations in order to substantiate a claim of limited adaptive skills.  His school records show that he was "consistently held back or socially promoted."  At the age of 14, he was still performing at a first or second grade level in math, reading, and writing.  At the age of 17, he finally dropped out of the ninth grade.  One of his teachers described his inability to perform simple tasks as matchless.  Rivera's family members described a person who was often abused and incapable of caring for himself.  His only "friends" were those boys with whom he sniffed inhalants.  He did not play games or sports.  He did not read, write, or even watch television and he slept outside under the house regardless of the cold or rain.[51]  As an adult, Rivera relied on his family to provide for him and to help him find jobs that he never managed to hold.  His sister or wife handled what little money he made so that he would not waste it.  Rivera further argues that the few functional skills he has now are not inconsistent with mental retardation. Indeed, his current skills in the artificial environment of prison are a far cry from true adaptive

---

[51]    Affidavits submitted by Rivera's sisters indicate that he slept outside because the house was either too crowded or too hot due to the fact that the house did not have air conditioning.  There was also a suggestion that he did so because his parents banished him from the house for repeated drug usage.

behavior and an even further cry from his skill level at the age of 18.

The most prominent aspect of Rivera's adaptive limitations is the fact that he was not only a consistent drug abuser beginning at a very young age, but he was specifically an inhalant abuser. Indeed, Rivera has argued that his inhalant abuse either contributed to or caused his mental retardation.[52] The experts agree that there can be many causes of mental retardation, including self-induced toxins to the brains. Some causes are unknown; others are attributed to genetic make-up, accidents involving head trauma, or disease. As noted above, the evidence presented is hardly overwhelming in any respect.

The Texas Court of Criminal Appeals has addressed another situation in which inhalant abuse crossed paths with allegations of possible mental retardation. *Ex parte Rodriguez*, 164 S.W.3d 400 (Tex. Crim. App. 2005). While their ultimate evaluation differs from this Court's, their analysis seems to have been quite similar. The concurring opinion went so far as to note how close a question was presented and that even the experts testified that the issue was a "close call." *Id*. at 404. It also expressed displeasure with the *Atkins* decision and the subjectivity it has injected into death penalty decisions.

> As school children we were taught that King Solomon weighed all of the evidence before him and made a reasoned decision; Nero divined merit on a whim and just pointed his thumb up or down. I fear that, under *Atkins* and the subjective legal definition of the "adaptive deficits" prong of mental retardation, we are moving farther from King Solomon and closer to Nero.
>
> ***
>
> But I fear there is no such bright line. There is, on the contrary, broad agreement among mental health experts that determining whether a person suffers from the type and level of "adaptive deficits" that qualifies for a mental retardation diagnosis is highly subjective and largely a matter of individual judgment.

*Id*. at 406. These observations ring especially true in the instant matter when one considers an

---

[52]    This concept is not foreign to courts as it parallels the concepts of contributory and comparative causation.

extensive history of not just drug abuse, but the persistent use of inhalants, combined with a language barrier.[53]

As is widely reported both in medical texts and in the lay press, persistent and heavy inhalant abuse can result in a variety of sensory and psychological disorders, including learning disabilities, memory loss, and personality changes.[54]    Indeed, at least one of the experts testified in this case that inhalant abuse can cause mental retardation.    This Court anecdotally has seen far too many young persons who have appeared before it as defendants who have permanently damaged themselves with inhalants.

As in *Ex parte Rodriguez*, the evidence concerning adaptive functioning in this case could likewise be described as a close call in light of Rivera's history of inhalant abuse.    In a way, Rivera argues that one can "back into" the diagnosis of mental retardation by finding the presence of certain risk factors in adaptive functioning and extrapolating that they are a manifestation of reduced intellectual functioning.    Specifically, he cites four risk factors from the 2002 AAMR Manual: (1) biomedical, (2) social, (3) behavioral, and (4) educational.    *See* 2002 AAMR Manual, at 123–41. With regard to the first factor, he readily concedes a long and extensive history of inhalant abuse and postulates that it was a contributing cause, or perhaps even the sole cause, of his mental retardation. He also suggests that the abuse he suffered at the hands of his mother and neighborhood kids may have played a role, although the Court is not impressed with either the quantity or quality of the evidence supporting this claim.    He also cites poverty as a social risk factor, and impaired parenting and inadequate family support as education risk factors.    He claims that all of these factors establish

---

[53]    Rivera's inhalant usage was so striking that his childhood friends nicknamed him "Sprayback".

[54]    The effects of inhalant ingestion on an unborn child can be similar to those caused by Fetal Alcohol Syndrome (the suggested etiology of the petitioner's alleged mental retardation in *In re Hearn*).    *See* http://www.inhalants.org/about.htm (last visited Mar. 30, 2006).

not only that he is mentally retarded, but that the condition existed prior to the time he reached 18.

Regardless of the cause, whether it be due to genetics, accident, disease, or self-induced by illegal drugs, the uncontroverted testimony is that if the three elements in the 1992 AAMR definition are met, a person is considered mentally retarded. This is a medical conclusion that many people may find truly offensive. This Court is troubled by the notion that one can "fry" his own brain by using illegal drugs and then be excused from some of the possible consequences of committing a gruesome and murderous act.[55] According to the dictates of the Supreme Court's decision in *Atkins*, this notion is entirely possible. Such a concept flies in the face of the laws of most states and even the United States Sentencing Guidelines. For example, Texas law holds that voluntary intoxication does not constitute a defense to the commission of a crime. TEXAS PENAL CODE § 8.04. Moreover, the federal sentencing guidelines dictate that the court may not depart below the applicable guideline range if "the significantly reduced mental capacity was caused by the voluntary use of drugs or other intoxicants."[56] U.S. SENTENCING GUIDELINES MANUAL § 5K2.13 (2005).

*Atkins* proponents will suggest that a person such as Rivera is not escaping punishment, merely the death penalty. Yet, this Court points out that most of the arguments made in the majority opinion in *Atkins* (such as the diminished ability to give meaningful assistance to their counsel or the fact that, as a group, mentally retarded individuals tend do be poor witnesses on their own

---

[55]    Other sources agree that the etiology of mental retardation is irrelevant for the purposes of proving an *Atkins* claim. For example, one author stated: "[C]ounsel need not prove the cause of mental retardation, only its existence." Keyes et al., *Mitigating Mental Retardation in Capital Cases: Finding the Invisible Defendant*, 22 MENTAL & PHYSICAL DISABILITY L. REP. 529, 534 (1998).

[56]    This Court is not trying to compare transient conditions, such as intoxication, with the permanent condition of mental retardation. It raises this only to point out examples whereby conditions caused by the voluntary consumption of intoxicants cannot be raised as defenses to criminal acts committed while under the influence. In the instant case, if Rivera's mental retardation was truly the result of his drug usage, then all of his subsequent actions would, in a sense, be while he was under the influence.

behalf) could equally be used to argue someone like Rivera should escape incarceration altogether.[57] Such an approach is an anathema to this Court and would be offensive to almost every law-abiding citizen of Texas, especially to the family members of victims of crimes like those committed by Rivera.

## VIII.  AREAS OF AGREEMENT AND DISAGREEMENT

Having discussed the implications of the *Atkins* decision raised by this case, this Court is nonetheless compelled to follow it.  This process is best begun by describing the areas in which there is general agreement of the parties:

1.    The definition of mental retardation.  Both Rivera and the State agree that the AAMR standard is the correct basis for determining whether a death row inmate is mentally retarded under *Atkins*.  There also seems to be a consensus that the Court can use the 1992 version.

2.    The WAIS-III test, which was administered by Dr. Kessner, is the gold standard, i.e., the most reliable test to determine Rivera's IQ.  The test was administered according to recognized clinical standards.

3.    One cannot retest Rivera to see if his score on the WAIS-III was accurate or was an aberration given the so-called "practice effect," as well as other factors mentioned above, which may skew future scores.

4.    It is impossible in hindsight to separate out what may be "true" mental retardation

---

[57]    The majority's opinion cited the reduced capacity of mentally retarded offenders as a justification for making them ineligible for the death penalty.  *Atkins*, 536 U.S. at 320.  It further stated:

> The risk "that the death penalty will be imposed in spite of factors which may call for a less severe penalty," is enhanced, not only by the possibility of false confessions, but also by the lesser ability of mentally retarded defendants to make a persuasive showing of mitigation in the face of prosecutorial evidence of one or more aggravating factors. Mentally retarded offenders may be less able to give meaningful assistance to their counsel and are typically poor witnesses, and their demeanor may create an unwarranted impression of lack of remorse for their crimes.

*Id.* at 320–21 (internal citation omitted).  Although the majority was careful to state that "mentally retarded offenders who meet the law's requirements for criminal responsibility should be tried and punished when they commit crimes," *Id.* at 306, many of the factors quoted above could easily be used to argue that mentally retarded offenders should escape punishment altogether because they are more likely to be convicted of a crime in the first place.

(existing before the age of 18) from whatever damage Rivera may have done to himself from his continual use of inhalants, cocaine, and marijuana.[58]

5.     Rivera was not given a comprehensive IQ test prior to the age of 18. Consequently, all of the analysis done by the experts for both sides had to use "recent" test results and then work backwards utilizing anecdotal incidents and experience in an attempt to draw an appropriate conclusion.

6.     Neither the WAIS-III nor any of the other intelligence tests available today were designed for the purpose of determining whether a person convicted of a capital crime should live or die but are, in fact, only an estimate of one's intelligence level.

7.     Although it appears to be the best test available, the WAIS-III given to Rivera was not designed to test the intelligence of an adult who is not fluent in English.

8.     Rivera's first language is Spanish and his ability to communicate in English may certainly be described as less than perfect. He conversed with all of the experts in English and there is evidence indicating he speaks and reads in English. There is also anecdotal evidence of him speaking English throughout different periods of his life, including during his current incarceration.

9.     Rivera was able to understand various terms that he missed while taking the WAIS-III test in English when he was asked those terms in Spanish by Dr. Saunders.

10.     The fact that he attended public school in Brownsville until the age of 17, does not mean that he necessarily mastered the English language.

Conversely, in addition to the facts that have been painted, the two sides disagree regarding the following:

1.     Obviously, the parties disagree as to the answer to the ultimate question: whether Rivera is mentally retarded.

2.     They disagree on whether Rivera is fluent in English.

3.     The parties disagree about the accuracy of the WAIS-III test administered by Dr. Kessner in large part due to the perceived language barriers.

4.     They disagree as to the weight this Court should give to prior IQ tests administered by prison officials and, while the state has not argued it, this Court will presume it disagrees with the accuracy of the prior BISD IQ test if one assumes the score should

---

[58]     This statement is qualified by the fact that the State obviously feels that Rivera is not "truly" mentally retarded.

be interpreted as "less than seventy."

5.      They disagree as to the ultimate conclusion as to the effect of Rivera's drug abuse.

6.      They disagree on the validity of the State's suggestion that this Court can cure the perceived language problem by placing more emphasis on the performance results and less on the verbal results of Rivera's WAIS-III.

7.      They disagree on the cause of any behavior problems Rivera exhibited prior to the age of 18.[59]

## IX.    THE HOLDING

The underlying crime for which Rivera was given the death penalty is one of the most senseless and brutal crimes that this Court has ever encountered. Indeed, the facts of the crime would probably push many of those who sit on the fence in the death penalty debate off their neutral perch. Nevertheless, the Supreme Court in *Atkins* has banned the execution of mentally retarded capital offenders in the United States and has opened a Pandora's box filled with multiple issues in the process. This case illustrates the fact that the issues raised by the *Atkins* decision and the lack of guidance provided by the Supreme Court have placed courts in the position of making determinations based on assumptions and equivocal evidence with no objective guidelines in either science or law.

With regard to the specific testimony in this case, this Court is somewhat astounded by the uncontroverted testimony that there is no appropriate gold standard test that is normed to the thousands of adult Spanish speakers in the United States who are not fluent in English. While this Court is aware of the time and expense involved in establishing and norming a test to a specific population, it seems almost implausible that neither the military, the school systems, the

---

[59]      While, as stated above, they agree that there exists some difficulty in analyzing this topic, the State would attribute all of Rivera's adaptive problems to his almost constant drug abuse and the problems inherent thereto rather than to mental retardation. Rivera's experts either blame a combination of mental retardation and drug abuse and/or postulate that the drug abuse, itself, caused the mental retardation. Either of Rivera's suggested etiologies support his ultimate conclusion that he is mentally retarded.

government, nor any private sector entity that tests or utilizes IQ tests within the United States has

an accurate test to establish the IQ of an adult Spanish speaker who is not fluent in English or of

Puerto Rican descent. Additionally, the evidence presented in this case was often ambivalent,

unsophisticated, and incomplete and several of the arguments made by the State in this case were

problematic and untenable if taken to their logical conclusion.

Having pointed out the law, the evidence, the problems in the wake of *Atkins*, and the

problems presented in applying reasonable and standard psychological procedures to someone with

Rivera's characteristics, this Court rules that Rivera is mentally retarded and makes the following

findings and conclusions.

1.  The 1992 AAMR definition of mental retardation is the appropriate standard to apply in the instant matter. It requires Petitioner to show that he has:

    A.  Substantial limitations in present functioning characterized by significantly subaverage intellectual functioning;

    B.  Existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work; and

    C.  Manifestation of both before the age of 18.

2.  Rivera displayed adaptive deficits prior to the age of 18.

3.  These deficits include self-care, social skills, home living, and functional academics.

4.  The deficits may or may not have been caused by Rivera's diminished intellectual capacity. It is just as likely that these adaptive deficits were caused by his long-term drug abuse.

5.  Rivera has a lengthy and extensive history of drug abuse, including the abuse of inhalants, marijuana, and cocaine. His drug usage could have caused in whole or in part his adaptive behavior problems and diminished intellectual functioning.

6.  Rivera was given the WAIS-III IQ test, which is the best measure of intellectual

capacity available today.[60]

7.      The test was properly given and properly analyzed by Dr. Kessner.

8.      The test resulted in a borderline score of 68—two points below the limit established for mental retardation.

9.      Rivera's performance in school as detailed both by the exhibits and by the testimony of his sisters and at least one teacher support that his subaverage intellectual functioning existed prior to the age of 18.

10.     The test results along with the evidence regarding Rivera's intellectual functioning and school history establish that Rivera had significant subaverage intellectual functioning prior to the age of 18.

11.     Rivera has, according to the evidence, enough fluency in English to take the WAIS-III in English and achieve reliable results.

12.     This Court does not feel compelled to nor capable of "qualifying" the verbal result of the WAIS-III administered by Dr. Kessner as has been suggested by the State. The Court was not given any reliable methodology to perform such a task, nor was it satisfied by the evidence that such a course of action would result in a reliable score.

13.     None of the other available test scores have a degree of sufficient reliability to satisfy this Court. Those that were administered in prison were not gold standard tests given in an appropriate fashion to establish a reliable IQ score. They were for the most part screening tests given in a group setting to help guide the prison system in its mission to house and care for prisoners. Additionally, these results, while being above the demarcation line for mental retardation, certainly show a less than average performance.

14.     If the Court were to give these scores a high probative value, it would be compelled to give equally high consideration to the Kuhlmann-Finch test given by BISD, which resulted in a "-70" score. This score is below the demarcation line and supports Rivera's claim. Indeed, the Kuhlmann-Finch test given by BISD is the only test administered  before Rivera's eighteenth birthday and, if the Court were to rely on the unsupported, group-administered tests with questions abounding about their accuracy, the Court would be compelled to give the apparent Kuhlmann-Finch score at least comparable weight given its date.

15.     The Court repeatedly asked the State to provide details about Rivera's previous IQ

---

[60]      This Court has previously noted that there are other tests in addition to the WAIS-III that are available to test a person's intellectual capacity. Nevertheless, the uncontroverted testimony in this case is that the WAIS-III is the gold standard and that it has no comparable competitor.

scores and how the tests were administered in prison.  It was repeatedly told by counsel that no such details could be found.  Yet, on April 16, 2005, affidavits concerning such tests were finally produced.  *See Docket No. 69*.  The Court finds this, at worse, to be extremely suspicious or, at best, haphazard.  Either way, the information that was provided does not inspire any degree of confidence regarding the validity of those scores.  Additionally, those tests were also given in English, which undermines the State's argument that the Court should qualify the WAIS-III score because it was administered in English.

16.     Given the testimony concerning this data, the paucity of details surrounding their administration and scoring, and, in the case of the prison-administered tests, the manner in which information about the tests was provided, this Court finds that each score should be of some, but not controlling, weight.  As such, when taken as a whole, they display a picture of an individual who is, at best, of borderline intelligence, thereby confirming the same data obtained by Dr. Kessner in her administration of the only comprehensive IQ test given to Rivera under controlled circumstances.

Given these findings, the Court is compelled to reach a conclusion that Rivera has satisfied his burden and has proven himself to be mentally retarded as per the 1992 AAMR definition of mental retardation.  The Court reaches this conclusion with great reluctance given the unconscionable nature of the crime and the tragic circumstances that have befallen the family of Luis Daniel Blanco, but does so in conformance with the Supreme Court's dictates in *Atkins*.

That being the case, this Court concludes that Rivera has indeed exhausted his state court avenues and that the presentation of new evidence did not render his *Atkins* claim unexhausted under 28 U.S.C. § 2254(b)(1)(A).  This Court grants Rivera's Petition for a Writ of Habeas Corpus [Docket No. 1], and permanently enjoins Doug Dretke, Director of the Texas Department of Criminal Justice—Institutional Division, his successors, and the State of Texas from executing Jose Alfredo Rivera for the brutal murder and sexual assault of Luis Daniel Blanco.

Signed in Brownsville, Texas, this 31st day of March, 2006.

Andrew S. Hanen
United States District Judge